UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

RON FOSTER, MARKETING & PLANNING
SPECIALISTS LIMITED PARTNERSHIP, and
FOSTER FARMS, LLC.

       Plaintiffs,

v.                           Civil Action No. 2:14-cv-16744

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and
GINA MCCARTHY, in her official capacity as Administrator,

       Defendants.

### MEMORANDUM OPINION AND ORDER

Pending is the motion to dismiss of defendants Gina McCarthy and the United States Environmental Protection Agency (collectively "the EPA"), filed December 3, 2014.

### Background

Neal Run is a tributary stream that flows into the Little Kanawha River near the city of Parkersburg, West Virginia. Pl. Am. Compl. ¶¶ 11-12. The plaintiffs in this case own and are engaged in the development of several parcels of land ("the Property") in "the vicinity of Neal Run." Id. ¶ 12; see also ¶ 8, ¶ 11. The EPA contends that in the course of developing the Property, the plaintiffs discharged dredge and

fill materials into unnamed, semi-permanent,[1] tributary streams which flow into Neal Run, and, therefore, into the "waters of the United States" without the necessary permit.  Id. ¶ 2; see also Def. Mem. of Law in Supp. Mot. to Dismiss at * 1.  The EPA issued a compliance order under section 309 of the Clean Water Act (the "CWA"), 33 U.S.C § 1251 et seq., requiring the plaintiffs to "restore [the relevant portions of the Property] to pre-disturbance grade and conditions."  Compliance Order ¶ 12.[2]  The plaintiffs, who purchased the Property out of the bankruptcy estate of the previous owner, initiated this action seeking both declaratory and injunctive relief from that order.

The plaintiffs filed their complaint on May 21, 2014. They invoke this court's jurisdiction to adjudicate federal questions, 28 U.S.C. § 1331, provide declaratory and injunctive relief, 28 U.S.C. §§ 2201 & 2202, and invoke the relevant section of the Administrative Procedures Act ("APA"), 5 U.S.C. §

---

[1] The EPA contends that the plaintiffs discharged fill material into eleven streams on the Property.  See "April 5, 2012 Letter" attached as "Exhibit G" to Pl. Am. Compl. (ECF 25-1).  Three of those streams are classified as "intermittent" and the eight others "ephemeral."  Id.  Intermittent streams "predictably flow during some portion of every non-drought year" and therefore are considered to be jurisdictional "waters of the United States" in and of themselves.  Id.  The EPA claims jurisdiction over the ephemeral streams due to the "significant nexus" between those streams and the "traditional navigable waters," namely Neal Run and the Little Kanawha River, which are "approximately 3.2 miles downstream."  Id.
[2] Attached as "Exhibit F" to the Amended Complaint. ECF (25-1).

702, authorizing suits against federal government agencies that have taken agency action which results in a "legal wrong." The plaintiffs seek both review of the EPA's compliance order under the APA and either a declaration that the order is unconstitutional or an injunction preventing its enforcement until various constitutional deficiencies are addressed. Pl. Am. Compl. ¶ 1, ¶5, ¶ 57, ¶ 58, ¶ 63, ¶ 67.

The plaintiffs' constitutional claims, the subject of this motion to dismiss, flow from the Fifth Amendment. The plaintiffs allege that the issuance of the compliance order infringed both their procedural and substantive due process rights. Additionally, they contend that the EPA's enforcement action was both motivated by improper animus and initiated in a retaliatory manner, thereby violating the precepts of equal protection. Id. ¶ 63, ¶ 66. The EPA's motion asserts that these constitutional claims fail to state a claim for which relief can be granted.

<u>The Motion to Dismiss Standard</u>

Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff's complaint to contain "a short and plain statement of the claim showing . . . entitle[ment] to relief." Fed. R. Civ. P. 8(a)(2); <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007). Rule 12(b)(6) correspondingly permits a defendant to challenge a

complaint when it "fail[s] to state a claim upon which relief can be granted . . . ."  Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957), overruled on other grounds, Twombly, 550 U.S. at 563); see also Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007).  The showing of an "entitlement to relief" must amount to "more than labels and conclusions . . . ."  Twombly, 550 U.S. at 555.  "[A] formulaic recitation of the elements of a cause of action will not do."  Id.; Giarratano v. Johnson, 521 F.3d 298, 304 (4th Cir. 2008).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570); see also Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009).

