**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| RON FOSTER, FOSTER FARMS, LLC, and | ) | |
| MARKETING & PLANNING SPECIALISTS | ) | |
| LIMITED PARTNERSHIP, | ) | |
| | ) | |
| Plaintiffs and Counterclaim-Defendants, | ) | |
| | ) | |
| v. | ) | **No. 2:14-cv-16744 (JTC)** |
| | ) | |
| UNITED STATES ENVIRONMENTAL | ) | **UNITED STATES'** |
| PROTECTION AGENCY et al., | ) | **MEMORANDUM OF LAW** |
| | ) | **IN SUPPORT OF MOTION** |
| Defendants and Counterclaimants. | ) | **FOR SUMMARY JUDGMENT** |
| _____ | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES'
MOTION FOR SUMMARY JUDGMENT**</u>

CAROL A. CASTO
United States Attorney

<u>/s/ Gary L. Call</u>
Assistant United States Attorney
W.V. State Bar No. 589
United States Attorney's Office
P.O. Box 1713
Charleston, W.V. 25326
Phone: 304-345-2200
Fax: 304-347-5440
Email: Gary.Call@usdoj.gov

JEFFREY H. WOOD
Acting Assistant Attorney General

<u>/s/ Amanda Shafer Berman</u>
Amanda Shafer Berman
Laura Jane Brown
Sonya Shea
United States Department of Justice
Env't and Nat. Resources Division
600 D St. N.W., Ste. 8000
Washington, D.C. 20004
202-514-1950 (Berman)
202-514-3376 (Brown)
202-514-2741 (Shea)
amanda.berman@usdoj.gov
laura.j.s.brown@usdoj.gov
sonya.shea@usdoj.gov

February 21, 2017

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

STATUTORY AND REGULATORY BACKGROUND...................................................3

FACTUAL BACKGROUND ...............................................................................................4

I.     Neal Run Crossing and the Site ..............................................................................4

II.    Plaintiffs' Initial Discharges of Fill at the Site .....................................................7

III.    EPA's Discovery of the Illegal Filling....................................................................7

IV.    Plaintiffs' Continued Illegal Filling at the Site .....................................................8

V.    EPA's Issuance of the ACO.....................................................................................9

VI.    Events After Issuance of the ACO .......................................................................10

STANDARD OF REVIEW ................................................................................................10

ARGUMENT .......................................................................................................................11

I.    The Undisputed Facts Establish that Plaintiffs Violated the CWA ...................11

    A.    Plaintiffs are responsible "persons" within the Act's meaning ............11

    B.    Plaintiffs' development activities at the Site discharged fill material ..................12

    C.    The equipment used by Plaintiffs' contractors are "point sources."......................13

    D.    Plaintiffs' contractors discharged fill into "waters of the United States."............13

        1.    RR4 is a "water of the United States" under the *Rapano*s plurality standard ........................................................15

            *a.*    *Prior to being filled, RR4 had relatively permanent seasonal flow*........................................................15

            *b.*    *Prior to its filling, RR4 was connected to a navigable-in-fact water* ...........................................................18

2.    The Filled Streams are "waters of the United States" under Justice Kennedy's "Significant Nexus" standard ..................................................19

          a.    *The Filled Streams contributed flow, sediment and other materials to downstream waters* ....................................................21

          b.    *The Filled Streams supported and exchanged aquatic life with downstream waters* ................................................................24

          c.    *The Filled Streams processed nutrients, minerals and pollutants*...................................................................................25

E.    Plaintiffs did not obtain a CWA section 404 permit ................................27

II.    The Undisputed Facts Show that EPA's Issuance of the ACO Was Reasonable .............27

III.    The Undisputed Facts Show that EPA Has Not Violated the Fifth Amendment .............30

A.    Plaintiffs fail to show that they were deprived of a protected property interest....30

B.    EPA satisfied any applicable due process requirements.......................................32

      1.    EPA was not required to hold a hearing before issuing the ACO ............32

      2.    EPA afforded Plaintiffs sufficient process before issuing the ACO.........34

IV.    Plaintiffs' First Amendment Retaliation Claim Fails ......................................................36

A.    EPA's issuance of the ACO in January 2012 and subsequent actions were the continuation of an ongoing enforcement process that began in 2010.............38

B.    No temporal relationship exists between EPA's alleged discovery of Plaintiffs' campaign contribution and EPA's enforcement actions in 2012.........39

CONCLUSION....................................................................................................40

The United States Environmental Protection Agency ("EPA") and Administrator Scott Pruitt[1] (the "United States") submit this memorandum in support of their Motion for Summary Judgment, wherein they request this Court to enter judgment as follows:

(1) Plaintiffs/Counterclaim-Defendants Ron Foster et al. ("Plaintiffs") violated sections 301 and 404 of the Clean Water Act ("CWA") by discharging pollutants into waters of the United States without a permit issued by the United States Army Corps of Engineers;

(2) EPA's issuance of an Administrative Compliance Order ("ACO") to Plaintiffs, ordering them to cease the discharges and submit a restoration plan, was lawful and reasonable;

(3) EPA did not violate Plaintiffs' procedural due process rights while enforcing the Act; and

(4) EPA did not violate Plaintiffs' First Amendment rights while enforcing the Act.

## INTRODUCTION

The CWA requires any person discharging dredged or fill material into waters of the United States to first obtain a permit from the U.S. Army Corps of Engineers ("the Corps"). The questions presented by the United States' Motion for Summary Judgment are:

(1) Whether Plaintiffs violated the Act by discharging dirt and other pollutants into streams located on a property near Parkersburg, West Virginia (the "Site") without a permit.

(2) Whether EPA's January 2012 Administrative Compliance Order ("ACO"), ordering Plaintiffs to stop their unpermitted discharges, was lawful and reasonable.

(3) Whether Plaintiffs can show that, in taking action to address the discharges on the Site, EPA violated their procedural due process rights.

(4) Whether Plaintiffs can show that EPA violated their First Amendment rights.

---

[1] EPA Administrator Scott Pruitt is automatically substituted for his predecessor in office pursuant to Fed. R. Civ. P. 25(d).

The evidence is not in genuine conflict that, beginning in early September of 2010, a contractor hired by Plaintiff Ron Foster began clearing the Site for development, and these activities resulted in discharges of dirt, brush, rocks, and other materials—which are unquestionably pollutants under the CWA—into streams on the Site. Contrary to Plaintiffs' claim, uncontroverted EPA and expert testimony has established that the streams are indeed waters within the regulatory jurisdiction of the United States. It is undisputed that Plaintiffs did not obtain a permit from the Corps for their activities on the Site; in fact, they continued to fill the streams months after EPA warned them that a permit was necessary. Thus, as a matter of law, the United States is entitled to summary judgment on its counterclaim that Plaintiffs violated sections 301 and 404 of the CWA.

The United States is also entitled to summary judgment in its favor on Plaintiffs' claim that EPA's issuance of the ACO in January 2012 was unlawful or arbitrary and capricious. Photos from EPA's fall 2010 visit to the Site and other contemporaneous evidence indisputably show that dirt, brush, and other fill had been placed into on-Site streams, and later visits by EPA inspectors disclosed further discharges of fill. The record shows that EPA reasonably relied on its inspectors' observations and photos, maps and scientific literature, and information provided by Plaintiffs themselves in determining that a CWA violation had occurred. Thus, EPA had ample evidence to support issuing the ACO.

Third, EPA did not violate Plaintiffs' procedural due process rights. No court has ever held that a formal administrative hearing is required prior to issuance of an ACO, while the Fourth Circuit and several other courts have held to the contrary. Furthermore, EPA engaged in extensive discussions with Plaintiffs, provided them with the Agency's reasons for believing that a CWA violation had occurred, and considered the information Plaintiffs submitted—including a

report in which Plaintiffs' own consultant concluded that the streams on the Site were likely protected under the CWA.  This more than satisfies any applicable due process requirements.

Finally, EPA did not violate Plaintiffs' First Amendment rights.  Plaintiffs' First Amendment claim is premised on the assertion that EPA undertook enforcement action against Plaintiffs in retaliation for a $250 contribution to a congressional campaign.  Corrected Second Amended Complaint ("2d Am. Comp."), Dkt. #153, ¶¶ 71-78.  Plaintiffs' only evidence is the alleged "temporal proximity" of EPA's discovery of the contribution to its enforcement action.  But EPA's enforcement activities—including issuance of the ACO—well *predate* the document from which Plaintiffs draw their inference, and no evidence links the two.  Because the evidence does not support Plaintiffs' far-fetched assertion that EPA's enforcement action was caused by the Agency's knowledge of their campaign contribution, Plaintiffs' First Amendment claim fails.

## STATUTORY AND REGULATORY BACKGROUND

The CWA is intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a) (quoting H.R. Rep. No. 92-911, at 76 (1972)).  To achieve the Act's objective, section 301(a) states that "the discharge of any pollutant by any person shall be unlawful" except where specifically authorized.  33 U.S.C. § 1311(a).  One potential source of authority to discharge pollutants is CWA section 404, which authorizes the Corps to issue permits for "discharge[s]" of "dredged or fill material."  33 U.S.C. § 1344(a).

The key terms of these provisions are defined in CWA section 502, 33 U.S.C. § 1362, as well as in Corps and EPA regulations.  The "person[s]" prohibited from unlawfully discharging under the Act include corporations and individuals.  33 U.S.C. § 1362(5).  A "discharge of pollutants" is "any addition of any pollutant to navigable waters from any point source."  *Id.* § 1362(12)(A).  The term "point source" means "any discernible, confined, and discrete

3

conveyance . . . from which pollutants are or may be discharged." *Id.* § 1362(14).  "Pollutant" is defined as including earthen materials such as "dredged spoil," "biological materials," "rock," "sand," and "cellar dirt." *Id.* § 1362(6).[2]

The Act defines the term "navigable waters" to include the "waters of the United States." 33 U.S.C. § 1362(7).  In turn, the Corps and EPA have defined "waters of the United States" to include waters that have been used or are reasonably susceptible to use in interstate commerce ("traditional navigable waters"), tributaries of traditional navigable waters (i.e., streams), and wetlands adjacent to such tributaries.[3]  33 C.F.R. § 328.3(a)(1), (5), (7) (2010).  Following the Supreme Court's fractured opinion in *Rapanos v. United States*, 547 U.S. 715 (2006), streams are "waters of the United States" if they either (a) are relatively permanent, and connected to downstream traditional navigable waters, or (b) have a "significant nexus" with a traditional navigable water.  *See United States v. Donovan*, 661 F.3d 174 (3d Cir. 2011); *United States v. Bailey*, 571 F.3d 791, 797-99 (8th Cir. 2009).

