**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

RON FOSTER, MARKETING & PLANNING )
SPECIALISTS LIMITED PARTNERSHIP, and )
FOSTER FARMS, LLC, )
                                    )     No. 2:14-cv-16744
         Plaintiffs, )
                                    )
v.                                       )
                                      )
UNITED STATES ENVIRONMENTAL     )    **PLAINTIFFS'**
                                      )    **MEMORANDUM OF LAW**
PROTECTION AGENCY and GINA       )    **IN SUPPORT OF**
MCCARTHY, in her official capacity as   )    **THEIR MOTION FOR**
Administrator,                           )    **SUMMARY JUDGMENT**
         Defendants. )

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION**
**FOR DISMISSAL OF DEFENDANTS' COUNTERCLAIMS**

Plaintiffs submit this memorandum of law in support of their attached motion for summary judgment under Fed. R. Civ. P. ("FRCP") 56.

**STATEMENT OF FACTS**

"None of this is common, what happens here." Richard Hemann ("Hemann"), U.S. Army Corps of Engineers ("USACE"), Deposition dated June 17, 2015 at 127 (attached as Ex. 1). EPA's enforcement in this case relates to a portion of two tracts of property in Wood County, West Virginia. The subject property is located north of Lubeck West Virginia, just south of the intersection of U.S. Highway 50 and West Virginia Route 68. See aerial photo (hereafter "The Site") (attached as Ex. 2). In September 2009, as general partner and shareholder/member plaintiff entities, Marketing & Planning Specialists, L.P. ("M&P") and Foster Farms, LLC ("Foster Farms"), Plaintiff Ron Foster purchased the Site out of the bankrupt estate of The Endurance Group, LLC (hereafter "Endurance") and assigned each tract M&P and Foster Farms, respectively.

Whether certain topographical draws at the Site constitute a jurisdictional "Waters of the United States" (hereafter "WOUS")[1] under Section 404 of the Federal Water Pollution Control Act,[2] more commonly referred to as the Clean Water Act (hereafter "CWA"), is the crux of this dispute.  Plaintiffs agree an intermittent to perennial stream  runs along the northern boundary of The Site, and an intermittent stream (which in this litigation has been come to be referred to as the "Blackwell Creek") runs contiguously along the western edge of the north tract of The Site, and non-contiguously along the western edge of the south tract (separated from the south tract by a third party's property which is, and has been for decades, an agricultural hayfield).  Both of those streams are indicated by classic "blueline" demarcations on U.S. Geological Survey (USGS) maps as streams.

Numerous topographical draws (i.e. small valleys) exist on The Site which during sufficient rainfall or snowmelt contain episodic surface flow.  EPA and USACE characterize these draws as streams (or relevant reaches "RR"s of streams), a characterization that for purposes of CWA jurisdiction is disputed by Plaintiffs.  None of these topographical draws are or have ever been indicated by classic "blueline" streams demarcations on standard USGS mapping.

The particular area at issue in EPA's enforcement against the Plaintiffs is in an area of The Site known as the "Pad 4 Area" (named from construction plans calling for mass balancing of earth to create level areas suitable for building construction) which is located in a topographic draw that contains what EPA identifies as RR4 and RR1.  See "Relevant Reach Map" (attached

---

[1] The issue of the scope of WOUS generally is disputed by numerous other parties, including the State of West Virginia, in other litigation against EPA in other forums

[2] 33 U.S.C. §1344.

as Ex. 3).[3] The entire acreage of the Pad 4 Area is only 30.7 acres. The total acreage The Site is about 99 acres.

The Pad 4 area runs down gradient into an adjacent third party property that is the agricultural hayfield and has been so since at least the 1950s. As the drainage gradient extends into the hayfield, all bed, bank and ordinary high water mark features disappear, flattening out into a quintessential upland hay field or swale. On the western (downgradient) end of the hayfield, after a gap of approximately 121 feet, the topography begins to dip again, forming a small divot with a short channel that drops into Blackwell Creek.[4]

Non-party deposition testimony of persons with decades of personal knowledge of the Pad 4 Area and the adjacent hayfield confirms that, since at least 1952, the Pad 4 Area displays surface flow only in response to heavy or extended periods of rainfall and snowmelt. The former owner of the adjacent hayfield property, owned that parcel since the 1960s, and confirmed that surface water only drains in sheet flow across the hayfield into the Blackwell Creek under conditions of extreme precipitation or snowmelt. See generally, Deposition extracts of Larry George, Larry Carr and Douglas Hatfield (attached as Ex. 4). These firsthand accounts of the Pad 4 Area and hayfield, are consistent with USACE guidance that such features as typically considered to be non-jurisdictional upland swales. See extract from USACE "Jurisdictional Form Instructional Guidebook" (attached as Ex. 5). As discussed more below, the conclusions of two independent expert assessments of the Pad 4 Area and hayfield also support this conclusion.

---

[3]     Contrary to the Court's order of 9/30/15 (ECF No. 114), EPA's order does not contend that the Foster Plaintiffs have discharged fill into eleven (11) streams on The Site. See, Dkt. #114 at 2, fn.1. The relevant enforcement action before this court involves only a claim by EPA that the Foster Plaintiffs have disturbed three (3) (alleged) stream segment locations claimed by EPA to be jurisdictional intermittent or ephemeral streams in the Pad 4 Area.

[4]     See assorted photos and aerial photos (attached as Exs. 3A and 3B); see also AR1044 (attached as Ex. 3C).

3

USACE issued this guidebook titled "Jurisdictional Determination ["JD"] Form Instructional Guidebook" dated May 30, 2007.   This document was "prepared jointly" by USACE and EPA.  *Id.*, cover page.  USACE's guidebook reads:

> **Swales.** Swales are generally shallow features in the landscape that may convey water across upland areas during and following storm events. Swales usually occur on nearly flat slopes and typically have grass or other low-lying vegetation throughout the swale. ***Swales are generally not waters of the U.S. because they are not tributaries or they do not have a significant nexus to TNWs.***"

> *Id.* at 38 (emphases added).

On December 2, 2008, the EPA and USACE issued a guidance memorandum for determining CWA jurisdiction in light of the U.S. Supreme Court decision in *Rapanos.*[5]  *See* Joint EPA/USACE Rapanos Memorandum (attached as Ex. 6).  This document states:

> "The agencies generally will not assert jurisdiction over the following features:
> • Swales or erosional features (e.g., gullies, small washes characterized by low volume, infrequent, or short duration flow)

> *Id.* at 1, 8.

EPA initially scrutinized The Site for enforcement sometime in 2009 when Endurance (the prior owner) conducted unauthorized dredge and fill activity in both the north end of the (USGS intermittent) Blackwell Creek (on the northwest corner of the north tract) and the (USGS perennial) unnamed tributary of Neal Run running due east/northeast along the northern edge of the north tract.  Endurance's activities were far removed from the Pad 4 area at issue here. Endurance's neighbor, the Blackwell's, complained initially to the West Virginia Department of Environmental Protection (hereafter "WVDEP"), who then brought USACE into the matter.

Endurance filed for involuntary bankruptcy.   Although internal financial conflicts precipitated Endurance's bankruptcy, Endurance's inability to develop the property due to the

---

[5]     *Rapanos v. United States*, 547 U.S. 715 (2006).

regulatory enforcement caused its suite of potential development investors to evaporate. *See* extract of Deposition of L. George dated June 15, 2015 at 73-75 (attached as Ex. 7). Since no prospects for reorganization were viable, the bankruptcy eventually liquidated Endurance's assets. EPA began addressing Endurance's disturbances of Blackwell Creek and the unnamed tributary of Neal Run by the spring of 2009. In May of 2009, Pamela Lazos ("Lazos") wrote Todd Lutte ("Lutte") of EPA that she'd spoken with Endurance's Larry George and noted that remediation prospects were low "***unless [EPA] can twist the arm of the next guy*** who intends on buying the site[.]" See, Email from Lazos to Letter dated May 12, 2009 (attached as Ex. 8) (emphases added). EPA did not issue an administrative order for compliance to Endurance until September 4, 2009.[6]

The Bankruptcy Court entered an Order on October 19, 2009 authorizing the sale of The Site "Free and Clear of Liens, Claims and Interests Including all Claims of the U.S. Environmental Protection Agency and U.S. Army Corps of Engineers". Deeds transferring the Site to Marketing and Planning Specialists, L.P. ("M&P") and Foster Farms, LLC ("Foster Farms") were executed on October 29, 2009. One entity holds title to the northern tract and the other, the southern tract. *See* Deeds (with Sale Order as exhibit) dated October 29, 2009 (attached as Ex. 9).

The particulars of the deed language and Bankruptcy order are significant. The order states that the purchaser of the Site:

"… shall take title to and possession of the Real estate free and clear of any and all liens, claims, liabilities, interests and encumbrances. All such liens, claims, liabilities, interests and encumbrances, shall attach solely to the proceeds of the Sale …. Further… the Real Estate, ***shall be free and clear of all liability of the***

---

[6] The circumstances of the filing of the Endurance order are somewhat dubious. For brevity' sake, the Plaintiffs will not expound upon this issue here, but refer the Court to ECF Doc. No. 139 at 12-13.

