UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

RON FOSTER, and FOSTER
FARMS, LLC, and MARKETING
& PLANNING SPECALISTS
LIMITED PARTNERSHIP,

       Plaintiffs,

v.                             Civil Action No. 14-16744

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and SCOTT
PRUITT, in his official capacity
as Administrator,

       Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

       Pending is the motion for summary judgment filed February 21, 2017, by the United States Environmental Protection Agency ("EPA") and Scott Pruitt, in his official capacity as Administrator (collectively "defendants") and the motion for summary judgment as to defendants' counterclaim, filed on February 21, 2017, by Ron Foster ("Foster"), Foster Farms, LLC, ("Foster Farms") and Marketing & Planning Specialists Limited Partnership ("Marketing & Planning Specialists") (collectively "plaintiffs"). This case presents a challenge by plaintiffs to a Clean Water Act ("CWA") Administrative Compliance Order ("ACO") under the Administrative Procedures Act and defendants'

counterclaim which seeks injunctive relief and a civil penalty under the CWA.

## I. Background

In September 2009, Ron Foster, general partner and shareholder member of Foster Farms and Marketing & Planning Specialists, purchased two tracts of property in Wood County, West Virginia, north of Lubeck, West Virginia, known as "Neal Run Crossing," (hereinafter "Neal Run Crossing"). Foster purchased Neal Run Crossing out of the bankruptcy estate of the Endurance Group, LLC ("Endurance") and assigned one parcel to Foster Farms and the other to Marketing & Planning Specialists. 2d Am. Comp. ¶ 8(d)-(f); Defs.' Mem. Ex. 2; Administrative Record ("AR") 47 at AR 000384.

In 2009, when Neal Run Crossing was owned by Endurance, a stream was relocated on a portion of the property known as Pad 1 (being one of five such pads) without a Section 404 permit to do so, in violation of the Clean Water Act, 33 U.S.C § 1251 et seq. 2d Am. Comp. ¶¶ 14, 16-17. Endurance declared bankruptcy before the EPA could begin enforcement proceedings and the bankruptcy court permitted the sale of the Neal Run Crossing Property to Foster clear of Clean Water Act liability as long as Foster agreed to spend $50,000 to restore the violations committed by Endurance. Pls.' Mem. Ex. 9 (Deeds

with Sale Order dated October 29, 2009).  A restoration plan was eventually agreed on by the EPA and Foster, and was completed in 2011.  Defs.' Mem. Ex. 10 (Lutte Decl.) at ¶ 13.

On September 9, 2010, EPA inspectors Stephanie Andreescu and Todd Lutte visited the Neal Run Crossing property. Defs.' Mem. Ex. 4 (Andreescu Decl.) ¶¶ 11, 13; Lutte Decl. at ¶ 14.  According to defendants, their visit related to complaints about flooding on neighbors' land caused by Endurance's movement of the Pad 1 stream.  Defs.' Mem. in Supp. of Mot. for Summary Judgment ("Defs.' Mem.") at 7; Andreescu Decl. at ¶¶ 15-16; Lutte Decl. ¶¶ 15-16.  During this visit, they saw a billboard that advertised the sale of portions of the Neal Run Crossing property.  Defs.' Mem. at 7; Andreescu Decl. at ¶¶ 15-16; Lutte Decl. ¶¶ 15-16; Andreescu Decl. at Attach. C.  The sign included a topographical map, which indicated that fill had or would be placed on streams in Pad 4, which is the focal point of this dispute.  Defs.' Mem. at 7; Andreescu Decl. at ¶¶ 15-16; Lutte Decl. ¶¶ 15-16; Andreescu Decl. at Attach. C.[1]

_____

[1] In their memorandum in support of their motion for summary judgment on defendants' counterclaim, plaintiffs seem to infer that Andreescu and Lutte had an ulterior motive for visiting Neal Run Crossing on September 9, 2010, and plaintiffs attempt to discredit multiple facts contained in Andreescu's report of this visit.  See Pls.' Mem. at 7.

3

The Neal Run Crossing property has been divided into five "pads" for development purposes. Stipulation ¶ 15. The alleged CWA violations at issue in this case occurred on Pad 4, which is also sometimes referred to as "the Site." Id. at ¶ 4. Foster Farms and Marketing and Planning Specialists each own part of Pad 4.[2] Id. at ¶ 16. Before plaintiffs developed Pad 4, four streams, known as "relevant reaches," RR1, RR2, RR3, and RR4 existed on the Site. Defs.' Mem. Ex. 25; Defs.' Ex. 20 at AR0000483-0484; Dow Decl. ¶ 20. Before being filled, RR1, RR2, and RR3 flowed into RR4. Defs.' Mem. Ex. 20 at AR 0000483. As RR4 exited the western boundary of the Site, its path crossed a neighbor's hayfield and then joined the First Unnamed Tributary to Neal Run (also known as the Blackwell Creek or Blackwell Tributary). Ex. 7 to Defs.' Mem. (Decl. of Stokely) ¶ 17; Defs.' Ex. 28 (Carr Dep.) 12, 24, 28-29; Defs.' Ex. 9 (Moore Dep.) 19, 22, 33-34.

The First Unnamed Tributary joins the Second Unnamed Tributary to Neal Run. Stipulation ¶ 25. The Second Unnamed Tributary is a relatively permanent water, which flows into Neal Run. Id. at ¶ 26. Neal Run is a relatively permanent water,

---

[2] Although at one point, Foster appeared to deny that Foster Farms owned the Site, plaintiffs, in the briefing for the motions for summary judgment, do not contest that Foster Farms and Marketing & Planning Specialists each own part of Pad 4.

which flows into the Little Kanawha River.  Id. at ¶ 27.  The
Little Kanawha River flows into the Ohio River at Parkersburg,
West Virginia.  Id.  The portion of Neal Run, from its
confluence with the Little Kanawha River, has been identified by
the Corps as a "navigable water of the United States" for
purposes of Section 10 of the Rivers and Harbors Act of 1899.
Id.  The Little Kanawha River is navigable-in-fact, and has been
identified as a "navigable water of the United States" for
purposes of Section 10 of the Rivers and Harbors Act of 1899.
Id. at ¶ 29.  The approximate distance from the confluence of
RR4 and the First Unnamed Tributary of Neal Run to the
designated navigable portion of Neal Run is 3.1 miles.  Stokely
Decl. ¶ 21.

        This case revolves around whether RR1, RR2, RR3, and
RR4 are "waters of the United States" under the CWA.  Defendants
assert that RR4 is a relatively permanent water as defined in
the plurality opinion of four Justices in Rapanos v. U.S., and
that RR1, RR2, RR3, and RR4 have a significant nexus with a
navigable water and thus meet the test contained in Justice
Kennedy's concurring opinion in Rapanos.  547 U.S. 715 (2006).
Plaintiffs dispute these assertions.

        Andreescu and Lutte approached the Site through a
field on adjoining property next to Pad 4 and discovered a

stream channel that had been partially buried with dirt and
vegetation.  Defs.' Mem. at 7-8; Andreescu Decl. at ¶ 18; Lutte
Decl. ¶¶ 17, 19.  Andreescu and Lutte observed that the portion
of the stream that was not buried had a bed, bank, an ordinary
high water mark, and "other attributes associated with the
regular presence of flowing water," of which Andreescu took
photos.  Defs.' Mem. at 8; Andreescu Decl. at ¶¶ 19, 21; Lutte
Decl. ¶ 17; Andreescu Decl. at Attach. D, E.

      A man, who was later identified as Bryan Scott Moore,
approached the inspectors while they were observing the Site and
stated that a stream previously flowed on the Site.  Defs.' Mem.
at 8; Pls.' Mem. at 8; Andreescu Decl. at ¶¶ 19, 21; Lutte Decl.
¶ 17.  Moore attempted to take Andreescu and Lutte to the source
of the stream, but they were unable to locate it due to thick
vegetation.  Defs.' Mem. at 8; Andreescu Decl. at ¶ 20.  When
they returned to the Site, the inspectors encountered men with a
bulldozer, one of whom they later learned was David Walters of
Walters Excavating.  Defs.' Mem. at 8; Andreescu Decl. at ¶ 21;
Lutte Decl. at ¶ 19.  The men indicated that they had filled the
stream and Walters stated that he had not obtained a permit for
the work.  Lutte Decl. ¶ 19; Defs.' Mem. Ex. 8 (Walters Dep.) at
99-100.  The men from Walters Excavating were preparing "the

area for the construction of a storm water control cell." Pls.'
Mem. at 8.

Lutte's declaration states that while he does not
specifically remember what he said to Walters, his "usual
practice would be to inform him of applicable law and the fact
that a permit may be required." Lutte Decl. at ¶ 19. Walters
testified that Lutte or Andreescu told him that they "may be in
violation" for filling in the stream and that they needed a 404
permit for the work done. Defs.' Ex. 27 (David Walters Dep.) at
106.

When leaving the Site, Andreescu observed the stream
channel exiting Pad 4 and continuing towards a hayfield.
Andreescu Decl. ¶ 22. Andreescu and Lutte walked across the
hayfield and noted that the stream channel lost its bed, bank,
and ordinary high water mark in the middle of the field. Id. A
defined bed, bank, and ordinary high water mark re-formed on the
western side of the field and joined the First Unnamed Tributary
to Neal Run. Id.

After Lutte and Andreescu left, David Walters informed
Foster of his conversation with them. Id. at 107. Foster and
Walters both spoke with Dan Metheny of Fox Engineering, Foster's
engineering consultant for the project. Pls.' Mem. at 9;
Walters Dep. at 107-08; September 9, 2010 email between Foster

and Metheny (Exhibit 28 to Pls.' Mem.).  Metheny stated that he
checked the plans and did not believe a permit was required at
the Pad 4 location.  Pls.' Mem. at 9; Sept. 9 email between
Foster and Metheny.  After pausing operations for several days,
Marketing & Planning Specialists continued the construction
operations.  Pls.' Mem. at 9; Defs.' Mem. at 8; Walters Dep. at
74:18-87:14; 92:4-93:8.  Foster's contractors placed fill in
three additional streams (RR1, RR2, and RR3) on the Site and
built a sediment pond.  Defs.' Mem. at 8, Walters Dep. at 74:18-
87:14; 92:4-93:8; Andreescu Decl. ¶ 32; Lutte Decl. ¶ 22.

          In late fall 2010, the EPA sent information requests
pursuant to Section 308 of the Clean Water Act to Foster Farms,
Walters Excavating, and Fox Engineering in order to determine
whether and to what extent Clean Water Act violations occurred
in the Pad 4 area.  Andreescu Decl. ¶ 27.  Responses to the
requests were provided in December 2010.  Id.  EPA officials
also conducted two additional Site visits to the Pad 4 area in
May 2011 and September 2011.  Id. at ¶¶ 32, 35.

          In March 2011, plaintiffs commissioned a delineation
report, which was conducted by Jacob White of Randolph
Engineering and was submitted to the United States Army Corps of
Engineers ("the Corps") for input into their jurisdictional
determination ("JD").  Pls.' Mem. at 10; Andreescu Decl. Attach.

F ("Randolph Report"), AR 61. White determined that the Pad 4 site likely contained jurisdictional waters. Id. at USEPA000418. White's report was then forwarded to the EPA. Defs.' Mem. at 9.

Between October and December 2011, the EPA and the Corps discussed whether plaintiffs' discharges would be addressed through an EPA enforcement action or an after-the-fact permit issued by the Corps. Defs.' Mem. at 9; Andreescu Decl. ¶ 37; Lutte Decl. ¶ 25. Defendants contend that while the EPA began drafting the ACO in December 2011, the EPA was still "urg[ing] the Corps to take lead agency status," although the Corps ultimately decided not to do so. Defs.' Mem. at 9; Andreescu Decl. ¶ 36; Lutte Decl. ¶ 25.

During this time, Pam Lazos of the EPA represented to Foster that the Corps refused to issue a permit because the violations at the Site were so "egregious." Pls.' Mem. at 11; Pls.' Mem. Ex. 32 (October 18, 2011 email from Lazos to Foster). In an email sent in March, 2012, Richard Hemann, who worked for the Corps, informed Andreescu that the Corps "did not wish to verify the delineation if the EPA will not consider improvements to unauthorized work as compensatory mitigation for other unauthorized work." Pls.' Mem. at 12-13; Pls.' Mem. Ex. 37.