When evaluating the motion, a district court is required to "'accept as true all of the factual allegations contained in the complaint . . . .'"  Erickson, 551 U.S. at 94 (quoting Twombly, 550 U.S. at 555-556); see also South Carolina Dept. Of Health And Environmental Control v. Commerce and

Industry Ins. Co., 372 F.3d 245, 255 (4th Cir. 2004) (quoting
Franks v. Ross, 313 F.3d 184, 192 (4th Cir. 2002)).  Factual
allegations are to be distinguished from legal conclusions,
which the court need not accept as true.  Iqbal, 556 U.S. at 678
("the tenet that a court must accept as true all of the
allegations contained in a complaint is inapplicable to legal
conclusions").  The court must also "draw[] all reasonable . . .
inferences from th[e] facts in the plaintiff's favor . . . ."
Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).

Discussion

        The defense's motion concerns three constitutional
arguments that are advanced by plaintiffs.  First, in the
complaint's "Third Claim for Relief," plaintiffs set forth a
procedural due process claim.  See Pl. Am. Compl. ¶ 63 (The
EPA's "delay in providing a forum for hearing, irregular
sequencing of jurisdictional review . . . [and] threat[s] [to]
imminent[ly] impos[e] . . . civil and criminal penalties without
providing Plaintiffs a just, fair and impartial enforcement
process [limited] Plaintiffs' opportunity to appeal and be
heard.").

        Second, in the "Fourth Claim for Relief," they advance
a substantive due process claim.  Id. ¶ 66 (The EPA's "improper
. . . motivation . . . [as well as the] irregular sequencing of

5

jurisdictional review" coupled with the fact that the "standard for issuance of a compliance order is impermissibly vague" has resulted in the EPA "violat[ing] Plaintiffs' . . . substantive due process rights.").

Finally, also in the "Fourth Claim for Relief," the plaintiffs make an equal protection argument, asserting that they qualify as members of a "class of one" and have been subjected to unlawful treatment based on that status.  Id. ("[The EPA] ha[s], with improper, retaliatory and animus based motivation . . . issued a compliance order against Plaintiffs . . . [and] thereby violated Plaintiffs' equal protection . . . rights.").

### A. Procedural Due Process

### 1.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"  Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999).  The EPA argues that the plaintiffs have not identified such an interest.  The plaintiffs contend that they have a liberty interest to use and develop their land in order to earn a living.  Pl. Mem. of Law in Supp. Resp. in Opp'n * 13 ("[The] Plaintiffs' personal and business

livelihoods are earned through the development and management of properties.  The freedom to conduct business and earn a living are very much liberty interests long recognized under Constitutional law.")(citing Yick Wo v. Hopkins, 118 U.S. 356, 369-70 (1886)).

"[D]ue process protection for deprivations of liberty [extends] beyond the sort of formal constraints imposed by the criminal process."  Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 572 (1972).  There is a cognizable liberty interest, protected by due process, implicated when a government employer takes action that damages a government employee's ability to earn a living.  See e.g., Lentsch v. Marshall, 741 F.2d 301, 303-04 (10th Cir. 1984)(noting that an "individual's freedom to earn a living," is protected by due process and explaining that "[w]hen a public employer . . . impose[s] a stigma that forecloses the employee's freedom to take advantage of other employment opportunities, due process requires that the employee receive an opportunity to clear his or her name."). However, the plaintiffs have not cited any authority demonstrating that the "right to earn a living" is a cognizable liberty interest when the government is acting in a regulatory capacity, as opposed to when it acts as an employer.  "[T]he range of interests protected by procedural due process is not

7

infinite." <u>Paul v. Davis</u>, 424 U.S. 693, 709 (1976) (quoting <u>Roth</u>, 408 U.S. at 570).  This court declines to cast so wide a net.

Although the plaintiffs have not identified a protected liberty interest, their procedural due process claim need not be dismissed if they have a cognizable property interest impacted by the compliance order.  The range of "property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." <u>Roth</u>, 408 U.S. at 571-72, <u>see</u> <u>also</u> <u>Connecticut v. Doehr</u>, 501 U.S. 1, 12 (1991)("[E]ven the <u>temporary or partial</u> impairments to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection.") (emphasis added).