## FACTUAL BACKGROUND

### I.    Neal Run Crossing and the Site.

The Site is located on a property known as "Neal Run Crossing" in Wood County, West Virginia.  *See* Ex. 1 (map).  The property consists of two parcels: one owned by Foster Farms, LLC and one owned by Marketing & Planning Specialists, LLC ("M&PS").  2d Am. Comp.

---

[2] EPA and Corps regulations further define a "discharge of fill material . . . into waters of the United States" as including any "[p]lacement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; [and] site-development fills for recreational, industrial, commercial, residential, or other uses." *See* 33 C.F.R. § 323.2(f).

[3] EPA and the Corps amended the definition of "waters of the United States" in 2015, but those amendments were not in effect at the time of Plaintiffs' discharges and are stayed.  *See In re E.P.A.*, 803 F.3d 804 (6th Cir. 2015).

¶ 8(d)-(f); Ex. 2 (Administrative Record Doc. ("AR") #47) [4] at AR000384.  Both companies are

owned, in whole or part, by Plaintiff Ron Foster.  Mr. Foster represents that he seeks to develop

Neal Run Crossing for commercial use.

The Neal Run Crossing property has been divided into five "Pads" for development

purposes.  Ex. 3 (Foster Dep. Tr.) at 22:24-23:7; Ex. 4 (Declaration of Stephanie Andreescu

("Andreescu Decl.")) at ¶ 15.  The activities at issue here—the unpermitted discharges of

pollutants into waters of the United States—occurred on "Pad 4" of the property, which is the

"Site" at issue here.  It is undisputed that there were at least four streams on the Site prior to

development work undertaken by Foster.  Plaintiffs' consultant, Randolph Engineering,

delineated the streams and designated them as "stream assessment reaches" or "SAR."

Andreescu Decl. Attach. F (Randolph Engineering Report) at USEPA000426-27.[5]  EPA and the

Corps confirmed those stream locations and the Corps re-designated them as "relevant reaches"

("RR") 1-4.  Andreescu Decl. ¶ 30 & Attach. O (Corps JD letter).  Using digital modeling and

Geographic Information Systems ("GIS") tools, the United States' experts independently

identified RR1, RR2, RR3 and RR4 at the same stream locations delineated by Randolph

Engineering and confirmed by the Corps and EPA.  Ex. 6 (Declaration of Charles Dow ("Dow

Decl.")) ¶ 20.  Additionally, RR2, RR3, and RR4 are visible in pre-disturbance aerial

photographs of the Site.  Ex. 7 (Declaration of Peter Stokely ("Stokely Decl.")) ¶¶ 11-12.

EPA inspectors observed portions of the stream channels during the September 2010 Site

visit (discussed below).  Andreescu Decl. ¶ 3.  And David Walters, Mr. Foster's contractor who

---

[4] The Administrative Record was filed with this Court on November 25, 2014. Dkt. #26.  AR references are to the record number identified in the record's index.

[5] The Randolph Engineering Report appears in the Administrative Record at AR #61.  To avoid duplicative exhibits, citations are to the version attached to Ms. Andreescu's declaration.

filled the Site, testified that he saw RR4's channel prior to beginning work at the Site. Specifically, Mr. Walters testified he saw a channel where he constructed the sediment basin that forked off to the right and left upstream. Ex. 8 (Walters Dep. Tr.) at 33:1-10.[6] Mr. Walter's description of the channel is consistent with Randolph Engineering's delineation of RR4 at the location where the sediment basin was constructed and the delineation of RR2 and RR3 forking off from RR4 upstream. *See* Andreescu Decl. Attach. F at USEPA000438.

Prior to being filled, RR1, RR2 and RR3 flowed into RR4. *See id.* at USEPA000428. RR4 then exited the western boundary of the Site and flowed across a neighbor's hayfield to the first unnamed tributary ("UNT") of Neal Run. Stokely Decl. ¶ 16; Ex. 10 (Declaration of Todd Lutte ("Lutte Decl.")) ¶ 23. The first UNT then flows to a second UNT of Neal Run for about 500 meters before it connects to Neal Run. Dow Decl. ¶ 21. Neal Run then connects to the Little Kanawha River and then to the Ohio River at Parkersburg. Stokely Decl. ¶ 19. The total distance from where RR4 joins the first UNT to the nearest traditional navigable water (the navigable portion of Neal Run) is 3.1 miles. *Id.* ¶ 21.

Before Neal Run Crossing was purchased by Foster Farms and M&PS in 2009, it was owned by The Endurance Group, LLC ("Endurance Group"). 2d. Am. Comp. ¶ 14. In 2009, the CEO of Endurance Group relocated a stream on Pad 1 without a permit, in violation of the CWA. Before EPA could begin formal enforcement proceedings, Endurance Group declared bankruptcy for reasons unrelated to the violations. Lutte Decl. ¶ 5. Ultimately, the bankruptcy court permitted the sale of the Neal Run Crossing property to Mr. Foster, provided that Mr. Foster set aside $50,000 for restoration work to address the Pad 1 violation, confined to within

---

[6] A neighbor that EPA inspectors met on the Site also described the channel consistently with Mr. Walters' description in a February 18, 2011, recorded conversation with Mr. Foster, which was read into the record and confirmed in a deposition. Ex. 9 (Moore Dep. Tr.) at 47:9-48:24.

30 feet of the stream at issue.  2d. Am. Comp. ¶¶ 16-17.  Although it took several attempts for Endurance Group's contractor, EPA, and Plaintiff Foster to agree on a restoration plan, the court-ordered work was completed in 2011.  Lutte Decl. ¶ 13.

## II.    Plaintiffs' Initial Discharges of Fill at the Site.

Beginning in late August 2010, David Walters, the site development contractor hired by Mr. Foster, conducted various operations at the Neal Run Crossing property, including in the Pad 4 area.  Among other things, Mr. Walters and his associates used a bulldozer and other mechanized equipment to move and deposit earth, brush, rocks and other materials on the Site.  Ex. 11 (AR #49) at AR0000409; Walters Dep. Tr. at 24:24-27:12; 73:4-74:12.

## III.   EPA's Discovery of the Illegal Filling.

On September 9, 2010, EPA inspectors Stephanie Andreescu and Todd Lutte visited the Neal Run Crossing property because EPA had received complaints from the neighboring owners, Mr. and Mrs. Blackwell, about flooding on their property caused by Endurance Group's unlawful movement of the stream on Pad 1.  Andreescu Decl. ¶¶ 11 & 13; Lutte Decl. ¶ 14.  After viewing that stream, Ms. Andreescu and Mr. Lutte saw a billboard advertising the sale of portions of the Neal Run Crossing property and showing development activities.  Andreescu Decl. ¶¶ 15-16; Lutte Decl. ¶¶ 15-16.  The sign contained a topographical map indicating that fill had been, or would be, placed on a part of Pad 4 that contained streams.  *Id.*  Ms. Andreescu and Mr. Lutte decided to inspect that area (the "Site").  *Id.*

To reach the Site, the EPA inspectors followed a stream from the Blackwell property into a field adjoining Pad 4.  Andreescu Decl. ¶ 18; Lutte Decl. ¶ 17.  After leaving the stream channel to cross the field, they located the Site.  Andreescu Decl. ¶ 18; Lutte Decl. ¶ 19.  A stream channel appeared to have been disturbed; specifically, the area had been cleared and dirt

7

and vegetation had been pushed into the stream, thereby "burying" and "obliterating" it.  *Id.*  In the undisturbed portion of the stream, as well as upstream of the disturbance, both EPA inspectors observed that the stream had a bed and banks, an ordinary high water mark, and other attributes associated with the regular presence of flowing water.  Andreescu Decl. ¶ 19; Lutte Decl. ¶ 17.  Ms. Andreescu took pictures of the stream channel.  Andreescu Decl. ¶¶ 19 & 21.

A man who identified himself as a neighbor approached the EPA inspectors while they were observing the Site and confirmed that flowing streams had previously existed on the Site. Andreescu Decl. ¶ 20; Lutte Decl. ¶ 18.  He then attempted to take the inspectors to the stream's source, which could not be located due to thick upland vegetation.  Andreescu Decl. ¶ 20.

Upon returning to the Site, Ms. Andreescu and Mr. Lutte encountered men with a bulldozer, one of whom identified himself as with Walters Excavating (the inspectors later learned his name was Dave Walters).  These men indicated that they had done the work that had disturbed the stream.  Andreescu Decl. ¶ 21; Lutte Decl. ¶ 19.  The inspectors asked Mr. Walters if a permit had been obtained for the work; he said no.  Andreescu Decl. ¶ 21.  Mr. Lutte informed Mr. Walters that a Corps permit was likely necessary for the work that had been undertaken on the Site.  Lutte Decl. ¶ 19; Walters Dep. Tr. 99:24-100:5, Ex. 12 (MPS000606).

## IV.   Plaintiffs' Continued Illegal Filling at the Site.

Despite EPA's notification that a permit was likely needed, Foster's contractors continued to work on the Site.  Walters Dep. Tr. 74:18-87:14; 92:4-93:8; AR # 49 at AR0000402-08.  They placed large quantities of fill and built a sediment pond, completely obliterating the streams on the Site, including those observed by the inspectors (albeit in an already-altered state) during the 2010 visit.  Walters Dep. Tr. 74:18-87:14; 92:4-93:8; Andreescu Decl. ¶ 32; Lutte Decl. ¶ 22.  The fill has remained in place ever since.  Andreescu Decl. ¶ 57.

**V.     EPA's Issuance of the ACO.**

From late fall 2010 through December 2011, EPA engaged in regular email and telephone communications with Mr. Foster on behalf of Plaintiffs.  *See* Andreescu Decl. ¶¶ 27-36; Lutte Decl. ¶¶ 20-26.  At Mr. Foster's request, EPA also conducted two additional Site visits.  Andreescu Decl. ¶¶ 31 & 34; Lutte Decl. ¶¶ 21-22.  To determine whether Plaintiffs had in fact filled waters of the United States in violation of the CWA, EPA personnel considered (in addition to their observations during Site visits) GIS data; aerial imagery; scientific literature; Plaintiffs' responses to EPA information requests; and information provided by the Corps, including Plaintiffs' own consultant report, which concluded that intermittent and ephemeral streams on the Site had been filled or greatly disturbed and that those streams were likely covered by the CWA.  Andreescu Decl. ¶¶ 24-34; Lutte Decl. ¶¶ 23-26.