> *Purchaser to the U.S. Environmental Protection Agency ("EPA") and U.S. Army Corps of Engineers ("Corps") for Debtor's failure to obtain permits under the Clean Water Act... all such liability of Purchaser to the EPA and Corps shall attach to the $50,000.00 remediation fund established under the Purchase Agreement; .... EPA and the Corps shall be limited to accessing only that portion of the Real Estate within 30 feet of the toe of the fill discharged by the Debtor in relocating the stream to perform remedial assessment and remedial work on the stream*[.]"  Id. at pp. 9-10 (emphases added).

Per the terms of the order, Plaintiffs set aside $50,000.00 to fund remediation of Endurance's legacy stream relocation if needed.  EPA utilized a contractor (CIM) to come up with a proposed remediation plan for the legacy issue in the northwest corner of The Site.  EPA presented the proposal to Plaintiff Ron Foster ("Foster") via email on June 7, 2010. *See* Emails between Ron Foster and Lutte, and Lutte to Lazos, dated June 7-8, 2010 (attached as Ex. 10).  The following day, Foster rejected EPA's proposed legacy remediation because its earthwork encroached far in excess of the thirty foot restriction set in the bankruptcy order.  Foster also called off a planned conference call to discuss the proposed remediation due to the fact that the remediation was facially invalid under the bankruptcy court order. *Id.*  Almost immediately after receiving Foster's rejection, Lutte sent a terse email to Lazos that simply read "Let's talk!!"[7]  Id.

Foster soon received a heated phone call from Lazos, berating him for cancelling the conference call and threatening "We'll see who has more authority, the EPA or the Bankruptcy Court," or words to that effect.  See, Deposition Extract of Ron Foster dated June 8, 2015 at 49 (attached as Ex. 13).  Foster took Lazos's statements to imply that he would soon have his own dealings with EPA to contend with.  Id. at 49-50.[8]

---

[7]        The phrase "Let's talk" appears to be a code among EPA Region 3 personnel for discussing a matter off line and not in writing.  Although the implications of this are not necessarily nefarious, the known instances in this case point to offline discussions having questionable motivation in dealings with the Plaintiffs. *Compare* Ex. M with email from Jeffrey Lapp to McGuigan dated January 28, 2013 (attached as Ex. 11) and email from Lazos to Lutte and Andreescu dated April 7, 2011 (attached as Ex. 12).

[8]        Foster is not the only individual to report EPA claims of superior authority to the Bankruptcy Court, and/or threats.  Joe McCoy also noted in deposition that an EPA representative, believed by McCoy to be

Shortly after Foster's rejection of the proposed remediation. Lazos emailed the Department of Justice's Austin Saylor for reasons not entirely clear. See, Email from Lazos to Saylor dated July 7, 2010 (attached as Ex. 15). The text of the email is redacted and withheld as privileged, but the timing is suggestive—placed between Foster's June rejection and EPA's allegedly unplanned visit to the Site a mere two months later.

On September 9, 2010, Stephanie Andreescu (nee Chin)[9] and Lutte visited The Site, allegedly to check on the Blackwell complaint. See undated report on September 9, 2010 site visit (attached as Ex. 16).[10] Andreescu acknowledged in deposition to be the primary author of the report. However, Andreescu and Lutte spent virtually no time looking at the Blackwell property vicinity and instead went almost immediately onto the southern tract of the site to the Pad 4 area (an area not visible from the location where the Plaintiffs' signage is on the northern tract). See generally AR668 (attached as Ex. 21); field notes of S. Andreescu of September 9, 2010 (attached as Ex. 22). Despite two separate signs at the Site showing the contact phone for the Plaintiffs, neither Andreescu nor Lutte attempted to contact the Plaintiff Site owners prior to

Todd Lutte, made almost the same statement regarding the comparative authority of the EPA and the Bankruptcy Court. *See* Deposition extract of Joe McCoy dated June 11, 2015 at 83-84 (attached as Ex. 14). Larry George reported that a female at EPA in Philadelphia threatened him over the phone that she had "a 1,000 lawyers at her disposal…" implying that any resistance was futile. *See* supra Ex. 7 at 76-78.

[9]  Ms. Andreescu married during the pendency of the case and changed her surname. Although earlier documents refer to her as Stephanie Chin, for simplicity's sake, she will be referred to by her married name herein, even if the document cited may use her maiden name.

[10]  Discovery efforts have disclosed that this report by Andreescu is misleading on a number of levels. As established in his deposition, Bryan Scott Moore ("Moore") did not have permission to be on the Site as reported by Ms. Andreescu. See, Deposition Extract of Moore dated September 16, 2015 at 28-29 (attached as Ex. 17). Most significant, unlike reported by Andreescu in her report, Moore did not claim that the Pad 4 location had been covered by four (4) feet of fill. *Compare* Ex. 16 with Deposition Extract of Moore at 69 (attached as Ex. 17). Other facts ascertained in discovery call into serious question the accuracy (if not veracity) of Andreescu's report. Andreescu stated in deposition that the water in Blackwell Creek was a few feet wide up to her upper shin. Deposition Extract of Andreescu dated August 19, 2015 at 39 (attached as Ex. 18). Lutte testified that the hayfield was "saturated." Deposition Extract of Lutte dated June 18, 2015 at 71-72 (attached as Ex. 19). But overwhelmingly dry conditions are apparent in the photographs taken by Andreescu and Lutte during the September 9, 2010 visit, evincing absolutely no evidence of the wet and muddy conditions claimed by them in deposition and implied in the report. *See* photos (attached as Ex. 20).

7

trespassing upon the property. *See* photos USEPA 001234 and 001237 (attached as Exs. 23 and 24).[11]

According to both the report and deposition testimony of several witnesses, Andreescu and Lutte proceeded onto the southern tract as a guest of a "neighbor" who allegedly had permission to be on the property. Although the report did not identify who this neighbor was, discovery efforts confirmed that the person was Bryan Scott Moore ("Moore"). Precisely how ingress was obtained by Andreescu and Lutte is not entirely clear, since their deposition testimony also recounts them walking up gradient (i.e. south) in the bed of Blackwell Creek and then cutting east across the hayfield into the Pad 4 area. *See supra* Ex. 19 at 71-72 and Ex. 18 at 38. At the Pad 4 area Andreescu and Lutte came upon members of Walters Excavating, the contractors working for Plaintiffs on The Site to clear and grub the Pad 4 area and prepare the area for the construction of a storm water control cell. The construction of storm water control structures is an activity recognized by USACE's nationwide permitting program, a program of pre-approved CWA permits for certain categories of common activities.[12] Seth and David Walters testified in deposition that either Lutte or Andreescu told them only that they "may be in violation" for the earthwork being done. *See* extract of deposition of Seth Walters dated June 11, 2015 (attached as Ex. 26) and David Walters dated June 11, 2015 (attached as Ex. 27). At no time during their visit at the Site did Lutte or Andreescu inform anyone at the Site that a violation of the Clean Water Act had actually occurred.

---

[11]        Andreescu and Lutte's entry upon The Site is in direct violation of EPA CWA inspection guidance that has been in place since at least 1979 and confirmed by updated EPA policy since at least 2004. *See* extracts of EPA Memorandum "Conduct of Inspections After the Barlow's Decision" (April 11, 1979) and EPA "NPDES Compliance Inspection Manual" (July 2004) (attached as Ex. 25).

[12]        *See* generally, 72 Fed. Reg. 11092 11138 (March 12, 2007) for the Nationwide Permit 43 (Stormwater Management) that would have been in place at the time of the Pad 4 storm cell construction.

In response to the Lutte and Andreescu visit, David Walters informed Plaintiff Ron Foster of the incident. *See supra* Ex. 27 at 107. Foster contacted his engineering consultant for the project at that time, Dan Metheny ("Metheny") of Fox Engineering. See email dated September 9, 2010 from Foster to Metheny (attached as Ex. 28). Metheny checked the location on the plans and opined that he did not see how a permit could be thought to be required at the Pad 4 location. Id. After an operational pause of a few days, M&P re-initiated construction operations.

EPA still did not ever state that the Plaintiffs were in violation of the Clean Water Act in 2010. Nevertheless, Ron Foster voluntarily suspended operations on or about sometime in 2010 at the Site pending resolution of the matter with EPA. *See* extract of deposition of Dan Metheny Dated June 15, 2015 at 50-51 (attached as Ex. 29)

In December of 2010, EPA generated and internal draft guidance memorandum on establishing CWA jurisdiction titled "Clean Water Protection Guidance." *See* extracts of same (attached as Ex. 30). This document states:

> A tributary may be physically characterized by the ***presence of a channel with defined bed and bank.*** The bed of a stream is the bottom of the channel. The lateral constraints (channel margins) are the stream banks. ***One means of identifying the lateral constraints is the existence of an ordinary high water mark (OHWM)***. Corps regulations define OHWM as "that line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas. …

> "When performing a significant nexus analysis for a tributary, ***the first step is to determine whether that tributary has a bed and bank and an ordinary high water mark.*** If the tributary possesses those characteristics, the next step is to determine whether the tributary drains, or is part of a network of tributaries that drain, into a downstream traditional navigable water or interstate water. …

*"The presence of a bed and bank and an OHWM are physical indicators of flow and it is likely that flows through tributaries with the above characteristics are generally sufficient to transport pollutants, sediments, and other materials downstream to the traditional navigable water or interstate water.* ...