On January 3, 2012, the EPA informed Foster that the case was proceeding as an EPA enforcement action. Defs.' Mem. at 9; Defs.' Ex. 17 (AR 84) at AR0000632. On January 24, 2012, the EPA issued an ACO to Foster Farms stating that there had been unauthorized discharges of fill materials to waters of the United States in Pad 4. Defs.' Mem. at 9; Andreescu Decl. ¶ 37 & Attach. K; Lutte Decl. ¶ 26. Although the EPA had already assumed lead agency status, the Corps finished its analysis of the Site, which defendants state was at the request of Foster. Defs.' Mem. at 10; Andreescu Decl. Attach O. The Corps concluded that the four streams on Pad 4 that were filled by plaintiffs were covered by the CWA, and informed plaintiffs of this in a February 22, 2012 letter. Defs.' Mem. at 10; Andreescu Decl. Attach. O.

Because the Corps' jurisdictional analysis provided an administrative appeal process, plaintiffs' appealed the Corps' jurisdictional determination. Pls.' Mem. at 14. The EPA issued a letter on April 5, 2012, which stated that due to the EPA's issuance of the ACO on January 24, 2012, it was "superseding the Corps' authority to verify the jurisdictional status" at the Site, and reaffirmed its findings that RR1, RR2, RR3, and RR4 were jurisdictional waters. Pls.' Mem. Ex. 44 (April 5, 2012 Letter). The Corps' denied plaintiffs' appeal because the EPA

had assumed the role of lead agency for the Site.  <u>See</u> Pls.'
Mem. Ex. 45 (Letter from Margaret Burcham, Brigadier General to
Foster); <u>see also</u> 33 C.F.R. § 331.11 (stating that a
jurisdictional determination by the Corps cannot be appealed
when the EPA has assumed lead agency status).  The EPA's ACO did
not permit an appeal.  On May 8, 2014, Foster received a letter
from the Department of Justice proposing plaintiffs pay a
$414,000 penalty and remediate the Site, or face an enforcement
litigation and more penalties.  Pls.' Mem. Ex. 57.

## II.  <u>Governing Standard</u>

Summary judgment is appropriate only "if the movant
shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to
establish the elements of a party's cause of action.  <u>Anderson
v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>News
& Observer Publ'g Co. v. Raleigh-Durham Airport Auth.</u>, 597 F.3d
570, 576 (4th Cir. 2010) (same).  A "genuine" dispute of
material fact exists if, in viewing the record and all
reasonable inferences drawn therefrom in a light most favorable
to the non-moving party, a reasonable fact-finder could return a
verdict for the non-moving party.  <u>Anderson</u>, 477 U.S. at 248.

The moving party has the initial burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party satisfies this burden, then the non-moving party must set forth specific facts, admissible in evidence, that demonstrate the existence of a genuine issue of material fact for trial. See id. at 322-23; Fed. R. Civ. P. 56(c), (e).

Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find for the non-moving party. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248.

### III. Discussion

#### A. The Clean Water Act

In 1972, Congress passed the CWA "to restore and maintain the chemical, physical, and biological integrity of the

Nation's waters." 33 U.S.C. § 1251. The CWA prohibits the discharge of pollutants into navigable waters, which are defined as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The Supreme Court has interpreted the term "navigable waters" on multiple occasions, most recently in Rapanos, 547 U.S. 715. In Rapanos, no majority of the Court agreed as to how to define navigable waters.

The plurality opinion of four Justices, authored by Justice Scalia, limited CWA jurisdiction to traditional navigable waters, waters connected to traditional navigable waters that have a "relatively permanent flow," and wetlands that have a "continuous surface connection" to relatively permanent waters. Id. at 742. Justice Kennedy concurred in the judgment but stated that "navigable waters" extended to "a water or wetland [that] . . . possesses a 'significant nexus' to the waters that are or were navigable in fact or that could reasonably be made so." Id. at 780 (Kennedy, J., concurring) (citing Sold Waste Agency of Northern Cook Cnty. V. Army Corps of Engineers, ("SWANCC") 531 U.S. 159 (2001). The four dissenting Justices concluded that "waters of the United States" included all tributaries and wetlands that satisfied either definition. Id. at 810.

Circuit courts are divided on how to interpret navigable waters post-Rapanos.  The 2008 Waters of the United States Guidance issued by the Corps and EPA in light of Rapanos states that there is CWA jurisdiction if either the plurality's relatively permanent waters test or Justice Kennedy's significant nexus test is satisfied.  See Pls.' Ex. 6 (Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos) ("2008 Waters of the United States Guidance") at 1.  The United States Courts of Appeals for the First, Third, and Eighth Circuits have found that a water is subject to the CWA if it meets either the plurality test or Justice Kennedy's test.  See United States v. Donovan, 661 F.3d 174 (3d. Cir. 2011); United States v. Bailey, 571 F.3d 791, 797-799 (8th Cir. 2009); United States v. Johnson, 467 F.3d 56 (1st Cir. 2006).  The United States Courts of Appeals for the Seventh, Ninth, and Eleventh Circuits have determined that a water is subject to the CWA if it meets Justice Kennedy's test only.  See Northern California River Watch v. City of Healdsburg, 496 F.3d 993 (9th Cir. 2007) cert. denied, 552 U.S. 1180 (2008); U.S. v. Robinson, 505 F.3d 1208 (11th Cir. 2007); United States v. Gerke Excavating, Inc., 464 F.3d 723 (7th Cir. 2006) (per curiam).  In Precon Development Corporation v. U.S. Army Corps of Eng'rs. ("Precon I", 633 F.3d 278 (4th Cir. 2011), because the parties agreed that Justice Kennedy's "significant

nexus" test governed, the Fourth Circuit did not address "the issue of whether the plurality's 'continuous surface connection' test provides an alternate ground upon which CWA jurisdiction can be established."  Id. at 288.  In Deerfield Plantation Phase II-B Property Owners Association v. U.S. Army Corps of Engineers ("Precon II"), 501 Fed. App'x 268, 275 (4th Cir. 2012), our court of appeals found that the Corps did not err in finding that there was no CWA jurisdiction under either the plurality's or Justice Kennedy's Rapanos test.

Defendants argue that because three circuits have found that either test satisfies jurisdiction under the CWA, and because the Fourth Circuit has adopted the parties' agreement in Precon I that a water that satisfies Justice Kennedy's test is a "water of the United States," and, according to defendants, has implied it would accept the plurality's test in Precon II, a finding that either test is met in this case satisfies jurisdiction under the CWA.  Pls.' Mem. at 13-14.

Plaintiffs argue that only the Rapanos plurality's relative permanence test is applicable for a number of reasons. First, plaintiffs state that although our court of appeals applied the significant nexus test in Precon I, and applied both tests in Precon II, it did so only because the parties agreed that one or both tests were controlling.  Pls.' Mem. at 24

(citing Precon I, 633 F.3d at 288 and Precon II, 501 Fed. App'x at 273). Plaintiffs contend that they do not agree with defendants as to which test should govern and maintain that "the plurality opinion's 'relatively permanent water' standard should apply because the Pad 4 area is not a wetland and this test provides more readily identifiable criteria for ascertaining whether CWA jurisdiction exists." Pls.' Mem. at 24. However, the significant nexus test framed by Justice Kennedy is not limited solely to wetlands. In Rapanos, Justice Kennedy did not confine the significant nexus test to wetlands, stating that "a water or wetland" that "possesses a 'significant nexus'" to navigable waters is a jurisdictional water under the CWA. 547 U.S. at 759 (citing SWANCC, 531 U.S. at 167, 172) (emphasis added); see also 547 U.S. at 767 ("[I]n some instances . . . the connection between a nonnavigable water or wetland and a navigable water may be so close, or potentially so close, that the Corps may deem the water or wetland a 'navigable water' under the Act. In other instances, . . . there may be little or no connection.") (Kennedy, J., concurring) (emphasis added). Accordingly, the court finds plaintiffs' argument that the significant nexus test should be disregarded is without merit.

For the first time in their reply to defendants' response to plaintiffs' motion for summary judgment on the

counterclaim, plaintiffs' assert that "Although Precon [II] holds that satisfaction of either Rapanos test is sufficient, . . . Precon [II] is at odds with U.S. Supreme Court precedent for the proper application of split plurality opinions."  Pls. Reply at 3-4, n. 3.  According to them, the plurality's test is the narrowest and thus is controlling under Marks v. United States, 430 U.S. 188 (1977).  Id.

As noted above, circuit courts are divided on whether to apply the plurality's test, Justice Kennedy's test, or both post-Rapanos.  The Courts of Appeal for the Seventh and Eleventh Circuits have found only Justice Kennedy's opinion to be controlling based on the Supreme Court's decision in Marks. Gerke Excavating Inc., 464 F.3d at 724-25; Robinson, 505 F.3d at 1221-22.  In Marks, the Court directed that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."  Id. at 193 (internal citations and quotations omitted).  According to those circuits courts, Justice Kennedy's view is controlling because it is the least restrictive of federal jurisdiction. Gerke Excavating Inc., 464 F.3d at 724-25; Robinson, 505 F.3d at 1221-22.

The Courts of Appeals for the First, Third and Eighth Circuits instead have found Marks to be inapposite because neither the plurality opinion nor Justice Kennedy's concurrence relied on a narrower ground than the other did. Johnson, 467 F.3d at 62-64; Bailey, 571 F.3d at 799; Donovan, 661 F.3d at 182. The court in Donovan describing the conundrum that the Johnson court faced explained:

> Judge Lipez, writing for the majority of the panel in Johnson, disagreed that the "narrowest grounds" in the Marks sense necessarily means those grounds least restrictive of federal jurisdiction. The court in Johnson stated that "it seems just as plausible to conclude that the narrowest ground of decision in Rapanos is the ground most restrictive of government authority . . . because that ground avoids the constitutional issue of how far Congress can go in asserting jurisdiction under the Commerce Clause." 467 F.3d at 63 (emphasis added). Even if one were to conclude that the opinion resting on the narrowest grounds is the one that relies on "less sweeping reasons than the other"—meaning that it requires the same outcome (here, the presence of federal regulatory jurisdiction) in only a subset of the cases that the other opinion would, and in no other cases—the court in Johnson concluded that Marks is unhelpful in determining which Rapanos test controls. Id. at 64. This is because Justice Kennedy's test would find federal jurisdiction in some cases that did not satisfy the plurality's test, and vice versa. Id. For example, if there is a small surface water connection between a wetland and a remote navigable water, the plurality would find jurisdiction, while Justice Kennedy might not. Furthermore, a wetland that lacks a surface connection with other waters, but significantly affects the chemical, physical, and biological integrity of a nearby river would meet Justice Kennedy's test but not the plurality's. See id. It is therefore difficult, if not impossible, to identify the "narrowest" approach.

Donovan, 661 F.3d at 181.

18

Instead, those courts looked to the suggestion by Justice Stevens contained in his _Rapanos_ dissent as a "simple and pragmatic way to assess what grounds would command a majority of the Court." _Id._ (citing _Johnson_, 467 F.3d at 64). Justice Stevens' dissent, which was joined by three other Justices, states:

> I would affirm the judgments in both cases, and respectfully dissent from the decision of five Members of this Court to vacate and remand. I close, however, by noting an unusual feature of the Court's judgments in these cases. It has been our practice in a case coming to us from a lower federal court to enter a judgment commanding that court to conduct any further proceedings pursuant to a specific mandate. That prior practice has, on occasion, made it necessary for Justices to join a judgment that did not conform to their own views. In these cases, however, while both the plurality and Justice Kennedy agree that there must be a remand for further proceedings, their respective opinions define different tests to be applied on remand. Given that all four Justices who have joined this opinion would uphold the Corps' jurisdiction in both of these cases — and in all other cases in which either the plurality's or Justice Kennedy's test is satisfied — on remand each of the judgments should be reinstated if either of those tests is met.

_Rapanos_, 547 U.S. at 810 (Stevens, J., dissenting).

In accordance with these instructions, these circuits have decided to follow "Justice Stevens' instructions and look[] to see if either _Rapanos_ test is satisfied." _Donovan_, 661 F.3d at 183. This "ensures that lower courts will find jurisdiction in all cases where a majority of the Court would support such a finding." _Johnson_, 467 F.3d at 64. The _Johnson_ court also

indicated that the Supreme Court has strayed away from the <u>Marks</u> test, citing cases where "members of the Court have indicated that whenever a decision is fragmented such that no single opinion has the support of five Justices, lower courts should examine the plurality, concurring and dissenting opinions to extract the principles that a majority has embraced"; the court further observed that Justice Stevens' failure to refer to <u>Marks</u> "indicates that he found its framework inapplicable." 467 F.3d at 65-66 (citing cases).