The EPA argues that the plaintiffs do not have a protected property interest because an "alleged deprivation . . . must come directly at the hands of the government."  Def. Mem. of Law in Supp. Mot. to Dismiss at * 10.  They claim that, at most, the compliance order has an "indirect impact[]" on the plaintiffs' property rights and that indirect effects do not trigger due process protection.  <u>Id.</u> at * 11 (citing <u>O'Bannon v. Town Court Nursing Ctr</u>., 447 U.S. 773, 789 (1980)(holding that decertification of nursing home constitutes only an indirect

8

impact on the residents who may locate elsewhere)).  Contrary to
the EPA's characterization, a compliance order, as in this case,
has direct legal consequences that touch upon important property
rights possessed by the plaintiffs.

In Sackett v. E.P.A., 132 S. Ct. 1367 (2012), the
Supreme Court held that a compliance order issued under the CWA
constitutes "final agency action" and is reviewable, under the
APA, at least to the extent that the EPA's jurisdiction over the
regulated party is challenged.[3]  The Court's conclusion was
predicated on the fact that "legal consequences . . . flow from
issuance of [a compliance] order."  Id. at 1371 (internal
quotation marks omitted).  The Court provided several examples
of such consequences, including "the legal obligation to
'restore' [the affected] property" according to the terms of an

---

[3] As a general matter, the Supreme Court's Sackett opinion
provides the most appropriate and analogous guidance for this
court to use in issuing a ruling on due process claims related
to a compliance order.  Although our Court of Appeals, before
the ruling in Sackett, had denied due process claims based on
EPA compliance orders, no case where it did so is perfectly
analogous to the present matter.  In Southern Pines Associates,
by Goldmeier v. United States, the Fourth Circuit affirmed a
dismissal of the plaintiffs' procedural due process objections
to an EPA compliance order.  912 F.2d 713 (4th Cir. 1990).  In
that case, however, the EPA's compliance order was sent along
with a request that "asked Southern Pines to provide information
about the site for it to review in order to make a 'final
determination of the boundaries of the wetlands that fall under
the jurisdiction of the Clean Water Act.'"  Id. at 714.  Since
the compliance order in this case was accompanied by no request
or statement of uncertainty, Southern Pines appears inapposite.

order, id., and the potential "expos[ure] . . . to double
penalties in a future enforcement proceeding," id. at 1372.

The legal consequences described in Sackett provide
examples of the type of direct effect a compliance order can
have on a plaintiff's property rights.  The plaintiffs here have
alleged the existence of similar effects.  Their complaint
states that the compliance order has "delay[ed] . . . the
completion of [planned] construction," "rendered some portions
of the [P]roperty unusable," and "effectively frozen the
[P]roperty, rendering it commercially undesirable to potential
purchasers or lessees."  Pl. Am. Compl. § 40.

These significant effects on plaintiffs' property
rights are sufficient to ground a due process claim.  The
Supreme Court has recognized that even a temporary or partial
impairment of a property right normally enjoyed by a landowner
can trigger the protections of due process.  Doehr, 501 U.S. at
12 ("temporary or partial impairments to property rights . . .
are sufficient to merit due process protection."); Fuentes v.
Shevin, 407 U.S. 67, 84-85 (1972)("it is now well settled that a
temporary, nonfinal deprivation of property is nonetheless a
'deprivation'"); see also Gen. Elec. Co. v. Jackson, 610 F.3d
110, 120 (D.C. Cir. 2010)(discussing Doehr and explaining that
the Supreme Court therein held nonfinal interference with a

landowner's property rights to be a "property deprivation"
because it "pluck[ed] a stick from the property owner's bundle
and hold[s] it as surety" and recognizing that "direct, partial
impairments of property rights . . . warrant due process
safeguards"), <u>Reardon v. United States</u>, 947 F.2d 1509, 1518 (1st
Cir. 1991)(en banc)(holding that the EPA's "filing of a federal
lien" upon the appellant's property in an effort to recoup the
costs of hazardous waste removal "amount[ed] to the deprivation
of a 'significant property interest' within the meaning of the
due process clause.").