Between October and December 2011, EPA and the Corps discussed whether the unauthorized discharges should be addressed through an EPA enforcement action, or an after-the-fact permit issued by the Corps.  Andreescu Decl. ¶ 37; Lutte Decl. ¶ 25; *see also* Ex. 13 (AR #79) at AR0000624; Ex. 14 (USEPA001473); Ex. 15 (USEPA001467).  To keep the matter moving along, EPA began drafting an Administrative Compliance Order ("ACO") in December 2011, s*ee* Ex. 16 (MPS001652), while still "urg[ing] the Corps to take lead agency status"; however, the Corps ultimately declined to do so.  Andreescu Decl. ¶ 36; Lutte Decl. ¶ 25.  On January 3, 2012, EPA informed Mr. Foster that the case was proceeding as an EPA enforcement action.  Ex. 17 (AR #84) at AR0000632.  On January 24, 2012, EPA issued an ACO to Foster Farms on the grounds that there had been unauthorized discharges of fill material to waters of the United States on the Site.  Andreescu Decl. ¶ 37 & Attach. K; Lutte Decl. ¶ 26.

## VI.    Events after Issuance of the ACO.

Shortly after EPA issued the ACO, Mr. Foster informed EPA that it should have been issued to M&PS instead of Foster Farms.  Andreescu Decl. ¶ 42 & Attach. M (Feb. 14, 2012 letter).  EPA therefore researched the corporate structure of M&PS.  Andreescu Decl. ¶ 42 & Attach. N (email chain).

Although the Corps had declined to serve as the lead agency, at Mr. Foster's request, the Corps finished its analysis of the Site.  Andreescu Decl. Attach. O (Corps JD letter).  Like EPA, the Corps concluded that the streams on the Site are covered by the CWA, and conveyed that determination to Plaintiffs in a February 22, 2012 letter.  *Id.*  In an April 5, 2012 letter written in response to a request from Mr. Foster, EPA reaffirmed its finding in the ACO that the Site contained—and Plaintiffs had unlawfully filled—CWA-protected waters.  Andreescu Dec. ¶ 48 & Attach. Q (Apr. 5, 2012 letter).  EPA invited Mr. Foster to provide any information he believed would show otherwise.  Andreescu Decl. ¶ 48 & Attach. Q.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]ll facts and reasonable inferences therefrom" must be viewed "in the light most favorable to the nonmoving party." *T–Mobile Ne., LLC v. City Council of Newport News, Va.,* 674 F.3d 380, 384-85 (4th Cir. 2012) (internal quotation marks and citations omitted).  However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original).  Rather, to defeat a summary judgment motion, the evidence must be sufficient to sustain a decision for the non-moving party at trial;

"[i]f the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Id.* at 249-50.

## ARGUMENT

**I.     The Undisputed Facts Establish that Plaintiffs Violated the CWA.**

To prove that a CWA violation has occurred, the United States must show that Plaintiffs are (i) persons that (ii) discharged a pollutant, (iii) from a point source, (iv) to a water of the United States, (v) without a CWA section 404 permit.  33 U.S.C. §§ 1311(a) & 1344(a).  All of these elements are established by the undisputed facts in this case.

### A.  Plaintiffs are responsible "persons" within the Act's meaning.

The CWA's definition of "person" includes individuals, partnerships, and corporations. 33 U.S.C. § 1362(5).  A person is liable under CWA section 301(a) if he has either (1) performed the work or (2) exercised responsibility for or control over performance of the work.  *See Sierra Club v. MasTec North America*, Nos. 03-1697 & 06-6071, 2007 WL 4387428 (D. Or. Dec. 12, 2007) ("Liability is predicated on either performance of the work or control over performance of the work . . . .  ").

Plaintiffs do not dispute that they are "persons" within the meaning of the CWA.  Answer to Counterclaim, Dkt. #160, ¶ 42.  Moreover, no triable issue exists regarding Plaintiffs' responsibility for the pollutant discharges at issue. The Site is owned by Foster Farms and M&PS.  2d Am. Comp. ¶ 8(d)-(f).  Mr. Foster is a member of Foster Farms and a limited partner and employee of M&PS.  AR #47 at AR000384; Ex. 18 (Foster Farms Interrogatory Responses) at Response No. 3; Ex. 19 (M&PS Interrogatory Responses) at Response No. 2.  Mr. Foster directs the day-to day-operations of M&PS, including the activities at the Site.  Foster Dep. Tr. at 12:17-22; M&PS Interrogatory Response Nos. 3, 5.  Mr. Foster hired Fox Engineering to design

11

plans for the pad construction at the Neal Run Crossing property and to procure the necessary permits. Ex. 20 (Metheny Dep. Tr.) at 28:22-30:5; 90:19-91:5.  Mr. Foster hired Walters Excavating to clear, fill, and level the Site and construct a sediment control basin. AR #49 at AR0000401; M&PS Interrogatory Response No. 5; Walters Dep. Tr. 24:24-26:12.

     **B.  Plaintiffs' development activities at the Site discharged fill material.**

Plaintiffs' activities at the Site resulted in the discharge of pollutants, specifically fill material.  The CWA defines the term "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source . . . ." 33 U.S.C. § 1362(12).  The CWA defines pollutants broadly to include, *inter alia*, fill material such as rock, soil, and dirt.  33 U.S.C. § 1362(6) (definition), §§ 1311(a) & 1344(a) (prohibiting discharge of dredged and/or fill material without a permit); *United States v. Pozsgai*, 999 F.2d 719, 724 (3d Cir. 1993) (fill material is a pollutant); *United States v. Bradshaw*, 541 F. Supp. 880, 882-83 (D. Md. 1981) (same).  David Walters testified that, beginning in September 2010, he and his employees used mechanized equipment to clear and fill the Site and construct a sediment retention pond.  Walters Dep. Tr. at 24:14-27:12.  First, Walters and his crew cleared brush and dug out tree stumps.  *Id.* at 24:14-26:2; 30:20-31:22.  Next, they constructed the sediment pond.  *Id.*  Then they filled the Site by hauling excavated dirt and rocks from another area of the Neal Run Crossing property, placing the excavated dirt and rocks on the Site using a bulldozer, and rolling the material with a compactor.  *Id.* at 26:6-22; 27:18-28:17.  These activities resulted in the addition and redistribution of rock, dirt, and other fill material, which constitutes a "discharge" of "pollutants" under the CWA.  *See* 33 U.S.C. § 1362(6), (12); 40 C.F.R. § 232.2.

**C.  The equipment used by Plaintiffs' contractors are "point sources."**

The bulldozers, dump trucks, and other earthmoving equipment, described above, used by Mr. Walters and his employees to deposit rock, dirt, and other fill material at the Site are point sources.  *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 922 (5th Cir. 1983) (earth-moving equipment is a point source); *United States v. Lambert*, 915 F. Supp. 797, 802 n.8 (S.D.W. Va. 1996) (bulldozers and other earthmoving equipment are point sources); *United States v. Tull*, 615 F. Supp. 610, 622 (E.D. Va. 1983) (bulldozers and dump trucks are point sources), *aff'd*, 769 F.2d 182 (4th Cir. 1985), *rev'd on other grounds*, 481 U.S. 412 (1987).

**D.  Plaintiffs' contractors discharged fill into "waters of the United States."**

The CWA protects "navigable waters," defined as "waters of the United States." 33 U.S.C. § 1362(7).  In 2006, the Supreme Court interpreted the phrase "waters of the United States," but the Justices disagreed on the scope of the term, resulting in plurality, concurring, and dissenting opinions.  *Rapanos*, 547 U.S. 715.  All of the Justices agreed that the term "waters of the United States" includes some waters that are not navigable in the traditional sense.  *See id*. at 730 (plurality opinion); *id*. at 758-59 (Kennedy, J. concurring); *id.* at 787 (Stevens, J. dissenting). The plurality limited CWA regulatory jurisdiction to (1) traditional navigable waters, (2) waters that are connected to traditional navigable waters and have a "relatively permanent flow," and (3) wetlands that have a "continuous surface connection" to such relatively permanent waters. *Id.* at 742.  Justice Kennedy's concurrence included within CWA jurisdiction waters or wetlands with a "significant nexus" to a traditional navigable water.  *Id.* at 780 (wetlands are within CWA jurisdiction when "either alone or in combination with similarly situated lands in the region, [they] significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable'").  The four dissenting Justices concluded that the term

13

"waters of the United States" encompasses all tributaries and wetlands that satisfy either the plurality's or Justice Kennedy's standard. *Id.* at 810.

The Corps and EPA have issued guidance for implementing the *Rapanos* decision, explaining that CWA regulatory jurisdiction exists if either the plurality's relatively permanent waters standard or Justice Kennedy's significant nexus standard is satisfied. Three courts of appeals have explicitly affirmed this view.[7] The Fourth Circuit has adopted the significant nexus test and has suggested it would also adopt the plurality's relative permanence test.[8]

Here, the uncontroverted evidence establishes that the streams Plaintiffs filled at the Site, RR1, RR2, RR3, and RR4 (together, the "Filled Streams"), are "waters of the United States." First, RR4 undisputedly is a relatively permanent water connected to a traditional navigable water and, thus, satisfies the *Rapanos* plurality's standard. Additionally, all of the Filled Streams significantly affect the chemical, physical, and biological integrity of the downstream traditional navigable waters, and thus satisfy Justice Kennedy's significant nexus test.

As discussed below, both EPA's and the Corps' conclusions that the Filled Streams are "waters of the United States" are supported by independent expert opinions. At the outset, however, it is important to note that, because Plaintiffs have filled the waters at issue here and constructed a sediment basin (with a volume of 125,000 cubic feet), the hydrology of the Site

---

[7] *United States v. Donovan*, 661 F.3d 174 (3d Cir. 2011); *United States v. Bailey*, 571 F.3d 791, 797-99 (8th Cir. 2009); *United States v. Johnson*, 467 F.3d 56 (1st Cir. 2006).

[8] In *Precon Development Corporation v. U.S. Army Corps of Eng'rs*, 633 F.3d 278 (4th Cir. 2011) (*Precon I*), the Fourth Circuit held that a water that satisfies Justice Kennedy's "significant nexus" standard is a "water of the United States." Because the Corps had not relied upon the plurality's "relative permanence" standard, the Fourth Circuit did not opine as to whether a water meeting that standard would be a "water of the United States." In *Deerfield Plantation Phase II-B Property Owners Association v. U.S. Army Corps of Engineers*, 501 F. App'x 268, 275 (4th Cir. 2012) (*Precon II*), the Fourth Circuit rejected a challenge to a Corps finding of no jurisdiction using the plurality standard, thus implying that it would also accept that standard.

and downstream waters has been altered.  *See* Ex. 22 (Pehrman Dep. Tr.) at 157:14-24.  As such,

the EPA and Corps inspectors and the independent experts retained by both parties had to engage

in a forensic analysis to determine the nature and functions of the Filled Streams prior to the

Plaintiffs' impacts by, *inter alia*, studying similar streams and watersheds, modeling the stream

systems, and reviewing historic maps and aerial photographs of the Site and vicinity.