*"Thus, field staff may conclude on a case-by-case basis that a tributary is jurisdictional when they have determined and documented that the tributary has a bed and an OHWM,* is part of a tributary system to a traditional navigable water or an interstate water, and that there is no reasonable basis to conclude that pollutants, if introduced, would not be transported to the downstream traditional navigable water or interstate water. *Wherever possible, field staff should also document, using available or readily obtainable information, the flow characteristics and functions of the tributary or tributaries,* and their hydrologic relationship to the nearest downstream traditional navigable water or interstate water."

*Id.* at 12, 14 (emphases added).[13]

After ceasing operations, Plaintiffs agreed to commission a delineation assessment[14] to be conducted for the Site by Randolph Engineering. This delineation report was conducted by Jacob White ("White") and is dated March 10, 2011. White's 2011 report did conclude that the Pad 4 site likely contained jurisdictional waters. However, White's analysis looked only upgradient of the Site's property boundary within the topographical draws in the Pad 4 area of the Site. See extract of deposition of White dated June 10, 2015 at 135-140 (attached as Ex. 31). White acknowledged in deposition that he did not assess the lack of connectivity between the Pad 4 site and jurisdictional waters well down gradient of the Pad 4 site. *Id.* Indeed, White recanted his opinion in deposition testimony after reading the 2013 report of GAI Consultants (detailed more below) that made clear the significant gap in surface connection between the Pad

---

[13]   Interestingly, but perhaps not surprisingly given this agency's agenda, this document was never released. This draft document would have been entirely consistent with established USACE regulatory requirements limiting CWA jurisdiction to the constraints of OHWM. *See* 33 CFR 328.4(c)(1) (2010).

[14]   Delineation reports are preliminary assessments of the scope of potential jurisdictional waters in a project area, usually commissioned by the landowner or project manager. These are then submitted to USACE for review and input in USACE's JD, the official regulatory document that defines the parameters of the jurisdictional waters from the agency's perspective. These determinations, at least those made by USACE, have an administrative appeal process of which the regulated community can avail itself.

4 area and Blackwell Creek, represented by the hayfield. *Id.* When asked whether if he had seen the same features in 2011 as GAI had in 2013 it would have altered the conclusions of his 2011 report, he confirmed it would have. Had he seen the lack of bed, bank and OHWM in the hay field, White would have concluded that the Pad 4 area likely did *not* contain jurisdictional waters. *Id.* The significance of White's reversal cannot be overstated as both USACE and EPA relied on White's delineation analysis for their JDs.

After the 2011 Randolph report, Plaintiffs tried unsuccessfully to get either EPA or USACE to provide a path forward to resolve the situation. Although Plaintiffs were open at the time to after-the-fact permitting as a possible solution, Lazos represented to Foster that a permitting option through USACE was essentially foreclosed with because the alleged violations at the Site were so "egregious." See email from Lazos to Foster dated October 18, 2011 (attached as Ex. 32). Yet, discovery has revealed precisely zero evidence that USACE or its representatives ever felt that the alleged violations were "egregious." *See supra* Ex. 1 at 165. Moreover, there is compelling evidence that USACE's reluctance to consider permitting options was rooted in EPA's refusal to consider proposed mitigation work.

In 2011 and 2012 both USACE and EPA prepared CWA JDs for the Pad 4 area. Both USACE and EPA utilized USACE's Approved Jurisdictional Determination Form ("AJDF") for recording their findings. Interestingly, neither USACE nor EPA followed the requirements set forth on the AJDFs for finding CWA jurisdiction as both rely on proximity to the nearest TNW as the justification for significant nexus and neither contain any supporting chemical or biological data analysis. *See* e.g. Ex. 33 (USACE AJDF).

11

At Foster's request, in July of 2012, Congressman McKinley wrote the Region 3 Regional Administrator Shawn M. Garvin ("Garvin") to inquire regarding the Plaintiffs' case before the agency.  See letter from McKinley to Garvin dated July 2, 2012 (attached as Ex. 34).

On August 13, 2012, in a letter already acknowledged under oath to have been drafted at least in part by Lazos, Garvin represented to Congressman David McKinley that the U.S. Army Corps of Engineers ("USACE") was unwilling to allow Plaintiffs to pursue a Section 404 Clean Water Act permit "given the extent of the violations at the site."  *See* letter from Garvin to Congressman McKinley dated August 13, 2012 (attached as Ex. 35).  This language was consistent with Lazos's email to Foster in October of the previous year, claiming that "because the violation is so egregious, [USACE] [is] hesitant to [take the] case back." *See supra* Ex. 32.

The representations that USACE did not want to consider options for alternative permitting resolutions because the alleged violations were "egregious" were false.   And, in the case of Lazos, the evidence of record supports a finding that these statements were made with knowledge that they were false.  While it is true that, in the spring of 2012, Hemann of USACE had informed Andreescu that USACE was unwilling to consider improvements to the site at issue "as compensatory mitigation for other [alleged] unauthorized work," the reason was ***not*** "extent of the violations," as represented to Congressman McKinley (and Foster) by Garvin and Lazos.    Instead, the USACE took this position because "EPA will not consider [such improvements] as compensatory mitigation[.]"  Such compensatory mitigation would have been a component in the Plaintiffs' obtaining a Section 404 permit – a so-called "after-the-fact" permit – as a potential avenue to resolve the situation and which potential compromise had been specifically suggested in Congressman McKinley's inquiry letter to Garvin.  Plaintiffs, however, were never given that opportunity to consider that option due to the misrepresentations of

Lazos—directly to Foster, and indirectly to Congressman McKinley. *Compare* redacted and unredacted email dated March 19, 2012 from Hemann to Andreescu (attached as Exs. 36 and 37).[15]

Plaintiffs did not know of USACE's willingness to consider such compensatory work because, in the fall of 2012, in preparation for a FOIA response to Foster, Lazos asked to review the USACE materials "just to be sure there is nothing we want redacted." *See* email from Lazos ot Andreescu and Anderson dated October 11, 2012 (attached as Ex. 38). Lazos undertook this task notwithstanding Hemann's instruction to the EPA to "release all correspondence between Corps and EPA regarding [the Foster] matter." *See* email from Hemann to Andreescu (attached as Ex. 39)

But, due to Lazos' redaction effort,[16] the version of Hemann's March 19, 2012 email that went out under that pre-litigation FOIA production had Hemann's language describing USACE's reluctance to consider compensatory improvements by Plaintiffs due to the fact that "EPA will not consider [such improvements] as compensatory mitigation," completely whited out.[17] *Compare* Exs. 37 and 36.

---

[15]     This version of the email was produced by EPA *only after* this litigation had commenced, in response to Plaintiffs' discovery requests.

[16]     Lazos admitted to redacting this email. *See* extract of Deposition of Pamela Lazos dated August 20, 2015 at p. 129, lines 4 through 9 (attached as Ex. 40):

"4     Q. Okay.
 5     But so you -- but -- so is it your
 6     recollection that you would have been the person who
 7     would have redacted that sentence?
 8     A. If I was still the attorney on the case, then
 9     it would have fallen to me to do that job, yes."

[17]     Significantly this whiting out of the text had no annotation that any redaction had been even been made by EPA, and easily goes unnoticed. Indeed, Plaintiffs only caught the redaction during document review in preparation for depositions of the defendants, when in organizing documents in chronological order, the difference between MPS001831 and USEPA001856 were finally observed.

13

Although Lazos promised, after telling him that "the case is ours," to provide Foster with proposed figures for a penalty to resolve the matter in early 2012, no proposed administrative penalties were ever forwarded to the Plaintiffs.  See email from Lazos to Foster dated January 3, 2012 (attached as Ex. 41).  Less than a month later, EPA issued its administrative enforcement order against the Plaintiffs. See EPA Order No. CWA-03-2012-0070DW dated January 24, 2012 (attached as Ex. 42).

Strangely, even though the delineation by Randolph had been completed and submitted since spring of 2011, no formal jurisdictional JD for the Site had yet been made.  USACE rectified this omission by issuing a JD on February 22, 2012. *See* Letter from USACE to Foster dated February 22, 2012 (attached as Ex. 43).  This JD provided an administrative appeal process by which the Plaintiffs could avail themselves.  Id.  Plaintiffs timely filed an appeal, but in the interim, EPA notified Foster that it was taking "superseding" authority of the case and issuing its own JD.  See Letter from Andreescu to Foster dated April 5, 2012 (attached as Ex. 44).  Significantly, EPA's JD did ***not*** allow for an administrative appeal. Id.   Due to EPA's taking "superseding" authority, USACE informed Foster that it could not hear his administrative appeal on USACE's JD.  See letter from Burcham to Foster dated May 29, 2012 (attached as Ex. 45).  EPA and USACE and EPA and DOJ held several meetings, calls and emails shortly before and after EPA's issuance of its JD. *See* e.g. meeting notice (attached as Ex. 46).  Why this activity took place is unclear (no EPA witnesses could recall even having any such calls or meetings, let alone the content of the discussions) though the description plainly reads "Bankruptcy, JDs, Mitigation and Huntington's [USACE's] role[.]" EPA's actions, probably with USACE collusion,  precluded Plaintiffs' ability to appeal the JD.