The court finds the analysis of the Courts of Appeals for the First, Third, and Eighth Circuits more persuasive, as affirmed by the Fourth Circuit's willingness to apply the significant nexus test in <u>Precon I</u> and consider both tests in <u>Precon II</u>. That the plurality's test may find jurisdiction where Justice Kenendy's test would not and vice versa makes determining which test is the "narrowest" under <u>Marks</u> most difficult. By allowing for jurisdiction under either test, support will be had by a majority of the <u>Rapanos</u> Court. "If the [waters] have a continuous surface connection with 'waters of the United States,' the plurality and dissenting Justices would combine to uphold the Corps' jurisdiction over the land, whether or not the [waters] have a 'substantial nexus' (as Justice Kennedy defined the term) with the covered waters. If the

[waters] (either alone or in combination with similarly situated lands in the region) significantly affect the chemical, physical, and biological integrity of 'waters of the United States,' then Justice Kennedy would join the four dissenting Justices from Rapanos to conclude that the [waters] are covered by the CWA, regardless of whether the [waters] have a continuous surface connection with 'waters of the United States.'  Finally, if neither of the tests is met, the plurality and Justice Kennedy would form a majority saying that the [waters] are not covered by the CWA."  See Donovan, 661 F.3d at 183.

Accordingly, in determining whether the Pad 4 streams are subject to the CWA under both plaintiffs' APA claim and defendants' enforcement counterclaim, the court will find jurisdiction if either the Rapanos plurality test or Justice Kennedy's test is met.

Plaintiffs make several additional arguments as to why only the Rapanos plurality opinion applies to this case.  In 2015, the EPA and the Corps amended the definition of "waters of the United States" in a final rule entitled "Clean Water Rule: Definition of 'Waters of the United States'".  See 80 Fed. Reg. 37,054 (June 29, 2015).  On February 28, 2017, President Trump issued an executive order, which instructs the Administrator of the EPA and Assistant Secretary of the Corps to review the Clean

Water Rule "and publish for notice and comment a proposed rule rescinding or revising the rule, as appropriate and consistent with law." Pls.' Resp. Ex. 1 (Feb. 28, 2017 Executive Order). The executive order also directed the Administrator of the EPA and Assistant Secretary of the Corps to consider interpreting "navigable waters" consistent with the plurality's Rapanos opinion. Id. Plaintiffs acknowledge that this case is based on the 2008 Waters of the United States Guidance, and not the 2015 Clean Water Rule to which the Executive Order applies, but argues "it would make little sense for the Kennedy test to still be applied here." Pls.' Resp. at 3; Feb. 28, 2017 Executive Order. Plaintiffs additionally assert that the 2008 Waters of the United States Guidance issued by the EPA and the Corps after Rapanos is not legally enforceable because it was never submitted to Congress for final approval. Id.

However, as noted by defendants, the 2015 EPA Clean Water Rule was not in effect when plaintiffs' discharges occurred and therefore does not govern this case. See Defs.' Reply at 2. Because the 2015 Clean Water Rule does not guide this case, neither does President Trump's February 28, 2017 Executive Order. Moreover, because the court bases its decision to utilize both the relative permanence test and the significant nexus test on Rapanos itself and not the 2008 Waters of the

United States Guidance, it is irrelevant that it was not submitted to Congress for final approval.

### B. Clean Water Act Enforcement Counterclaim

Defendants and plaintiffs both move for summary judgment on defendants' counterclaim, which seeks injunctive relief and civil penalties against defendants for their violation of the CWA.

In order to prevail under the CWA, defendants must establish that plaintiffs are: (1) persons that (2) discharged a pollutant (3) from a point source (4) to a water of the United States (5) without a CWA Section 404 permit. 33 U.S.C. §§ 1311(a), 1344(a).

### 1. Persons under the CWA

Under the CWA, "person" means "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5).

Plaintiffs do not dispute that they are "persons" under the CWA. Foster is a member of Foster Farms and a limited partner and employee of Marketing & Planning Specialists. AR 47 at AR 000384; Pls.' Mem. Ex. 18 (Foster Farms Interrogatory

Responses) at 3; Pls. Mem. Ex. 19 (M&PS Interrogatory Responses) at 2. Foster Farms and Marketing & Planning Specialists own the Site. 2d Am. Comp. ¶ 8(d)-(f). Foster hired Fox Engineering to design the plans for the pad construction and hired Walters excavation to clear, fill, and level the Site. Pls.' Mem. Ex. 20 (Metheny Dep.) at 28-30; 90-91. The court thus finds that plaintiffs are "persons" under the CWA.

## 2. Discharge of a Pollutant

Defendants contend that plaintiffs' activities at the Site "resulted in a discharge of pollutants, specifically fill material." Defs.' Mem. at 12.

The CWA defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source. . . ." 33 U.S.C. § 1362(12). Pollutant means "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). Courts have concluded that fill material is a pollutant under the CWA and plaintiffs do not contest this assertion. See, e.g., United States v. Pozsgai, 999 F.2d 719, 724 (3d. Cir.

1993).  Defendants have made a prima facie showing that

plaintiffs discharged pollutants within the meaning of the CWA.

### 3. "From a Point Source"

Defendants assert that the "bulldozers, dump trucks,

and other earthmoving equipment . . . used by Mr. Walters and

his employees to deposit rock, dirt, and other fill material at

the Site are point sources.  Defs.' Mem. at 13.

A point source is defined in the CWA as "any

discernible, confined and discrete conveyance, including but not

limited to any pipe, ditch, channel, tunnel, conduit, well,

discrete fissure, container, rolling stock, concentrated animal

feeding operation, or vessel or other floating craft, from which

pollutants are or may be discharged."  33 U.S.C. § 1362(14).

Under the CWA, "[t]he concept of a point source embraces the

broadest possible definition of any identifiable conveyance from

which pollutants might enter waters of the United States.  As

such, bulldozers, backhoes, draglines, and other earthmoving

equipment are all point sources under the CWA."  United States

v. Lambert, 915 F. Supp. 797, 802 (S.D.W. Va. 1996) (internal

citations and quotations omitted).  The court is satisfied that

plaintiffs' actions qualify as discharge "from a point source"

and plaintiffs do not dispute this contention.

4.  <u>Into Waters of the United States</u>

Under the CWA, "navigable waters" are defined as "waters of the United States."  33 U.S.C. § 1362(7).  As discussed, the court will apply both the relatively permanent flow test and the significant nexus test to determine whether the Pad 4 streams are waters of the United States.

a.  Relatively Permanent Flow

The parties do not dispute that waters that are connected to traditional navigable waters that have a "relatively permanent flow" are jurisdictional waters under the CWA.  Defs.' Mem. at 13; Pls.' Mem. at 23; <u>see</u> <u>Rapanos</u>, 547 U.S. at 732.  The plurality in <u>Rapanos</u> explained that jurisdiction under this test was limited to "relatively permanent, standing or flowing bodies of water . . . forming geologic features" and not "ordinarily dry channels through which waters occasionally or intermittently flows."  <u>Rapanos</u>, 547 U.S. at 732.  The plurality further elaborated that they did not "necessarily exclude streams, rivers, or lakes that might dry up in extraordinary circumstances, such as drought. . . .  [or] seasonal rivers, which contain continuous flow during some months of the year but no flow during dry months."  <u>Id.</u> at 732, n. 5 (internal quotations omitted).

As discussed, RR4 is a stream that crosses Pad 4 which was filled with dirt, rock and other materials by plaintiffs.  RR1, RR2, and RR 3 flow into RR4.  RR4 then exits the western boundary of Pad 4 and its path crosses a neighbor's hayfield and then joins the First Unnamed Tributary to Neal Run.

Defendants assert that prior to being filled, RR4 had a relatively permanent seasonal flow.[3]  Defs.' Mem. at 15. Plaintiffs do not dispute defendants' contention that RR4 once flowed seasonally on the Site.  Defs.' Mem. at 16.  Indeed, in reviewing aerial imagery prior to being filled, plaintiffs' expert Dane Pehrman found that "there was a defined channel with seasonal flow within the topographic depression that flows from the Foster site."  Defs.' Mem. Ex. 61 (Pehrman Report) at 7. Drs. David Arscott and Charles Dow, who are defendants' experts

---

[3] In the argument relating to the relative permanence test in defendants' motion for summary judgment, defendants only argue that RR4 had a relatively permanent flow.  However, in a footnote in their significant nexus analysis, defendants state "The aquatic life found in the unburied section of RR2 suggestions that RR2 had a relatively permanent seasonal flow. Arscott Decl. ¶ 37-38.  Because RR2 flowed into RR3, which ultimately flows into the navigable-in-fact portion of Neal Run, RR2 may meet the Rapanos plurality standard as well as Justice Kennedy's significant nexus standard."  Defs.' Mem. at 22, n. 15.  Inasmuch as defendants provide no other evidence for this assertion and do not otherwise support this argument in the relatively permanent flow section of their brief, the court finds that defendants have failed to provide sufficient evidence to preclude summary judgment on this point.

on stream ecology and hydrology, concluded that RR4 was a
seasonal stream prior to being filled based on their finding of
water-dependent lifeforms in the undisturbed reaches of the
stream and other similar streams on the Neal Run Crossing
property.  Defs.' Mem. at 16-17; Defs.' Ex. 24 ("Arscott Decl.")
at ¶ 45.  Based on Dr. Arscott's findings, he believes that
prior to being filled, RR4 flowed for approximately 4-8 months
in non-drought years.[4]  Id.

          That RR4 flowed seasonally on the Site is further
supported by Randolph Engineering's stream delineation report,
which classified RR4 as an intermittent stream because it showed
the same flow characteristics as RR5 and RR10 (which were viewed
as similar, unfilled streams on the Site), which White observed
and classified as intermittent, and because it received
contributing flow from three ephemeral streams, RR1, RR2, and

_____

[4] The parties do not state how many months of the year is
required for a stream to qualify as having a seasonal flow.
Plaintiffs cite to Precon II as "recogniz[ing] the [Corps']
interpretation of the term 'seasonal rivers' to include those
bodies of water which have continuous flow at least seasonally,
e.g. typically 3 months."  Pls.' Mem. at 25 (citing 501 Fed.
Appx. at 271, n. 1).  Defendants cite to cases finding a
seasonal flow when a body of water held water continuously for
three months or less.  Defs.' Mem. at 15-16 (citing cases).  The
court need not determine how long a stream must flow to qualify
as relatively permanent, but instead refer to the Rapanos
plurality's statement that "[c]ommon sense and common usage
distinguish between a wash and a seasonal river." 547 U.S. at
732, n. 5.

RR3.  Pls.' Mem. Ex. 25 ("White Dep.") at 50.  In addition, the
Corps and the EPA independently determined that RR4 was a
relatively permanent water.  The Corps conducted its own
analysis and verified Randolph Engineering's delineation and
concluded that RR4 was an intermittent-seasonal stream based in
part on the watershed's size and the characteristics of RR5 and
RR10, which are similar watersheds located on Pads 4 and 5, and
thus concluded it was a relatively permanent water.  Defs.' Mem.
at 17; Andreescu Decl. Attach. O ("Corps JD Letter").  During
their Site visit on September 9, 2010, Andreescu and Lutte
observed RR4's stream channel emerging from the disturbed area
with a bed, banks and "ordinary high water mark" ("OHWM"),
observed the channel upstream and Andreescu later reviewed GIS
data and aerial photographs of the Site, from which she
concluded RR4 was a relatively permanent water.  Defs.' Mem. at
17-18; Andreescu Decl. ¶¶ 19, 24; Lutte Decl. ¶¶ 17, 24; Defs.'
Mem. Ex. 27.

        Defendants contend that prior to being filled by
plaintiffs, RR4 "exited the western boundary of the Site and
flowed across a neighbor's hayfield to the First Unnamed
Tributary of Neal Run.  Defs.' Mem. at 18; Stokely Decl. ¶ 16.
To support this contention, defendants first point to Fosters'
response to defendants' information request, which stated,

"[d]rainage [from the Site] was flowing across an open field into the main stream without the benefit of a silt fence." Defs.' Mem. 18; AR # 47 at AR 000383. Defendants also assert that the flow across the hayfield is supported by the testimony of Larry Carr, who owned the hayfield from 1965 to 2000. Defs.' Mem. at 18. Carr testified that, in the wintertime and early spring, water from the Site would "run down through here [indicating on the map a "concave dip" on the hayfield] and down all the way to this Neal Run area." Defs.' Mem. at 18; Carr Dep. at 12, 24, 28-29. During the Site visit, Andreescu and Lutte additionally observed RR4's flow path as it left the Site and traveled into and across the hayfield to the First Unnamed Tributary. Defs.' Mem. at 18; Andresscu Decl. ¶ 22; Lutte Decl. ¶¶ 23-24. Defendants assert that RR4's flow path across the hayfield is visible in aerial photographs taken before and after plaintiffs' filling activities. Defs.' Mem. at 18; Stokely Decl. ¶¶ 116-17. The state of West Virginia mapped RR4 as it flows across the hayfield to the First Unnamed Tributary. Defs.' Mem. at 18; Andresscu Decl. ¶ 48 & Attach. P (SAMB Map). Finally, Pehrman, plaintiffs' expert, observed water from the Site flowing continuously across the hayfield into the First Unnamed Tributary. Pehrman Dep. at 106-107.