In <u>Doehr</u>, the Court provided a list of the effects
attributable to a nonfinal deprivation that could impinge upon a
landowner's property rights.  <u>Doehr</u>, 501 U.S. at 11.  It then
explained that the deprivation suffered by the landowner in
<u>Doehr</u> – prejudgment attachment of real estate as surety against
a future judgment – "clouds title; impairs the ability to sell
or otherwise alienate the property; taints any credit rating;
reduces the chance of obtaining [a loan backed by the value of
the property]; and can even place an existing mortgage in
technical default."  <u>Id.</u>  The plaintiffs' complaint contains
allegations that the compliance order has wrought similar
effects.  Most significantly, as noted, the complaint contains
the allegation that the order has "effectively frozen the

[P]roperty, rendering it commercially undesirable to potential purchasers or lessees." Pl. Am. Compl. § 40. Hence, the plaintiffs have identified a property interest – the ability to freely alienate their land – that is cognizable under due process.

Accordingly, the plaintiffs have shown a substantial property interest of which they have been deprived by the government's issuance of the compliance order.

2.

The question, then, becomes, "what process is due[?]" Morrissey v. Brewer, 408 U.S. 471, 481 (1972). At this stage of the litigation, the court need not answer that question in full. For purposes of evaluating the motion to dismiss, a more apt formulation of the question is: does APA review of a compliance order, standing alone, satisfy due process? If it does, the plaintiffs' procedural due process claim is not viable, and must be dismissed.[4]

---

[4] This due process issue was presented in the second of the two certiorari questions granted in Sackett. See Sackett v. E.P.A., 131 S. Ct. 3092, 180 L. Ed. 2d 911 (2011)(granting certiorari as to two questions: "1. May petitioners seek pre-enforcement judicial review of the administrative compliance order pursuant to the Administrative Procedure Act, 5 U.S.C. § 704? 2. If not, does petitioners' inability to seek pre-enforcement judicial review of the administrative compliance order violate their rights under the Due Process Clause?"). Since the Court issued

Plaintiffs argue that APA review is constitutionally insufficient.  They assert that their due process claims are "not cured" by "substantive review" of the "merits" of the compliance order because "the improper and unlawful nature of the EPA's actions leading up to the [o]rder are due process violations in and of themselves."  Mem. of Law in Supp. Resp. in Opp'n at * 14-15.  That is, the EPA violated due process when it "issued [the order] without providing Plaintiffs an opportunity[:] to appeal, [to] be heard by an impartial decision maker[,] and to contest [the EPA's] findings."  Pl. Am. Compl. ¶ 4.

The plaintiffs contend that they are entitled to a "just, fair and impartial administrative enforcement process" before either "a neutral and independent administrative law judge . . . or by this federal court."  Id. ¶ 5, "Prayer for Relief" ¶ 2.  Essentially, the plaintiffs argue that APA review does not satisfy the fundamental tenet of procedural due process, which is the opportunity to be heard at "a meaningful time and in a meaningful manner."  Armstrong v Manzo, 380 U.S. 545, 552 (1965).

In general, procedural due process is satisfied if

a ruling based on the first of the two questions, the second question regarding due process did not come into play.

"some form of hearing [occurs] before an individual is finally deprived of a property interest." Mathews v. Eldridge, 424 U.S. 319, 333 (1976).  Under most circumstances, that hearing must take place before the deprivation of a significant property interest actually occurs.  Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 19 (1978)("Ordinarily, due process of law requires an opportunity for 'some kind of hearing' prior to the deprivation of a significant property interest."); see also U.S. v. James Daniel Good Real Property, 510 U.S. 43, 48 (1993) ("Our precedents establish the general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property.")  In the present case, however, the government contends that post-deprivation judicial review pursuant to the APA is sufficient.

In effect, the government requests that the court give the EPA power unprecedented in the body of administrative law. The government cites no case in which a federal court has squarely held that due process protections for an aggrieved party may be limited to post-deprivation judicial review under the APA.  Although the federal courts "tolerate some exceptions to the general rule requiring predeprivation notice and hearing, [it is] only in extraordinary situations," James Daniel Good Real Property, 510 U.S. at 53 (emphasis added), and these

"extraordinary situations" almost uniformly require an unusual government interest in speedy action as well as a post-deprivation remedy beyond APA judicial review.  See, e.g., North Am. Cold Storage Co. v. City of Chicago, 211 U.S. 306, 315-16 (1908) (allowing seizure of food "not fit to be eaten," and noting that plaintiff will have post-deprivation recourse to a tort-law jury "trial in an action brought for the destruction of his property"); Ingraham v. Wright, 430 U.S. 651 (1977) (allowing corporal punishment for schoolchildren without a hearing, and noting the availability of state-law remedies in the form of both civil damages and criminal penalties); Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc., 452 U.S. 264, 300 (1981) (allowing for pre-deprivation hearing to be waived "in [an] emergency situation[]" where the aggrieved party would receive a post-deprivation agency hearing); cf. Hudson v. Palmer, 468 U.S. 517, 533 (1984) ("[U]nauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available.").