   1. RR4 is a "water of the United States" under the *Rapano*s plurality standard.

   RR4 satisfies both criteria identified by the *Rapanos* plurality for CWA jurisdiction over

non-navigable-in-fact waters it has:  (1) "relatively permanent flow," 547 U.S. at 757, and (2) a

"connect[ion] to traditional navigable waters."  *Id.* at 742.

     *a. Prior to being filled, RR4 had relatively permanent seasonal flow*.

   Prior to Plaintiffs' unlawful filling, the undisputed evidence establishes that RR4 flowed

at least seasonally.  The *Rapanos* plurality clarified that streams that are dry during drought or

that flow seasonally qualify as "waters of the United States."  *Id.* at 732 n.5 (explaining that

"waters of the United States" does not exclude streams that dry up in times of drought or

"*seasonal* rivers, which contain continuous flow during some months of the year but no flow

during dry month[s]") (emphasis in original).

   Courts have held that streams that flow seasonally satisfy the plurality's definition of a

water of the United States.  *See, e.g.*, *United States v. Moses*, 496 F.3d 984, 989 (9th Cir. 2007)

(finding that a tributary holding water continuously for only two months per year is a water of

the United States); *United States v. Mlaskoch*, No. 10-2669, 2014 WL 1281523, at *17 (D. Minn.

Mar. 31, 2014) (finding tributaries with "seasonal flow for at least three months" sufficient to

meet the *Rapanos* "relatively permanent" standard); *United States v. Brink*, 795 F. Supp. 2d 565,

579 (S.D. Tex. 2011) (finding that a seasonal creek satisfied the *Rapanos* plurality's definition of

a relatively permanent water); *Sequoia Forestkeeper v. U.S. Forest Serv.*, No. 09-392, 2011 WL

902120, at *5 (E.D. Cal. Mar. 15, 2011) (finding a creek to be "relatively permanent" even where it "dr[ies] up in the summer months").

It is undisputed that RR4 was a seasonal stream that flowed across the Site prior to Plaintiffs' unlawful fill. Plaintiffs' own expert conceded that RR4 flowed seasonally at the Site, stating: "[a] review of aerial imagery prior to the disturbance suggests that there was a defined channel *with seasonal flow* within the topographic depression that flows from the Foster site." Ex. 23 (Pehrman Expert Report) at 7 (emphasis added); *see* Pehrman Dep. Tr. at 216:4-13 (confirming that the channel referred in his report is SAR 3, which is also referred to as RR4).[9]

The United States' experts on stream ecology and hydrology, Drs. David Arscott and Charles Dow also concluded that RR4 was a seasonal stream prior to filling based on the existence of water-dependent lifeforms in the undisturbed reaches of streams on the Site and in other similar streams located on the Neal Run Crossing property. *See* Ex. 24 (Declaration of David Arscott ("Arscott Decl.")) ¶ 45. In particular, Dr. Arscott identified aquatic species that must be underwater for more than three months to develop, mature, and reproduce in the undisturbed upper reaches of RR2 (which flowed into RR4) as well as in two undisturbed streams (designated as RR5 and RR10) on the Neal Run Crossing property that are similar to RR4 in terms of watershed size and characteristics. *Id.* ¶¶ 37-41. The presence of these organisms evidences at least seasonal flow in those reaches. *Id.* ¶ 41. For instance, the presence of mayflies, crayfish and aquatic worms in the undisturbed reach of RR2 during a May 2015 Site visit is evidence that the stream flowed or remained wet since the summer of 2014. *Id.* ¶¶ 37-38. The life-spans of the organisms identified by Dr. Arscott in RR5 and RR10 indicate that these

---

[9] As Plaintiffs' expert, Dane Pehrman, explained when evaluating waters post-disturbance, aerial photography serves as a "key tool in understanding what was there before the disturbance took place." Pehrman Dep. Tr. 44:20-23; 129:11-24.

streams—which are similar to RR4—are nearly perennial. *Id.* ¶¶ 39-40. Based on these findings, it is Dr. Arscott's uncontested expert opinion that, prior to filling, RR4 flowed seasonally for approximately 4-8 months (likely October to May) in non-drought years. *Id.* ¶ 45.

Both Parties' experts' opinions that RR4 flowed at least seasonally across the Site prior to filling are supported by the determination of Plaintiffs' own consultant, Randolph Engineering. Randolph Engineering classified RR4 (identified as SAR3 in its report) as an intermittent stream because: (1) it appeared to show the same flow characteristics as RR5 (SAR1) and RR10 (SAR2), which Randolph had observed and classified as intermittent; and (2) it received contributing flow from three ephemeral streams, RR2 (SAR3b2), RR3 (SAR3a2), and RR1 (SAR3c). Andreescu Decl. Attach. F at USEPA000426-27; Ex. 25 (White Dep. Tr.) at 50:8-14.

Finally, EPA and the Corps, the agencies charged with characterizing relatively permanent waters, identified RR4 as such. After conducting its own analysis, the Corps verified Randolph Engineering's delineation and concluded that RR4 was an intermittent-seasonal stream, and thus a relatively permanent water. Andreescu Decl. Attach. O (Corps JD letter). The Corps based its determination, in part, on the watershed's size (30 acres) and characteristics of similar watersheds (RR5 and RR10) that had not been impacted. Ex. 26 (MPS001238).

EPA staff also determined that RR4 was relatively permanent based on field inspectors' observations during the Agency's September 9, 2010 Site visit, and confirmed by a review of aerial images and GIS data. Andreescu Decl. ¶ 24; Lutte Decl. ¶¶ 17 & 24. Specifically, during the September 9, 2010 Site visit, Ms. Andreescu and Mr. Lutte observed a stream channel emerging from the disturbed area on the Site with a bed, banks, and "ordinary high water mark" ("OHWM") (a physical indication of regular flow). Andreescu Decl. ¶ 19; Lutte Decl. ¶ 17. They also observed the channel upstream of the disturbance. Andreescu Decl. ¶ 19; Lutte Decl.

17

¶ 17.  Ms. Andreescu reviewed GIS data and aerial images from a number of different years that consistently showed a linear wet feature where she had observed the stream channel, which confirmed her conclusion from her observations on the Site that RR4 was a relatively permanent water.  Andreescu Decl. ¶ 24; Ex. 27 (AR #95).

> b.  *Prior to its filling, RR4 was connected to a navigable-in-fact water.*

Prior to Plaintiffs' unlawful filling, RR4 exited the western boundary of the Site and flowed across a neighbor's hayfield to the first unnamed tributary ("UNT") of Neal Run. Stokely Decl. ¶ 16.  This flow path is well established.[10]  Larry Carr, who owned the hayfield from 1965 through 2000 testified that, in the wintertime and early spring, water from the Site would "run down through here [indicating on a map a "concave dip" on the hayfield] and down all the way to this Neal Run area."  Ex. 28 (Carr Dep. Tr.) at 12:9-17; 24:1-5; 28:9-29:6.  Using arrows, Mr. Carr illustrated the flow path of RR4 on an aerial photograph showing the flow from the Site and across the hayfield to the first UNT.  *See* Carr Dep. Tr. at 31:20-32:6, Ex. P-4A. During their Site visit, EPA's inspectors observed RR4's flow path (as described by Mr. Carr) as it left the Site and traveled down the center of the hayfield to the first UNT.  Andreescu Decl. ¶ 22; Lutte Decl. ¶¶ 23-24.  RR4's flow path from the Site across the hayfield to the first UNT is visible in numerous aerial photographs taken before and after Plaintiffs' unlawful filling activities.  Stokely Decl. ¶¶ 16-17.  The State of West Virginia also mapped RR4 as it flows from the Site across the hayfield to the first UNT.  Andreescu Decl. ¶ 48 & Attach. P (SAMB map).

_____

[10] Even Mr. Foster confirmed this flow path in his sworn response to EPA's information requests, stating that "[d]rainage [from the Site] was flowing across an open field into the main stream without the benefit of a silt fence."  AR #47 at AR000383

Indeed, Plaintiffs' expert observed water from the Site flowing continuously across the hayfield into the first UNT.  Pehrman Dep. Tr. 106:25-107:8.[11]

The first UNT then flows to a second UNT of Neal Run for about 500 meters before it connects to Neal Run.  Dow Decl. ¶ 21.[12]  Neal Run connects to the Little Kanawha River and then to the Ohio River at Parkersburg.  Stokely Decl. ¶ 19.  The Corps has designated the portion of Neal Run 2.4 miles upstream from its confluence with the Little Kanawha River as a navigable-in-fact water under section 10 of the Rivers and Harbors Act.  Ex. 30 (USEPA000080) at USEPA000097; *see* Pehrman Dep. Tr. 118:21-120:13.  From where RR4 joins the first UNT to the navigable portion of Neal Run is 3.1 miles.  Stokely Decl. ¶ 21.

This evidence indisputably shows that RR4 was a relatively permanent seasonal stream that was connected to the navigable-in-fact portion of Neal Run.  As such, under the *Rapanos* plurality definition, RR4 is a water of the United States.

> 2. The Filled Streams are "waters of the United States" under Justice Kennedy's "significant nexus" standard.

All of the Filled Streams significantly affect the chemical, physical, and biological integrity of downstream traditional navigable waters and therefore are "waters of the United States" under Justice Kennedy's significant nexus standard.  *Rapanos*, 547 U.S. at 779-80.

Justice Kennedy set a broad and flexible approach for determining a significant nexus, which "must be assessed in terms of the statute's goals and purposes" (*id.* at 779):  specifically,

---

[11] Contrary to Plaintiffs' assertion that RR4 is not jurisdictional because it appears to lose its bed, banks and OHWM for approximately 120 feet within the hayfield, *see* Pehrman Report at 7, this break does not sever the connection between RR4 and the navigable water.  Andreescu Decl. ¶ 23; Lutte Decl. ¶ 24; Ex. 29 (Hemann Dep Tr.) at 213:11-214:21.  Corps guidance provides for jurisdiction "where the stream temporarily flows underground, or where the OHWM has been removed . . . ."  Ex. 26 (MPS0001238) at MPS0001240, n.1.

[12] Plaintiffs' expert agreed that the first UNT, second UNT, and Neal Run are all relatively permanent waters.  Pehrman Dep. Tr. 121:2-24; *see also* Pehrman Report at 4.