14

The content of both USACE's and EPA's JDs were deficient by their own criteria. And EPA misrepresented to Foster in November of 2012, that the chemical and biological basis for the agency's JD had been provided to Foster. *See* letter from Lazos to Foster dated November 29, 2012 (attached as Ex. 47); *see also* email from Lazos to Andreescu dated November 5, 2012 (attached as Ex. 48) and letter from Nadolski to Foster dated July 25, 2013 stating that all chemical and biological data had been provided by USACE (attached as Ex. 49). Both USACE and EPA AJDFs expressly state that mere proximity to a TNW is insufficient justification for finding jurisdiction. See *supra* Ex. 33 at 5 (MPS0001212). Both Hemann and Andreescu acknowledged in deposition that no supporting chemical or biological data is listed in AJDFs for their respective JDs. *See supra* Ex. 1 at 233 and Ex. 18 at 247.

In March of 2012, in between USACE's JD and EPA's JD, the Supreme Court of the United States ("SCOTUS") handed down it seminal decision in *Sackett v. EPA*, 132 S. Ct. 1367 (2012). Foster did not become aware of the decision until sometime later. He then began a long sequence of requests to EPA asking how he might appeal the enforcement order against him. *See* 2012-2013 communications from Foster to EPA (attached as Ex. 49.1) Significantly, in 2013, EPA issued its own internal guidance on how to alter its administrative compliance order language to account for the Sackett decision. *See* EPA memorandum dated March 13, 2013 (attached as Ex. 50). Although Lazos testified in deposition that she had seen the memorandum she acknowledged that she had not informed Foster of its existence or content. *See supra* Ex. 40 at 191-195. No evidence has been discovered that Defendants made the changes in administrative compliance order language known to the Plaintiffs, nor did the agency otherwise seek to make the January 24, 2012 order at issue in this matter consistent with the Sackett decision or EPA's 2013 memorandum.

In late 2011 and early 2012, the parties had some discussions over whether potential work on the northern tract to improve legacy issues by Endurance could serve as a mitigation offset for the alleged impacts in the Pad 4 area of the southern tract.  In order to contemplate the feasibility of such offset credit, however, USACE needed to complete a JD on that area of the Site.  The propriety of USACE's role in conducting the JD was acknowledged by Lazos. *Compare* redacted and unredacted emails from Lazos to Lutte and Andreescu dated February 6, 2012 (attached as Exs. 50 and 51).  Ultimately EPA concluded it was unwilling to grant such credit, for reasons which remain obscure. *See* supra Exs. 36 and 37.  USACE informed EPA that they were unwilling to perform the JDs *if* EPA was unwilling to consider the offset credits.  *Id.* EPA then performed the JD themselves, which (of course) again provided no means of administrative appeal.

2012 languished into 2013 with no further progress by Plaintiffs to secure guidance from EPA on how to appeal, nor on any proposed penalty calculation.  Although unknown to Plaintiffs until Defendants' October 25, 2016 response to Plaintiffs' Fourth Set of Requests for Production of Documents, Lazos asked EPA paralegal Bettina Dunn ("Dunn"), who in turn requested the research of Anne Gold ("Gold"), to ascertain the fair market value of The Site.  See March-April 2013 emails among Lazos/Gold/Dunn/Andreescu/Lazzaro (attached as Ex. 53).  These communications are intriguing and contradictory.  At one point, an EPA contractor states that the property appraisal is to assess whether the value would be sufficient for Plaintiffs to sell the Property to pay the penalty.  Later, Lazos states the appraisal is not for forced sale to pay a penalty but to "figure out the economic benefit of the property[.]"  How these communications figured into EPA's proposed penalty calculation remain unclear since EPA never provided any insight into their penalty calcualtions.  Regardless, the proposed penalty made in 2014 is

approximately twice the value of the entire Property as estimated in the figures ascertained by Gold in April of 2013. It is also unclear why this colloquy took place more than a year after Lazos told Ron Foster that she would shortly provide him penalty figures in early 2012, and why no proposed penalty figures were forwarded prior to DOJ's initial demand in April of 2014.

In June of 2013, Plaintiffs retained GAI Consultants ("GAI") to review the jurisdictional basis of the EPA's claims. GAI, unlike Randolph Engineering before it, actually looked not just at the Pad 4 area, but also at the geomorphology between the Pad 4 area and Blackwell Creek. GAI noted that the Pad 4 draw, once it met the adjacent hayfield, quickly flattened out into a broad upland field devoid of any bed, bank or OHWM for one hundred and twenty one feet. *See* Report of GAI Consultants dated June 14, 2013 (attached as Ex. 54). GAI noted that the loss of the signature jurisdictional features were indicative that CWA jurisdiction stopped at the loss of bed, bank and OHWM at the western side of the hayfield, just a few feet upland of Blackwell Creek. Id. at 2-3. GAI's field analyst, confirmed that she still stood by the conclusions reached in 2013. *See* extract of deposition of Jayme Fuller dated August 4, 2015 at 186-188 (attached as Ex. 55). Plaintiffs sent EPA the GAI report in late summer of 2013. EPA, however, summarily rejected the GAI report as grounds for setting aside the agency's 2012 order. *See* letter from Bolender to Foster dated October 25, 2013 (attached as Ex. 56).

On May 8, 2014, Foster received a letter from the Department of Justice on behalf of EPA, proposing that the Plaintiffs pay a $414,000.00 penalty, be prepared remediate the situation on the ground or face enforcement litigation and even more severe penalties (attached as Ex. 57).

On May 21, 2014, the Plaintiffs filed this lawsuit.

In August of 2014, USACE issued a guidance document entitled "A Guide to Ordinary High Water Mark (OHWM) Delineation for Non-Perennial Streams in the Western Mountains,

Valleys, and Coast Region of the United States" *see* extracts of same (attached as Ex. 58). This

document contains the following language:

> "Taken together, *ordinary high water* implies streamflow levels that are greater than average, but less than extreme, and that occur with some regularity." ...

> ".... [F]eatures suggestive of individual flow events or those known or evidenced to be unstable or highly migratory over time are unlikely to accurately indicate the OHWM location." ...

> "The OHWM should ideally be tied to land-scape features that are relatively stable over time, and these features should be representative of long-term, recurring flow conditions rather than recent flow conditions or individual flow events." ....

> "Thus, while information on prior landscape or streamflow conditions (e.g., from aerial imagery, stream gage records, anecdotal evidence, etc.) may provide useful supporting evidence, *the OHWM at any given location should ultimately be delineated based on current site conditions as observed in the field*.

*Id.* at 10-11, 46 (emphases added).

On May 12, 2015 the parties conducted FRCP 34 inspection of the Site at Defendants'

request. Defendants' experts, Peter Stokely ("Stokely"), David B. Arscott ("Arscott") and

Charles B. Dow ("Dow"), were present and took various water chemistry and biological samples

at the Site, and/or made other observations. A rainfall event had taken place in the preceding

twenty-four hours of the inspection. Plaintiffs' had independent "shadow" sampling conducted in

nearby locations to EPA's expert's sampling sites. EPA's experts also made several visits to

other locations in the vicinity of the Site, but EPA did not make this known to the Plaintiffs at the

time and Plaintiffs were not able to obtain shadow samples of EPA's expert's various off site

locations.   Crucially, however, EPA's experts made **no inspection or field observations**

**whatsoever** of the critical adjacent hayfield that lies downgradient of the Pad 4 area and

upgradient of Blackwell Creek.

18

In June of 2015, EPA's Peter Stokely drafted a report allegedly supporting WOUS connectivity of the Pad 4 area to Blackwell Creek. *See* Stokely Report dated June 2015 (attached as Ex. 59). Critically, however, Stokely's report involved no on the ground validation of the features he claimed to identify by remote imagery. *See* extracts of deposition of Stokely dated August 27, 2015 at 45 (attached as Ex. 60).

On July 10, 2015, Plaintiffs expert, Dane Pehrman ("Pehrman") of Environmental Resources Management ("ERM")[18] conducted an independent analysis of the hayfield (which Pehrman refers to as the Area of Concern or "AOC") in between the Pad 4 area and Blackwell Creek in order to assess whether the Pad 4 area was jurisdictional under the CWA. See ERM Report "Evaluation of Jurisdictional Limits of Wetlands and Waters of the U.S. Foster Site Parkersburg, Wood Co., West Virginia" dated July 21, 2015 (attached as Ex. 61). Pehrman confirmed no CWA jurisdiction should apply to the hayfield and Pad 4 area for reasons similar to those GAI reached two years earlier.