The parties do not dispute that the tributaries downstream from the hayfield are all relatively permanent bodies of water: the First Unnamed Tributary flows into the Second Unnamed Tributary for about 500 meters before it connects to Neal Run, from which Neal Run connects to the Little Kanawha River and then to the Ohio River.  Dow Decl. ¶ 21; Pehrman Dep. 121.

Plaintiffs' sole disagreement with defendants' characterization of RR4 as relatively permanent is that CWA jurisdiction is lost in the hayfield, because there is no relatively permanent flow across it and no visible bed, bank or OHWM for 120 to 121 feet.  Pls.' Resp. at 6-13; Pls.' Mem. at 29-36.

In support of the position that there is no hydrological connection across the hayfield, plaintiffs cite to the testimony of Carr, Larry George, and Doug Hatfield. Although defendants interpret Carr's testimony as establishing that there is a relatively constant flow of water across the hayfield in the winter and spring, plaintiffs point to Carr's testimony that the hayfield was "always dry" from June through early fall, that flow across the hayfield would only occur due to an "overnight watershed" and "wouldn't be a continuous thing."  Pls.' Resp. at 6; Pls.' Ex. 4 (Carr, George, Hayfield

Dep.).  When asked if there was ever continuous flow across the hayfield for three months or more, Carr testified, "No.  Never.  Never."  Id.  However, Carr repeatedly testified that water traveled from the Site through the hayfield from late winter to early spring.  Carr Dep. at 12, 24, 28-29, 31-32.

Larry George testified that he had been familiar with the Pad 4 area and hayfield since 1952.  George stated that surface flow was only visible across the hayfield if it rained for ten days.  Pls.' Resp. at 7; Pls.' Ex. 4.  George testified that there was never a ditch or erosional feature across the hayfield.  Id.  Doug Hatfield, who had lived near the Pad 4 area and the hayfield since 1988 testified, "It's a natural runoff.  It's not a stream. . . . That doesn't stay wet . . . . There's no permanent water source like a point or a spring to bring that water all the time it just dissipated. . ."  Id.  Defendants argue that in accordance with the testimony of plaintiffs' expert Pehrman, testimony by neighbors as to their perception of flow is not a reliable indicator of determining the delineation of streams and wetlands.  Defs.' Resp. at 14.

Plaintiffs also reference the report completed by GAI Consultants ("GAI") in June 2013.  Pls.' Resp. at 8; Pls.' Mem. Ex. 54 ("GAI Report").  According to the report, the hayfield "did not exhibit defined channel characteristics and appeared to

be consistent with an upland hayfield. . . . At approximately 121 feet down-gradient from the loss of bed and bank a channel was found to reestablish."  GAI report at 2.  GAI's field analyst, Jayme Fuller stated, "If there was flow, it would have had to present the physical characteristics that we've identified here in our report."  Pls.' Mem. Ex. 55 (Fuller Dep.) at 186-88.

     Plaintiffs next argue that there cannot be CWA jurisdiction upstream of the hayfield because of the loss of the ordinary high water mark.  They cite to EPA and Corps guidance regarding OHWMs.  The EPA guidance states, "One means of identifying the lateral constraints is the existence of an [OHWM]."  Pls.' Mem. at 10; Pls.' Mem Ex. 30 (Clean Water Protection Guidance) at 12, 14.  The Corps regulation states "(1) In the absence of adjacent wetlands, the jurisdiction extends to the ordinary high water mark[.]"  33 CFR § 328.4.  However, as is stated in the guidance and the regulation, and as is noted by defendants, this refers to the way to identify the "lateral extent of jurisdiction in the absence of adjacent wetland (i.e., the jurisdictional width of the tributary when not abutted by a wetland) and has no bearing on the vertical extent of jurisdiction (i.e., the jurisdictional length), which is what Plaintiffs dispute here."  See Defs.' Resp. at 8, n. 8.

Plaintiffs also contend that the GAI Report contains historical aerial photography that shows the hayfield has always lacked physical indicators of flow, such as a bed, banks or OHWM.  Pls.' Resp. at 8-10; GAI Report at 7-11.

Plaintiffs additionally argue that White, who prepared the delineation report for Randolph Engineering, upon which defendants rely, recanted his opinion that RR4 was jurisdictional after he read the GAI report.  Pls.' Resp. at 9. White testified that "[I]t's interesting that what was considered to be an intermittent stream not only doesn't show any groundwater, but not even any bed and bank features. . . . [which] would strongly go against any kind of a significant nexus connection to the downstream water . . . . [and] would go against the relatively permanent water."  Pls.' Resp. at 9; Pls.' Mem. Ex. 31 (White Dep.) at 137-40.  White also testified that had he observed the "same things that are represented" in the report, he "would have deemed everything . . . not jurisdictional because there was no physical connection to the downstream water."  Id.  Defendants argue that "White's [deposition] testimony was based on his (incorrect) assumption that a break in OHWM severed the physical hydrologic connection to the downstream water. . . . Plaintiffs' expert, Mr. Pehrman, who (unlike Mr. White) observed the hayfield, testified that the

hydrologic connection between the Site and downstream waters was not unbroken." Defs.' Resp. at 15 (citing Pls.' Mem. Ex. 31 (White Dep.) at 138 and Pls.' Resp. Ex. C (Pehrman Dep.) at 213.

Plaintiffs also point to the expert opinion of Pehrman, of Environmental Resources Management ("ERM"), who made a ground inspection of the hayfield in 2015 and reviewed topographical mapping, aerial imagery, ground photography, soil mapping and the GAI and Randolph Engineering studies and concluded that even though water was continuously flowing through the hayfield on the day he conducted his site visit, CWA jurisdiction ended at the upstream end of the hayfield because the hayfield "lacks a defined bed and bank and is best described as a broad swale through the farm field which conveys episodic runoff to the downgradient jurisdictional tributaries during heavy precipitation/ snowmelt events . . . ." Pls.' Resp. at 9-10; Pls.' Mem. Ex. 61 (ERM Report) at 7.

Finally, plaintiffs attempt to discredit the testimony of defendants' experts. First, plaintiffs argue that Stokely made no "on the ground validation of the features he claimed to identify by remote imagery" and this methodology has been rejected by a court in United States v. Lipar, 2015 WL 7681272, No. H-10-1904 (S.D.T.X. Aug. 30, 2015). Pls.' Resp. at 10. However, as noted by defendants, Stokely's aerial photo

interpretation has been accepted and relied upon by other courts, see, e.g., United States v. Lucas, 516 F.3d 316, 326-27 (5th Cir. 2008). And the Lipar case upon which plaintiffs rely to invalidate Stokely's tesimony was reversed by the Court of Appeals for the Fifth Circuit on the grounds that the district court's waters of the United States analysis was "flawed legally and factually," and the case was remanded to the trial court. 665 Fed. App'x 322, 325 (5th Cir. 2016).

Defendants also argue that the expert opinions of Arscott and Dow are flawed in that they did not inspect the hayfield or account for the loss of bed, bank and OHWM in the hayfield in their report. Pls.' Resp. at 11. But, as defendants discuss, Arscott stated in his rebuttal report that "it is common in montane regions for some water to flow sub-surface where sediment plumes are deposited in valleys where stream channel/ valley slopes transition from higher gradient to lower gradient. . . . To the extent that ERM reports the formation of a defined channel with bed and bank characteristics in the downstream portion of the ACO, we note that such a feature would be formed by the flow of water from the surface, the sub-surface or both." Defs.' Mem. Ex. 24 at Ex. B (Rebuttal Report). Stokely similarly stated that "it is not uncommon to observe a tributary to change its character, including the

nature of its bed and banks as it flows across different landscape features and scopes." Defs.' Mem. Ex. 7 at Ex. B (Rebuttal Report). Pehrman testified in his deposition that a change in character of flow can be caused by a change in the landscape. Defs.' Resp. Ex. C (Pehrman Dep.) at 199-202.

As noted, defendants' experts refute plaintiffs' experts' contention that the loss of OHWM severs CWA jurisdiction. In addition, defendants point to the Corps instructions for identifying jurisdictional waters, which states that "a natural or manmade discontinuity in the OHWM does not necessarily sever jurisdiction (e.g. where the stream temporarily flows underground, or where the OHWM has been removed by development or agricultural practices)." Defs.' Mem. Ex. 26 at MPS 001240 n. 6. In such circumstances, the field staff are instructed to "look for indications of flow above and below the break." Id. Reestablishment of the OHWM after the break evidences the continuous hydrologic connection through the break." See id. Defendants argue that the loss of OWHM for 120 feet is due to the transition in the slope of the land, which caused the water to briefly flow subsurface, as well as the years of agricultural activities conducted in the hayfield. Defs.' Reply at 6-7; Lutte Dec. ¶ 24; Andreescu Decl. ¶ 23; Carr Dep. at 10, 13.

The court finds that the above evidence raises genuine questions of material fact that preclude summary judgment for either party as to whether RR4 is a relatively permanent water under the plurality's test in <u>Rapanos</u>.  First, there is a dispute over whether there was a relatively continuous flow across the hayfield prior to the filling of RR4.  Both parties have presented sufficient evidence to prevent summary judgment on the issue of the frequency of flow through the hayfield. Second, there is a dispute over whether the break in OHWM severs CWA jurisdiction.  Defendants argue that the break does not sever jurisdiction inasmuch as here, it was caused by a change in the slope of the land and the agricultural use of the hayfield for many years, and not due to infrequent flow, which is evidenced by the reestablishment of bed, banks, and OWHM 120 feet downstream of the hayfield.  Plaintiffs disagree and instead argue that the hayfield evidences a break in flow, which severs jurisdiction.  The evidence presented by each party sufficiently precludes the grant of summary judgment for the other party.  Summary judgment for each party on the counterclaim on this basis is accordingly denied.

b.  Significant Nexus

Defendants contend that RR1, RR2, RR3, and RR4 significantly affect the chemical, physical, and biological

integrity of Neal Run and the Little Kanawha River, and are thus a "water of the United States" under Justice Kennedy's significant nexus test. Defs.' Mem. at 19. Rapanos, 547 U.S. at 779-80 (Kennedy, J., concurring). Plaintiffs argue that the evidence supports a finding that there is no significant nexus between RR 1, RR2, RR3, and RR4 and a navigable water.

According to Justice Kennedy, "[t]he required nexus [under the significant nexus test] must be assessed in terms of the [CWA's] goals and purposes. Congress enacted the law to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters,' 33 U.S.C. § 1251(a), and it pursued that objective by restricting dumping and filling in 'navigable waters,' §§ 1311(a), 1362(12)." Rapanos, 547 U.S. 715, 779-80 (Kennedy, J., concurring). "[T]he significant nexus test does not require laboratory tests or any particular quantitative measurements to establish significance." Precon I, 633 F.3d at 294.

According to defendants, the filled streams were headwater streams, which are the upper tributaries of a stream network which have a "profound influence on larger downstream waters." Defs.' Mem. at 20-21, n. 14; Arscott Decl. ¶ 13; Andreescu Decl. ¶ 25; Defs.' Mem. Ex. 31-33. Defendants assert that the filled streams significantly affect Neal Run and the

Little Kanawha River by: (1) contributing flow, sediment and other material to downstream waters; (2) supporting and exchanging aquatic life with downstream waters; and (3) processing nutrients, materials, and pollutants. Defs.' Mem. at 21-26. These activities have been recognized by courts as forming a significant nexus with a traditional navigable water. See Donovan, 661 F.3d at 186; United States v. Cundiff, 555 F.3d 200, 210-11 (6th Cir 2009).

### i. Contribution of Flow, Sediment, and Other Materials

Drs. Arscott and Dow observed other, similar streams and concluded that the filled streams contributed flow, sediment and other materials to the navigable-in-fact portion of Neal Run. Defs.' Mem. at 21; Arscott Decl. ¶ 44; Dow Decl. ¶ 34. Dr. Dow used Digital Elevation Modeling ("DEM") and Geographic Information System ("GIS") tools to map the stream locations prior to being filled, and as discussed, concluded that RR4 presented a hydrological connection across the hayfield. Defs.' Mem. at 22; Dow Decl. ¶¶ 20-21. By examining aquatic life in the unburied portions of RR2, RR3 as well as RR5 and RR10, Drs. Arscott and Dow deduced that RR2 was intermittent, RR3 was ephemeral, and RR4 was intermittent or nearly perennial. Arscott Decl. ¶¶ 41, 42, 45.