These cases illustrate that some remedy beyond APA judicial review, even if it is state-law relief, has been present even in emergency situations where the courts allow

agencies to dispense with pre-deprivation hearings.  The one arguable break in this line of authority, which the government does cite in passing, is <u>Ewing v. Mytinger & Casselberry</u>, 339 U.S. 594 (1950).  In <u>Ewing</u>, the court allowed a pre-deprivation seizure of property where the only remedy was a judicial proceeding at a later time.  But in that case, the Court's opinion was based on its view that the seizures were the non-final first step in a judicial proceeding rather than a final agency action.  <u>Id.</u> at 598.  Obviously, that argument cannot be made here, given the Supreme Court's clarification in <u>Sackett</u> that compliance orders constitute final agency action.

Beyond failing to explain how APA judicial review could be sufficient, the government has not made even the less demanding argument that this is one of the few unusual cases (in the vein of <u>Cold Storage</u> and <u>Ingraham</u>) in which the agency itself may dispense with providing internal due process protections, and instead leave plaintiffs with only an outside remedy such as state law.  A basic principle of administrative law is that, barring extraordinary circumstances, the agency itself must supply appropriate due process protections in the first instance.  <u>See</u>, <u>e.g.</u>, <u>Gerator Corp. v. EEOC</u>, 592 F.2d 765, 768 (4th Cir. 1979) ("[W]hen governmental agencies adjudicate or make binding determinations which directly affect the legal

rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process.")(quoting Hannah v. Larche, 363 U.S. 420, 442 (1960), reh'g denied, 364 U.S. 855 (1960)); Londoner v. City and County of Denver, 210 U.S. 373 (1908) (establishing that the government body effecting deprivation must supply procedure to the persons to be deprived).

In this proceeding, the government's main authority for its contention that the agency itself need not provide due process protections, and that a process outside the agency will be sufficient, is Hodel v. Va. Surface Mining. In Hodel, however, the Supreme Court did not find that the aggrieved party could be deprived of its property with recourse only to procedures outside the agency. To the contrary, the court allowed the agency to dispense with predeprivation procedures in an emergency situation given that the party would "receive[] a full adjudicatory hearing before an administrative law judge, with a right of appeal to an administrative board," after the agency's action. Hodel, 452 U.S. at 304. Similarly, even if a pre-deprivation hearing were not required in the present case, the government has not persuaded the court that the agency may dispense with any internal due process protections and throw the matter into the judicial system.

17

Beyond its lack of support in federal administrative law, the government's request also asks the court to run afoul of traditional rules prohibiting the government from cutting off an aggrieved party's access to judicial relief as a practical, if not a formal, matter.  As discussed above, the Supreme Court in Sackett highlighted several examples of the significant legal consequences that flow directly from a compliance order, including the potential exposure to "double penalties": a plaintiff who judicially challenges a compliance order and loses on the merits could be subjected to a fine of up to $37,500 per day for the underlying violation and an additional fine of up to $37,500 per day simply for being in violation of the order itself. See Sackett, 132 S. Ct. at 1375 (Alito, J., concurring).

This double penalty clarifies the insufficiency of APA review for alleviating plaintiffs' plight.  Yes, plaintiffs may be entitled to APA review, but that review takes time.  While plaintiffs await the outcome of an APA challenge, they have two options: 1) they can undertake the necessary effort to comply with the order, or 2) they can do nothing and remain in violation.  Compliance is burdensome: it would require the plaintiffs to engage in expensive environmental remediation in order to "restore [the] impacted streams . . . to pre-disturbance grade and conditions," Compliance Order ¶ 12,

representing both an outlay of money and the destruction of the investment the plaintiffs have in the development efforts already undertaken on the Property.  Moreover, if plaintiffs complete the physical actions that the government has required, such as submitting plans and restoring parts of the property, review of those requirements under the APA will be useless, since APA lawsuits cannot give rise to compensatory money damages.  <u>See</u> 5 U.S.C. § 702 (providing review for "relief other than money damages"); <u>Bowen v. Massachusetts</u>, 487 U.S. 879 (1988) (explaining that the APA does not allow monetary damages in compensation for injuries).  On the other hand, noncompliance creates the risk of an ever-increasing fine — possibly $75,000 a day — if the APA challenge is ultimately unsuccessful.  Faced with such a choice, the plaintiffs may essentially be deprived of judicial review because the risks associated with non-compliance are so high, and compliance would mean that they must expend huge sums of money and also lose the possibility of enjoying judicial review as to some parts of the order.