Congress' desire to "restore and maintain the chemical, physical, and biological integrity" of the Nation's waters.[13]  "[T]he significant nexus test does not require laboratory tests or any particular quantitative measurements to establish significance."  *Precon I*, 633 F.3d at 294.  As such, "purely qualitative evidence may satisfy the significant nexus test." *Precon II*, 603 F. App'x at 152.  The evidence need only support a finding that effects on water quality are not "speculative or insubstantial."  *Id.*

The types of functions courts have approved as forming a significant nexus with a downstream traditional navigable water include contribution of flow (*Donovan*, 661 F.3d at 186), runoff or floodwater storage (*Precon II*, 603 F. App'x  at 153; *United States v. Cundiff*, 555 F.3d 200, 210-11 (6th Cir. 2009)), nutrient recycling (*Precon II*, 603 F. App'x  at 153-54; *Donovan*, 661 F.3d at 186), pollutant trapping or filtering (*Donovan*, 661 F.3d at 186; *Cundiff*, 555 F.3d at 211), export of organic matter or food resources as part of the aquatic food web (*Donovan*, 661 F.3d at 186), and fish and wildlife habitat (*Donovan*, 661 F.3d at 186; *Cundiff*, 555 F.3d at 211).

Here, the undisputed evidence establishes that the Filled Streams were headwater streams[14] that feed downstream traditional navigable waters, i.e. Neal Run and the Little

---

[13] 33 U.S.C. § 1251(a).  Under the significant nexus standard, a water is jurisdictional if it significantly affects the chemical, physical, *or* biological integrity of a downstream traditional navigable water.  *See Benjamin v. Douglas Ridge Rifle Club*, 673 F. Supp. 2d 1210, 1217 n.4 (D. Or. 2009) ("[A] showing of a significant chemical, physical, or biological connection satisfies Justice Kennedy's test. . . . Interpreting Justice Kennedy's test as requiring a demonstration of a chemical, physical, *and* biological nexus is incongruous with the Act's objectives and inconsistent with the language in the Act."); EPA and Corps, *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United States & Carabell v. United States* (2008) ("Consistent with Justice Kennedy's instruction, EPA and the Corps will apply the significant nexus standard in a manner that restores and maintains any of these three attributes of traditional navigable waters."), *available at* https://www.epa.gov/sites/production/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf.

[14] Headwater streams are the upper tributaries of a stream network.  Andreescu Decl. ¶ 25. Headwater streams generally start out small, as "first order streams" (*i.e.*, streams that do not receive flow from any other defined streams).  Arscott Decl. ¶ 13.  When first order streams join

Kanawha River, and as such, critically influence the character and quality of those downstream waters.  Arscott Decl. ¶¶ 44-45; Dow Decl. ¶¶ 33-34; Andreescu Decl. ¶ 25.  After studying similar streams in the vicinity of the Site, as well as the undisturbed reaches of RR2 and RR3, Drs. Arscott and Dow confirmed EPA's determination that the Filled Streams were headwater streams to Neal Run and the Little Kanawha River.  Arscott Decl. ¶ 43.  As headwater streams, the Filled Streams performed valuable functions that significantly affected the physical, chemical, and biological integrity of downstream waters, Arscott Decl. ¶¶ 43-44, and thus have a significant nexus to downstream, navigable waters.  Andreescu Decl. ¶ 30; Ex. 30 at USEPA000093.  The United States' experts on stream ecology and hydrology documented important functions of the Filled Streams, which, prior to their fill:  (a) produced and exported flow, sediment and other materials downstream; (b) supported and exchanged aquatic life with downstream waters; and (c) held "biofilms" (microorganisms that adhere to surfaces) that process nutrients, minerals, and pollutants.  Arscott Decl. ¶ 44.  As discussed below, the United States' evidence on these functions is undisputed.

> a.  *The Filled Streams contributed flow, sediment and other materials to downstream waters.*

Based on their observations of similar streams, Drs. Arscott and Dow concluded that the Filled Streams contributed flow, sediment, and other materials to the downstream navigable-in-fact portion of Neal Run.  Arscott Decl. ¶ 44; Dow Decl. ¶ 34.  Using Digital Elevation Modeling ("DEM") and GIS based tools, Dr. Dow mapped the streams' locations on the Site as

---

together, they form a second order stream, and when second order streams join together they form a third order stream, and so on to form large rivers (usually sixth order or greater).  *Id.* Generally, the first, second, and third order streams are the headwater streams.  *Id.*  Established scientific research shows that headwater streams have a "profound influence on larger downstream waters." Arscott Decl. ¶ 13; *see* Andreescu Decl. ¶ 25; Exs. 31-33 (AR ##2, 3, 4).

21

they existed before the unlawful fill and the streams' downstream connection to the navigable-in-fact stretch of Neal Run.  Dow Decl. ¶ 20.  The DEM-defined stream network showed RR1, RR2, RR3 and RR4 at the same locations delineated by Randolph Engineering and verified by the Corps and EPA.  *Id.*  The DEM-defined stream reach for RR4 also presented a clear hydrological connection downstream across the neighboring hayfield to the first UNT and ultimately to Neal Run.  *Id.* ¶ 21.  That connection was confirmed through (*inter alia*) (1) historic aerial photography, (2) observations of Plaintiffs' expert, and (3) the deposition testimony of Larry Carr, the former owner of the hayfield.  Thus, it cannot be genuinely disputed that the Filled Streams were hydrologically connected, and thus contributed flow to downstream waters.

Given the forensic nature of their task, Drs. Arscott and Dow were unable to quantify the rate of flow that the Filled Streams contributed downstream prior to Plaintiffs' unlawful impacts.  However, based on the aquatic life found in the unburied sections of RR2, RR3, and in RR5 and RR10, Drs. Arscott and Dow opined that RR2 was intermittent,[15] RR3 was ephemeral, and RR4 was intermittent or nearly perennial.  Arscott Decl. ¶¶ 41, 42, 45.  Additionally, to assist them in understanding the hydrodynamics of the Filled Streams at the Site, Drs. Arscott and Dow analyzed a three-year hydrological study by the United States Geological Survey of two similar streams—Robins Run and North Bend Run (the "reference streams")—less than 50 miles from the Site.  Dow Decl. ¶ 27.  Those streams dried up in the summer and early fall.  *Id.* ¶ 28.  Given that their watersheds and physiographic features are comparable to streams on the Site, Drs. Arscott and Dow opined that the Filled Streams likely had comparable hydrological patterns.  *Id.*

---

[15] The aquatic life found in the unburied section of RR2 suggest that RR2 had relatively permanent seasonal flow.  Arscott Decl. ¶¶ 37-38.  Because RR2 flowed into RR4, which ultimately flows into the navigable-in-fact portion of Neal Run, RR2 may meet the *Rapanos* plurality standard as well as Justice Kennedy's significant nexus standard.

Drs. Arscott and Dow cited the annual sediment load exported by the reference streams to illustrate the hydrologic function of the similar Filled Streams draining the Site.  *See id.* ¶ 29. For instance, annual suspended sediment loads for North Bend Run were between 8 and 11.6 tons/year and in Robinson Run were between 3.5 and 22.9 tons/year.  *Id.* ¶ 30.  The amount of sediment exported from North Bend Run and Robinson Run demonstrates the substantial type of physical connection that the Filled Streams likely shared with downstream waterways.  *Id.*

Additionally, Dr. Dow used GIS tools to calculate the total stream length (including the Filled Streams) and watershed area by stream order within the Neal Run watershed.  *Id.* ¶ 23. More than 50% of the total stream length within the Neal Run watershed is comprised of first order streams, which drain more than 60% of the watershed area.  *Id.*  Second order streams constitute approximately 24.2% of the total stream length and drain almost 17% of the total watershed area.  *Id.*  Thus, Neal Run's first and second order streams, including the Filled Streams, account for more than 75% of the stream network length and drain nearly the same percentage of the total watershed.  While individual lengths of the Filled Streams may be a small percentage of the total stream network and watershed, the streams' individual sizes are not the determinative factor in establishing regulatory jurisdiction.  *See Precon II*, 603 F. App'x at 152 (rejecting argument that a wetland could not be jurisdictional under the significant nexus test because it made up only a small percentage of the watershed).  Indeed, if all stream reaches fell outside CWA protection based on their size, Neal Run and the Little Kanawha could be seriously impaired, if not destroyed, by the incremental loss of their headwaters by similar impacts, resulting in a "death by a thousand cuts."  *Id.*

b. *The Filled Streams supported and exchanged aquatic life with downstream waters.*

The Filled Streams were part of a larger aquatic ecosystem and served as habitat to aquatic organisms that contributed to the maintenance and viability of species downstream. To assess the quality, structure, and function of Filled Streams' ecosystem, Drs. Arscott and Dow studied communities of aquatic life in: (1) the unburied reaches of RR2 and RR3, (2) RR5 and RR10 (the similar, undisturbed streams on the Site), and (3) the first and second UNTs to Neal Run, and (4) Neal Run. Drs. Arscott and Dow identified numerous different types of aquatic lifeforms in the unburied reaches of RR2 and RR3, as well as from RR5 and RR10. Arscott Decl. ¶ 36. Drs. Arscott and Dow also identified and documented populations of aquatic lifeforms directly downstream in the unnamed tributaries of Neal Run and Neal Run itself. *Id.*

The presence of this life demonstrates that the Filled Streams served as aquatic habitats for several species and were connected to downstream waters. *Id.* ¶ 43. The downstream species, such as those found in the UNTs and Neal Run, are critically linked to the upstream species. *See id.* As explained by Drs. Arscott and Dow, aquatic organisms in headwater streams, like those found in the unburied reaches of RR2 and RR3 and the similar streams, RR5 and RR10, process materials and serve as the bottom of the food chain to support downstream life. *Id.* ¶ 18. For instance, the organisms "eating leaves in headwater streams transform the food from large particles (single whole leaves) to small particles of food (feces and leaf fragments . . .), which, in turn, can then be fed upon by downstream . . . communities whose species have specialized mouth parts and structures enabling them to filter out the small organic particles being transported in the water column." *Id.* Additionally, organisms from headwater streams, like the Filled Streams, drift or fly downstream to serve as food for larger organisms in downstream reaches. *Id.* ¶ 19.