EPA retained experts, Arscott and Dow to provide scientific justification for the agency's claim that the Pad 4 area was a jurisdictional water under the CWA. Arscott and Dow had previously produced a voluminous report on June 22, 2015,[19] weighing in at over one hundred pages. Arscott and Dow also briefly rebutted the Plaintiffs' ERM report on August 7, 2015.[20] Arscott and Dow in their initial report concluded merely that in their "scientific opinion … the streams draining the NRC property have distinct stream channel structure (bed, bank, and water

---

[18]    Pehrman has since joined the consulting firm of CH2M.

[19]    Arscott & Dow, "Expert Report: Physical, Chemical, and Biological Connections Between Headwater Aquatic Habitats Associated with the Neal Run Crossing Property and Downstream Navigable Waters in Wood County, WV" (June 22, 2015) (hereafter "Arscott & Dow Report") (attached as Ex. 62).

[20]    Arscott & Dow, "SWRC Response to 'Evaluation of Jurisdictional Limits of Wetlands and Waters of the U.S.; Forster (*sic*) Site; Parkersburg, Wood Co., West Virginia.'" (August 7, 2015) (hereafter "Arscott & Dow Rebuttal") (attached as Ex. 63).

marks) and they have a hydrologic connection to the downstream navigable portion of Neal Run." *See infra* Ex. 62 at 28. Their rebuttal report stated that they "maintain our scientific opinion that the streams draining the NRC property are/were tributaries to downstream navigable waters.... Exert[ing] hydrological, chemical, and biological influence on ... Little Kanawha mainstem [.]" *See infra* Ex. 63. at 1. However, neither report quantifiably assessed the loss of OHWM in the hayfield, nor made the crucial conclusion that a significant nexus exists between the Pad 4 site the nearest navigable water.

On May 13, 2016, Supreme Court of the United States rendered an opinion in *Hawkes v. United States Corps of Engineers*, 136 S.Ct. 1807 (2016). The SCOTUS' *Hawkes* decision unanimously affirmed the 8th Circuit Court of Appeals' decision in *Hawkes v. United States Corps of Engineers*, 782 F.3d 994 (8th Cir. 2015) which held that constitutional due process requires an immediate right of appeal of an underlying CWA JD due to the very real and onerous burdens costs and risks such determinations impose and/or how they constrain otherwise lawful activity.

**STANDARD OF REVIEW:**

Summary judgment for the moving party is appropriate under the FRCP "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). Once this burden to show absence of material fact is met, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 250.

Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) Summary judgment is appropriate whenever the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

## ARGUMENT

## I.   PLAINTIFFS' ACTIVITIES DID NOT OCCUR IN CWA WOUS.

To paraphrase U.S. Supreme Court Justice Samuel Alito, "[t]he position taken in this case by the [Defendants]… [places] the property rights of ordinary Americans entirely at the mercy of [EPA] employees." *Sackett v. EPA*, 132 S.Ct. 1367, 1375 (Alito, concurring).  As Justice Alito further observed, "[t]he reach of the Clean Water Act is notoriously unclear." *Id.*   With increasing uncertainty over the last two decades, virtually "[a]ny piece of land that is wet at least part of the year is in danger of being classified by EPA employees as [jurisdictional waters or wetlands] covered by [the CWA.]"[21]   *Id.* "Until the EPA sues them [for alleged unauthorized activity under the CWA], such citizens are blocked from access to the courts [to challenge the agency's claim of CWA jurisdiction]." *Id.*   EPA often as it did in this case, waits years before deciding to sue.  By that time, potential fines easily reach to millions of dollars. As Justice Alito again rightly observed, "In a nation that values due process, not to mention private property, such treatment is unthinkable." *Id.*

---

[21]     *See supra* Exs. 3A, 3B, and 3C.

While EPA's unconstitutional actions in this case are of paramount import to the Foster Plaintiffs, they are not moving for summary judgment on those issues. Foster Plaintiffs instead will solely address the substantive CWA claims raised by Defendants in their counterclaim(s). Defendants' counterclaims, and the underlying JDs and administrative order upon which the counterclaim(s) is/are based, are unsupportable at law and must be vacated with prejudice.

## A.   The Applicable Clean Water Act Legal Standards and Enforcement Protocols

### 1.   Substantive Clean Water Act jurisdictional legal standards

Defendants' counterclaim hinges on whether the Pad 4 area is or is not WOUS. As the U.S. Supreme Court justices have made clear since *Sackett*, the regulatory meaning of the term "waters of the United States" is anything but clear. *Sackett v. EPA*, 132 S.Ct. 1367, 1375. (Alito, concurring). Prior to 2006, U.S. Supreme Court decisions concluded that wetlands adjacent to navigable or interstate waters being subject to CWA jurisdiction[22] and that isolated intrastate waters completely unconnected other waters not being subject to CWA jurisdiction.[23]

In 2006, the Supreme Court construed the term "navigable waters" for the third time in *Rapanos v. United States,* 547 U.S. 715 (2006), a decision that has evoked significant debate. The wetlands at issue in *Rapanos* were located near ditches and man-made drains that eventually emptied into traditionally navigable waters, but it was unclear whether these surface connections contained continuous or merely occasional flows. The Court held that the Corps exceeded its jurisdiction in both cases, but did not adopt a rationale supported by a majority of the justices.

Justice Scalia, joined by Chief Justice Roberts, Justice Alito, and Justice Thomas, wrote the plurality opinion, which found that the Corps' authority to regulate limited waters of the

---

[22]    *United States v. Riverside Bayview Homes I*, 474 U.S. 121 (1985).

[23]    *Solid Waste Agency of Northern Cook County (SWANCC) v. U.S. Army Corps of Engineers,* 531 U.S. 159 (2001).

United States was limited to "*only relatively permanent, standing or flowing bodies of water* . . . forming geologic features" and not "ordinarily dry channels through which water occasionally or intermittently flows." *Id.* at 732-33. "By describing waters as *relatively permanent*, we do *not necessarily exclude streams, rivers, or lakes that might dry up in extraordinary circumstances*, such as drought. We *also do not necessarily exclude seasonal rivers*, *which contain continuous flow during some months of the year* but no flow during dry months." *Id.* at 732 n.5 (internal quotations omitted) (emphases added). The plurality **excluded** from the definition "*streams that flow intermittently or ephemerally[24], or channels that periodically provide drainage for rainfall*." *Id.* at 739 (emphases added).

Justice Kennedy concurred in the result but based on a separate rationale that wetlands adjacent to navigable waterways are waters of the United States based on a "reasonable inference of ecologic interconnection[.]" *Id.* at 780. With regard to isolated wetlands or wetlands adjacent to a non-navigable tributary, Justice Kennedy's concurring opinion held that the Corps must establish a "significant nexus" to navigable waters in order to classify the wetlands as adjacent. *Id.* at 782. The significant nexus test requires a finding that "wetlands, either alone or in combination with similarly situated lands, *significantly* affect the *chemical, physical, and biological* integrity of other covered waters more readily understood as navigable." *Id.* at 780 (emphases added). Conversely, Justice Kennedy opinion noted that "*[w]hen*, in contrast,

---

[24]     In July of 2010, USACE issued a guidance document titled "Operational Draft Regional Guidebook for the Functional Assessment of High-gradient Ephemeral and Intermittent Headwater Streams in Western West Virginia and Eastern Kentucky." This document contains the following definition:

**Ephemeral stream:** A stream, or any portion thereof, that has flowing water only during, and for a short duration after, precipitation events in a typical year.... Runoff from rainfall is the primary source of water for streamflow (Federal Register 2007). Ephemeral streams typically have flowing water for a few hours to a few days after a storm event and have no discernable floodplain.

*Id.* at 92.

wetlands' *effects on water quality are speculative or insubstantial, they fall outside* the zone fairly encompassed by *the statutory term 'navigable waters.*'" *Id.* (emphases added). Justice Kennedy's concurrence rejected a bright-line connection test, noting that a "*mere hydrologic connection should not suffice in all cases*," *Id.* at 784-85 (emphases added), because the connection "may be *too insubstantial for the hydrologic linkage to establish the required nexus with navigable waters as traditionally understood*." *Id.* (emphases added).

The Federal Circuit Courts of Appeals have been divided over how to interpret the *Rapanos* meaning of the phrase "waters of the United States" in 33 U.S.C. §1362(7) of the Clean Water Act ("CWA"). [25] The Fourth Circuit has in two cases applied whichever test the parties before it agree is controlling. *Precon Dev. Corp. v. United States Army Corps of Eng'rs*, 633 F.3d 278 (4th Cir. 2011) (parties agreeing that Justice Kennedy's test governs); *Deerfield Plantation Phase II-B Prop. Owners Ass'n v. United States Army Corps of Eng'rs*, 501 Fed. Appx. 268 (4th Cir. 2012) (parties agreeing that either test could establish jurisdictional waters).

Needless to say, the Plaintiffs and Defendants do not agree as to which *Rapanos* test governs. Plaintiffs contend that the plurality opinion's "relatively permanent water" standard should apply because the Pad 4 area is not a wetland[26] and this test provides more readily identifiable criteria for ascertaining whether CWA jurisdiction exists. However, Plaintiffs contend that EPA's claim of CWA jurisdiction still fails even if Justice Kennedy's more

---

[25]     Because no opinion in *Rapanos* commanded a majority, the lower courts have struggled to develop a rule of decision where no majority holding exists. The disparate appellate decisions following *Rapanos* flow from the Supreme Court's own jurisprudence regarding the effect of its own decisions when no opinion commands of majority of justices. The leading case is *Marks v. United States*, 330 U.S. 188 (1977). In *Marks* the Supreme Court held that "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." All of the courts of appeal that have attempted to determine the scope of the term "waters of the United States" post-*Rapanos* have wrestled with how to give effect to this formulation. They have not agreed on how to do so.