Drs. Arscott and Dow analyzed a three-year hydrological study by the United States Geological Survey of two streams that dried up in the summer and early fall, Robinson Run and North Bend Run, which are located less than 50 miles from the Site.  Defs.' Mem at 22; Dow Decl. ¶¶ 27-28.  Drs. Arscott and Dow opined that these streams had comparable hydrological patterns with the filled streams, and cited to their "annual suspended sediment loads," which was between 8 and 11.6 tons per year for North Bend Run and between 3.5 and 22.9 tons per year for Robinson Run, which defendants contend illustrates "the substantial type of physical connection that the Filled Streams likely shared with downstream waterways."  Defs.' Mem. at 22-23; Dow Decl. ¶¶ 27, 29-30.

Dr. Dow also used GIS tools to calculate the total stream length and watershed area within the Neal Run watershed.  Dow Decl. at ¶ 23.  According to Dr. Dow's analysis, Neal Run's first and second order streams account for more than 75% of the stream network length and drain almost the same percentage of the total watershed.[5]  Defs.' Mem. at 23; Dow Decl. at ¶ 23.

---

[5] First order streams are streams that do not receive flow from any other defined streams.  Arscott Decl. at ¶ 13.  When first order streams join together, they form a second order stream. First order streams "grow quickly in almost exponential fashion as small and intermediate (2nd – 5th order) sized channels connect with one another to form large rivers (usually 6th-order or greater."  Id.  "An increase in stream order requires that

Defendants assert that although the lengths of the filled streams individually are a small percentage of the total watershed, the individual sizes are not the determinative factor in establishing jurisdiction.  Defs.' Mem. at 23 (citing Precon II, 603 F.App'x at 152).

### ii. Support and Exchange Aquatic Life

Defendants contend that the filled streams "served as habitat to aquatic organisms that contributed to the maintenance and viability of species downstream."  Defs.' Mem. at 24.  Drs. Arscott and Dow studied and documented numerous types of aquatic life in: (1) the unburied portions of RR2 and RR3; (2) RR5 and RR10, which defendants assert are similar streams on the Site that were not filled; (3) the First and Second Unnamed Tributaries to Neal Run; and (4) Neal Run.  Id.; Arscott Decl. ¶ 36.

According to Drs. Arscott and Dow, the presence of life in these areas demonstrates that the filled streams were "aquatic habitats to several species that were connected to downstream waters."  Defs.' Mem. at 24; Arscott Decl. ¶ 43.  According to them, aquatic organisms in headwater streams, like

_____

two identical stream orders merge to form the next ordinal stream order downstream."  Id.  First, second, and third order streams are collectively described as headwater streams.  Id.

those they found in RR2, RR3, RR5 and RR10, process materials
and serve as the bottom of the food chain to support downstream
life.  Defs.' Mem. at 24; Arscott Decl. ¶ 18.  For example,
organisms "eating leaves in headwater streams transform the food
from large particles (single whole leaves) to small particles of
food (feces and leaf fragments . . .), which, in turn, can then
be fed upon by downstream . . . communities whose species have
specialized mouth parts and structures enabling them to filter
out the small organic particles being transported in the water
column."  Defs.' Mem. at 24; Arscott Decl. ¶ 18.

        This function is important because "the ability of
each species to span several stream orders enables larger
effective population size, which contributes significantly to
the species' ability to maintain a viable genetic
structure . . . and high level of reproductive health."  Defs.'
Mem. at 25; Arscott Decl. ¶ 20.  If headwater streams are
eliminated, there are "impacts [on] the potential viability of
species living downstream, in second, third, or higher order
navigable tributaries in a way that could lead to their gradual
extinction via inability to maintain effective population sizes"
in the watershed.  Defs.' Mem. at 25; Arscott Decl. ¶ 20.

### iii. Process Nutrients, Materials, and Pollutants

Defendants contend that RR1, RR2, RR3, and RR4 "transformed and transported organic matter to be used by aquatic life downstream." Defs.' Mem. at 25. Headwater streams "have smaller channels canopied by trees, and accumulate leaf litter, twigs and other tree parts . . . which are transformed by microorganisms into dissolved organic carbon ("DOC"). Defs.' Mem. at 25; Arscott Decl. ¶ 15. DOC is a nutrient for aquatic life and is transported with the water downstream and supplements the energy for downstream aquatic life." Defs.' Mem. at 25; Arscott Decl. ¶ 15.

Drs. Arscott and Dow measured chemical properties in the Site, directly downstream from the Site and at other similar headwater streams within 50 miles of the Site and found the levels in the channels within the Site to be consistent with other nearby headwater streams. Defs.' Mem. at 25; Arscott Decl. ¶¶ 29-30. Headwater streams are generally lower in specific conductivity than downstream waters, and help to dilute pollution in downstream waters where there are greater human inputs that cause conductivity to rise. Defs.' Mem. at 26; Arscott Decl. ¶ 31. When headwater streams are altered or destroyed, like the filled streams, their ability to dilute downstream water lessens, which causes the concentration of

pollutants to rise downstream and degrade traditional navigable waters.  Defs.' Mem. at 26; Arscott Decl. ¶ 31.  Drs. Arscott and Dow found that the water emerging from the filled streams as it discharged to the stormwater pond constructed by plaintiffs at the edge of the Site had an elevated specific conductivity compared to the other similar streams within 50 miles that Drs. Arscott and Dow analyzed, which impact downstream waters, as previously discussed.  Id.

Drs. Arscott and Dow also collected water samples to analyze nutrients and ions and discovered increased concentrations of sodium ions and chlorine ions downstream of the fill, which "are strong indicators of human impact."  Defs.' Mem. at 26; Arscott Decl. ¶¶ 32, 33.  Defendants assert that this is caused by the inability of lost, impacted or degraded headwater streams to dilute downstream waters, which causes the downstream waters to be threatened or impaired.  Id.

Plaintiffs primarily dispute defendants' evidence by arguing that none of the above described functions could occur in any significant way because of the lack of hydrologic connection, except during "extreme precipitation conditions," between RR4 and the First Unnamed Tributary at the far edge of the hayfield.  Pls. Mem. at 13-15.  As discussed above, whether there is a significant connection in the hayfield such that

water flow is relatively permanent, despite the loss in bed, bank, and OHWM, is a genuine question of material fact. For the same reason, whether sufficient hydrologic connection exists across the hayfield for sediment, aquatic life, and the processing of nutrients, minerals and pollutants to significantly affect Neal Run and the Little Kanawha River is also a genuine issue of material fact.[6]

In addition, plaintiffs dispute that the species identified by Arscott were present prior to the filling of the Pad 4 streams, stating that they could have developed after the plaintiffs placed a stormwater pond, and because the species were winged, "it is entirely plausible that the specimens gathered came from oviposit egg placement by adult specimens of the species in question." Pls.' Resp. at 14. To the extent plaintiffs dispute Arscott's expert opinion that the species he identified were present in the filled streams prior to being filled, this constitutes a dispute of fact.

---

[6] Plaintiffs also point to the JD Guidebook which establishes that the "presence of a reliable OHWM with a channel defined by bed and banks" is among one of the principal considerations for evaluating significant nexus. Pls.' Mem. at 28-29. As noted, whether the loss in these characteristics across the hayfield is from a change in elevation, soil characteristics, or the use of the hayfield for agricultural purposes for many years or from infrequent flow is a genuine question of material fact.

Plaintiffs also argue that defendants' experts' failure to "present any quantifiable analysis of the alleged influence of the Pad 4 area on flow, biology and water chemistry to the [Traditional Navigable Water]" and their failure to "compare any other watersheds with similar OHWM discontinuities, renders EPA's empirical support . . . deficient as a matter of law." Pls.' Resp. at 16. But, a "significant nexus showing does not require laboratory tests or any particular quantitative measurements." Precon I, 633 F.3d at 294. And, as defendants state, such quantifiable analysis of the influence on the Pad 4 area on flow, biology and water chemistry became impossible when the streams were filled by plaintiffs. The court is additionally unwilling to reject the opinions of defendants' experts solely for their failure to compare watersheds with OHWM continuities. Requiring defendants to find streams identical to the filled streams for comparison purposes would impose a significant and unnecessary burden on plaintiffs. Plaintiffs cite to no source that requires streams to be identical for their comparative use in a significant nexus analysis.[7]

---

[7] Plaintiffs also claim that Drs. Arscott and Dow's reports are flawed because they do not render an ultimate significant nexus conclusion. Drs. Arscott and Dow testified to the impact the filling of the Pad 4 streams had on downstream navigable waters and need not render an ultimate conclusion in order for the court to consider their testimony in answering whether there is CWA jurisdiction in this case.

Plaintiffs cite to Pehrman's testimony to establish that the Pad 4 streams do not have a significant nexus with downstream navigable tributaries. In making his findings, Pehrman examined at EPA and Corps guidance for establishing a significant nexus and concluded:

> The [hayfield] lacks a defined bed and bank and is best described as a broad swale through the farm field which conveys episodic runoff to the downgradient jurisdictional tributaries during heavy precipitation/snowmelt events. The area does not contain wetlands nor an aquatic habitat that would support the Little Kanawha River (the nearest TNW). Additionally given the small contributory watershed size (30.7 acres), low and episodic flow volume, and insignificant suspended sediment load from the forested upgradient areas, there is no evidence that the [hayfield] would have carried substantial pollutants, flood waters or impacted the water quality in the Little Kanawha River. Based on these factors, the [hayfield] does not have the ecological factors needed to meet the significant nexus test.

Pehrman Report at 10.

The court finds that defendants have presented prima facie evidence of a significant nexus between the Pad 4 streams and navigable waters that precludes summary judgment against them. Additionally, the court finds that plaintiffs have presented evidence that creates a genuine issue of material fact as to whether the Pad 4 streams have a significant nexus with downstream navigable waters under Justice Kennedy's concurrence in Rapanos.

48

5. <u>Without a Permit</u>

The parties do not dispute that plaintiffs did not obtain a Section 404 permit prior to filling the Pad 4 streams.

6. <u>Summary</u>

The court finds that genuine issues of material fact preclude summary judgment on whether RR4 is a water of the United States under the relatively permanent water test and whether RR1, 2, 3, and 4 are waters of the United States under the significant nexus test. Accordingly, plaintiffs' and defendants' motions for summary judgment on defendants' CWA counterclaim are denied.

## C. Administrative Procedure Act Claims

Plaintiffs second amended complaint first claims that the EPA's issuance of the Administrative Compliance Order, which found that they were in violation of the CWA, was "arbitrary, capricious, and an abuse of discretion" pursuant to the APA, 5 U.S.C. §§ 701-706. Pls.' Mem. at 36. Second, plaintiffs allege that defendants violated their procedural due process rights by failing to give them an opportunity to appeal the findings in the ACO. Third, they argue that the EPA took retaliatory action against them based upon a campaign donation to Congressman McKinley, in violation of the First Amendment.

49

Defendants move for summary judgment on all three of plaintiffs' claims.  Plaintiffs move for summary judgment on the claim that the issuance of the ACO was arbitrary, capricious, and an abuse of discretion.

Because plaintiffs are challenging federal agency action under the CWA, their claims are subject to judicial review under the APA.  The APA "confines judicial review of executive branch decisions to the administrative record of proceedings before the pertinent agency." Shipbuilder's Council of Am. v. United States Dept. of Homeland Sec., 770 F. Supp. 2d 793, 802 (E.D.Va. 2011).  See also 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party."); Camp v. Pitts, 411 U.S. 138, 142 (1973).  No genuine issue of material fact exists here because "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Occidental Eng'g Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985).  See also American Forest Res. Council v. Hall, 533 F. Supp. 2d 84, 89 (D.D.C. 2008).  Accordingly, the questions presented are solely legal in nature, and summary judgment is warranted on the basis of the information contained in the administrative record.

Section 706(2)(A) of the APA provides that a court will "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Our court of appeals has elaborated on the standard:

> In determining whether agency action was arbitrary or capricious, the court must consider whether the agency considered the relevant factors and whether a clear error of judgment was made.  Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency.  Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made.

> The "arbitrary and capricious" standard is not meant to reduce judicial review to a "rubber-stamp" of agency action.  While the standard of review is narrow, the court must nonetheless engage in a searching and careful inquiry of the record.  But, this scrutiny of the record is meant primarily to educate the court so that it can understand enough about the problem confronting the agency to comprehend the meaning of the evidence relied upon and the evidence discarded; the questions addressed by the agency and those bypassed; the choices open to the agency and those made.