When the penalties from disobeying a law are ruinous, but compliance undermines judicial review, the effect is a deprivation of due process because judicial review becomes unavailable as a practical matter.  <u>See</u> <u>Ex parte Young</u>, 209 U.S. 123, 144-45, 147 (1908)(holding that "enormous fines and

possible imprisonment as a result of an unsuccessful effort to test the validity of [a] law[]" have the same practical effect as an outright prohibition on judicial review and therefore violate due process); <u>see</u> <u>also</u> <u>Thunder Basin Coal Co. v. Reich</u>, 510 U.S. 200, 218 (1994)(describing the "situation confronted in <u>Ex parte Young</u>" as one in which "the practical effect of coercive penalties for noncompliance [with a statute] was to foreclose all access to the courts."); <u>Yakus v. United States</u>, 321 U.S. 414, 438 (1944) (explaining that the doctrine announced in <u>Ex parte Young</u> is intended to prevent plaintiffs from being forced to choose between "abandoning their businesses or subjecting themselves to the penalties of [a statute] before they have sought and secured a determination of the [statute's] validity.").

The persons in <u>Ex parte Young</u> could only seek judicial review after violating a law and exposing themselves to enormous penalties, which led the Supreme Court to hold that their due process rights had been violated.  <u>Ex Parte Young</u>, 209 U.S. at 144-45, 147.  Much like those in <u>Ex parte Young</u>, the plaintiffs here face an illusory choice: although they can ostensibly comply with the order or challenge it under the APA, the extravagant and ever-increasing fine assessable for noncompliance has the practical effect of forcing them to comply

20

with the very order they are challenging, at great expense, lest they face economic ruin if their challenge is unsuccessful.  <u>See</u> <u>Sackett</u> 132 S. Ct. at 1375 (Alito, J., concurring).[5]  And like the persons in <u>Ex parte Young</u>, once the plaintiffs here have complied, they will lose judicial review of any part of the statute where compensatory money damages would be the only suitable remedy, since those damages cannot be recovered under the APA.  <u>See</u> 5 U.S.C. § 702.

Moreover, even if plaintiffs could receive review of

---

[5] In his concurrence, Justice Alito described in detail the contours of the dilemma faced by plaintiffs such as the appellants in <u>Sackett</u> and the plaintiffs in this case:

> The reach of the Clean Water Act is notoriously unclear. Any piece of land that is wet at least part of the year is in danger of being classified by EPA employees as wetlands . . . [I]f property owners begin [construction] on a lot that the [EPA] thinks possesses the requisite wetness, the property owners are at the agency's mercy. The EPA may issue a compliance order demanding that the owners cease construction, engage in expensive remedial measures, and abandon any use of the property. If the owners do not do the EPA's bidding, they may be fined up to $75,000 per day ($37,500 for violating the Act and another $37,500 for violating the compliance order). And if the owners want their day in court to show that their lot does not include covered wetlands, well, as a practical matter, that is just too bad.  [Under the EPA's litigating position,] [u]ntil the EPA sues [the property owners], they are blocked from access to the courts, and the EPA may wait as long as it wants before deciding to sue. By that time, the potential fines may easily have reached the millions. In a nation that values due process, not to mention private property, such treatment is unthinkable.

the whole order under the APA after complying with it, the
Supreme Court has clarified that when "compliance is
sufficiently onerous and coercive penalties sufficiently potent
. . . a constitutionally intolerable choice [may] be presented."
<u>Thunder Basin</u>, 510 U.S at 218.  Thus, compliance with the order
need not foreclose judicial review to the plaintiffs altogether
in order to violate their right to due process.  It is enough
that they face "sufficiently onerous" costs both to comply with
the statute and to violate it, and that they have no option for
review before facing this choice.  When a statutory scheme
forces a plaintiff into this situation, the scheme violates due
process.