24

Thus, the Filled Streams, as headwater streams, served as important aquatic habitat to support the viability of downstream life.  This is important because "the ability of each species to span several stream orders enables larger effective population size, which contributes significantly to the species' ability to maintain a viable genetic structure . . . and high level of reproductive health."  *Id.* ¶ 20.  The elimination of headwater streams, including the Filled Streams, "impacts the potential viability of species living downstream, in second, third, or higher order navigable tributaries in a way that could lead to their gradual extinction via inability to maintain effective population sizes" within the watershed.  *Id.*

### c.   *The Filled Streams processed nutrients, minerals and pollutants.*

The Filled Streams also transformed and transported organic matter to be used by aquatic life downstream.  Headwater streams—including those observed on the Site—have smaller channels canopied by trees, and accumulate leaf litter, twigs and other tree parts.  Arscott Decl. ¶ 15.  These materials are transformed by microorganisms into dissolved organic carbon ("DOC").  *Id.*  DOC serves as a nutrient for the aquatic life within the stream and is transported with the water downstream where it supplements the energy for downstream aquatic life.  *Id.*

Drs. Arscott and Dow measured chemical properties, including the specific conductivity, temperature, pH, and dissolved oxygen at sampling points in all of the channels within the Site and in water emerging from the fill.  Arscott Decl. ¶ 29.  They also measured these chemical properties at points directly downstream from the Site, including Neal Run, and at eight headwater streams in close proximity to the Site that are similar to the streams on the Site.  *Id.* Drs. Arscott and Dow observed that the ranges in those channels were within the ranges "typically experienced by aquatic biota found in headwater and downstream waters."  *Id.* ¶ 30. For instance, Drs. Arscott and Dow documented that the specific conductivities of all of the streams located on the Site were consistent with the other nearby headwaters.  *Id.*

25

Generally, headwater streams are lower in specific conductivity than downstream waters, and help to dilute pollution in downstream waters where there are greater human inputs (such as contributions of road salt and agri-chemicals) that cause conductivity to rise.  *Id.* ¶ 31.  As headwater streams are altered or destroyed, as they have been here, their ability to dilute downstream waters lessens and ultimately concentrations of pollutants can rise downstream and eventually degrade the traditional navigable waters.  *Id.*  At the Site, Drs. Arscott and Dow noted that water emerging from the fill had an elevated specific conductivity compared to similar streams.  *Id.* Thus, the increase in conductivity in the water emerging from the fill is one example of the impacts that the fill may have on downstream water quality as a result of Plaintiffs' unlawful actions.  Ex. 5 (Arscott Dep. Tr.) at 106:15-107:3.

In addition to measuring the chemical properties described above, Drs. Arscott and Dow collected water samples from eight locations (one sample from the unburied reach of RR2 on the Site and seven samples from downstream reaches, including Neal Run) for laboratory analysis of nutrients and ions.  Arscott Decl. ¶ 32.  Sodium ions ($Na^+$) and chlorine ions ($Cl^-$) are strong indicators of human inputs.  *Id.* ¶ 33.  The results of the sampling analysis showed that levels of $Na^+$ and $Cl^-$ increased in concentration downstream of the fill.  *Id.*  Again, as headwaters are lost, impacted, or degraded, they lose their ability to dilute downstream waters and those downstream waters become threatened or impaired.  *Id.*

In sum, the undisputed evidence establishes that the Filled Streams were headwater tributaries that were connected to Neal Run and served important physical, chemical, and biological functions by supporting aquatic life and contributing flow, nutrients, energy, and food downstream to maintain or improve the integrity of that water.  While Neal Run is not identified as an impaired water, its health is threatened as its headwaters are impacted, degraded or lost.

26

### E.  Plaintiffs did not obtain a CWA section 404 permit.

It is undisputed that Plaintiffs never obtained a section 404 permit from the Corps for the clearing and fill work undertaken on the Site.  Answer to Counterclaim, Dkt. # 160, ¶ 35.  Thus, if the Court agrees that the undisputed evidence shows that Plaintiffs discharged fill into waters of the United States on the Site, the United States has established all the elements of a CWA section 301 claim and is entitled to summary judgment in its favor on the counterclaim.[16]

## II.    The Undisputed Facts Show that EPA's Issuance of the ACO Was Reasonable.

EPA's ACO is valid and should be upheld because the evidence demonstrates it was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.  This Court's review of the ACO is governed by the deferential standard of review set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  *See Sackett v. EPA*, 132 S. Ct. 1367, 1371-72 (2012).  Section 706(2)(A) provides that a reviewing court may set aside "agency action, findings, and conclusions" that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Review under this standard is "highly deferential," with a presumption in favor of finding the agency action valid.  *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009).  In reviewing a claim that an agency's decision was arbitrary or capricious, the court is limited to the administrative record.  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419-20 (1971).

---

[16] If the Court grants the United States summary judgment on the counterclaim, all that will remain is to identify the appropriate remedies.  The United States seeks restoration and/or mitigation of the damages caused by Plaintiffs' unlawful activities at the Site and the imposition of a civil monetary penalty, *see* 33 U.S.C. § 1319(b) & (d), and suggests that the parties submit briefs addressing what penalty is appropriate and how restoration or mitigation should proceed. The Court could then determine whether any further proceedings are necessary to reach a final decision on the appropriate remedy for Plaintiffs' CWA section 301 violations.

EPA is entitled to summary judgment upholding the ACO because the administrative record fully supports EPA's determination regarding each element necessary to establish that Plaintiffs violated CWA section 301, 33 U.S.C. § 1311. As discussed in detail above, EPA reasonably determined that Plaintiffs are (1) persons (2) who added a pollutant (3) from a point source (4) to waters of the United States (5) without the necessary permit. The only finding that Plaintiffs have challenged in the ACO is EPA's determination that streams on the Site are "waters of the United States," and therefore protected by the CWA. *See* 2d Am. Comp. at ¶ 67. EPA's interpretation and application of its regulatory definition of "waters of the United States" is entitled to heightened deference where, as here, its determination relates to subjects where the agency has special scientific and technical expertise. *See Aracoma Coal*, 556 F.3d at 192 (citing *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).

The administrative record fully supports EPA's determination that the Filled Streams are within the jurisdiction of the CWA. As detailed above, on September 9, 2010, EPA inspectors, Mr. Lutte and Ms. Andreescu, who are scientists trained to identify such jurisdictional waters, observed and photographed what they believed to be jurisdictional stream channels above and below the disturbed areas on the Site. Ex. 34 (AR #41). The EPA inspectors advised Mr. Walters, who was working on Site, that a section 404 permit was likely required for the work in that stream. Ex. 35 (AR #40). After that inspection, Ms. Andreescu reviewed GIS data (including topographic and contour maps) and aerial photographs of the Site. *See* AR #95. The aerial images taken over multiple years showed a dark linear feature where she and Mr. Lutte observed the stream channels, as well as a downstream connection from the Site through the neighboring hayfield. *Id.* Based on her field observations and the GIS data and aerial imagery, Ms. Andreescu concluded that the stream she observed on the Site (RR4) was a relatively

28

permanent headwater tributary of Neal Run.  Based on her training and knowledge of established scientific literature on the important ecological contributions of headwater streams to downstream waters, Ms. Andreescu also concluded that the stream she observed had a significant nexus to the downstream navigable-in-fact portions of Neal Run.  *See, e.g.*, AR ##2 & 3

Thereafter, EPA sent information requests pursuant to CWA section 308, 33 U.S.C. § 1318 to Foster Farms, LLC, and Fox Engineering to obtain information about the work at the Site.  Ex. 36 (AR #45); Ex. 37 (AR #46).  EPA received responses in December 2010.  Ex. 38 (AR #44); Ex 2 (AR #47); Ex. 11 (AR #49).  Those section 308 responses confirmed that Plaintiffs had cleared, graded, and filled the Site and indicated that additional work had taken place since the September 2010 Site visit.  *See* AR #49 at AR0000402-0410.

In April 2011, the Corps forwarded Plaintiffs' consultant's stream and wetland delineation report to EPA.  Ex. 39 (AR #58).  In that report, Randolph Engineering delineated 11 stream reaches on Pads 4 and 5 that it believed were jurisdictional.  Andreescu Decl. Attach F. at USEPA000429.  The Randolph delineation was consistent with Ms. Andreescu's determination months earlier that the channel she observed at the Site was jurisdictional.  The Randolph delineation also stated that Plaintiffs had filled ephemeral streams, SAR 3c, 3a1 and 3a2 (also known as RR1, RR2, and RR3).  *Id.* at USEPA000426-27.

Ms. Andreescu, along with other EPA staff, visited the Site again in May 2011.  During this visit EPA confirmed that Plaintiffs had performed substantially more unauthorized work in the area where Ms. Andreescu and Mr. Lutte originally observed the stream disturbance in September 2010.  *See* Andreescu Decl. Attach. H (AR #99).  Specifically, Plaintiffs had constructed a sediment basin.  *Id.* at AR0001032.  The volume of the fill and the footprint of the disturbance had also greatly increased.  *Compare* Andreescu Decl. Attach. E at AR0001076

29

(Photo ID P9090273) *with* Attach. H. at AR0001043.  Again, based on her training and the established scientific literature on the important ecological contributions of headwater streams to downstream waters, Ms. Andreescu concluded that those streams also had a significant nexus to the downstream navigable portion of Neal Run.  Thereafter, based on Ms. Andreescu's observations, her review of aerial imagery and GIS data, her technical and scientific expertise, and consideration of Plaintiffs' own jurisdictional delineation, EPA concluded that Plaintiffs had unlawfully filled jurisdictional waters and issued the ACO on January 24, 2012.  In sum, the undisputed facts in the administrative record amply demonstrate that EPA's decision to issue the ACO was reasonable and well-supported.

**III.    The Undisputed Facts Show that EPA Has Not Violated the Fifth Amendment.**

Summary judgment also should be entered for the United States in regard to Plaintiffs' procedural due process claim.  To begin, Plaintiffs have not shown that they have been deprived of a property right protected by the Fifth Amendment; while they alleged that issuance of the ACO prevented them from developing and selling the property, they have not put forth evidence supporting that allegation.  Plaintiffs' due process claim also fails because it is well-established that no formal hearing is required before issuance of an EPA administrative order, and EPA fulfilled any applicable due process requirements by giving Plaintiffs notice of the violation, communicating extensively with them for over fourteen months before issuing the ACO, and meaningfully considering the information Plaintiffs submitted.