[26]     The Pad 4 area of the Site has been admitted to not be a wetland by EPA (which arguably the Kennedy test only properly applies to). See supra Ex. 18 at 135.

24

nebulous "significant nexus" test is applied in this case. *Rapanos* then raises several sub-issues which this court must assess.

The first inquiry is whether the Pad 4 area has sufficient permanency of flow to establish CWA jurisdiction. The 4th Circuit has recognized USACE's interpretation of the term "seasonal rivers" to include those bodies of water which have ***continuous flow at least seasonally, e.g. typically 3 months***. *Deerfield Plantation Phase II-B Property Owners Ass'n, Inc. v. U.S. Army Corps of Engineers*, 501 Fed.Appx.268, 271 n.1 (4th Cir. 2012) (accepting USACE guidance and use of three months as a benchmark)(emphases added).[27]

The "significant nexus" test is a flexible inquiry into the relationship between the wetlands at issue and traditional navigable. *See Rapanos*, 547 U.S. at 779–80. However, the test requires some evidence of a nexus and its significance. "Otherwise, it would be impossible to engage meaningfully in an examination of whether a wetland had "significant" effects or merely "speculative or insubstantial" effects on navigable waters." *Precon Development Corp., Inc. v. U.S. Army Corps of Engineers*, 633 F.3d 278, 294 (4th Cir. 2011). The record must contain documentation that allows a court to review the regulator's assertion that the functions that the allegedly impacted jurisdictional resource perform are "significant" for the receiving TNW. ("[T]here is no documentation in the record that would allow us to review [plaintiff's] assertion that the functions that these wetlands perform are "significant" for the [TNW]. In particular, although we know that the wetlands and their adjacent tributaries trap sediment and nitrogen and perform flood control functions, we do not even know if the Northwest River suffers from high levels of nitrogen or sedimentation, or if it is ever prone to flooding.") *Id.* at 295. Thus in the

---

[27]     Thus under the plurality test of *Rapanos*,  no CWA jurisdiction would be present in this case as there is no evidence that the Pad 4 area displays surface flow except episodically in response to heavy rainfall or snowmelt. *See infra* Sec. I.C.1.b.

4th Circuit, the significant nexus test requires a showing that the effects cited will be significant to the TNW based on the individual characteristics of the receiving jurisdictional water.[28]

### 2.    Interagency Clean Water Act enforcement protocol

A 1989 interagency memorandum guides how USACE and EPA are to handle alleged unauthorized activities. *See* Memorandum of Agreement Between the Department of Army and the Environmental Protection Agency Concerning Federal Enforcement for the Section 404 Program of the Clean Water Act" (January 19, 1989) (hereafter "1989 MOA"). The 1989 MOA also states that "EPA will act as the lead enforcement agency when an unpermitted activity involves the following: (a) Repeat Violators(s); (b) Flagrant Violation(s); (c) Where EPA requests a class of cases or a particular case; or (d) The Corps [USACE] recommends that an administrative penalty action may be warranted." *See* AR 0000422-0000427 and Ex. 2 to ECF No. 140-3. In cases where none of these four criteria are met, the case is to proceed under USACE's review. *See* Ex. A to ECF No. 141.

### 3.    The USACE defined limits of Clean Water Act jurisdiction

As set forth in the CWA itself and also in the 1989 MOA, in the absence of extraordinary circumstances, USACE has primary regulatory authority for dredge and fill activities in WOUS. *See generally*, 33 U.S.C. §1344; *see also* 1989 MOA, Ex. 2 to ECF No. 140-3 and Ex. A to ECF No. 141. The limits of USACE CWA jurisdiction are set forth at 33 CFR § 328.4 (2010) which reads in relevant part:

**§ 328.4 Limits of jurisdiction.**

---

[28]    On remand in *Precon*, the district court relied upon examples given by Justice Kennedy in *Rapanos* concerning what an adequate record may include when evaluating a significant nexus. *Precon Development Corp, Inc. v. U.S. Army Corps of Engineers*, 984 F.Supp.2d 538, 548, 555 (E.D. Va. 2013). Justice Kennedy's examples included documentation of the significance of the tributaries to which the wetlands are connected, *a measure of the significance of the tributaries* to which the wetlands are connected, *a measure of the significance of the hydrological connections for downstream water quantity, and/or an indication of the quantity or regularity of flow in the adjacent tributaries*. *Precon*, 984 F.Supp.2d at 548 (quoting *Rapanos*, 547 U.S. at 784, 786).

> ...
> (c) *Non-tidal waters of the United States.* The limits of jurisdiction in non-tidal waters:
> (1) In the absence of adjacent wetlands, the *jurisdiction extends to the ordinary high water mark*[.] .... (emphases added) (attached as Ex. ___).

This limitation of jurisdictional reach was expressly articulated by USACE in this case in the agency's JD letter that is sent to Foster on February 22, 2012. "The determination of jurisdiction for streams on-site is based on the presence of an ordinary high water (OHW) mark and evidence indicating the streams exhibit surface water connections to tributary systems to navigable waters. *The USACE regulates streams up to the point where they no longer exhibit an OHW mark*." *See* supra Ex. 38 at 1 (emphases added).

The phrase "up to the point where they no longer exhibit an OHW mark" is critical. Under the CWA, jurisdiction is always present down gradient from a TNW (because once the water body is sufficient to be navigable, the aquatic body only becomes larger as one moves down gradient in a watershed). Thus moving up gradient in a watershed (by definition moving into smaller and smaller feeder drainages), USACE rightly limited the reach of its jurisdiction to the point where the OHWM ceases. Why? Because this is the point above which the land ceases to display "evidence indicating the streams exhibit surface water connections to tributary systems to navigable waters." *Id.*

## 4. Agency Analytic Protocols for Making Clean Water Act Jurisdictional Determinations

When rendering a JD, both USACE and EPA document their analysis on what are referred to as Approved Jurisdictional Determination Forms ("AJDFs"). *See supra* Ex. 1 at 233, and Ex. 18 at 247. In 2007, USACE developed a guidebook for the use of AJDFs. *See* supra Ex. 5. The JD Guidebook contains the following illuminating text:

27

### 1. Significant nexus findings for non-RPW that has no adjacent wetlands and flows directly or indirectly into TNW.

Field staff will assert jurisdiction over tributaries that are not relatively permanent where the tributary has a significant nexus with a TNW. As a result, the explanation in Section III.C.1 will include a discussion documenting the characteristics and underlying rationale for the conclusions regarding the presence or absence of a significant nexus. ***Principal considerations when evaluating significant nexus include the volume, duration, and frequency of the flow of water in the tributary*** and the proximity of the tributary to a TNW. ***Field staff will consider*** all available hydrologic information (e.g., gage data, flood predictions, ***historic records of water flow***, statistical data, ***personal observations/records***, etc.) and ***physical indicators of flow including the presence and characteristics of a reliable OHWM with a channel defined by bed and banks***. Other physical indicators of flow may include shelving, wracking, water staining, sediment sorting, and scour …. ***Consideration will be given to certain relevant contextual factors*** that directly influence the hydrology of tributaries ***including the size of the tributary's watershed, average annual rainfall, average annual winter snow pack, slope, and channel dimensions***.

*Id.* at 55 (emphases added).

Thus, the JD Guidebook establishes that the presence of a "reliable OHWM" remains the key factor in establishing whether a significant nexus exists between the location being assessed and the TNW.

The AJDF Forms also clearly state that chemical and biological data are to be assessed and that mere proximity to a TNW is not appropriate for determining if a significant nexus exists. "[A] significant nexus exists if the tributary… has more than a speculative or insubstantial effect on the chemical, physical and/or[29] biological integrity of a TNW…. It is not appropriate to determine significant nexus based solely on any specific threshold of distance… between a tributary and the TNW." *See supra* Ex. 1 at 85-86. The JD form also states that only in situations where a break in the OHWM occurs (called a discontinuity) that is "***unrelated*** to the

---

[29] The addition of a disjunctive option among the chemical, physical and biological criteria is inconsistent with Justice Kennedy's concurring opinion in *Rapanos* which stated that the criteria needed to be met conjunctively. *See* 547 U.S. at 780 (2006).

waterbody's flow regime (e.g. flow over a rock outcrop or through a culvert) the agencies will look for indicators of flow above and below the break." *Id.* at fns. 6 and 7.    Thus by the guidance utilized by USACE and EPA themselves, a OHWM discontinuity that is *related* to the natural flow regime indicates a terminus to the extent of CWA jurisdiction. Critically, however, neither EPA nor USACE ever took this discontinuity into consideration in making their CWA jurisdictional analyses.