Ohio Valley Environmental Coalition v. Aracoma Coal Co., 556 F.3d 177, 192–93 (4th Cir. 2009) (internal citations and quotation marks omitted); see also Ohio Valley Environmental Coalition, Inc. v. United States Army Corps of Engineers, 828 F.3d 316 (4th Cir. 2016).

Although not explicitly stated in their motions for summary judgment, the parties made clear that they disagreed as to the scope of review for plaintiffs' procedural due process and First Amendment retaliation claims. Defendants argue that review should be limited to the administrative record, because these claims are brought pursuant to the APA. Plaintiffs argue that because the acts giving rise to these claims took place after the issuance of the ACO, a review of only the administrative record will be insufficient.

Under the APA, the reviewing court may also set aside agency action that is "contrary to constitutional right" or "without observance of procedure required by law." See 5 U.S.C. § 706(2)(B),(D). Plaintiffs' procedural due process and First Amendment retaliation claim fall into these categories. The APA is a limited waiver of sovereign immunity that permits review of final agency action; review outside the scope of the APA is impermissible absent some other waiver of sovereign immunity. Lane v. Pena, 518 U.S. 187, 192 (1996); 5 U.S.C. §§ 702, 704. The ACO constitutes final agency action, which is subject to judicial review under the APA. See Sackett v. EPA, 566 U.S. 120, 131 (2012) (stating that "final agency action" is that which determines rights or obligations and from which "legal consequences . . . flow.").

Because plaintiffs have pointed to no other action by defendants that qualifies as final agency action and have likewise failed to cite to another source of waiver of sovereign immunity by the government, their challenge to the ACO as unreasonable, their procedural due process claim and their First Amendment retaliation claim are limited to an administrative record review by the court. As discussed below, the court has reviewed evidence presented by plaintiffs outside of the administrative record and finds that defendants are entitled to a grant of summary judgment on these claims even when this evidence is considered.

1. Issuance of Administrative Compliance Order

In the corrected second amended complaint, plaintiffs contend that the issuance of the administrative compliance order by the EPA was arbitrary and capricious. In their motions for summary judgment, plaintiffs and defendants both argue that the court should grant summary judgment in their favor on this claim.

a. Applicable Law

The court will review the administrative record to determine whether the evidence supports the EPA's determination

that the Pad 4 waters were waters of the United States under the
relatively permanent waters test or the significant nexus test.

    b. Application

        According to defendants, the ACO should be upheld
"because the administrative record fully supports EPA's
determination regarding each element necessary to establish that
Plaintiffs violated [the] CWA."  Defs.' Mem. at 28.  The EPA
determined and plaintiffs do not dispute that plaintiffs are
persons, who added a pollutant, from a point source, without a
necessary permit.  Id.  Accordingly, plaintiffs only object to
the EPA's determination that the Pad 4 streams are waters of the
United States.

        Defendants contend that the administrative record
fully supports the EPA's finding that the filled streams are
within the jurisdiction of the CWA.  Id.  In support of this,
defendants point to the inspection by Andreescu and Lutte on
September 9, 2010, who are scientists trained to identify
jurisdictional waters, where they observed and photographed
stream channels above and below the disturbed area in Pad 4.
Defs.' Mem. at 28; AR 41.  The inspectors advised Walters,
plaintiffs' contractor who excavated the Pad 4 area, that a
Section 404 permit was likely required for the work.  Defs.'
Mem. at 28; AR 40.  After the inspection, Andreescu reviewed GIS

data, including topographic and contour maps, and aerial photographs of the Site. Defs.' Mem. at 28; AR 95. According to defendants, [t]he aerial images taken over multiple years showed a dark linear feature where [Andreescu] and [Lutte] observed the stream channels, as well as a downstream connection from the Site through the neighboring hayfield." Id. Based on this information and her expertise, Andreescu concluded that RR4 "was a relatively permanent headwater tributary of Neal Run." Id. Andreescu additionally concluded that the stream had a significant nexus to the downstream portions of Neal Run "[b]ased on her training and knowledge of established scientific literature on the important ecological contributions of headwater streams to downstream waters." Defs.' Mem. at 29; AR 2, 3 (articles describing the importance of headwater streams).

The EPA then sent CWA information requests to Foster Farms and Fox Engineering, and received responses to those requests in December 2010. Defs.' Mem. at 29; AR 44-49. The responses "confirmed that Plaintiffs had cleared, graded, and filled the Site [Pad 4] and indicated that additional work had taken place since September 2010." Defs.' Mem. at 29; AR 49.

In April 2011, the Corps forwarded to the EPA the stream and wetland report prepared by Randolph Engineering at plaintiffs' request. Defs.' Mem. at 29; AR 58. The Randolph

Engineering report delineated RR1, RR2, RR3 and RR4 on Pad 4,
and 7 other streams on Pads 4 and 5 that it believed were
jurisdictional and that plaintiffs had filled ephemeral streams
RR1, RR2, and RR3.  Id.

In May 2011, Andreescu and other EPA staff visited the
Site again and confirmed that plaintiffs had performed more
work.  Defs.' Mem. at 29; AR 99.  Andreescu again determined
that RR4 was a relatively permanent headwater stream and that it
had a significant nexus to the downstream portion of Neal Run.
Defs.' Mem. at 29.  "Thereafter, based on Ms. Andreescu's
observations, her review of aerial imagery and GIS data, her
technical and scientific expertise, and consideration of
Plaintiffs' own jurisdictional delineation, EPA concluded that
Plaintiffs had unlawfully filled jurisdictional waters and
issued the ACO on January 24, 2012."  Id.

Plaintiffs argue that the EPA's evidence is not
legally sufficient to support a finding that the streams on Pad
4 were jurisdictional waters under the CWA.  Pls. Mem. at 36.
While much of plaintiffs' arguments target whether defendants'
expert testimony is sufficient to support the EPA's conclusion
that there is a significant nexus between the Pad 4 streams and
a water of the United States, these arguments need not be
addressed as this expert evidence is not contained in the

administrative record, making it inappropriate to rely on it in determining whether the ACO was arbitrary and capricious under the APA.  See  Shipbuilder's Council of Am., 770 F. Supp. 2d at 802; 5 U.S.C. § 706; Camp, 411 U.S. at 142.  The court will instead determine whether there is sufficient evidence contained in the administrative record to find that the EPA "considered the relevant factors and whether a clear error of judgment was made."  Aracoma, 556 F.3d at 192–93.

### i.  Taking Lead Status

Plaintiffs first argue that the EPA acted unlawfully in taking lead agency status from the Corps in that it was inconsistent with a 1989 memorandum of agreement between the Corps and EPA.  Pls.' Mem. at 29.  As defendants correctly note, the memorandum of agreement states that it is not enforceable by third parties and provides no defense to liability and therefore cannot constitute "procedure required by law" for EPA to issue an ACO.  Defs.' Resp. at 21; 5 U.S.C. § 706(d)(2); AR 40 (1989 MOU).

The court also cannot say that the EPA's assumption of lead agency status was arbitrary, capricious, or an abuse of discretion.  The memorandum of understanding between the parties to the agreement explains the process that the EPA and the Corps have agreed to use to determine which agency will take the lead

in an enforcement action.  The EPA had an interest in the Site
because it oversaw the restoration of Pad 1 and EPA
investigators first discovered the Pad 4 violations.  Moreover,
the memorandum of understanding states that that while the Corps
will generally assume lead status, the EPA will take the lead
when the case involves repeat violators, flagrant violators,
EPA's request of a case or class of cases, or a recommendation
by the Corps that an EPA penalty is warranted.  1989 MOU at
III.D.1 to D.2.  Thus, it appears that even if the memorandum of
understanding was binding, the EPA could have requested that it
assume lead agency status of this case.  The court cannot say
that this constitutes "prima facie evidence of irregularity" as
plaintiffs allege.  Pls.' Reply at 17.

### ii. Relatively Permanent Body of Water

As discussed, under the relatively permanent body of
water test developed by the plurality in Rapanos, the Court
found that the CWA covered "relatively permanent, standing or
flowing bodies of water . . . forming geologic features" and not
"ordinarily dry channels through which water occasionally or
intermittently flows[,]" but did not "necessarily exclude" from
this definition bodies of water that "might dry up in
extraordinary circumstances," or "seasonal rivers."  See 547
U.S. at 732-33.

In concluding that RR4,[8] was a relatively permanent body of water, the EPA relied on Andreescu's field observations of the Site where she examined the stream channels above and below the disturbed area, her review of GIS data and aerial imagery, which shows a connection between RR4 in Pad 4 and "a downstream connection from the Site through the neighboring hayfield[,]" responses to information requests provided by plaintiffs, and the stream delineation report performed by Randolph Engineering on behalf of plaintiffs.  Defs.' Mem. at 28-29; AR 40, 41, 44, 47, 49, 61, 95, 99.

---

[8] Defendants appear to contend only that the EPA determined that RR4 was a relatively permanent body of water.  See Defs.' Mem. at 28-30.  The Randolph Report states that RR4 was intermittent and RR1, RR2, and RR3 were ephemeral, but then concludes that the streams "exhibit a surface connection to, or are a part of, . . . the Unnamed Tributary of Neal Run."  Randolph Report at 1-2.  An ephemeral stream "has flowing water only during, and for a short duration after, precipitation events in a typical year. . . .  Runoff from rainfall is the primary source of water for streamflow. . . . Ephemeral streams typically have flowing water for a few hours to a few days after a storm event and have no discernable floodplain."  Corps' "Operational Draft Regional Guidebook for the Functional Assessment of High-gradient Ephemeral and Intermittent Headwater Streams in Western West Virginia and Eastern Kentucky" (July 2010) at 92.  The Rapanos plurality concluded that "channels through which water flow intermittently or ephemerally, or channels that periodically provide drainage for rainfall" are not waters of the United States.  547 U.S. at 739.  Inasmuch as the Randolph Report found that RR1, RR2, and RR3 were ephemeral, and no other evidence in the administrative record indicates that they have characteristics of a relatively permanent water, to the extent that defendants argue RR1, RR2, and RR3 are relatively permanent, the court cannot find support for these determinations in the administrative record.

Defendants contend that under the "highly deferential" standard, the evidence contained in the record supports a finding that RR4 is a relatively permanent body of water. Pls.' Mem. at 27-28. The court agrees. As discussed, the evidence in the administrative record includes a summary of Andreescu and Lutte's September 9, 2010 visit to the Site, as well as photographs from both of the inspectors' visits, which show that a stream on Pad 4 with stream features had been disturbed and filled. AR 41, AR 99. In addition, GIS data and aerial photographs from multiple years show a dark line that crosses the hayfield and connects to the first unnamed tributary, which appears to be a stream channel. AR 95. That Andreescu considered the lack of bed, bank and ordinary high water mark in the hayfield is evident by her photographs of it during her second Site inspection. <u>Id.</u> Randolph Engineering's delineation report, which was prepared at the request of plaintiffs, confirmed the EPA's conclusion that RR4 was a relatively permanent stream covered under the CWA.[9] AR # 58.

---

[9] As noted, plaintiffs contend that White retracted his position that RR4 was a relatively permanent body of water during his deposition. Assuming the court could properly review his deposition, which is not contained in the administrative record, the court cannot say that it was improper for the EPA to rely on it when they issued the ACO. Moreover, the court disagrees with plaintiffs' characterization that White recanted his position, given that he did not examine the hayfield, nor was he made aware that there was at least an occasional hydrologic

The court finds that there is sufficient evidence
contained in the record to support the EPA's factual conclusion
that RR4 is a relatively permanent stream covered under the CWA.
See Precon I, 633 F.3d at 296 (citing 5 U.S.C. § 706(2)(A))
(stating that an agency's "factual findings are entitled to
deference under the APA, and should be reversed only if
'arbitrary, capricious, an abuse of discretion or otherwise not
in accordance with law'").

Plaintiffs assert a number of arguments as to why the
issuance of the ACO was not reasonable, none of which contest
the adequacy of the evidence contained in the administrative
record that support the EPA's conclusion that RR4 is a
relatively permanent body of water.  Plaintiffs first argue that
because Andreescu and Lutte did not have permission to be on the
Site on September 9, 2010, any information or evidence obtained
during the visit should be excluded from consideration in
evidence supporting EPA's claims.  Pls.' Resp. at 17.  In
support of this contention, plaintiffs point to Marshall v.
Barlow's, Inc., 436 U.S. 307, 312 (1979) and EPA guidance for
inspecting premises.  Pls.' Resp. at 17; Pls.' Mem Ex. 27.

---

connection across the hayfield, as was present when Pehrman
conducted his examination.

Defendants respond that Andreescu and Lutte believed they had permission to be on the Site, and even if they did not, it does not constitute a search under the Fourth Amendment because of the "open fields doctrine." Defs.' Rep. at 9 (citing Hester v. United States, 265 U.S. 57, 59 (1924) and Oliver v. United States, 466 U.S. 170, 183-84 (1984)).