         In sum, the plaintiffs have identified property
interests, protected by due process, that are affected by the
EPA's compliance order.  Firmly-established rules of
administrative law show that judicial review under the APA,
standing alone, does not provide a process sufficient to satisfy
the plaintiffs' constitutional rights.  Moreover, if they wish
to challenge the validity of the government's order, via the APA
or otherwise, the plaintiffs appear to face an implacable
choice: incur significant expense and comply with the terms of
what they believe to be a facially invalid order, thereby giving
up the possibility of effective judicial review of significant

parts of the order, or challenge the order and face a ruinous
fine if they lose their case.  Ex Parte Young and its progeny
stand for the proposition that being forced to make such a
choice is, in some circumstances, an abridgement of the Fifth
Amendment's guarantee of procedural due process.  Accordingly,
the plaintiffs have alleged a plausible procedural due process
claim and the EPA's motion to dismiss that claim is denied.

### B. Substantive Due Process

The protection afforded by the substantive component
of Fifth Amendment due process "prevents the government from
engaging in conduct that 'shocks the conscience,' or interferes
with rights 'implicit in the concept of ordered liberty.'"
United States v. Salerno, 481 U.S. 739, 746 (1987)(internal
citations omitted).  "[S]ubstantive due process [protections]
have for the most part been accorded to matters relating to
marriage, family, procreation, and the right to bodily
integrity."  Albright v. Oliver, 510 U.S. 266, 271-72 (1994).

"In a due process challenge to executive action, the
threshold question is whether the behavior of the governmental
official is so egregious, so outrageous, that it may fairly be
said to shock the contemporary conscience."  County of

<u>Sacramento v. Lewis</u>, 523 U.S. 833, 847 n. 8 (1998)[6] ; <u>see</u> <u>e.g.</u>,
<u>Rochin v. California</u>, 342 U.S. 165, 172(1952)(forcible stomach
pumping of suspect in an effort to produce swallowed evidence
"shock[ed] the conscience" and was held to be a violation of
substantive due process.).  This is a high standard not easily
met.  As the Eighth Circuit explained in <u>Golden ex rel. Balch v.</u>
<u>Anders</u>:

> Substantive due process is concerned with violations of
> personal rights [...] so severe [...] so
> disproportionate to the need presented, and [...] so
> inspired by malice or sadism rather than a merely
> careless or unwise excess of zeal that it amounted to
> brutal and inhumane abuse of official power literally
> shocking to the conscience.

324 F.3d 650, 652-53 (8th Cir. 2003)(internal quotation marks
omitted).

    One may question the scope of the EPA's authority
under the CWA and even take umbrage with the methods employed by
the agency in an effort to vindicate its expansive
interpretation of the statute's jurisdictional mandate.  <u>See</u>

---

[6] Although <u>Lewis</u> involved evaluation of a substantive due process
claim arising under the Fourteenth Amendment, the standard is
equally applicable to a claim arising under the Fifth Amendment.
<u>See</u> <u>Piechowicz v. United States</u>, 885 F.2d 1207, 1214 n. 9 (4th
Cir. 1989); <u>see</u> <u>also</u> <u>Malloy v. Hogan</u>, 378 U.S. 1, 26 (1964)
(Harlan, J., dissenting)(noting that "'Due process of law is
secured against invasion by the federal Government by the Fifth
Amendment and is safeguarded against state action in identical
words by the Fourteenth.'")(internal citations omitted).

Sackett, 132 S. Ct. at 1375 (Alito, J., concurring)(noting that
"[t]he reach of the Clean Water Act is notoriously unclear" and
stating that "[w]hen Congress passed the Clean Water Act in
1972, it provided that the Act covers 'the waters of the United
States.' But Congress did not define what it meant by 'the
waters of the United States' . . . . Unsurprisingly, the EPA . .
. interpreted the phrase as an essentially limitless grant of
authority. We [have previously] rejected [the EPA's] boundless
view . . . but the precise reach of the Act remains
unclear.")(internal citations omitted).

        Even after fully crediting the plaintiffs' assertions
that the EPA's decision to issue the order was predicated on
"irrational animus and improper retaliatory motivation," see Pl.
Am. Compl. ¶¶ 4, 5, 21, 22, the complaint contains no
allegations of conduct of a sufficient egregiousness that rises
to the level of a substantive due process violation.  Quite
simply, the complaint's allegations concerning the EPA's
enforcement efforts do not shock the conscience.  Accordingly,
the plaintiffs' substantive due process claim fails as a matter
of law.