**A.  Plaintiffs fail to show that they were deprived of a protected property interest.**

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"  Mem. Op. and Order, Dkt. #114 at 6 (citing *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)); *see also Davidson v. Cannon*, 474 U.S. 344, 348 (1986) (the Constitution "does not require a remedy when there has

been no 'deprivation' of a protected interest")).  In declining to dismiss Plaintiffs' procedural due process claim prior to discovery, this Court concluded that Plaintiffs had asserted a cognizable property interest by alleging the ACO had delayed the completion of construction, rendered some portions of the property unusable, and rendered the property unsaleable.  Dkt. #114 at 10.  But Plaintiffs have not made good on those allegations.  Plaintiffs have not offered testimony or documentary evidence indicating that the property has been "effectively frozen" or "render[ed] . . . commercially undesirable to potential purchasers or lessees" (*id*. at 11-12); they have not shown, for example, that they attempted to sell the property but were unable to do so because of the ACO.[17]  At this stage of the case, Plaintiffs cannot "rest on [their] allegations . . . without 'any significant probative evidence tending to support the complaint.'"  *Liberty Lobby*, 477 U.S. at 249 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 290 (1968)).[18]

Moreover, the ACO itself does not deprive Plaintiffs of a property interest.  Unlike the prejudgment attachment at issue in *Connecticut v. Doehr*, 501 U.S. 1 (1991), or the federal lien imposed in *Reardon v. United States*, 947 F.2d 1509, 1518 (1st Cir. 1991), the ACO does not encumber the land; it simply directs Plaintiffs to cease unpermitted discharges into streams.  Plaintiffs have no vested right to use their property in a manner that violates the law.  *White Oak Prop. Dev., LLC v. Wash. Twp., Ohio*, 606 F.3d 842, 853-54 (6th Cir. 2010) (ability to use

---

[17] It would be particularly inappropriate to simply presume that the Site cannot be sold or leased because of the ACO given that Plaintiffs themselves purchased the Site while it was the subject of EPA enforcement proceedings (i.e., regarding the Endurance violation).

[18] Plaintiffs' only pertinent testimony is that, at some point, they became reluctant to proceed with development on the Site.  *See* Foster Dep. Tr. 67:4-10 ("until we get this issue resolved [] I'm not going to develop a plan").  But Plaintiffs' decision to hold off on further development of the Site because of the CWA issues raised by EPA does not come close to showing a direct governmental deprivation of property for Fifth Amendment purposes.  *See O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 789 (1980).  The ACO itself does not compel Plaintiffs to halt all construction.  Moreover, it is not self-executing and is subject to challenge under the APA.

property to build multi-family homes not a protected property interest where zoning laws prohibited such construction); *Miller v. Montgomery Cty. Md.*, No. AW-09-3137, 2010 WL 3894500, at *6-11 (D. Md. Sep. 29, 2010) (agreement to purchase timber not a property interest where sale was contingent upon obtaining a permit), *aff'd*, 458 F. App'x 304 (4th Cir. 2011).

Accordingly, in *Dan Eoff v. EPA*, the court rejected a rancher's argument that EPA's issuance of an ACO without a hearing had violated his due process rights, explaining that, while "[n]o doubt the EPA's order has serious consequences for Eoff and his ranch[,] [i]t has not deprived him—in the constitutional sense—of his property." No. 4:13-cv-00368, Dkt. #81 (E.D. Ark. Mar. 2, 2016) (Ex. 40) at 3. Plaintiffs' Fifth Amendment claim fails for the same reason.

**B. EPA satisfied any applicable due process requirements**.

Even if the Court were to accept Plaintiffs' unsupported assertions of a protected property right, Plaintiffs procedural due process claim still fails. The heart of Plaintiffs' claim is that an administrative hearing was required before issuance of the ACO. *See* Dkt. #114 at 13. But numerous courts have held that no hearing is required before issuance of an EPA administrative order, and no court has held the contrary. And while EPA did not hold a formal hearing before issuing the ACO, it gave Plaintiffs ample notice and the opportunity to submit information regarding the alleged violations, which fulfills any applicable due process requirements.

    1. <u>EPA was not required to hold a hearing before issuing the ACO</u>.

Plaintiffs claim that EPA violated their procedural due process rights by failing to afford them a hearing before issuing the ACO. *See* 2d Am. Compl. ¶¶ 61, 65, 68 & 81. But under *Mathews v. Eldridge*, "[a] claim to a predeprivation hearing as a matter of constitutional right rests on the proposition that full relief cannot be obtained at a postdeprivation hearing." 424 U.S. 319, 331 (1976) (citation omitted). Here, Plaintiffs are receiving a full judicial hearing on their claims that the ACO is unlawful, and they are not subject to injunctive relief or penalties unless

32

the United States prevails on its enforcement claim, in which event it will be up to this Court to decide what relief is appropriate.  This satisfies the requirements of due process.  *See Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 118 (D.C. Cir. 2010) ("there is no constitutional violation if the imposition of penalties is subject to judicial discretion") (quotation marks and citation omitted).

Accordingly, no court has ever held that, under the Fifth Amendment, a hearing must be held *prior* to issuance of an EPA administrative order.  In fact, several courts—including the Fourth Circuit—have held otherwise.  In *Southern Pines Associates by Goldmeier v. United States*, 912 F.2d 713, 717 (4th Cir. 1990), the Fourth Circuit *rejected* appellants' claim that EPA's issuance of a CWA compliance order without first holding a hearing violated due process because "appellants . . . are not subject to an injunction or penalties until EPA pursues an enforcement proceeding."[19]  The D.C. Circuit similarly rejected the argument that, because the statute permitted EPA to impose daily fines and seek treble damages, due process required EPA to hold a hearing before issuing an administrative order.  *General Elec.*, 610 F.3d at 118.  The court explained that there was no constitutional issue because (as is true here) the potentially liable party faced such penalties "only if a federal court finds [] that the [administrative order] was proper" and "that, in the court's discretion, fines and treble damages are appropriate."  *Id.* at 118.  Most recently, the *Eoff* court yet again rejected the argument that "EPA violated the constitution by not holding a hearing before issuing the order," explaining that the challenged

---

[19] When declining to dismiss this claim, this Court noted that, in *Southern Pines*, "EPA's compliance order was sent along with a request that 'asked Southern Pines to provide information about the site for it to review in order to'" further assess whether the site was within the jurisdiction of the CWA.  Dkt. #114 at 9 n.3.  Here, EPA sent Plaintiffs the same information request—a CWA section 308 request.  The only difference is that EPA did so earlier in this case, over a year before issuing the ACO.  Ex. 37 (AR #46).  Surely EPA's *earlier* provision of the same opportunity to submit information cannot give rise to a due process violation where—under Fourth Circuit precedent—one would be lacking had EPA sent the same request years later.

33

order was subject to pre-enforcement judicial review and "no penalty may be imposed until a jury concludes that Eoff has violated the Clean Water Act." Ex. 40 at 1, 3. This Court should abide by Fourth Circuit precedent and not break new ground by holding, for the first time, that a formal hearing is required before EPA's issuance of an administrative compliance order.

2. <u>EPA afforded Plaintiffs sufficient process before issuing the ACO</u>.

Even if Plaintiffs could establish a property deprivation, there still would be no due process violation because EPA engaged extensively with Plaintiffs on the legal and factual issues for over a year prior to issuing the ACO, thereby giving them ample opportunity to be heard "at a meaningful time and in a meaningful manner." *Barry v. Barchi*, 443 U.S. 55, 66 (1979) (internal quotation marks and citation omitted).

In late 2010 (shortly after the Site visit during which EPA informed Plaintiffs' contractor that a CWA permit was likely needed), EPA sent information requests to Plaintiffs to assist the Agency in determining whether and to what extent a CWA violation had occurred. Ex. 37 (AR #46). Plaintiffs responded to that request in December 2010. Ex. 2 (AR #47). In March 2011, Plaintiff Foster informed EPA that he had retained a consultant to delineate jurisdictional waters on the Site, and then sent the Corps (which then sent EPA) the delineation report prepared by that consultant, which depicted a number of jurisdictional streams and stated that several had been filled or disturbed. Ex. 41 (AR #52); Andreescu Decl. ¶ 30 & Attach. F.

In April 2011, Plaintiffs corresponded with EPA staff, asserting that work done to address the prior violations on the Endurance Site should count as mitigation for any violations on the Site. Ex. 42 (USEPA001453-56). EPA responded that because (*inter alia*) they were two separate sites, the same work could not be counted as mitigation towards both violations. *Id.*

On May 2, 2011—at Mr. Foster's request—EPA conducted a second Site visit, during which EPA staff observed that the streams on the Site had been further filled. Andreescu Decl. ¶

34

32; Ex. 43 (MPS001984).  EPA conducted a third Site visit—again at Mr. Foster's request—in September 2011, during which the parties discussed next steps and potential mitigation measures.  *Id.* ¶ 34; Ex. 15 (USEPA001467-72).  The parties had a call on October 20, 2011, to discuss the path forward for resolving the violations.  *Id.*  The parties corresponded further in November and December of 2011, and EPA explained that it was attempting to ascertain whether the Corps would handle the matter via an after-the-fact permit.  *Id.*; Ex. 13 (AR #79) at AR0000624; Ex. 17 (AR #84) at AR0000632.  On January 3, 2012, EPA's counsel informed Mr. Foster that EPA would be moving forward with the case, and that the Agency would soon propose a penalty and remedy.  AR # 84 at AR0000632.  Finally, on January 24, 2012—after almost fourteen months of extensive communications, and consideration of information submitted by Plaintiffs' consultants—EPA issued the ACO.  Andreescu Decl. ¶ 37 & Attach. K.

This lengthy and exhaustive process satisfies any applicable due process rights.  *See Buckingham v. USDA*, 603 F.3d 1073, 1082-83 (9th Cir. 2010) (rejecting claim that a pre-deprivation hearing was required before cancelation of a grazing permit where the agency had provided notices of noncompliance and informally discussed the issues with plaintiff); *Signet Constr. Corp. v. Borg*, 775 F.2d 486, 491 (2d Cir. 1985) ("numerous meetings and some written exchanges" were sufficient process prior to city's withholding of payments); *Blackhawk Mining Co. v. Andrus*, 711 F.2d 753, 757 (6th Cir. 1983) ("opportunity to submit written information and the right to an informal conference" was sufficient process before agency required prepayment of proposed penalties); *Irwin v. City of New York*, 902 F. Supp. 442, 448-49 (S.D.N.Y. 1995) (city's provision of "informal process in the form of extensive correspondence . . . negotiations . . . and a meeting" prior to denial of a dockage permit was sufficient for Fifth Amendment purposes).

IV.     **Plaintiffs' First Amendment Retaliation Claim Fails.**

Plaintiffs' assertion that EPA violated their First Amendment rights is based solely upon a single document produced by EPA:  Ex. 44 (USEPA002570), which reflects that Plaintiff Foster, on behalf of Plaintiff M&PS, made a $250 contribution to a congressional candidate.  2d Am. Compl. ¶¶ 71-78.  Based on the mere fact that EPA produced this document,[20] Plaintiffs claim that EPA took enforcement action in retaliation for their campaign contribution.  But Plaintiffs have failed to show a "but for" relationship (or any causal relationship) between EPA's possession of the document and EPA's pursuit of an enforcement action against Plaintiffs.