## B.    EPA Did Not Properly Assume Lead Agency Status

Plaintiffs will not belabor this point here, but respectfully refer the Court to their argument in ECF No. 141 at pp. 5-11. It follows necessarily that if EPA did not properly assume lead agency status, its enforcement action is unlawful and void. 5 U.S.C. §706(2)(A) and (D). *Cf.*, *Montana Wildlife Federation v. Morton*, 406 F. Supp. 489, 491-92 (D.C. Mont. 1976)("…Court… can only change [an agency's] decision if it is found that procedures required by law are not observed.").

## C.    EPA Has Failed to Establish CWA Jurisdiction.

### 1.    No evidence supports a significant nexus to a TNW.

#### a.    Imagery evidence: loss of OHWM in hay field.

Historic aerial and satellite imagery clearly shows a natural break in the bed, bank and OHWM of RR4 in the hay field down gradient from the Pad 4 area. *See supra* Ex. 54 at 7-11. These photos show the natural discontinuity in both before and after the Plaintiffs' activities in the Pad 4 area. *Id.* The hayfield is made up of highly water permeable soils. *See* Soil Mapping (attached as Ex. 64). Arscott attempted to explain away the lack of OHWM due to the transmissive soil characteristics of the hayfield. See extracts of Arscott depositions dated September 2, 2015 at 142-144 (attached as Ex. 65). But Blackwell Creek cuts an indisputable

29

bed, bank and OHWM thorough this same soil deposit, so with sufficient surface flow, CWA jurisdiction is capable of being created. See extracts of Dow deposition dated September 3, 2015 at 151-156 (attached as Ex. 66). Thus, the soil characteristics do not account for the discontinuity in bed, bank and OHWM. Rather, the absence of bed, bank and OHWM in the hay field for some one hundred and twenty one (121) feet confirms the lay testimony of local residents that the Pad 4 hollow flows only episodically in response to periods of high precipitation and snow melt. *See next subsection, infra.* This infrequent, episodic flow is insufficient to create the necessary bed, bank and OHWM required for CWA jurisdiction. *See* Ex. FFFF. Per the regulatory limits of jurisdiction then, the termination of the OHWM at the downgradient (west) end of the hay field (just upgradient from Blackwell Creek) marks the end of CWA jurisdiction. 33 CFR § 328.4 (2010). Accordingly, the hayfield itself, and the Pad 4 area above it are not jurisdictional WOUS. *Id.*

### b.    Historic testimony: evidence loss of OHWM in hay field.

Neither EPA enforcement personnel nor the agency's experts interviewed or considered the testimony of local residents familiar with the Pad 4 site and the hay field between the Pad 4 site and Blackwell Creek. Three local residents with a combined personal knowledge of the Pad 4 area and the hayfield extending back to the 1950s all testified that the Pad 4 area flows only episodically in response to high precipitation or snow melt conditions. *See supra* Ex. 4 *passim.* Local witness testimony also confirmed that the hayfield has never displayed a bed, bank and OHWM across its surface from the Pad 4 area to Blackwell Creek. *Id.* This testimony also confirmed that no agricultural plowing or disturbance of the hay field can account for the lack of bed, bank and OHWM. *See supra*, Ex. 4, Deposition of Carr at 34.

### c.    GAI Investigation and Conclusions.

30

As noted above, GAI's June 2013 review of the jurisdictional basis of the EPA's claims further confirmed the lack of CWA jurisdiction. The Pad 4 draw (RR4), once meeting hayfield, quickly flattens out into a broad upland field devoid of any bed, bank or OHWM for one hundred and twenty one feet. The loss of the signature jurisdictional features (i.e. bed, bank and OHWM) indicate that CWA jurisdiction stops near the western boundary of the hayfield, just a few feet upland of Blackwell Creek. *See supra* Exs. 54 and 55. Thus the features of the hayfield, or rather the *lack* drainage features in the hayfield clearly and unambiguously support a conclusion that the hayfield is a non-jurisdictional swale and that it follows necessarily that the upgradient Pad 4 area is not WOUS. *See supra*, Ex. 5 at 38; 33 CFR 328.4 (2010).

### d.    Jacob White's Reversal of Opinion.

As noted above, White recanted his March 10, 2011 delineation report conclusions in deposition due to the observations established by GAI in its report. *See supra* Ex. 31 at 137-138. Thus even the consultant upon whose delineation both USACE and EPA relied for their JDs has admitted that the Pad 4 area is not WOUS. Yet again, the evidence requires a conclusion that the hayfield is a non-jurisdictional swale and that the Pad 4 area is not WOUS. *See supra*, Ex. 5 at 38; 33 CFR 328.4 (2010).

### e.    ERM Investigation and Conclusions.

Pehrman also confirmed no CWA jurisdiction should apply to the hayfield and Pad 4 area for reasons similar to those GAI reached two years earlier. After an on the ground inspection of the hayfield/AOC on July 10, 2015 and review and consideration of topographic mapping, aerial imagery, nearby ground photography, soil mapping, and previous [GAI and Randoph Engineering] studies conducted at or near the AOC as described below, Pehrman concluded that, "prior to the disturbance on the Foster site in September 2010, jurisdiction under the CWA ended

at the upstream end of a erosional channel tributary to the unnamed 2nd order tributary to Neal Run [i.e., Blackwell Creek.]" *See supra* Ex. 61. at 7.

Pehrman also looked at EPA and USACE guidance that describe criteria for finding CWA jurisdiction. These guidance documents include factors required to find a "significant nexus" to a TNW (as claimed by EPA here) and USACE's limits of jurisdictional applicability under the CWA generally. These guidance documents discuss physical indicators of flow including the presence and characteristics of a reliable OHWM with a channel defined by bed and banks, and also other indicators of flow such as shelving, wracking, water staining, sediment sorting, and scour. Pehrman (as well as GAI in 2013) found no such indicators in the hayfield/AOC. Pehrman concluded:

The AOC lacks a defined bed and bank and is best described as a broad swale through the farm field which conveys episodic runoff to the downgradient jurisdictional tributaries during heavy precipitation/snowmelt events. The area does not contain wetlands nor an aquatic habitat that would support the Little Kanawha River (the nearest TNW). Additionally, given the small contributory watershed size (30.7 acres), low and episodic flow volume, and insignificant suspended sediment load from the forested upgradient areas, there is no evidence that the AOC would have carried substantial pollutants, flood waters or impacted water quality in the Little Kanawha River. Based on these factors, the AOC does not have the ecological factors needed to meet the significant nexus test.

In accordance with the USEPA/USACE Guidance, this area does meet the criteria of a swale or erosional feature (e.g. gullies, small washes characterized by low volume, infrequent, or short duration flow) that generally are not jurisdictional waters.

In conclusion, since the AOC is not jurisdictional, the upgradient areas on the Foster site would also not be jurisdictional WOUS.

*Id.* at 7.

Thus Pehrman's testimony also requires a conclusion that the hayfield is a non-jurisdictional swale and that the Pad 4 area is not WOUS. *See supra*, Ex. 5 at 38; 33 CFR 328.4 (2010).

32

### 2. EPA/USACE did not follow required analytic protocols.

The AJDF forms utilized by both USACE and EPA as the basis for their JDs are demonstrably deficient even under their own terms. Hemann testified in deposition that he neither gathered nor assessed any chemical or biological data in preparing his AJDF. *See supra* Ex. 1 at 233. Andreescu admitted the same in her deposition. *See* supra Ex. 18 at 247.

Moreover, the AJDF used to support the JD provides only proximity to the nearest TNW as the *only* quantifiable physical characteristic by which to assess whether a significant nexus existed between the Pad 4 site and the Little Kanawha River. *See supra* Ex. 2 at 5 (MPS001212). The reliance of the AJDFs on this sole criteria is contrary to the AJDF itself which plainly states that "It is not appropriate to determine significant nexus based solely on any specific threshold of distance… between a tributary and the TNW." *Id.*

Additionally, the studies referenced by Andreescu in her (*post-hoc*) significant nexus analysis memorandum clearly state that they are speculative, inconclusive and require additional research to support their conclusions. See AR 2-15, AR 40-58 and AR 16-39.[30] *See supra* Ex. 18 at 229-231 and Andreescu Memorandum dated June 13, 2012 (attached as Ex. 67). Thus, EPA's own scientific references for its significant nexus determination in this case are, by their own terms, speculative and lacking in valid empirical basis to verify the agency's claims [and therefore] fall outside the zone fairly encompassed by the statutory term "navigable waters." *See* 547 U.S. at 780 (2006) (Kennedy, concurring).

---

[30]     These reports each expressly contain language that establishes that their bases are speculative or biased. *See e.g.* AR 11-12 ("still require direct testing"); AR 17 (sponsored by Sierra Club); AR 41 ("the Rosemary Mackay Fund is intended to promote publication of speculative… articles on any aspect of benthology.").

Accordingly, even by EPA's own putative empirical justification, they have utterly failed to establish a significant nexus as a matter of law. Defendants' counterclaim must be dismissed and the underlying administrative order vacated.