The court agrees that even though Andreescu and Lutte did not have permission to be on the Site when they conducted the September 9, 2010 inspection, their visit does not constitute a search in violation of the Fourth Amendment. Barlow's, the case on which defendants rely, involved a search by an Occupational Safety and Health Act ("OSHA") inspection of "the working areas of" an electrical and plumbing installation business. 436 U.S. at 310. The Court found that "[t]he Warrant Clause of the Fourth Amendment protects commercial buildings as well as private homes." Id. at 311 (emphasis added). Unlike in Barlow's, the EPA inspectors were on plaintiffs' undeveloped commercial land, which, from photographs of the Site, does not appear to be fenced in or otherwise guarded from the public.[10]

_____

[10] From the evidence presented, the court does not believe there was any structure on the Pad 4 area. Moreover, although the court's review is limited to the administrative record, it is notable that Andreescu's declaration states that she did not encounter any "No Trespass" signs or fencing surrounding the Site during her inspection. Andreescu Decl. ¶ 18.

In Barlow's, the Court did not suggest that the same exceptions that apply to the search of private premises, such as the open fields' doctrine, do not likewise apply to commercial property. Under the open fields doctrine, "an individual has no legitimate expectation that open fields will remain free form warrantless intrusion by government officers." Oliver, 466 U.S. at 181. Therefore, "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields." Hester, 265 U.S. at 59; see also United States v. Vankesteren, 553 F.3d 286, 290 (4th Cir. 2009) (finding that the placement of a surveillance video camera in defendant's field "located a mile or more from his home [where] the land was being used for farming and not intimate activities" was not an unreasonable search). Because the Pad 4 area was a large, undeveloped tract of commercial land, Andreescu's and Lutte's inspection of it was not an unreasonable search under the Fourth Amendment.

Nor does internal EPA search guidance upon which plaintiffs rely support their allegation that the evidence obtained from the Site visit was illicit. Contrary to plaintiffs' assertion, the entry onto the Site did not violate EPA's inspection guidance. First, the post-Barlow's memorandum by the Assistant Administrator for Enforcement of the EPA

pointed to by plaintiffs states that "'Open Fields' and 'In Plain View' situations" are "Areas Where a Right of Warrantless Entry Still Exists[,]" and further elaborates "Thus, an inspector's observations from the public area of a plant <u>or even from certain private property not closed to the public are admissible</u>." Pls.' Mem. Ex. 25 at 5-6 (emphasis added). This document appears to explain the law post-<u>Barlow's</u> and further indicates that <u>Barlow's</u> did not limit the open fields doctrine. Nor does the EPA "NPDES Compliance Inspection Manual" appear applicable to the inspection of the Site, because it refers to a "facility inspection[,]" like the one at issue in <u>Barlow's</u>, not the observations of commercial land not closed to the public, as in this case. <u>See id.</u> at 2-12. Because plaintiffs had no expectation of privacy in the Site, and because the EPA guidance on which plaintiffs rely does not preclude the search of a tract of commercial land, the Fourth Amendment cannot serve as a basis to exclude the evidence obtained during Andreescu's and Lutte's inspection.[11]

Plaintiffs also assert that Andreescu's report and deposition testimony as well as Lutte's deposition testimony are

---

[11] It is unclear what purpose excluding evidence from the September 9, 2010 inspection would serve, given that plaintiffs consented to EPA's inspection visit of the Site in May 2011, before the issuance of the ACO. <u>See</u> Defs.' Mem. at 29; AR 99.

"misleading" and inconsistent with the photographs taken during
the Site visit.  Pls.' Resp. at 17-18.  However, as already
noted, in reviewing the reasonableness of the ACO under the APA,
the court is limited to review of the administrative record, and
should not consider deposition testimony and evidence that was
obtained during discovery in this case of defendants' CWA
enforcement counterclaim.  Because the photographs from the EPA
inspectors' September 9, 2010 visit are contained in the
administrative record, and the depositions plaintiffs refer to
are not, plaintiffs concerns are unfounded.  Moreover, contrary
to plaintiffs' assertions, Andreescu's report contained in the
administrative record does not state how much water was in the
First Unnamed Tributary during her site visit.  See AR 41.  Nor
does the court see how plaintiffs are prejudiced by Andreescu's
statement in her report that Moore stated that plaintiffs placed
four feet of fill on top of RR4, even if it were untrue, given
that plaintiffs do not contest that they placed fill in RR4.

        The court finds that "[t]he agency has examined the
relevant data and provided an explanation of its decision that
includes a rational connection between the facts found and the
choice made."  Aracoma, 556 F.3d at 192-93.  Accordingly, the
court finds that the administrative record supports the EPA's

determination that RR4 is a relatively permanent water and thus a water of the United States under the CWA.

### iii. Sufficient Nexus

Defendants attack the adequacy of the evidence that supports the EPA's finding that there is a significant nexus between RR1, 2, 3 and 4 and navigable waters. Pls. Mem. at 36.

Our court of appeals in Precon Development Corp., Inc. v. U.S. Army Corps of Engineers ("Precon I"), 633 F.3d 278 (4th Cir. 2011) has provided useful instruction on how to determine whether there is sufficient evidence to support a significant nexus finding:

> We agree that the significant nexus test does not require laboratory tests or any particular quantitative measurements in order to establish significance. . . . However, in announcing this test, [Justice Kennedy] clearly intended for some evidence of both a nexus and its significance to be presented. Otherwise, it would be impossible to engage meaningfully in an examination of whether a [water] had "significant" effects or merely "speculative or insubstantial" effects on navigable waters. Id. at 780.

Precon I, 633 F.3d at 294.

In this case, the administrative record is almost devoid of evidence pertaining to the significant nexus that the Pad 4 waters have on navigable waters. Defendants point to Andreescu's observations of RR4, the fact that it was a

relatively permanent headwater tributary, the Randolph Report,
to the extent it found that RR1, RR2, RR, and RR4 were
jurisdictional, and Andreescu's training and knowledge of
literature on the important ecological contributions headwater
streams have on downstream waters to support the EPA's finding
that it had a significant nexus to navigable waters.  Defs.'
Mem. at 28; AR 2, AR 3.  While quantitative measurements are not
required for a significant nexus analysis, the administrative
record does not contain enough evidence to allow the court to
evaluate the significance of the connection between the Pad 4
waters and navigable waters.  See Precon I, 633 F.3d at 294.

        The court is also concerned that the EPA did not
follow the required analytic protocols in making its significant
nexus determination.  As noted by plaintiffs, the administrative
record lacks any chemical or biological data that was analyzed
by the EPA prior to the issuance of the ACO.  Pls. Mem. at 33.
The court finds that some data analysis is necessarily required
in a significant nexus determination.  Guidance by the EPA and
the Corps suggests a number of factors that are to be considered
in determining whether a significant nexus exists.

        The court is unable to determine from the
administrative record that the EPA considered the relevant
factors.  "Clean Water Act Jurisdiction Following the U.S.

Supreme Court's Decision in <u>Rapanos v. United Stats & Carabell</u> <u>v. United States</u>," *available at* https://www.epa.gov/cwa-404/2008-rapanos-guidance-and-related-documents, states that a significant nexus should include consideration of:

- • . . . hydrologic factors including the following:
  -volume, duration, and frequency of flow, including consideration of certain physical characteristics of the tributary
  -proximity to the traditional navigable water
  -size of the watershed
  -average annual rainfall
  -average annual winter snow pack
- • . . . ecologic factors including the following:
  - – potential of tributaries to carry pollutants and flood waters to traditional navigable waters
  - – provision of aquatic habitat that supports a traditional navigable water
  - – potential of wetlands to trap and filter pollutants or store flood waters
  - – maintenance of water quality in traditional navigable waters

"Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in <u>Rapanos v. United Stats & Carabell v. United States</u>." The memorandum further instructs,

> Accordingly, Corps districts and EPA regions shall document in the administrative record the available information regarding whether a tributary and its adjacent wetlands have a significant nexus with a traditional navigable water, including the physical indicators of flow in a particular case and available information regarding the functions of the tributary and any adjacent wetlands. The agencies will explain their basis for concluding whether or not the tributary and adjacent wetlands, when considered together, have more than speculative or insubstantial effect on the chemical, physical, and biological integrity of a traditional navigable water.

. . .

> The record shall, to the maximum extent practicable,
> explain the rationale for the determination, disclose the
> data and information relied upon, and if applicable,
> explain what data or information received greater or lesser
> weight, and what professional judgment or assumptions were
> used in reaching the determination.

Id. at p. 11-12.

From the administrative record, the court can infer
that the EPA considered the hydrologic factors based upon the
two Site visits to Pad 4, the Randolph Report, and maps of the
area.  However, there is no evidence in the administrative
record from which the court can determine that the EPA
considered the ecologic factors listed above in reference to the
Pad 4 streams.  Moreover, the existence of such ecologic factors
was not documented in accordance with the above guidance. It is
not enough to simply rely on articles that discuss the impact
headwater streams have on downstream waters; some site-specific
observations or data is necessarily required for the court to
review the EPA's significant nexus determinations.

Defendants argue that plaintiffs cannot fault the EPA
for failing to use "site specific, quantifiable data" to support
their significant nexus determination because when plaintiffs
filled the streams, they destroyed the source of the data.
Defs.' Mem. at 24.  The court agrees that EPA need not use
quantifiable data from the Site, especially considering that

RR1, RR2, RR3, and RR4 were filled by plaintiffs.  However, this does not relieve them of the duty to support their finding of significance with some analysis beyond articles about the effects of headwater streams on navigable waters.  Because none exists in the administrative record, the court cannot find the EPA's conclusion to that end persuasive.  See id. at 297. "Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made."  See Aracoma, 556 F.3d at 192–93.  Because the administrative record does not explain the EPA's reasons for finding a significant nexus with navigable waters, the court finds the ACO regarding RR1, RR2, RR3, and RR4 on this basis is arbitrary and capricious.

### iv. Summary of Review of ACO

Because there is no evidence of significance of the effect of these streams on a navigable water, the administrative record does not support the EPA's determination that RR1, RR2 RR3, and RR4 have a significant nexus with a navigable water. However, there is sufficient evidence contained in the administrative record to support the EPA's finding that RR4 is a relatively permanent stream under the CWA.  Accordingly, the court grants defendants' motion for summary judgment on the

reasonableness of the ACO to the extent it relates to RR4, and otherwise denies it.  The court additionally grants plaintiffs' motion for summary judgment to the extent it relates to RR1, RR2, RR3, and otherwise denies it.

2.  First Amendment Retaliation Claim

During discovery on defendants counterclaim, plaintiffs obtained from the EPA's internal files, a printed document from a website stating that plaintiffs contributed to the campaign of United States Congressman David McKinley, with plaintiffs' name circled by hand.  Despite extensive discovery on the matter, the origin of the document was never discovered. The only EPA representative with knowledge of the document, Pam Lazos, stated in her deposition that she believed the document was obtained during the course of research on the corporate relationship between Foster, Foster Farms and Marketing & Planning Specialists, which was conducted after Foster complained that the EPA named the wrong entity in the ACO. Defs.' Mem. at 36, n. 20; Ex. 45 to Defs.' Mem. (Lazos Dep.) at 21:1-5, 22:16-24; 24:21-25:13).

As discussed by the court's August 22, 2016 memorandum opinion and order, in order to recover for a First Amendment retaliation claim, plaintiffs must establish: (1) they were "engaged in protected First Amendment activity[;]" (2) "the

defendants took some action that adversely affected [their]
First Amendment rights[;]" and (3) "there was a causal
relationship between [their] protected activity and the
defendants' conduct." <u>Constantine v. Rectors & Visitors of
George Mason Univ.</u>, 411 F.3d 474, 499 (4th Cir. 2005) (citing
<u>Suarez Corp. Indust. v. McGraw</u>, 202 F.3d 676, 685 (4th Cir.
2000)).

    In their motion for summary judgment, defendants do
not dispute that plaintiffs' political contribution is a
protected activity and that if the EPA's enforcement proceeding
was based upon their political contribution, it would "likely
deter a person of ordinary firmness from exercise of First
Amendment rights." Defs.' Mem. at 36 (quoting <u>Constantine</u>, 411
F.3d at 500). Thus, plaintiffs must supply evidence showing
that defendants took an action that adversely affected their
First Amendment rights and a causal relationship between
plaintiffs' contribution and the EPA's actions.