                    C. Equal Protection

        The Equal Protection Clause of the Fourteenth
Amendment does not apply to the Federal Government; however, it

                            25

has long been established that the Fifth Amendment's guarantee
of due process contains an equal protection component.  <u>See</u>
<u>Bolling v. Sharpe</u>, 347 U.S. 497 (1954); <u>Adarand Constructors,</u>
<u>Inc. v. Pena</u>, 515 U.S. 200, 217 (1995) (holding "the equal
protection obligations imposed by the Fifth and the Fourteenth
Amendments [to be] indistinguishable" and citing cases).

In <u>Village of Willowbrook v. Olech</u>, the Supreme Court
held that an equal protection claim arises for a "class of one"
when a "plaintiff . . . has been intentionally treated
differently from others similarly situated and . . . there is no
rational basis for the difference in treatment."  <u>Village of</u>
<u>Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000)(per curiam).

The plaintiffs assert that they have a "class of one"
claim because the EPA's decision to issue a compliance order was
based on "improper" and "irrational animus."  <u>See</u> Pl. Am. Compl.
¶¶ 4, 5, 21, 22, 63, 66.  But an allegation of animus is not
enough: a "class of one" claim cannot survive a motion to
dismiss if it is not supported by an allegation that the
plaintiff was treated differently than some similarly situated
party.  <u>See</u> <u>Olech</u>, 528 U.S. at 564; <u>Ruttenberg v. Jones</u>, 283 F.
App'x 121, 131 (4th Cir. 2008).

<u>Ruttenberg</u> is instructive on this point.  In
<u>Ruttenberg</u>, the plaintiffs, who owned a once-successful billiard

26

club, alleged that outrageous actions by a police officer
seriously damaged the club's commercial viability.  Ruttenberg,
283 F. App'x at 124-129.  The officer allegedly disliked his
girlfriend's friendship with Ruttenberg, the club owner, and set
out to harm Ruttenberg and his business.  See Id.  The officer's
campaign included steps such as offering to dismiss charges
against criminal suspects if they would "help facilitate drug
transactions on the premises" of Ruttenberg's club, so that the
officer could then arrange for a raid of the club when drug
transactions were occurring.  Id. at 125.  Despite these
allegations, the Fourth Circuit rejected a "class of one" claim
because, among other defects, "the complaint fails to allege the
existence of similarly situated individuals."  Id. at 131.
Thus, even where the alleged conduct is outrageous and plainly
motivated by animus, plaintiffs must state that similarly
situated persons were treated differently to make a successful
"class of one" claim.

          In this case, plaintiffs have likewise failed to point
out some similarly situated party who received different
treatment.  If anything, the plaintiffs actually allege the
opposite.  The attached bankruptcy order demonstrates that the
plaintiffs' predecessors in interest were subject to some form
of EPA regulatory enforcement action involving the CWA.  See

"Bankruptcy Order"[7] at * 5 (limiting carryover liability for CWA violations incurred by prior owners to $50,000 remediation fund).  The fact that the EPA pursued regulatory action under the CWA against the prior owners, who are about as "similarly situated" as one could be to the current plaintiffs, demonstrates that the plaintiffs have not been singled out in the fashion necessary for a "class of one" claim.  Accordingly, the plaintiffs' equal protection claim fails as a matter of law.

### Conclusion and Order

For the foregoing reasons, the EPA's motion to dismiss is granted in part and denied in part.

The motion is granted with respect to the plaintiffs' substantive due process and equal protection claims.  As both claims are primarily set forth in the complaint's Fourth Claim for Relief, the court hereby ORDERS that the Fourth Claim for Relief is dismissed in its entirety.  To the extent that the complaint seeks relief for these claims elsewhere in the complaint, the court ORDERS that such claims are also dismissed.

The motion is denied with respect to the plaintiffs' procedural due process claim.

---

[7] Attached as "Exhibit C" to plaintiffs' complaint. (ECF 1-1).

   The Clerk is directed to transmit copies of this

order to counsel of record and any unrepresented parties.

   ENTER: September 30, 2015

   John T. Copenhaver, Jr.
   United States District Judge