For Plaintiffs' First Amendment retaliation claim to survive at this stage, they must show that there is a genuine issue of material fact as to whether:  (1) Plaintiffs engaged in a First Amendment-protected activity; (2) EPA took retaliatory action that adversely affected Plaintiffs' First Amendment rights; and (3) a causal, "but for" relationship exists between Plaintiffs' activity and EPA's action.  *Liberty Lobby, Inc*., 477 U.S. at 248-49; *Constantine v. Rectors & Visitors of George Mason Univ*., 411 F.3d 474, 499 (4th Cir. 2005).  Here, the United States does not dispute that Plaintiffs' political contribution is a protected activity.  The United States also does not dispute that, *if* EPA's enforcement proceedings were based on Plaintiffs' political contribution—which they were not—such actions would be "likely [to] deter 'a person of ordinary firmness' from exercise of First Amendment rights."  *Constantine*, 411 F.3d at 500. But Plaintiffs' First Amendment claim fails because there is no evidence of a causal relationship between Plaintiffs' contribution and EPA's actions.

---

[20] The EPA employee whose file contained the document testified that she believed it was obtained in the course of research on the corporate relationships between Plaintiffs Foster, Foster Farms, and M&PS, conducted after Foster complained that EPA named the wrong entity in the ACO.  *See* Ex. 45 (Lazos Dep. Tr.) 21:1-5; 22:16-24; 24:21-25:13.

Plaintiffs cannot rely on the alleged "temporal proximity" of EPA's actions to the Agency's discovery of the campaign contribution to show that Plaintiffs' contribution motivated EPA's enforcement action.  Although temporal proximity may allow a court to infer causation at the motion to dismiss stage, *see* Mem. Op. and Order, Dkt. #148 at 18 (citing *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)), that inference cannot sustain the claim at summary judgment. *See Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir. 1990) ("The causation requirement is rigorous; . . . [a plaintiff] "must show that 'but for' the protected expression the [defendant] would not have taken the alleged retaliatory action."); *Tobey*, 706 F. 3d at 390 (*Huang*'s rigorous causation requirement applies at the summary judgment stage).

In any event, the timing of events does not in fact support Plaintiffs' retaliation theory. When it allowed Plaintiffs to amend their Complaint, this Court found that Plaintiffs had adequately stated their First Amendment claim because they alleged that EPA's discovery of the campaign contribution and a "striking change in the government's behavior" both "came about in 2012." Dkt. #148 at 17-19.  However, the evidence shows neither a "striking change" in the government's behavior in 2012, nor any temporal connection between EPA's discovery of the contribution and its actions.  First, EPA's actions in 2012 were not a change—they were the continuation of a multi-year enforcement process.  There is simply no evidence that, "but for" having learned of Plaintiffs' political contribution, the Agency would have dropped its enforcement action against Plaintiffs for significant CWA violations.  Second, the undisputed facts show that EPA learned of the campaign contribution *after* it had issued the compliance order, and *after* it had sent the letter confirming EPA's jurisdictional determination.  Thus, there is not even a temporal relationship—much less a "but for" causal relationship—between EPA's discovery of the contribution and its actions.

**A. EPA's issuance of the ACO in January 2012 and subsequent actions were the continuation of an ongoing enforcement process that began in 2010.**

EPA has been seeking to redress Plaintiffs' violations of the CWA at the Site since late 2010, well before EPA's discovery of Plaintiffs' campaign contribution in 2012.

As outlined above, in September 2010, EPA inspectors visited the Site and notified Plaintiffs' contractor, Mr. Walters, that a Corps permit was likely necessary for work being done at the Site. Andreescu Decl. ¶ 21; Lutte Decl. ¶ 19; Walters Dep. Tr. 99:24-100:5, Ex 12 (MPS000606). Shortly thereafter, EPA sent Plaintiffs a request for information about the Site and their development activities. Based on their observations at the Site, EPA inspectors determined in late 2010 that fill had been discharged into streams covered by the CWA. Ex. 34 (AR #41 at AR0000350-357) (noting that a stream that connected to a navigable-in-fact body of water had been filled); Andreescu Decl. ¶¶ 19, 23-25; Lutte Decl. ¶ 24. As early as June 2011, the Corps employee who had conducted the Site visit advised Mr. Foster that the Filled Streams were likely jurisdictional. Ex. 46 (MPS000486).

In an October 18, 2011 email, EPA informed Mr. Foster that the violations were "egregious" and that the Agency would likely seek substantial penalties if it took the lead on the case. *See* Ex. 17 (AR #84) at AR0000634. Between October and December of 2011, EPA and the Corps discussed which agency would take the lead; although EPA urged the Corps to take lead agency status, the Corps ultimately declined. Andreescu Decl. ¶¶ 36-37; Lutte Decl. ¶ 25. By December 12, 2011, EPA was drafting an ACO. *See* Ex. 16 (MPS001652) ("in case we decide to go the [administrative order] route here is the one we started").

On January 3, 2012, Pam Lazos informed Foster that EPA was "working up a penalty calculation." Ex. 17 (AR #84) at AR0000632. EPA then issued the ACO on January 24, 2012. Andreesscu Decl. ¶ 37 & Attach. K. On April 5, 2012, EPA sent a letter, in response to a March

30, 2012 request from Plaintiff Foster, Ex. 48 (MPS000504), reaffirming its finding in the ACO that the Site contained jurisdictional waters.[21]  Andreescu Decl. ¶ 48 & Attach. Q.

Given EPA's involvement at the Site from fall 2010 onwards and its consistent assertions that the activities undertaken by Plaintiffs violated the CWA, EPA's January 2012 issuance of the ACO was hardly a "striking change" in the Agency's posture.  Indeed, this long history of enforcement activity pursuing violations that the Agency believed to be "egregious" shows that EPA would have issued the ACO regardless of whether it was aware of Plaintiffs' campaign contribution.  Conversely, there is not a shred of evidence suggesting that, "but for" EPA's discovery of Plaintiffs' political contribution in 2012, the Agency would have written off egregious violations, forgone substantial penalties, and simply dropped the case.

### B.  No temporal relationship exists between EPA's alleged discovery of Plaintiffs' campaign contribution and EPA's enforcement actions in 2012.

Plaintiffs stake the causation element of their First Amendment claim on the alleged temporal proximity between EPA's discovery of the contribution document and an alleged "set of irregular and burdensome enforcement measures."  *See* Dkt. #153 at ¶¶ 72-73.  At summary judgment, however, Plaintiffs must show more than "temporal proximity" to satisfy the rigorous causation element of their claim.  *Huang*, 902 F.2d at 1140.  They must present evidence that EPA knew of their protected activity *before* the alleged retaliatory action.  *See id.* at 1140-41; *Palfrey v. Jefferson-Morgan Sch. Dist.*, 355 F. App'x 590, 594 (3d Cir. 2009).  Plaintiffs have utterly failed to do so.

---

[21] At Plaintiff Foster's request, the Corps also opined that the Site contained jurisdictional waters in a February 22, 2012 letter.  Andreescu Decl. Attach. O.  But, consistent with its regulations (*see* 33 C.F.R. § 331.11 (prohibiting Corps from accepting appeal when "EPA has the lead enforcement authority")), the Corps denied Foster's attempt to appeal that determination because EPA was the lead agency for the Site.  Ex. 49 (MPS000626).

Here, the undisputed facts show that the alleged "temporal relationship" does not exist, because the sole document on which Plaintiffs' claim is premised—a printout from a publicly-available webpage (Ex. 44, (USEPA002570))—could not have been printed until *after* EPA's alleged retaliatory actions were taken. That document bears a 2012 copyright, and lists the total amount of contributions made by persons in the 25560 zip code to date for that election year[22] as $40,527.00. *Id.* (USEPA002570) at 1 & 4. That dollar figure is significantly more than what the webpage would have displayed had it been printed before EPA issued the ACO in January 2012; as of April 11, 2012, the contribution total for the 2012 election year was only $36,027.00, and the total surpassed $40,527.00 no earlier than April 30, 2012. *Compare id. with* Ex. 47 (USEPA002976) (spreadsheet from same website listing contributions for the 2012 election year).[23] Thus, the evidence shows that EPA did not know of Plaintiffs' contribution until well *after* it issued the ACO on January 24, 2012, and indeed after EPA confirmed on April 5, 2012—in response to a request from Plaintiffs—that it believed it had CWA jurisdiction over the Site.

Because Plaintiffs have not shown that any relationship exists between Plaintiffs' campaign contribution and EPA's enforcement efforts (let alone a "but for" relationship) they cannot sustain their First Amendment claim at the summary judgment stage.

## CONCLUSION

For all these reasons, the Court should grant the United States' motion for summary judgment.

Respectfully submitted,

CAROL A. CASTO
United States Attorney

---

[22] The 2012 election year includes contributions made in 2011 and 2012.

[23] Records from the website show that the total contributions for the 25560 zip code in 2011 to be $24,203.00. Ex.47 (USEPA002976). Because contributions made in January 2012 only add $1,600 (for a total of $25,203), *id.*, Exhibit 44 could not have been printed in that month.

/s/ Gary L. Call
Assistant United States Attorney
W.V. State Bar No. 589
United States Attorney's Office
P.O. Box 1713
Charleston, W.V. 25326
Phone: 304-345-2200
Fax: 304-347-5440
Email: Gary.Call@usdoj.gov

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division

/s/ Amanda Shafer Berman
Amanda Shafer Berman
Laura Jane Brown
United States Department of Justice
600 D St. N.W., Ste. 8000
Washington D.C.  20004
202-514-1950 (Berman)
202-514-3376 (Brown)
202-514-2741 (Shea)
amanda.berman@usdoj.gov
laura.j.s.brown@usdoj.gov
sonya.shea@usdoj.gov

February 21, 2017

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| RON FOSTER, MARKETING & PLANNING SPECIALISTS LIMITED PARTNERSHIP, and FOSTER FARMS, LLC, | ) ) ) ) | |
| Plaintiffs/Counterclaim Defendants, | ) ) | |
| v. | ) ) | No. 2:14-cv-16744 |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and GINA MCCARTHY, in her official capacity as Administrator, | ) ) ) ) ) | |
| Defendants/Counterclaimants. | ) ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2017, I served the foregoing Memorandum in

Support of Motion for Summary Judgment on the following counsel for Plaintiffs via the Court's

CM/ECF service:

James S. Crockett, Jr, Esquire
John C. Wilkinson, Jr, Esquire
Spilman Thomas & Battle, PLLC
P.O. Box 273
Charleston, WV 25231-0273
JCrockett@spilmanlaw.com
JWilkinson@spilmanlaw.com

/s/ Laura J. Brown
Laura J. Brown

Dated:  February 21, 2017