## D. EPA's Expert Reports and Findings are Legally Insufficient to Establish CWA Jurisdiction as a Matter of Law.

On August 27, 2015, Plaintiffs deposed EPA expert Stokely. Stokely relied upon exclusively aerial and/or satellite imagery for his analysis. See supra Ex. 60 at 21. Stokely concluded from the imagery that "curvilinear" features were indicative of bed and bank channelization. *Id*. at 57-59. However, Stokely acknowledged that he did not conduct any on the ground observations of the hayfield. *Id*. at 46, 139. Stokely's methodology has been rejected by another court as a basis for establishing CWA jurisidiction. *See United States v. Lipar*, Civil Action No. H-10-1904 (S.D. Texas) (August 30, 2015) [31] (rejecting EPA reliance upon aerial imagery, interpreted by Stokely, for the alleged establishment of a continuous surface connection).

The *Lipar* Court's rejection of Stokely's methodology as a basis for establishing a surface connection is entirely consistent with USACE's OHWM guidance document which states "Thus, while information on prior landscape or streamflow conditions (e.g., from aerial imagery, stream gage records, anecdotal evidence, etc.) may provide useful supporting evidence, *the OHWM at any given location should ultimately be delineated based on current site conditions as observed in the field*. *See supra* Ex. 58 at 46 (emphases added). This court should likewise reject Defendant's reliance on Stokley's report as a basis for showing an OHWM surface connection or significant nexus.

---

[31]     Plaintiffs have previously brought this case to the Court's attention. *See* ECF Nos. 110 and 110-1.

On September 2-3, 2015 Plaintiffs deposed EPA experts, David B. Arscott ("Arscott") and Charles B. Dow ("Dow"). Arscott acknowledged that he made no on the ground analysis of the hayfield. *See* supra Ex. 65 at 41-42. He also acknowledged that none of the comparative watersheds that he examined during his investigation contained breaks in the bed, bank and OHWM such as the hayfield separating the Pad 4 area from Blackwell Creek. *Id.* at 118-119. Arscott also concurred that USACE guidance stated that small upland swales could have some hydrologic connection but nevertheless *not* jurisdictional under the CWA. *Id.* at 90-92, 95-96. Most significantly, Arscott stated that he had *not* made a determination that the hydrologic connection that he had made constituted a significant nexus with the nearest TNW. *Id.* at 115, 183-185.

Dow, likewise gave no opinion as to whether their findings constituted a significant nexus between the Pad 4 area and the TNW. *See* supra Ex. 66 at 34-41. Dow did acknowledge that the slope and vegetative characteristics of the hayfield were consistent with those of upland swales, described in USACE guidance documents as usually non-jurisdictional drainages. *Id.* at 59-61, 120-122. Dow also confirmed that he made no actual physical observations of the hayfield on the ground. *Id.* at 27-29, 120. Moreover, Dow also confirmed that he and Dr. Arscott's analysis in no way quantified the influence of the Pad 4 area to the TNW relative to any of the other flow and water chemistry inputs to the TNW. *Id.* at 169-170.

EPA retained experts Arscott and Dow, therefore, also fail to provide the necessary scientific justification for the agency's claim that the Pad 4 area was a jurisdictional water under the CWA. Their joint voluminous report, merely concludes that in their "scientific opinion ... the streams draining the NRC property have distinct stream channel structure (bed, bank, and water marks) and they have a hydrologic connection to the downstream navigable portion of

35

Neal Run." *See supra* Ex. 62 at 28. Their rebuttal report stated that they "maintain our scientific opinion that the streams draining the NRC property are/were tributaries to downstream navigable waters.... Exert[ing] hydrological, chemical, and biological influence on ... Little Kanawha mainstem [.]" *See supra* Ex. 63 at 1. However, neither report made the crucial conclusion that a significant nexus exists between the Pad 4 site the nearest navigable water. The failure of Stokely, Arscott and Dow to address the loss of the OHWM in the hayfield, and to present any quantifiable analysis of the alleged influence of the Pad 4 area on flow, biology and water chemistry to the TNW, render EPA's empirical support for its CWA enforcement order deficient as a matter of law. *Precon*, 633 F.3d at 294; 984 F.Supp.2d at 548, 555.

## II.    EPA'S JD, ORDER AND COUNTERCLAIMS ARE ARBITRARY, CAPRICIOUS AND AN ABUSE OF DISCRETION THAT MUST BE VACATED.

### A.    EPA's JD and Enforcement Action Fails Under Controlling 4th Circuit Precedent.

In the 4th Circuit the significant nexus test requires a showing that the effects cited will be significant to the TNW based on the individual characteristics of the receiving jurisdictional water. Some quantifiable evidence of a nexus and its significance must be established in the record, "[o]therwise, it would be impossible to engage meaningfully in an examination of whether a [water or] wetland had "significant" effects or merely "speculative or insubstantial" effects on navigable waters." *Precon*, 633 F.3d at 294.

On remand *Precon* held that documentation of the significance of the tributaries to which the wetlands are connected, a measure of the significance of the tributaries to which the wetlands are connected, a measure of the significance of the hydrological connections for downstream water quantity, and/or an indication of the quantity or regularity of flow in the adjacent tributaries must be shown. *Precon*,   984 F.Supp.2d at 548, 555 (E.D. Va. 2013); (quoting

*Rapanos*, 547 U.S. at 784, 786).

For the reasons set forth in Argument I, *supra*, Defendants have indisputably failed to present any evidence that is legally sufficient to support their claim that a significant nexus exists between the Pad 4 area and the nearest TNW (the Little Kanawha River). Stokely's evidence fails because it is based solely on imagery. Arscott and Dow expressly stated they were not rendering an opinion that a significant nexus existed between the Pad 4 area and the TNW and acknowledged that they made no analysis of the hayfield/break in OHWM, nor did they conduct comparative analysis of the physical, chemical and biological impact of the Pad 4 area on the TNW. Defendants' counterclaim(s) must therefore be dismissed and their underlying administrative enforcement order must be vacated. *Precon*, 633 F.3d at 294.

## B.     EPA's JD and Enforcement Should be Dismissed as Arbitrary and Capricious.

As has been established above, Defendants' failed to assess the factors required for establishing a significant nexus under controlling 4th Circuit precedent.     Although not controlling, other court's have ruled that agency decisions that do not properly assess empirical claims of causation are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA. *Cf., Center for Biological Diversity v. National Marine Fisheries*, 977 F. Supp. 55, 88-91 (D. Puerto Rico 2013)(use of biomass as proxy for measuring status of herbivorous fish stock in biological opinion was arbitrary and capricious). Similar to these persuasive decisions, Defendants' JD, counterclaim and enforcement order here violate the APA because they relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it. *Id.*

Also, In *Hawkes v. USACE*, Civil Action No. 13-107 ADM/TNL (U.S. Dist. Minn.,

January 24, 2017),[32] the District Court found the government's evidence for CWA jurisdiction deficient at law under circumstances even less lacking than those EPA presents in this case. In *Hawke*, the Court noted that the regulatory authority had observed no flows but presumed their existence from modeling, and provided no specific, quantifiable data regarding flow, or chemical or biological connectivity. *Hawkes* at 6-10.     The Court concluded that the regulator had failed to provide any site specific, quantifiable data establishing the required connectivity, or was other wise speculative.     "In sum, the … JD is based on essentially the same information and documentation that was already determined … to be insufficient for establishing more than a speculative or insubstantial nexus[.]" *Id.* at 23.  For the reasons set forth in Argument I, *supra*, Defendants have likewise failed to establish anything other than a "speculative or insubstantial nexus" to the TNW downstream of the Pad 4 area.  Accordingly, both the JD and the EPA enforcement order should be vacated with prejudice, and USACE and EPA be enjoined from asserting CWA jurisdiction over the Pad 4 area.  *Id.* at 26.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment for dismissal of EPA's counterclaim(s) should be granted.  Plaintiffs further ask the Court to reverse the EPA's JD, vacate the enforcement order with prejudice, and enjoin EPA or USACE from asserting CWA jurisdiction over the Pad 4 area.

DATED this 21st day of February, 2017.

---

[32]     Plaintiffs noticed the Court of this persuasive authority on February 2, 2017. See ECF Doc. No. 180 and 180-1.     This case was the remand from the U.S. Supreme Court following these appeals *Hawkes Co., Inc. v. U.S. Army Corps of Eng'rs*, 782 F.3d 994 (8th Cir. 2015). The Supreme Court granted certiorari, affirmed the Eighth Circuit's holding, and remanded the case to D. Minn. for further proceedings. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S.Ct. 1807 (2016). The 8th Circuit and SCOTUS *Hawkes* opinions were likewise brought to this Court's attention in ECF Doc Nos. 44 and 143, respectively.

Respectfully submitted,

RON FOSTER, MARKETING & PLANNING
SPECIALISTS LIMITED PARTNERSHIP and
FOSTER FARMS, LLC

s/ J.C.  (Max) Wilkinson, Jr.
James S.  Crockett, Jr.  (WV State Bar  No.  9229)
J.  C.  (Max) Wilkinson, Jr.  (WVSB No. 8869)
300 Kanawha Boulevard, E.  (Zip 25301)
P.  O.  Box 273
Charleston, WV  25321-0273
jwilkinson@spilmanlaw.com
Telephone: (304) 340-3800
Facsimile: (304) 340-3801