    At the summary judgment phase, "[t]he causation
requirement is rigorous." <u>Huang v. Bd. of Governors of Univ. of
N.C.</u>, 902 F.2d 1134, 1140 (4th Cir. 1990). Plaintiffs "must
show that 'but for' the protected expression the [defendant]
would not have taken the alleged retaliatory action." <u>See</u> <u>id.</u>

Plaintiffs alleged in their corrected second amended complaint that the EPA's discovery of the campaign contribution and a "striking change in the government's behavior" both "came about in 2012." August 22, 2016 Mem. Op. & Order at 17-19. Defendants argue that "the evidence shows that there was no 'striking change' in the government's behavior in 2012, nor any temporal connection between the EPA's discovery of the contribution and its actions." Pls.' Mem. at 37.

The evidence in the administrative record demonstrates that the EPA inspectors first visited the Pad 4 area in September 2010 and informed Walters that a Corps permit was likely necessary for the work being performed there. AR 41. On October 18, 2011, the EPA informed Foster in an email that the violations were "egregious" and that if the case was put through the enforcement process, there would likely be "huge penalties." AR 84 at 0000634. After the EPA took lead agency status and after discussions between the agencies in October and December 2011, the EPA began drafting the ACO in December 2011. Defs.' Mem. at 38; Defs.' Ex. 16. On January 3, 2012, Lazos informed Foster that EPA was assuming lead agency status and that the EPA was "working up a penalty calculation." AR 84 at AR 0000632. The ACO was then issued on January 24, 2012.

On February 22, 2012, the Corps issued a letter
stating that the Site contained jurisdictional waters.
Defendants state that this determination was made at the request
of Foster even though the EPA had assumed lead agency status.
Defs.' Mem. at 39.  Although the letter stated that the Corps'
jurisdictional determination could be appealed, the Corps denied
plaintiffs' attempt to appeal because the EPA had assumed the
role of lead agency for the Site.  Id.; see 33 C.F.R. § 331.11
(stating that a jurisdictional determination by the Corps cannot
be appealed when the EPA has assumed lead agency status).  On
April 5, 2012, the EPA sent a letter to Foster reaffirming its
determination that the Site contained jurisdictional waters.

Plaintiffs assert that the EPA's "issuance of the ACO
in January 2012 and subsequent actions were the continuation of
an ongoing enforcement process fraught with animus irregularity,
malfeasance and misrepresentations that began in 2010 and
extended well into 2012."  Pls.' Resp. at 23.  For example,
plaintiffs discuss the purported animosity that EPA
administrators, particularly Lazos, had towards them because the
EPA did not approve of the bankruptcy order, which limited the
remediation efforts of the Pad 1 land to $50,000.[12]  But, these

_____

[12] Plaintiffs' discuss other allegations, which also relate to the
EPA's alleged animus towards them due to the bankruptcy court
order's limitation of remediation work on the Pad 1 area to

74

events do not explain hostile treatment on the part of EPA because of plaintiffs' campaign contribution or any other activity protected by the First Amendment.  Indeed, plaintiffs have not rebutted defendants' determination that the political research document could not have been printed earlier than April 30, 2012, which was after the EPA issued the ACO on January 24, 2012 and after it affirmed this determination on April 5, 2012. Defs.' Mem. at 39-40.  Moreover, plaintiffs have failed to establish that the issuance of the ACO by the EPA was out of the ordinary considering the EPA had been investigating the Site since 2010 and had been in frequent contact with Foster since that time regarding the investigation.

The EPA's assumption of lead authority over the case, even assuming it was fraught with "animus irregularity, malfeasance and misrepresentations," cannot serve as a basis for plaintiffs' First Amendment claim.  The EPA first informed plaintiffs that it was taking lead authority of the case on January 3, 2012.  Pursuant to 33 C.F.R. § 331.11, this act precluded appeal of the Corp's jurisdictional determination.

---

$50,000.  See Pls.' Resp. at 22-26.  These allegations served as a basis of plaintiffs' substantive due process claim, which the court dismissed in its September 30, 2015 memorandum opinion and order and did not allow to be revived in its August 22, 2016 memorandum opinion and order.  Because they are irrelevant to any existing claim, they are not otherwise discussed herein.

Even assuming that the EPA could have allowed such appeal, the Corps notified plaintiffs of its jurisdictional determination and plaintiffs' inability to appeal the determination in February 2012, prior to the date the political research document was printed.

Plaintiffs attempt to circumvent the unrebutted assertion that the EPA could not have known about the political research document until at least the end of April 2012 by alleging retaliation by the EPA in drafting letters sent to Congressman McKinley and Senator Manchin, which occurred in July and August 2012.

Senator Manchin made inquiries on behalf of Mr. and Mrs. Blackwell, who were concerned about the stream location work that was conducted on the Pad 1 area. Pls.' Resp. at 27-28; Pls.' Resp. Ex. 12A, 12B. According to plaintiffs, it is noteworthy that previous drafts of the letter to Senator Manchin included statements that the EPA was limited in remediation efforts on Pad 1 due to the constraints in the bankruptcy order, and that these statements were removed in the final version of the letter. Id. According to plaintiffs, the final version of the letter presumably stated, "EPA would like to see the site fully remediated and intends to pursue any avenue to that end that may develop," while an earlier version stated that the EPA

"continues to consider whether any additional avenues . . . .
may be available.  Pls.' Resp. Ex. 12B.

In August 2012, in a letter drafted in part by Lazos
and sent to Congressman McKinley, the EPA represented that the
Corps was not willing to allow plaintiffs to pursue a Section
404 permit "given the extent of the violations at the site."
Pls.' Resp. at 24; Pls.' Mem. Ex. 32.  Plaintiffs assert that
this statement was false and that Lazos knew it was false.
Pls.' Resp. at 24-25.  Instead, plaintiffs contend that Hemann
of the Corps, informed Andreescu that the Corps was unwilling to
consider improvements to the site because the "EPA will not
consider [such improvements] as compensatory mitigation."[13]
Pls.' Resp. at 25.  Plaintiffs assert that they were not given
the opportunity to consider the option of obtaining a Section
404 permit because of the misrepresentations by Lazos.  Pls.'
Resp. at 25; Pls.' Mem. Ex. 36, 37.

According to plaintiffs, "[t]he clear inclination by
EPA personnel to accommodate a Democratic Senator, but not a
Republican Congressman, easily implies that the Political

_____

[13] Notably, the letter does not state that the EPA was unwilling
to consider compensatory mitigation, but that the Corps "do[es]
not wish to verify the delineation if the EPA will not consider
improvements to unauthorized work as compensatory mitigation for
other unauthorized work."  See Pls.' Mem. Ex. 37 (emphasis
added).

Research Document was a check by the agency to ascertain the Plaintiffs' political contributions in order to determine whether the Plaintiffs did or did not support the agency's perceived ally. . . . EPA's commentary regarding its response to the inquiry from Senator Manchin clearly indicates that the agency was willing to circumvent bankruptcy order constraints, and strong arm the Plaintiffs into conducting remediation they had no obligation to perform pursuant to that ruling, in order to provide a politician whom the agency perceived to be friendly to EPA with an answer the agency believed or knew that politician would find more palatable."  Pls.' Resp. at 29-30.

        The court is not persuaded.  Plaintiffs have not demonstrated how either the letter to Senator Manchin or Congressman McKinley evidence a retaliation on the EPA's behalf and how that retaliation is connected to their First Amendment rights.  Assuming that plaintiffs are correct that Lazos did misrepresent to Congressman McKinley the reason a Section 404 permit was not permitted in this instance, as noted by plaintiffs, this language was consistent with Lazos' email in October 2011, which was prior to EPA's purported knowledge of the political research document, that the Corps was unwilling to take the case back.  Pls.' Resp. at 24.  As discussed above, plaintiffs have been unable to demonstrate any other retaliatory

conduct by the EPA that is causally linked to the political
research document or any other evidence related to political
animus on the part of the EPA.  Moreover, plaintiffs' theory
that the political research document was obtained as a check on
whether plaintiffs supported the agency's perceived ally is
speculative at best and is illogical given that the EPA had
already indicated it was unwilling to issue a Section 404 permit
and had already issued its ACO by the time it was drafting
letters to Senator Manchin and Congressman McKinley.

Plaintiffs attempt to point to other actions by the
EPA that demonstrate purported retaliation on the EPA's part due
to their campaign contribution.  First, they state that the
EPA's use of private email accounts "cannot be discounted as
potential sources of the mysterious, and as yet unexplained,
Political Research Document."  Pls.' Resp. at 24.  However,
plaintiffs need not explain the source of the political research
document, but rather they must causally link it to the EPA's
issuance of the ACO, which they have been unable to do.
Plaintiffs also contend that the EPA waited to provide
plaintiffs with a proposed penalty until 2014 although they
first calculated a penalty two months after the EPA's first site
visit and again in 2013 in order to "artificially increase the
period of the alleged violation."  Pls.' Resp. at 26; Pls. Resp.

Ex. 7A, 7B.  Given that the EPA first calculated a proposed penalty in 2010, this does not causally link this conduct to the EPA's discovery of the political research document, which could not have occurred until 2012.

Because plaintiffs have failed to establish that "but for" their campaign contribution, the EPA would not have issued the ACO, or denied plaintiffs the opportunity to obtain a Section 404 permit, or engaged in any other alleged retaliatory activity, they cannot demonstrate a causal link between a First Amendment protected activity and the EPA's conduct. Accordingly, defendants' motion for summary judgment on plaintiffs' First Amendment retaliation claim is granted.

3. Procedural Due Process Claim

Plaintiffs assert that defendants violated their procedural due process rights when the EPA failed to allow them to appeal the jurisdictional determination in the ACO, thereby depriving them of a property interest by "effectively fr[eezing] the [P]roperty, rendering it commercially undesirable to potential purchasers or lessess." Sept. 30, 2015 Mem. Op. & Order at 10.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest

in 'property' or 'liberty.'"  Am. Mfrs. Mut. Ins. Co. v.
Sullivan, 526 U.S. 40, 59 (1999).  In the court's September 30,
2015 memorandum opinion and order denying defendants' motion to
dismiss with respect to plaintiffs' procedural due process
claim, the court found that by alleging that the ACO rendered
the property undesirable to purchasers or lessees, plaintiffs
had "identified a property interest — the ability to freely
alienate their land — that is cognizable under due process."
Sept. 30, 2015 Mem. Op. & Order at 11-12.

    Plaintiffs have failed to present evidence of that
which was alleged in the corrected second amendment complaint.
That is, they have not cited to any factual evidence that they
have been unable to lease or sell or freely alienate their land
due to the issuance of the ACO.  Plaintiffs contend only that
"both in terms of imposition of affirmative obligations upon
Plaintiffs' property by both the JD and compliance order, and in
terms of risks of crushing penalties, Plaintiffs property
interests have most certainly by [sic] deprived by the EPA's
actions.  Both agency actions have also imposed very real and
substantial legal costs upon the Plaintiffs in defending their
interests."  Pls.' Resp. at 19.

    The affirmative obligations imposed on plaintiffs
under the ACO and the legal fees plaintiffs have paid to defend

this action do not deprive them of a constitutionally protected property interest.  Plaintiffs contend that Sackett, 566 U.S. 120 and United States Corps of Engineers v. Hawkes, 136 S.Ct. 1808 (2016) "indisputably establish[]" that the EPA's actions have deprived them of a protected property interest.  Pls.' Resp. at 18-19.  Plaintiffs misconstrue these cases.  In Sackett and Hawkes, the Supreme Court held that an ACO issued by the EPA and an approved jurisdictional determination issued by the Corps were final agency actions that are subject to judicial review under the APA.  Sackett, 566 U.S. at 131; Hawkes, 136 S.Ct. at 1816.  While the Court found that "legal consequences . . . flow" from an ACO, those consequences warrant a party's ability to judicially challenge the ACO in court under the APA. Sackett, 566 U.S. at 126.  The Court in Sackett and Hawkes did not find that the issuance of an ACO is a per se deprivation of a protected property interest.

Because plaintiffs have failed to establish that defendants deprived them of a substantial property interest by the issuance of the ACO, plaintiffs' procedural due process claim fails.

Defendants' motion for summary judgment with respect to plaintiffs' procedural due process claim is granted.

### IV.  Conclusion

For the foregoing reasons, it is ORDERED as follows:

1.  Defendants' motion for summary judgment be, and it hereby is, granted with respect to plaintiffs' procedural due process claim, plaintiffs' First Amendment retaliation claim, and reasonableness of the ACO pertaining to RR4 only, and it is otherwise denied.

2.  Plaintiffs' motion for summary judgment be, and it hereby is, granted with respect to the reasonableness of the ACO pertaining to RR1, RR2, and RR3, and it is otherwise denied.

The Clerk is requested to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: August 14, 2017

John T. Copenhaver, Jr.
United States District Judge