```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                        AT CHARLESTON

 3     _____x
       RON FOSTER, MARKETING & PLANNING:
 4     SPECIALISTS LIMITED PARTNERSHIP,:
       and FOSTER FARMS, LLC,          :  CIVIL ACTION
 5         Plaintiffs and Counterclaim :
           Defendants,                 :  NO. 2:14-cv-16744
 6                                      :
                  -vs-                  :
 7                                      :
       UNITED STATES ENVIRONMENTAL      :
 8     PROTECTION AGENCY and            :
       SCOTT PRUITT, in his official    :
 9     capacity as Administrator,       :
           Defendants and Counterclaim :
10         Plaintiffs.                  :
       _____x  BENCH TRIAL DAY 1
11

12                    TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.
13                UNITED STATES DISTRICT JUDGE
                       AUGUST 14, 2017
14

15     APPEARANCES:

16     FOR THE PLAINTIFFS:       JOHN C. (MAX) WILKINSON, JR.
                                  JAMES S. CROCKETT, JR.
17                                SPILMAN THOMAS & BATTLE
                                  P. O. Box 273
18                                Charleston, WV 25321-0273

19

20

21     FOR THE DEFENDANTS:       LAURA JANE SIMPSON BROWN
                                  SONYA J. SHEA
22                                STEFANIA D. SHAMET
                                  KENT E. HANSON
23                                United States Department of
                                  Justice
24                                P.O. Box 7611
                                  Washington, DC 20044
25
```

1

2          Proceedings recorded by mechanical stenography,
transcript produced by computer.

3                    _____
                     CATHERINE L. SCHUTTE-STANT, RMR, CRR
4                        LISA A. COOK, RMR, CRR, FCCR
                        Federal Official Court Reporters
5                         300 Virginia Street, East
                          Charleston, WV 25301
6                              304-347-3151

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                             INDEX
      DEFENDANT'S
 2    WITNESSES        DIRECT   CROSS   REDIRECT  RECROSS   EXAMINATION

 3

 4    STEPHANIE ANDREESCU     (Videotaped deposition played.)

 5

 6

 7    PLAINTIFFS'
      WITNESSES        DIRECT   CROSS   REDIRECT  RECROSS   EXAMINATION
 8
      (NONE)             ^         ^        ^         ^           ^
 9

10

11

12

13    DEFENDANT'S
      EXHIBITS              ADMITTED
14
      None
15

16

17    PLAINTIFFS'
      EXHIBITS              ADMITTED
18
      None
19

20

21

22

23

24

25
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S              9:33 a.m.

 2              THE CLERK:  All rise.

 3              THE COURT:  Good morning.  Please be seated.

 4              THE CLERK:  The case before the Court is Ron

 5   Foster, Marketing & Planning Specialists Limited

 6   Partnership, and Foster Farms, LLC, plaintiffs, versus

 7   United States Environmental Protection Agency, et al.,

 8   Case Number 2:14-cv-16744.

 9       Will counsel please note their appearance for the

10   record.

11              MR. WILKINSON:  J. C. Max Wilkinson for the

12   plaintiffs, Your Honor.  And also James Crockett.  Sorry.

13              THE COURT:  Thank you.

14              MS. BROWN:  Good morning, Your Honor.  Laura Brown

15   on behalf of the United States.  With me at counsel table is

16   Sonya Shea for the United States; Stefania Shamet, who is

17   Assistant Regional Counsel for EPA, but who has been

18   appointed as special U.S. -- Assistant U.S Attorney for this

19   case, and Kent Hanson from the Department of Justice.

20              THE COURT:  Thank you.

21       The Court would normally ask if you're ready for trial,

22   but an e-mail was received over the weekend indicating that

23   you wanted one matter cleared up and possibly time to

24   discuss settlement.

25       Do I understand that correctly?
```

1          MS. BROWN:  Yes, Your Honor.  Given that we

2     received the opinion on Friday evening.  The parties have

3     reviewed it.  We have one question regarding the actual

4     status of the claims that are pending.  And then the parties

5     would also like the opportunity to discuss settlement, given

6     the decision that was made on Friday.

7          THE COURT:  Thank you.

8        And is that the plaintiffs' position, as well?

9          MR. WILKINSON:  Yes, Your Honor.  We -- we have a

10    discrepancy between us in terms of what the scope of the

11    issues are that need to be tried today.

12         THE COURT:  The issue that was raised in the

13    e-mail has to do with the status of R1, R2, and R3 in the

14    trial of this matter.  The Court, in determining that the

15    administrative compliance order was wanting in support for

16    the position that it took on R1, 2, and 3, granted

17    plaintiffs' motion for summary judgment.

18        That, however, of course, was not intended to foreclose

19    the consideration of R1, 2, and 3, as well as 4, on the

20    counterclaim.

21        And as a consequence, all are in play for that purpose.

22        Does that answer the question that the parties have?

23         MS. BROWN:  Yes, Your Honor.  Thank you.

24         MR. WILKINSON:  Would Your Honor be willing to

25    hear an argument as to why we're confused by that?

```
 1                    THE COURT:  The Court's already ruled.

 2                    MR. WILKINSON:  Yes, sir.

 3                    THE COURT:  Let me ask whether or not you have

 4      anything further on that point, and, if not, whether or not

 5      you wish to be heard on the question of a brief continuance?

 6                    MR. WILKINSON:  Your Honor, the plaintiffs would

 7      ask -- when you say that 1, 2, and 3 are still in play in

 8      terms of the presentation of evidence, is that for the --

 9      for the ascertaining of what -- whether or not RR4 is

10      jurisdictional only, or are they going to be able to get a

11      second bite at the apple to say that 1, 2, and 3 are also

12      jurisdictional and, therefore, were impacted by the

13      activity?

14                    THE COURT:  As I mentioned, it's all in play.

15                    MR. WILKINSON:  Yes, sir.

16                    MS. BROWN:  Your Honor, at this time, we, as

17      counterclaim plaintiffs now, would request a continuance.

18      I would also just like to clarify that the United States

19      will, since it has the burden, be beginning the trial with

20      its opening statements once we begin after the continuance.

21                    THE COURT:  Yes.

22         And I think the parties at our pretrial conference were

23      allotted 40 minutes a side.  Is that what we finally came

24      to?

25                    MS. BROWN:  That's correct, Your Honor.
```

1            MR. WILKINSON:  Yes, Your Honor.

2            THE COURT:  I don't know whether or not the

3    Court's rulings may have permitted you to limit that, but at

4    least keep it no longer than 40 minutes.

5        Now then, what's the status of the pretrial order?

6            MS. BROWN:  It was filed approximately 10 minutes

7    ago, Your Honor.  I apologize for the delay.

8            THE COURT:  Very good.

9            MR. WILKINSON:  Your Honor, just one note on that.

10       I thought that I had inadvertently deleted one exhibit,

11   Number 136, but I didn't get the word to Laura in time for

12   that to be captured on the Order, and I'd just like to note

13   for the record that we would still like to have Exhibit 136

14   available.

15           THE COURT:  Any objection?

16           MS. BROWN:  No objection, Your Honor.

17           THE COURT:  All right.  Let me ask what period of

18   time the parties are requesting in order to conclude

19   settlement discussion?

20           MR. WILKINSON:  One moment, Your Honor.

21           THE COURT:  Certainly.

22       (An off-the-record discussion was held between Attorney

23   Max Wilkinson, Attorney James Crockett, and Mr. Ron Foster.)

24           THE COURT:  Let me ask whether or not you want to

25   recess for about 10 minutes while you talk about this?

1          I don't mean to rush you.  I'm just asking you if you

2     would like a bit more time?

3               MR. WILKINSON:  Yes, Your Honor.  We appreciate

4     that.

5               THE COURT:  We'll be in recess for 10 minutes.

6               THE CLERK:  All rise.

7          (A recess was taken from 9:42 a.m. until 10:30 a.m.)

8          (Trial resumed.)

9               THE CLERK:  All rise.

10               THE COURT:  Please be seated.

11          Are the parties ready for trial?

12               MS.  BROWN:  The United States is, Your Honor.

13               MR. WILKINSON:  The plaintiffs are ready, Your

14     Honor.

15               THE COURT:  You may proceed.

16               MS. SHEA:  Good morning.

17          May it please the Court, my name is Sonya Shea, and I

18     represent the United States of America.

19               MS. BROWN:  Excuse me, Your Honor.

20               MS. SHEA:  Oh, the screen on the --

21          (Interruption in the proceedings.)

22               THE CLERK:  Did that work?

23               MS. SHEA:  Only one element of the United States'

24     enforcement claim is in dispute.  Mr. Foster and his

25     companies do not dispute that they are persons within the

1    meaning of the Clean Water Act.  They do not dispute that

2    they discharged pollutants from the point source when their

3    contractor used heavy equipment to bury stream channels on

4    the site.  They do not dispute that they did not have a

5    Clean Water Act Section 404 permit to conduct the work on

6    the site.

7         One primary question remains:  Are the streams that Mr.

8    Foster and his companies buried waters of the United States?

9         The evidence will show that those streams are waters of

10   the United States within the protection of the Clean Water

11   Act.

12        Mr. Foster did not seek the answer to this question

13   before he placed 100,000 cubic yards of dirt, rock, and

14   other fill material onto a portion of the Neal Run Crossing

15   property, the portion known as Pad 4.

16        The fill material covered 1,970 linear feet of streams.

17   These streams have various designations, but I will refer to

18   them as Relevant Reaches 1, 2, 3, and 4.

19        Relevant Reaches 2 and 3, on the screen here, join

20   together to form the upper extent of Relevant Reach 4.

21             THE COURT:  Just one moment.  It's not on my

22   screen.

23        (Interruption in the proceedings.)

24             THE COURT:  Please proceed.

25             MS. SHEA:  Relevant Reaches 2 and 3 join together

1      to form the upper extent of Relevant Reach 4.

2          From there, Relevant Reach 4 continues downstream where

3      Relevant Reach 1 joins in.  Then water containing Relevant

4      Reaches 1, 2, and 3, now in Relevant Reach 4, continue

5      across the property boundary of the Neal Run Crossing

6      property site and into a neighbor's hayfield.

7          From there, the water continues into the first unnamed

8      tributary to Neal Run.

9          Then the water flows into the second unnamed tributary

10     to Neal Run; then into Neal Run itself.

11         Neal Run continues to the junction of the Little

12     Kanawha, which is near where it joins into the Ohio River,

13     near Parkersburg.

14         From the navigable portion of Neal Run, to the point

15     where Relevant Reach 4 joins into the first unnamed

16     tributary to Neal Run, also known as the Blackwell

17     Tributary, is about three miles.

18         The character of the site's streams and their important

19     connections with and contributions to downstream

20     traditionally navigable waters will be described by our

21     witnesses.

22         Stephanie Andreescu and Todd Lutte, both EPA Section

23     404 inspectors and scientists, first visited the site on

24     September 9, 2010.

25         They were there to check out violations in the first

1    unnamed tributary to Neal Run, also known as the Blackwell

2    Tributary by the site's previous owner Endurance Group, near

3    the Pad 1 of the site.

4        Endurance Group had declared bankruptcy and EPA had

5    preserved its claim in the bankruptcy proceedings.

6        When Mr. Foster had purchased the property, he had

7    promised the bankruptcy court that he would allow the

8    disturbed channel of Blackwell Tributary to be remediated

9    and would set aside funds for the restoration.

10        During EPA's inspection of the Blackwell Tributary, Ms.

11    Andreescu and Mr. Lutte saw a sign, a billboard, showing

12    development plans for the five pads on the Neal Run Crossing

13    property.  The signs suggested that the stream on Pad 4 --

14    streams on Pad 4 would be filled and that those streams

15    could be covered by the Clean Water Act.

16        So they decided to investigate further.

17        Ms. Andreescu and Mr. Lutte followed Blackwell

18    Tributary upstream.  They crossed the neighbor's hayfield

19    where they saw the Pad 4 area which had recently been

20    disturbed.  Trees and brush had been ripped out, and dirt,

21    rock, and other debris had been spread about the site.

22        Ms. Andreescu and Mr. Lutte observed the stream, which

23    they later confirmed was Relevant Reach 4, was partially

24    buried by the fill.  Ms. Andreescu and Mr. Lutte spoke with

25    Mr. Foster's contractor, Dave Walters, of Walters

1    Excavating, who was conducting the work on the site.  They

2    told him that, based on their observations, a permit was

3    likely required for work in the stream.

4        Mr. Walters then called Dan Metheny of Fox Engineering,

5    who notified Mr. Foster of EPA's belief that the streams on

6    the site were covered by the Clean Water Act.

7        Mr. Metheny also provided Mr. Foster with information

8    on Clean Water Act Section 404 permits.

9        After EPA's initial site visit, Mr. Foster did not seek

10   an official determination from EPA or the Corps.  He did not

11   contact EPA or the Corps, and he did not seek the advice

12   from someone qualified to determine whether the waters on

13   the site might be covered by the Clean Water Act.

14       He proceeded to continue development work until late

15   November of 2010.

16       Mr. Foster constructed a sediment basin over part of

17   Relevant Reach 4 buried channel, near the western edge of

18   the property.

19       Truckload after truckload of fill material was dumped

20   out and spread over Pad 4, covering the site in at least

21   100,000 cubic yards of fill.  That's the equivalent of more

22   than 900 railcars.

23       After EPA started its investigation, Mr. Foster hired

24   Jacob White, of Randolph Engineering, to conduct a

25   delineation report of the streams on the property.

1      Mr. White blocked the unfilled upper reaches of RR2 and

2  Relevant Reaches 2 and 3 and documented their extent.

3      Mr. White also confirmed the previous locations of the

4  buried stream channels on the site based on his

5  interpretations of topographic maps.  He concluded that the

6  streams on Pad 4 were likely covered by the Clean Water Act.

7  And Mr. White stated that conclusion in a report which he

8  forwarded to Mr. Foster.

9      Rick Hemann, an Army Corps of engineer employee

10  responsible for making jurisdictional determinations, came

11  to the site on June 2011.  He was there to evaluate the

12  delineations in the Randolph Engineering report.

13      Mr. Hemann also concluded that the fill material had

14  been placed into waters of the United States.

15      The fact that water flows from the streams, from the

16  site's streams to the Blackwell Tributary and then to

17  navigable waters is not disputed.  There is a hydrological

18  connection.

19      What is disputed is the significance of the connection

20  between the site's streams and the traditionally navigable

21  waters.

22      Mr. Foster and his companies assert that a change in

23  the physical characteristics of the Relevant Reach 4 for

24  about 120 feet as it flows through the neighbor's hayfield

25  means that the site's streams are not sufficiently connected

1   to the downstream waters to be covered by the Clean Water

2   Act.

3       It is true that one indicator EPA looks for in

4   determining whether waters are covered by the Clean Water

5   Act is the presence of a bed, bank, and ordinary high water

6   mark.  An ordinary high water mark is a line in the stream's

7   channel that indicates where water normally flows.

8       And we do not dispute that Relevant Reach 4's bed,

9   bank, and ordinary high water mark are not as clearly

10  defined within the 120-foot stretch as it traverses the

11  hayfield.  But the absence of those features does not

12  automatically mean that the stream is not covered by the

13  Clean Water Act.

14      There is no requirement that the features be continuous

15  for the entire length of the stream as it flows to navigable

16  waters.

17      In fact, Corps guidance instructs that evaluators

18  should look above and below a break in such features to see

19  if those features are reestablished.

20      In our case, Relevant Reach 4 assesses such features

21  for the majority of its length in the hayfield, including

22  any upstream portions near the fill.

23      And the evidence will show that the connection between

24  the site's streams and the traditionally downstream

25  navigable waters is sufficient to qualify the stream as

1    waters of the United States.

2         You will hear from Peter Stokely, an expert in aerial

3    photography and interpretation, who observed the physical

4    connection of Relevant Reaches to traditionally navigable

5    waters in photographs dating as far as back as 1968.

6         His findings are consistent with the observations of

7    Mr. Foster's expert, Dane Pehrman, who went into the

8    hayfield and found flowing water throughout the length of

9    Relevant Reach 4, And Larry Carr, the previous owner of the

10   hayfield, who observed flowing water across the hayfield

11   from late winter to early spring.

12        The connection is more than hydrological.

13        Experts in hydrology and biology, Doctors Charlie Dow

14   and David Arscott confirm the important contributions that

15   streams like Relevant Reaches 1, 2, 3, and 4 have on

16   downstream traditionally navigable waters.

17        They will describe their analysis of the topographic

18   features and watershed areas of the filled streams to

19   determine stream characteristics that likely existed before

20   those streams were buried.

21        Doctors Arscott and Dow collected a variety of

22   life-forms living in the undisturbed upper reaches of

23   Relevant Reaches 2 and 3, such as mayflies, crayfish, and

24   flatworms.

25        By understanding the lifecycles of these life-forms,

1    and their need to be submerged in water for many months of

2    the year, Doctors Arscott and Dow concluded that Relevant

3    Reach 2, whose upper extent is pictured on the screen now,

4    likely held water for at least four- to- eight months of the

5    year; and that Relevant Reach 3, whose upper extent is on

6    the screen, was likely ephemeral.

7        By studying 19 reference streams with similar

8    topographic features and watershed areas, both on and off

9    Mr. Foster's property, Doctors Arscott and Dow concluded

10   that, prior to the disturbance, Relevant Reach 4 likely

11   flowed for four- to- eight months of the year.

12       Doctors Arscott and Dow will detail their chemical

13   sampling of the water in the unfilled upper reaches of

14   Relevant Reaches 2 and 3, as well as the water in the

15   referenced stream, in the Blackwell Tributary, and the

16   second unnamed tributary to Neal Run, and Neal Run.

17       The chemistry of the waters from Relevant Reaches 2 and

18   3 was comparable to the undisturbed referenced headwater

19   streams.

20       Doctors Arscott and Dow compared -- or confirmed that

21   the Relevant Reaches 2 and 3 had a chemical composition that

22   was distinct from rainwater, meaning that the water had been

23   in those channels long enough to accumulate minerals and

24   nutrients.

25       Therefore, Doctors Arscott and Dow concluded that

1    Relevant Reaches 2 and 3 were headwater streams, which are

2    the kind of streams that have important contributions to

3    traditionally navigable waters.

4         Doctors Arscott and Dow also measured the water

5    emerging from the fill near where Relevant Reach 4's channel

6    was buried.

7         That water had higher conductivity, meaning that it

8    contained more salts, which was caused by the water flowing

9    through the fill materials.

10        Doctors Arscott and Dow's chemical and biological

11   analysis is undisputed.

12        Your Honor, after hearing the evidence, only one

13   conclusion can be drawn:  That the streams on Pad 4 are

14   waters of the United States, within the meaning of the Clean

15   Water Act.

16        Once liability of Mr. Foster and his companies is

17   established, then the question becomes what remedy is

18   appropriate in this case.

19        The remedy should include both injunctive and civil

20   penalties.  The injunctive relief should fairly compensate

21   for the loss and destruction that Mr. Foster caused to the

22   waters of the United States.

23        Usually the United States would seek remediation of the

24   streams that were destroyed, but, in this case, because of

25   the large volume of fill that was placed on the site,

1       remediation would likely not be feasible.

2            So, instead, the United States is seeking compensatory

3       mitigation.  Compensatory mitigation involves either

4       restoring, preserving, or creating streams offsite.

5            You will hear testimony about the various forms of

6       compensatory mitigation available.  And compensatory

7       mitigation would have been required had Mr. Foster received

8       a Section 404 permit from the Army Corps of Engineers for

9       his activities.

10           Allowing Mr. Foster to escape that responsibility by

11      violating the law would be unfair to persons who comply with

12      it by getting permits.

13           The civil penalties should be large enough to

14      sufficiently punish Mr. Foster and his companies for the

15      violation, while also serving to deter other violators of

16      the Clean Water Act.

17           The penalty amount should be determined by considering

18      the factors listed in Section 309(d) of the Clean Water Act.

19           The penalty amount should take into account Mr.

20      Foster's finances.  Mr. Foster himself is worth about

21      $13,000, and each of his companies is worth about $2

22      million.

23                THE COURT:  You may want to correct that figure.

24      You may want to restate the figure.

25                MS. SHEA:  Mr. Foster himself is worth about

```
 1     $13 million -- I'm sorry, Your Honor, yes -- and each of his

 2     companies is worth about $2 million.

 3             THE COURT:  Yes, ma'am.

 4             MS. SHEA:  Neither Mr. Foster nor his companies

 5     have asserted that they would be unable to pay civil

 6     penalties.

 7         Another factor to establish the penalty amount is Mr.

 8     Foster's knowledge and willfulness in the violating of the

 9     Clean Water Act, especially given that Mr. Foster purchased

10     the property knowing that he would be working to remediate

11     legacy Clean Water Act violations.  And Mr. Foster knew that

12     EPA considered the Pad 4 streams to be covered by the Clean

13     Water Act as early as September of 2010.  But Mr. Foster did

14     not seek to determine whether the streams were covered by

15     the Clean Water Act at that time.

16         He continued to place more rock, dirt, and other fill

17     materials on the site, burying more streams.

18         The extent of the violation is another factor in

19     assessing penalty.  And here the violation is quite

20     extensive, covering 1,970 linear feet of streams, which is

21     the equivalent of about six and a half football fields .

22         Your Honor, we will show that the streams that Mr.

23     Foster and his companies buried on the site are waters of

24     the United States, within the jurisdiction of the Clean

25     Water Act.
```

1           THE COURT:  Thank you.

2           MS. SHEA:  Thank you.

3           THE COURT:  Mr. Wilkinson, are you and Mr.

4    Crockett going to present?

5           MR. WILKINSON:  Yes, Your Honor.

6           THE COURT:  Please come ahead.

7           MR. WILKINSON:  May it please the Court.  Good

8    morning, Your Honor.  My name is J. C. Max Wikinson.  I am

9    counsel for the plaintiff, Ronald Foster, and his companies,

10   Foster Farms, LLC, and Marketing & Planning Specialists, LP.

11        In light of an 82-page opinion, there is obviously no

12   need to go over in detail most of the background facts.  And

13   we would agree that there is largely not a dispute over

14   many of the facts; however, the issue is -- we would dispute

15   that there is -- there was a discharge of pollutants.

16        We would dispute any aspect of what the activities on

17   the site that were conducted, meaning under the Clean Water

18   Act, because all of that hinges on the key issue here, which

19   is whether or not the Pad 4 area in question is or is not a

20   jurisdictional water of the United States.

21        EPA has the burden of proof in this case for

22   establishing the jurisdictional nature of -- the alleged

23   jurisdictional nature of these areas.

24        And the appropriate regulatory criteria is, again,

25   whether or not there is an absence of a bed, bank, and

1    ordinary high water mark.  Because as you move upgradient

2    upstream from the traditional navigable water, per the

3    regulatory guidance, once that disappears, it is to -- it

4    cuts off the jurisdiction under the Clean Water Act, unless,

5    as the plaintiffs have -- or the government has submitted,

6    you can show that there is actual flow that continues in

7    this break or the discontinuity.

8         We will show that that is not the case.  And that that

9    is not the case, neither because there is some kind of

10   subterranean fluid dynamics going on or that there is any

11   agriculture activity that has been the cause of this

12   discontinuity in the hayfield.

13        The remaining issues are really at the root, what is

14   the nature of RR4, Your Honor.  And the issue, here again,

15   is the hayfield.

16        As Ms. Shea pointed out, this is the location of --

17   this is the general location that we're talking about here.

18   This is the hayfield, the Pad 4 area (indicating.)

19        This area has been a hayfield for as long as every

20   witness that is in play here can remember.  And our

21   witnesses go back to 1952.  This image here is one of

22   defendant -- or now -- well, the Government's Exhibit 323,

23   this is a superimposition of RR2, 3, and 4 onto that prior

24   image.

25        And for whatever reason, they've left off RR1, which

1    would be, roughly, in this vicinity (indicating.)

2         Our position here, Your Honor, is that there simply is

3    not Clean Water Act jurisdiction here.  And it is because,

4    contrary to the claims of the government in this matter,

5    water does not flow seasonally for any duration of time in

6    either RR1, 2, or 3, or even 4.

7         And we will hear testimony, again, going back to 1952,

8    you'll hear from Mr. Doug Hatfield, who has lived in the

9    vicinity since the 1990s; Mr. Carr, who has lived on and

10   owned the property of the hayfield since the 1960s; and Mr.

11   Larry George, who lived in the vicinity and would often go

12   onto the property back in -- from 1952 forward.

13        You'll hear from Mr. Foster, who has been on the

14   property many times since 2010.

15        You'll hear deposition testimony that will be submitted

16   on Ms. Jayme Fuller from GAI, who was out on the site in

17   2013.

18        And you'll hear from our own expert, Dane Pehrman, who

19   was out on the site in 2015.

20        The fundamental crux issue here, we would contend and

21   we would agree with, is what is the nature of -- what does

22   the break in the bed, bank, and ordinary high water mark in

23   the hayfield mean for this case?

24        They have submitted in their briefs, and as noted in

25   your Order, that a natural or manmade discontinuity does not

1    necessarily sever jurisdiction, based on, one, either

2    temporary flow underground, or, two, that the bed, bank, and

3    ordinary high water mark has been removed by development or

4    agricultural activities.

5         We are going to be able to show you, Your Honor, that

6    this contention that water briefly flows subsurface in the

7    hayfield is simply not true.  There is no witness for either

8    party that will testify that that is -- that they can

9    testify that this is, in fact, happening.

10        In fact, Ms. Fuller, who was the author of the GAI

11   report, who Ms. Brown deposed back in 2015 to go over the

12   GAI report, stated -- she is the only person that ever went

13   out and looked for it and testified in her deposition, even

14   though water was flowing out of the discharge pipe at the

15   Pad 4 sediment pond into the field, it rapidly disappeared.

16   And then that she dug test pits to look for groundwater, and

17   it wasn't there -- or underground -- or subterranean flow,

18   and it was not there.  And there wasn't even groundwater

19   percolating in those test pits.

20        So this, again, simply reiterates that what is at issue

21   here is not a -- some kind of karst topography in which a

22   surface flow hits a discontinuity that allows it to actually

23   flow in a fluid manner underground and it pops back up and

24   comes out at the west end of the hayfield.

25        The soil characteristics of this hayfield are such

1    that, and the elevation differential are such that, when --

2    whenever water comes out of the Pad 4 area, out of 1, 2, 3,

3    4, and hits the hayfield, it just simply dissipates into

4    that soil characteristic like a giant sponge, in all but the

5    most infrequent and episodic high precipitation events.  And

6    that's exactly what the people who have lived there since

7    the 19 -- some since the 1950s are going to testify here

8    today or during this trial.

9         Now, so what does that mean with regard to -- from the

10   standpoint of the applicability of -- or the government's

11   approach in this matter?

12        Well, the government's own -- well, let me back up.

13        There is another factor here that plays into this.

14        As the government contended here and put forth in their

15   opening statement, you have to have a bed, bank, and

16   ordinary high water mark for this channel to be considered

17   jurisdictional.

18        Now, we would submit that one of the key factors of

19   the -- of the hayfield is the hay, unsurprisingly, because

20   it clearly shows that even at the west end of the hayfield,

21   which is down here -- this is the Pad 4 area -- (indicating)

22   -- sorry -- here's -- this is high tech -- this is the

23   western end of the hayfield (indicating).

24        This is the Pad 4 area, this is the berm where the

25   sediment pond in the Pad 4 area is located (indicating.)

1          Now, this picture was taken by EPA in 2011.  As you can

2     see, this westernmost reach of the hayfield is completely

3     covered with vegetation in this area where they contend is a

4     stream.

5          Now, there is absolutely no visible bed, bank, or

6     ordinary high water mark in this area at all.  And this is

7     the westernmost end of that location (indicating.)

8          And EPA's own guidance document from 2010 describes how

9     a bed of a stream is the bottom of the channel and the

10    lateral constraints of the stream banks.  As a general rule,

11    the bed is that part of the channel below the normal

12    waterline, and the banks often extend above the waterline.

13         There simply is no observable feature that meets the

14    criteria of their own technical characteristics that they

15    say has to be there to show that this is, in fact, a

16    jurisdictional stream.

17         So to whatever extent anything is going on above the

18    hayfield, it certainly does not reestablish itself in any

19    way that establishes jurisdiction here.  And the vegetation,

20    the hay itself supports that.

21         Quite simply, if this drainage behaved in the way that

22    EPA contends that it does, it would have the features that

23    are required to be shown.

24         It does not.

25         And the reason why is because there is not enough

1    drainage area above the hayfield; the hayfield elevation and

2    gradient is so dramatically different; and the hayfield's

3    soil characteristics are so dramatically different, that

4    whenever water does come up as a result of precipitation out

5    of that drainage area where Pad 4 is, it simply disappears

6    and becomes percolating groundwater, which is not

7    jurisdictional under the Clean Water Act.

8        The evidence is that this is, at best, a swale.  And,

9    again, this is -- this picture was taken in 2011 by EPA.

10       This is essentially a picture in just about the same

11   location.  It's maybe a little bit up into the field.  But

12   this picture was taken by Mr. Foster in 2015.

13       There just aren't -- every single picture that you will

14   see of this location on the ground -- now, they can -- Mr.

15   Stokely and EPA's experts, who -- the only expert who they

16   presented to state that there is, in fact, this supposed

17   linear connection on the ground has done all of his

18   assessment by looking at aerial photography, aerial or

19   satellite photography.

20       Well, there is all kinds of things that can be looked

21   at from the air from a distance of several hundred to

22   several thousand feet, but you have to actually get down on

23   the ground to see if what you think you see from the air is

24   what you think it is.  And the simple fact of the matter is

25   is that every piece of photographic evidence on the ground

1     shows that there is no bed, bank, and ordinary high water

2     mark.  We would contend, not only from the place where it

3     disappears in just the center of the field, but also on the

4     far end.  There is a little bit of an erosional divot there

5     that has formed over the -- who knows how many years.  You

6     know, the Appalachian Plateau is somewhere between 300 and

7     500 million years old.

8          So everything that's in that field was at one point in

9     time part of the mountain where the Pad 4 area is now.  But,

10    certainly, there's nothing that indicates that that flow is

11    scouring across there in any way, shape, or form, like they

12    have claimed.  Because if it was, it simply would have those

13    characteristics.

14         It does not.

15              THE COURT:  Let me ask, at what point is it agreed

16    that the water in the first unnamed tributary, also known as

17    Blackwell Creek, begins to flow?  And for what period of a

18    year?  Is there any agreement between the parties on that

19    matter?

20              MR. WILKINSON:  I don't know that we've discussed

21    that, Your Honor, in any detail.

22              THE COURT:  Well, water starts flowing at some

23    point.  You have to know where that is.

24         And so what I'm asking you is, where is it?

25              MR. WILKINSON:  It's absolutely above RR4, I will

1    tell you that.  And there's testimony from -- in Ms.

2    Fuller's deposition where she -- Ms. Brown asked her in

3    deposition -- well, she said, in Ms. Fuller's deposition,

4    she stated, "When I was out there in 2013, June of 2013,

5    water was flowing out of the decant of the sediment pond

6    into the field.  It disappeared into the field."

7         She dug three test pits in the field.  No groundwater

8    was found in those test pits.

9         She walked over to the confluence or at least the

10   juncture of where RR4's mouth is with Blackwell Creek and

11   looked in Blackwell Creek, and there was flow in Blackwell

12   Creek.

13        Blackwell Creek's drainage extends way beyond to the

14   south and east of the location of where RR4 is.  There is a

15   tremendously much larger amount of drainage area that feeds

16   Blackwell Creek than just RR4.

17        RR4 is an insignificant piece of that drainage for

18   Blackwell Creek, Your Honor.

19        And I believe I talked to Mr. Hemann about that in his

20   deposition, and when he's here as a witness, we can go over

21   that again.  But certainly, there is -- if it's the

22   contention, if the contention of EPA -- I've never

23   understood it to be their contention, but if it's the

24   Court's understanding that their contention is that RR4 is

25   the sole feed for flow in Blackwell Creek, there is

 1    absolutely no evidence for that.  And there is plenty of

 2    evidence to the contrary.

 3           THE COURT:  I don't understand that to be their

 4    contention.

 5       My question of you is:  At what point in relation to

 6    RR4 does the water begin to flow?  And if it's not

 7    year-round, for what period of time?

 8           MR. WILKINSON:  Oh, well, the testimony of

 9    everybody who has been out there and observed this thing

10    over time is that the only time you get any kind of surface

11    flow -- two things are going to happen, Your Honor, there

12    is, if you have a precipitation event in the Pad 4 area in

13    what's RR1, 2, 3, and the beginning of RR4, you will -- you

14    know, the testimony is, you'll get some -- if it's just

15    normal rain, you might get a little bit of surface flow; it

16    will come out and it will hit that hayfield and then it

17    disappears and percolates into the hayfield and is gone.

18       Mr. Carr -- all the people who have had extensive

19    experience with the hayfield over the decades state that you

20    will have -- on occasion, you'll have episodes where there

21    is either so much precipitation or snowmelt in a short

22    amount of time that you will get enough saturation where

23    you'll get a little bit of surface flow to go across there,

24    but it might last for 24- to- 48 hours and then it again

25    disappears and dries up.  And then that -- then you don't

1    have it again, doesn't matter what season it is, doesn't

2    matter whether it's the wet season or the dry season, you're

3    only going to get that kind of connection across the surface

4    in extremely infrequent and episodic situations, based on --

5    again, based on precipitation, not based on the --

6          THE COURT:  Excuse me for the interruption.

7    Please go ahead.

8          MR. WILKINSON:  Yes, Your Honor.

9       Again, going back -- so what this means from the

10   standpoint of EPA's own guidance documents, which is another

11   reason why the plaintiffs have been so perplexed and vexed

12   by this entire enforcement proceeding, is that EPA's own

13   guidance document -- guidance documents recognize that there

14   are features in the world called swales.

15      And swales are described as:  "Generally shallow

16   features in the landscape that may convey water across

17   upland areas during and following storm events.  Swales

18   usually occur on nearly flat slopes and typically have grass

19   or other low-lying vegetation throughout the swale."

20      We would contend that this is a picture of a textbook

21   swale.

22      Now, they do say -- and I misspoke.

23      This is actually guidance document -- this is a

24   guidance document by the Corps.  But Corps of Engineers is

25   ordinarily the agent, the proponent agency that deals with

1    404 situations and was involved in this case to begin with.

2         The guidance documents on these matters are generally

3    used interchangeably between the two.

4         Also, the 2008 Rapanos guidance document states

5    expressly that swales or erosional features, for example,

6    gullies, small washes, characterized by low volume,

7    infrequent, or short duration of flow.

8         Again, all of the testimony that you will hear from the

9    people who have known this location say that this is exactly

10   how water flows and water behaves in this -- in this

11   drainage are generally not waters of the United States,

12   because they are not tributaries, or they do not have a

13   significant nexus to downstream traditional navigable

14   waters.

15        So, again -- and Rapanos itself specifically states

16   that a mere hydrologic connection alone is not sufficient to

17   establish Clean Water Act jurisdiction.

18        The plaintiffs have never argued that or contended that

19   there is not a point in time, occasionally, when you have

20   the right precipitation conditions and a sufficient amount

21   of saturation in those transmissive soils in that field to

22   where you'll get a sheet flow, and almost like an oozing of

23   the surface water across that, and it will empty into the

24   Blackwell Creek, but it's incredibly short-lived.  And under

25   the definitions under Rapanos, it simply cannot be

1     considered to be significant or substantial.  It's, by

2     definition, insignificant and insubstantial.

3          Again, the nature of what led into this is shocking to

4     the degree, as Your Honor noted in your Order, that when EPA

5     went out there and Corps conducted their jurisdictional

6     analysis in the first instance on this thing and came up

7     with the claim that this location was jurisdictional, they

8     did not provide any, any -- the only physical aspect they

9     looked at was the proximity to the traditional navigable

10    water, which the AJDF form, the Approved Jurisdictional

11    Determination Form, itself says you are not to do.  They

12    didn't provide any chemical or biological analysis; and yet,

13    they made this claim that this location was jurisdictional.

14         And it had to come in -- now they get to come in after

15    the fact and present, supposedly, all this compelling

16    testimony by Dr. Arscott and Dr. Dow that supposedly proves

17    that this was all along a jurisdictional location.

18         Well, one of the things that Ms. Shea pointed out in

19    her opening was that they went up there in May of 2015 --

20    and we were with them -- and they -- it had rained the

21    previous day, and there was some sampling that was conducted

22    up in 1, 2, and 3, up above the location where the fill

23    activities had taken place.

24         Now, the thing that has to be kept in mind here is the

25    hydrological regime in the Pad 4 area itself has been

1    altered by the construction activities.  And there are check

2    dams that impede and retard flow coming out of those

3    drainages, because they're required to as part of their

4    sediment control structure plan.

5         So the nature of how water is even running off in

6    response to precipitation is different than it would have

7    been prior to any of those check dams or structures that

8    slow down and retard flow coming off of the site.

9         We would also contend that the sediment pond itself, by

10   the time that they were out there -- and these structures

11   have all been in place since 2010, when this thing was

12   built.  So we're talking about five years that have been in

13   place for a small, different kind of hydrologic ecosystem to

14   develop up there, based on the presence of a standing pond

15   that was never there before, and these check dams that

16   retard flow as it comes down off of the drainages.

17        And that the notion that what they found out there in

18   May of 2015, five years after-the-fact, under substantially

19   different conditions that would have been present under

20   natural circumstances, simply do not meet the criteria for

21   this Court to determine that the, that the 1, 2, and 3, and

22   even 4, are jurisdictional.

23        4 might arguably be jurisdictional if you had that true

24   connection across, across the mouth of the Pad 4 hollow all

25   the way over the Blackwell Creek.

 1          It simply does not.

 2          And, again, their contention that this water comes out

 3     of the surface and somehow dips underground and continues to

 4     flow in the nature of the way that a stream would flow and

 5     then pops back out is just simply not true.

 6          It becomes straight out, classic percolating

 7     groundwater.  And it must run very deep, because as Ms.

 8     Fuller's testimony, which you'll see in the designation --

 9     unfortunately, she's moved to Indianapolis, so she was

10     unavailable for this trial -- but it's just simply not

11     there.

12          So in -- let me go over just a few things I'd like to

13     address from her opening.

14          We're not sure where she got the cubic yard number.  We

15     would gladly address that during trial, because we're not

16     sure that that's entirely accurate.

17          The notion that EPA, when they came on the site, told

18     the construction representatives that were on the Pad 4 area

19     conducting clearing and grubbing and -- that's another

20     inaccurate statement.

21          Those photos from 2010 do not show -- there was no

22     placement of fill that took place when those photos were

23     taken, even though -- even though Ms. Andreescu in her

24     report and in her deposition contended that there had been

25     fill placed.

1          Clearing and grubbing had just taken place.  You have

2     to clear out the vegetation and the trees in order to start

3     your construction activities.

4          So that's one thing that we contend was inaccurate in

5     their presentation.

6          The contention that they were told you needed a permit

7     to do what they were doing is also not true.  That is --

8     that is not -- that is not even accurate as to what

9     Andreescu and Mr. Lutte stated in their deposition, and it

10    is not accurate into what Mr. Seth Walters and Mr. David

11    Walters testified in their deposition.

12         They were told, "Well, you may need a permit."

13         And, in response to that, Mr. Foster directed everybody

14    to stand down for three days while his technical consultant,

15    Mr. Metheny, looked into the situation and looked at the

16    location to decide whether or not, well, is this really

17    something that should be considered jurisdictional.

18         Which I think is relevant, also, to the contention

19    that, well, you couldn't -- you can't hold us accountable

20    for not going out there and testing because you had filled

21    the streams before we had a chance to.

22         That's not true.

23         The clearing and grubbing had taken place, but nothing

24    else had taken place.

25         If they felt so strongly about it, that this was,

1    indeed, a violation.  And, in fact, the chronology of this

2    indicates that this was a highly questionable and marginal

3    location considered by both agencies by the fact that it

4    took them over a year to determine who was even in charge of

5    this thing, and that the lack of jumping on the opportunity

6    to come out there and test when they were there on site, or

7    shortly thereafter, was never taken.

8         So the lack of the -- they can't pin the lack of

9    movement on this on the plaintiffs, or on Mr. Foster and his

10   companies.  It was their own lack of clarity, and their own

11   lack of initiative.

12        Again, she mentioned Mr. Jacob White.  I know that you

13   know from the briefings that they relied on his delineation.

14        Mr. White, when he went out there, looked only at the

15   nature of what the ground looked like moving upgradient from

16   the property boundary of Mr. Foster's property.

17        He didn't even look at the hayfield.  That was in 2011.

18        When we finally deposed him the summer of 2015 -- and

19   he had never seen this before, none of us had talked to

20   him -- we presented him with the GAI report from 2013.

21        He took a small pause; he read it over.  Came back.

22   Went on the record; asked him if that would effect in any

23   way what his conclusion was in 2011.

24        And he absolutely repudiated his contention that he

25   would have found RR1, 2, 3 and 4 jurisdictional.

1          He said, "If I'd taken the time to go back and see what

2     the actual nature of the continuity or lack of continuity

3     between the Pad 4 area and Blackwell Creek was, I would have

4     reached the same conclusion GAI did, that this was not a

5     jurisdictional location."

6          And during Ms. Andreescu's testimony, I presented her

7     with that same prior testimony of Mr. White, and she stated

8     that she had never even -- she had never even been made

9     aware of that fact until that point in time.  And that was

10    in July of this year.

11         One moment, Your Honor.

12         Again, I know that Your Honor addressed this in the

13    Order, but we again would state that the -- we agree that it

14    would probably be impossible for Mr. -- or Doctors Dow and

15    Arscott to have found a precise drainage location that is

16    exactly like the Pad 4 area and this hayfield for

17    comparative purposes, but there are almost certainly some.

18         In fact, as you can see in EPA's Exhibit 317, here's

19    another hayfield on the other side of Blackwell Creek --

20    (indicating).

21         Although this one looks like it has a little bit

22    more -- it probably gets a little bit steeper and has a

23    little bit more channelization.  But, I mean, there are --

24    the reason why we contend that it was -- the comparisons

25    that they made are not compelling here, is that in all of

1    these other drainages that they looked at, there isn't this

2    change in gradient, change in soil characteristics, change

3    in discontinuity of a surface connection the way that there

4    is at this location.  And, therefore, anything that is

5    running out of these other headwaters is going right into a

6    channel with bed, bank, ordinary high water mark, and

7    feeding the higher order streams as it moves downstream to

8    the traditional navigable water.

9         We would also contend that the civil penalty claims

10   that are made -- that were made in the opening are simply

11   not just.  There is absolutely no evidence that there was

12   knowledge that this, that this area required a permit on

13   September 9th, 2010.  That's not even supported by EPA's own

14   testimony.

15        And we would just simply say that, you know, the extent

16   of the violation that they have claimed, both the linear

17   footage of almost 2,000 feet and cubic yards, however you

18   want to put the metric on it, all of that hinges on whether

19   or not this location is or is not a jurisdictional area.

20        If it's not a Clean Water Act jurisdictional water,

21   then Mr. Foster has done what tens of thousands, probably

22   hundreds of thousands of construction businesses do across

23   this country every day, which is conduct cut and fill

24   operations, or what's also commonly referred to in the

25   construction industry as mass balancing, where you're taking

1     ground that is -- ground that's low one place and high

2     someplace else and leveling it off so that you can do

3     something with it.  And that what's he's always wanted to

4     do.  And he has been prevented from doing this for seven

5     years.

6          And he tried in good faith to work with these agencies.

7     They couldn't even tell him who was in charge.  And he had

8     many times been willing to work on alternate ways to resolve

9     this situation, and hit a brick wall every time, even after

10    he made them aware of the fact that the *Sackett* decision

11    gave him right of appeal.

12         And it took us another -- that was in 2012.  It took

13    two years for us to get to the point where we could file

14    this litigation to have a -- finally, have a fair say and

15    opportunity to present our case and Mr. Foster's facts, and

16    the facts as they have been known by people in this area for

17    over 60 years.

18         This is neither RR -- if RR4 is not a water of the

19    United States, then neither are R1, 2, and 3.

20         And we would submit, Your Honor, that the facts are

21    clear, they are indisputable -- and they can dress it up all

22    they want with fancy Ph.D. reports that found mayflies and

23    Caddisflies and flatworms up in an area that happened to be

24    wet the day they were out there -- but it does not change

25    the fact that this location only flows in response to

1    episodic high precipitation events.  And even when it does

2    that, most of the time it comes down and hits that soil and

3    gets absorbed and becomes true groundwater.

4        It is not jurisdictional.  It never has been

5    jurisdictional.

6        And, frankly, we certainly hope that this Court will

7    rule that it never will be jurisdictional.

8            THE COURT:  Thank you.

9        Let me ask whether the government is ready to proceed

10   with its first witness?

11           MS. BROWN:  Your Honor, our first witness is

12   Stephanie Andreescu.  And I believe we discussed at the

13   pretrial conference that because, I believe she's perhaps

14   having a baby today, that we had videotaped her deposition.

15   And there is a part of it that we would like to play.  It is

16   approximately two hours and a half on video.

17       We think because she is one of our key witnesses, it

18   would be best if the Court actually saw her testimony.

19       I know the Court has another engagement.  We could

20   begin it now if the Court would like?

21           THE COURT:  I think it would be well to get

22   started.  How long will it take you to set up?

23           MS. BROWN:  We can set up now, Your Honor.

24           THE COURT:  Go ahead.

25       (Pause.)

```
 1              MS. BROWN:  Your Honor, if I could have permission

 2    to approach with the exhibits that will be used?

 3              THE COURT:  Yes.

 4              Is that which you've handed the clerk, two items,

 5    one is a copy of the other?

 6              MS. BROWN:  They are both copies of the same

 7    thing.  They are the exhibits that she will be looking at

 8    during the deposition.

 9              THE COURT:  Thank you.  They're identical, so to

10    speak?

11              MS. BROWN:  Yes.  And, for the record, Your Honor,

12    at the time of the deposition, the parties had agreed that

13    the documents used, the authentication of the exhibits used,

14    there were a few objections that were preserved.

15         If Your Honor would like, we could pause the video

16    after objections are made if the Court would like to rule

17    then or we could preserve them to the end.

18              THE COURT:  I think we should probably take the

19    objections up as the occurrence presents itself and the

20    Court can rule then.

21              MS. BROWN:  Thank you, Your Honor.

22         (Videotaped deposition playing of Stephanie Andreescu.)

23              THE COURT:  Let's see if we can cut this for a

24    moment.

25         (Videotaped deposition playing paused.)
```

```
 1            THE COURT:  It seems to me that we don't need a

 2     lot of detail about what happened on Pad 1.  I understand

 3     that's the reason that brings the parties there in September

 4     of 2010.

 5        It has almost nothing to do with that which takes place

 6     later.

 7        I understand some credibility matters arise out of it,

 8     but I don't want us wasting a lot of time listening in

 9     detail to what is happening about curing the problem on Pad

10     1 that took place before the Fosters acquired the property.

11            MS. BROWN:  Yes, Your Honor.  I think this line of

12     testimony ends shortly, and it is used to offer just some

13     prior knowledge of Mr. Foster about how the process works,

14     because he was engaged with Mr. -- with EPA at this time

15     earlier, in 2009.

16            THE COURT:  Well, if the parties will, for future

17     witnesses, let's stay away from that which is not really

18     relevant to our case.

19        And please go ahead.

20            MS. BROWN:  Thank you, Your Honor.

21        (Videotaped deposition playing resumes.)

22        (Videotaped deposition playing paused.)

23            MR. WILKINSON:  I withdraw the objection.  Go on.

24            THE COURT:  Thank you.

25            MS. BROWN:  Appreciate it.
```

```
 1            (Videotaped deposition playing resumes.)

 2            (Videotaped deposition playing paused.)

 3            MS. BROWN:  Your Honor, if I may, that is the

 4   first tab behind your binder, just so you can follow along.

 5            THE COURT:  These are marked 5A.  Are these going

 6   to be coordinated?  Reference is made to 5.

 7            MS. BROWN:  Yes, later in the deposition, it's

 8   determined it's 5A.

 9            THE COURT:  Thank you.

10            (Videotaped deposition playing resumed.)

11            (Videotaped deposition playing paused.)

12            THE COURT:  If you will, stop at a stopping point.

13            (Videotaped deposition playing paused.)

14            THE COURT:  Is this as good as any?

15            MS. BROWN:  Yes, this is fine.

16            THE COURT:  Very good.

17        And as you are aware, the Court does have a hearing

18   that it must come back to at 1:30.

19            MS. BROWN:  Yes, I understand, Your Honor.

20            THE COURT:  And I'll ask that you return at 2:45.

21            MS. BROWN:  Thank you, Your Honor.

22            THE COURT:  Do the parties have anything further

23   at this time?

24        If not, we'll be in recess until 2:45.

25        (A recess was taken at 12:10 p.m. until 2:46 p.m.)
```

```
 1            (Proceedings resumed at 2:46 p.m.)

 2            THE COURT:  Good afternoon.  Please be seated.

 3       If you'll continue.

 4            MR. WILKINSON:  Your Honor, may it please the

 5  Court, counsel and I were talking right after the break.

 6  Would it be -- we would prefer if witnesses are excluded

 7  during the testimony of other witnesses, whoever is on the

 8  stand if that would be all right with the Court.

 9            THE COURT:  Counsel, if you've agreed to it,

10  that's fine.

11            MS. BROWN:  I'm actually comfortable with having

12  experts.  But if it's --

13            MR. WILKINSON:  Yeah, that's -- actually, experts

14  is probably who we most would like to keep excluded.  But we

15  figured let's just exclude everybody.  That way we can --

16            THE COURT:  So what is it that you've come to

17  agreement on?

18            MS. BROWN:  At this point, we will agree to a

19  sequestration order.

20            MR. WILKINSON:  Let's go ahead and -- whoever --

21  when there's a witness on the stand, no other witness can be

22  in the room, excluded, exclusion.

23            THE COURT:  All right.  State that again.

24            MR. WILKINSON:  We would like -- whenever a

25  witness is on the stand, Your Honor, whether it's an expert
```

```
 1    or lay witness, we would like all other witnesses in the
 2    room to be excluded from the courtroom.
 3              THE COURT:  And that includes by deposition?
 4              MR. WILKINSON:  Yes, Your Honor.  It probably --
 5    this one doesn't matter.  We're going to have to continue
 6    with this.  This is fine.  I'm sure that Mr. Lapp does in
 7    his deposition, so that's fine but --
 8              MS. BROWN:  He has not, Your Honor.  But after Mr.
 9    Wilkinson and I discussed it, I asked him to please not stay
10    in the courtroom.  We hadn't discussed this prior to the
11    beginning of the trial so --
12              THE COURT:  Is there any potential witness in the
13    courtroom now?
14              MR. WILKINSON:  I don't believe so.
15              MS. BROWN:  No, Your Honor.
16              THE COURT:  And, so, the Court grants the motion.
17    I'll ask the parties to police it.
18              MR. WILKINSON:  All right.  Thank you, Your Honor.
19              MS. BROWN:  And we will begin back with Ms.
20    Andreescu's testimony.  Just so the Court is aware, there's
21    about two hours left.  I will say this is far reduced from
22    the actual, I think it was seven hours of direct that we
23    additionally took from her.  So we tried to shorten it as
24    much as possible to the relevant issues.
25              THE COURT:  Well, thank heavens for that.  So
```

1    please go ahead.

2              MS. BROWN:  Thank you.

3         (Videotaped deposition of Stephanie Andreescu resumed.)

4         (Videotaped deposition paused.)

5              THE COURT:  Sustained.

6         (Videotaped deposition resumed.)

7         (Videotaped deposition paused.)

8              MS. BROWN:  Your Honor, if I could just be heard

9    for one moment here about this exhibit.

10        The document we used for the witness is behind U.S.

11   Exhibit 9.  The first page is very hard to read and it's --

12   when we got it back from the court reporter, it was scanned.

13   So right behind it is an exact copy.  It's a little clearer

14   to read but it's not actually the official exhibit.  I just

15   wanted to clarify.

16             THE COURT:  Thank you.

17        (Videotaped deposition resumed.)

18        (Videotaped deposition paused.)

19             MS. BROWN:  I think just to speed this along a

20   little bit, what is behind 5C is the ones that Mr. Wilkinson

21   objected to based on legibility at the deposition.

22        I don't know if you're preserving that objection.

23             MR. WILKINSON:  Yeah, I don't have any -- no

24   objection to 5B, Your Honor, but I still maintain it for,

25   for 5C just because the resolution is so poor.

```
1              THE COURT:  What is 5C?

2              MR. WILKINSON:  It's on the next tab there, Your

3      Honor.

4              THE COURT:  And -- just one moment.  And what is

5      the objection to 5C?

6              MR. WILKINSON:  Just the legibility is so poor.

7              THE COURT:  Let me ask, first of all, what does it

8      purport to show?

9              MS. BROWN:  Your Honor, these are copies of the

10     aerial imagery and GIS layers that Ms. Andreescu reviewed

11     after returning from her site visit.  I will agree that

12     these are very poor colored copies.  There are additional

13     copies in the record.  We didn't have them with us at the

14     deposition that day and we don't actually go through them.

15        So I, I will stipulate that we will provide them more

16     accurate copies to replace these.  We can, we can -- I can,

17     if necessary, withdraw this Exhibit 5C and supplement it if

18     need be.

19             MR. WILKINSON:  I don't know that they're, there's

20     any relevance to them.  I don't have any problem with 5B

21     because they're at least legible enough to see what's in the

22     pictures, but 5C I don't see a whole lot of worth in them.

23             THE COURT:  Well, as I understand it, 5C is being

24     withdrawn.  And you may propose something to substitute

25     later with a live witness perhaps?
```

```
 1              MS. BROWN:  That's, that's correct, Your Honor.
 2    And we'll go back and see if we actually need those in
 3    there, but we just questioned her about 5B during the
 4    deposition, so --
 5              THE COURT:  Very good.  Thank you.
 6         (Videotaped deposition resumed.)
 7         (Videotaped deposition paused.)
 8              MS. BROWN:  Your Honor, I do go on to lay some
 9    more foundation if you would like to proceed and then rule
10    on the objection or if Mr. Wilkinson would like to --
11              THE COURT:  If there is more foundation, let's
12    hear it first and then take the objection.
13              MS. BROWN:  Thank you.
14         (Videotaped deposition resumed.)
15         (Videotaped deposition paused.)
16              MR. WILKINSON:  I was sort of planning my
17    objection, Your Honor.  The issue, the issue really that we
18    have with, with these images that they put forward is not so
19    much that they're inauthentic representations of this
20    product that comes out of the State Addressing and Mapping
21    Board.  But, obviously, the suggestivity [sic] of the blue
22    lines that are on this map as being prima facie evidence
23    that this is, in fact, a stream location is what we have the
24    biggest problem with.
25         We get into this with, with some of our testimony, our
```

1    expert testimony when we have our case in chief, you know.

2    Our understanding is that these, these blue lines are placed

3    here, or they're mapped here based on what the GIS program

4    identifies as the lowest elevation point topographically on

5    the map.

6         Now, we wouldn't dispute that if under the right

7    conditions of sufficient precipitation you're going to have

8    potentially surface flow in those locations.  But just to

9    the extent that this is deemed taken or submitted as

10   evidence that everywhere there is a blue line on this map is

11   a stream, we would just ask the Court to note our objection

12   and give it the weight that your experience and

13   understanding would merit it.

14        THE COURT:  Well, let me ask if I understand.  Are

15   you suggesting that the blue lines on the map do represent

16   streams but not necessarily streams that are there on a

17   permanent basis?

18        MR. WILKINSON:  I would dispute, Your Honor, that

19   they represent streams.  I guess that's kind of a hot button

20   question as to what is -- what constitutes a stream.

21        I certainly would submit that everything in the Pad 4

22   area is obviously not a jurisdictional water.  That's always

23   been our position.  But they've, they've nevertheless

24   superimposed these blue lines here.

25        And, you know, it's -- the, the order of stream that is

1   represented in this image changes dramatically from the Pad

2   4 area down here to the north end of the, of the map which

3   is the actual perennial unnamed tributary of, of Neal Run.

4   And, yet, it's all shown on the map with the same category

5   of blue line.

6        And, so, it's just -- you've got more experience than

7   all of us combined in here, so I trust your judgment.  I

8   just wanted to make the point that this -- these lines could

9   be taken -- you know, could be misleading if they weren't

10  understood to have been superimposed simply to represent

11  where the lowest point of elevation is on them and not

12  necessarily to indicate that there is flow or, or certainly

13  not all of the lines.

14            THE COURT:  Let me hear from the Government.

15            MS. BROWN:  Yes, Your Honor.

16       We are -- we're not offering this exhibit to

17  demonstrate Clean Water Act jurisdiction or to, to claim

18  that every SAMB map stream falls within the Clean Water Act

19  jurisdiction.  However, we are using it to demonstrate that

20  the state has identified these areas as, as locations where

21  streams would flow.

22       And, so, it's just for the weight of the evidence the

23  Court would consider in identifying the fact that the state

24  had also mapped these reaches as well.

25            THE COURT:  Well, it appears the preparer of the

```
1    map is presenting it as though the blue line does represent
2    a stream.
3              MS. BROWN:  That is where the state has mapped
4    based on topography which is what Ms. Andreescu was
5    explaining based on a 1 to 49 - 4,800 scale resolution as
6    where flow would go.  And, again, we can debate whether or
7    not they're streams or not.  But based on the topography,
8    that's what the state has concluded.
9              MR. WILKINSON:  And, and I would somewhat submit
10   that if that -- I would alter my objection then.  That's
11   basically hearsay, Your Honor, because they're, they're
12   taking the representation of the State Addressing and
13   Mapping Board's contention that this is, in fact, a, quote,
14   stream as gospel and then submitting it.
15             THE COURT:  Let me ask the Government what it
16   expects the Court to take from the exhibit insofar as it
17   shows the blue line.
18             MS. BROWN:  Yes, Your Honor.
19        So I think it is an indication, first of all, that all
20   experts have relied on these mappings in terms of
21   identifying topographic features where water would flow.
22   And it is important to establish the reasonability -- and I
23   know that has somewhat changed since the summary judgment --
24   EPA's determination that there, there were streams at this
25   site.  It's one factor in a, in a plethora of tools that the
```

1    agency as well as others, experts in this case have

2    considered in determining the presence of streams.

3              THE COURT:  Well, EPA may say there were streams

4    at this site because this particular witness saw them at a

5    particular time.  This seems to me that it's different from

6    that; that this is what the photograph shows.  And the --

7    apparently there's been some enhancement that designates the

8    blue line stream.  Is that correct?

9              MS. BROWN:  So what, what happened, Your Honor, is

10   the, the State of West Virginia has created a, a GIS layer,

11   yes, that, that draws on, basically based on the topography

12   and the flight resolution of a 1:4,800 scale where they

13   would identify, identify streams.  That's where the State of

14   West Virginia has mapped it.

15             THE COURT:  If I understand what you just said,

16   the State of West Virginia says there's a stream where that

17   blue line is.

18             MS. BROWN:  Yes.

19             THE COURT:  How about it?

20             MR. WILKINSON:  Well, Your Honor, the U.S.

21   Geological Survey -- if we were to set the USGS map right

22   next to it, the USGS map, as she testified earlier, does not

23   show that there is a stream there.  Now, which of those two

24   proponent agencies has more qualification to identify such

25   things --

```
 1              THE COURT:  Wouldn't someone need then someone

 2      from the West Virginia authority to come in and tell us how

 3      it came to be that a stream as shown on their map is not

 4      shown on the United States's geological map?

 5              MS. BROWN:  First, Your Honor, I think this falls

 6      within the hearsay exception as a Government record.  It's

 7      produced by the state.  We can, we can --

 8              THE COURT:  No, I'm asking you whether or not

 9      there's someone that can say that; that, indeed, that's how

10      the state got it there and that's why it differs from the

11      U.S. geological map.

12              MS. BROWN:  Well, I believe Ms. Andreescu will

13      explain the difference because USGS is mapped at a much

14      higher -- lower resolution.

15              THE COURT:  Well, that's the 1:4,800 I think it

16      was.

17              MS. BROWN:  Exactly, yes.  This is at a lower

18      resolution, Your Honor.

19              THE COURT:  And this is a much finer product.

20          Let me ask what you have finally to add, Mr. Wilkinson.

21              MR. WILKINSON:  Well, we don't -- we certainly

22      don't contest that it's a, it's a higher resolution in the

23      sense that, you know, the scale is smaller.  The ratio of

24      the scale is smaller.

25          However, the ratio of the scale of the photographs that
```

1    we showed you in our opening of the hayfield are much, much

2    more close than, than this.  And that obviously doesn't show

3    a flowing water.

4        I mean, it's -- I won't belabor the point.  I think

5    that there are, there are a number of exhibits that use this

6    GIS layer or something like it that are, that have been

7    submitted at various times in this litigation.

8        My only point is that, that it's -- it does not -- it

9    cannot be taken to represent some kind of definitive,

10   definitive proof that the location for their blue lines on

11   these layers necessarily means that there is a stream, and

12   certainly not a jurisdictional stream.

13           THE COURT:  Well, what are you suggesting the blue

14   line means then?

15           MR. WILKINSON:  It means that it is a -- it is --

16   it's -- my understanding from having sorted this out in some

17   other deposition testimony later or previously in this

18   litigation is that it represents the lowest, the lowest

19   elevation point on the ground.

20           THE COURT:  And so, therefore, there must be water

21   in it.

22           MR. WILKINSON:  Well, not, not necessarily, Your

23   Honor, because there's all kind of low points on the ground

24   that, that --

25           THE COURT:  What I'm trying to get is the thinking

 1    of the West Virginia authority that has done what I

 2    understood you to say, simply put a blue line on that lower

 3    elevation.

 4              MR. WILKINSON:  Right.  And that's -- if that's --

 5    as long as that's understood that it's just a, a line that

 6    has been drawn to denote the lowest point in elevation on

 7    the ground and doesn't necessarily serve as proof that there

 8    is water there constantly or, or in sufficient degree to be

 9    considered jurisdictional under the Clean Water Act, that's

10    really the only point we're trying to drive home here.

11              THE COURT:  What's the Government say to that?

12              MS. BROWN:  Well, Your Honor, I think we would

13    agree that just because something is mapped on SAMB does not

14    mean it falls within the Clean Water Act jurisdiction.  This

15    is one piece of evidence that the United States is

16    presenting --

17              THE COURT:  I'm not talking about jurisdiction.

18    I'm talking about water, --

19              MS. BROWN:  Yes.

20              THE COURT:  -- whether it's there or not.  Are you

21    saying that because the blue line is there that the water

22    must be there, or are you saying what Mr. Wilkinson is

23    saying, that blue line represents the lowest point of

24    elevation and, as a consequence, there may be water there?

25              MS. BROWN:  Yes.  I do not dispute that.

```
1              THE COURT:  I think you're in agreement.

2              MS. BROWN:  Yes.  And I would just note that the

3    USGS also maps streams and we can take those at what they're

4    worth if that's what we're just presenting here.

5              THE COURT:  It is admitted.

6              MS. BROWN:  Thank you.

7         (Videotaped deposition resumed.)

8         (Videotaped deposition paused.)

9              THE COURT:  And, so, -- well, let's hold here a

10   moment.  Do we have a further objection or is it withdrawn?

11             MR. WILKINSON:  Well, given, given counsel's

12   confirmation that they don't necessarily -- they're not --

13   that they are not representing that just because there is a

14   blue line on this map that it is a jurisdictional water

15   under the Clean Water Act, I will withdraw the objection,

16   Your Honor.

17             THE COURT:  All right.  Then please go ahead.

18        Oh, before we do, what is 72?

19             MS. BROWN:  I'm sorry, Your Honor.  I should have

20   explained.  During the deposition, opposing counsel was

21   appearing by video.  And, so, I had sent him a binder with

22   all the exhibits I intend to use.  Luckily, I am not using

23   all 72 here.

24        And, so, once they were marked, they were given a

25   defendants' exhibit number and that's the number that
```

```
 1    they'll be in your binder.  So this one is 34, but it was in

 2    72 when Mr. Wilkinson first saw it.

 3             THE COURT:  Thank you.  Go ahead.

 4        (Videotaped deposition resumed.)

 5        (Videotaped deposition paused.)

 6             MS. BROWN:  Excuse me, Your Honor.  I just wanted

 7    to let you know Exhibit 22, that's Page 13 of Exhibit 22.

 8        (Videotaped deposition resumed.)

 9        (Videotaped deposition paused.)

10             MS. BROWN:  Your Honor, at this point I'd like to

11    move for the admission of all of the exhibits referenced

12    during Ms. Andreescu's deposition.  Those are in your binder

13    with the exception of 5C.

14             MR. WILKINSON:  No objection, Your Honor.

15             THE COURT:  Admitted.

16             MS. BROWN:  That's all we have for Ms. Andreescu.

17             MR. WILKINSON:  Your Honor, we -- I have

18    designated the portions of Ms. Andreescu's deposition but I

19    didn't have a copy of the video to synchronize it to.  I

20    don't know if it was the plan that we're going to continue

21    on here this evening.  I wasn't sure if we were getting

22    ready to adjourn for the day.  But I can certainly get

23    with --

24             THE COURT:  I thought we were through with that

25    witness.
```

```
 1              MR. WILKINSON:  That's a reasonable conclusion,

 2    Your Honor.

 3              MS. BROWN:  We appreciate your patience, Your

 4    Honor.

 5              THE COURT:  Well, is there more from her or not?

 6              MR. WILKINSON:  Yes.  I cross-examined her during

 7    --

 8              THE COURT:  So you're going with cross now?

 9              MR. WILKINSON:  Well, I just -- it depends on how

10    you want to do it, Your Honor.  I've got it designated in a

11    hard copy of the, of the deposition transcript.  But,

12    unfortunately, that's all that I've got because I didn't

13    have the video to synchronize it to.  But if you wanted

14    to -- I could get with the videographer and we could perhaps

15    begin first thing tomorrow with the cross-examination unless

16    you want to continue on.

17              THE COURT:  Well, tell me how much longer this is.

18    I had it represented that this was two and a half hours and

19    we've been more than two and a half hours already.  Is there

20    more?

21              MR. WILKINSON:  Well, there's my portion of it.  I

22    mean, it was maybe an hour plus at the time.  And I haven't

23    designated all of it from that, from that period.  But I

24    think the problem is that I don't know how long it would

25    take --
```

```
 1          If I just gave you the transcript and showed you where

 2     to pick up with the --

 3              MS. BROWN:  I'll just make clear this is not the

 4     videographer.  This is our paralegal.

 5              MR. WILKINSON:  Oh, okay, sorry.

 6              THE COURT:  Let me ask -- I take it what you're

 7     saying is that the cross hasn't been edited yet.

 8              MR. WILKINSON:  Correct, Your Honor, correct.

 9              THE COURT:  But you've got in hard copy what you

10     want to present?

11              MR. WILKINSON:  Yes, Your Honor.

12              THE COURT:  And, so, if you were to present it

13     live through the witness, how long will it take?

14              MR. WILKINSON:  I would imagine less than an hour.

15              THE COURT:  It looks like you have a more

16     formidable supply than what I have.

17              MR. WILKINSON:  Well, these are -- this is the

18     entire transcript of each of her depositions.  And we've

19     also designated some portions from her prior depositions

20     during, during discovery.

21              THE COURT:  Well, let's go back to editing.  Do

22     you have that done yet or can it be done tonight?

23              MR. WILKINSON:  No, Your Honor, I do not.

24              THE COURT:  Can it be done overnight?

25              MR. WILKINSON:  I'm not sure how long it will take
```

1    to accomplish that.  I'm not sure.  I would have to talk

2    with co-counsel to see how long it would take to get it

3    coordinated to, to have the designations in the hard copy

4    transferred as, as edited portions of the video.  I'm not

5    sure how long --

6              THE COURT:  Do you have a technician here to do

7    that?

8              MR. WILKINSON:  I do not, no.

9              MS. BROWN:  So our paralegals have the capability

10   of doing that.  They are, they are busy, but we would offer

11   their, their services.  It's just -- I don't know how much

12   you've designated.  The United States would, would offer its

13   capabilities to, to produce the video once we have the

14   designations.

15             MR. WILKINSON:  I think it starts on Page 207 and

16   it's not, it's not everything but, you know, it's basically

17   the last --

18             THE COURT:  How many breaks do you have in it?

19             MR. WILKINSON:  How many breaks, Your Honor?

20             THE COURT:  You know, are there five or ten or 20?

21             MR. WILKINSON:  There's quite a few.  I mean,

22   it's -- it -- there are a number of breaks, Your Honor,

23   and -- but there's also a fair amount of fairly good

24   stretches.

25        It might, it might just be easier just to see what the

```
 1    time signature is from the beginning of my cross until the

 2    end.  Honestly, I don't think that it was more than an hour.

 3    If it was, it wasn't much.  It might just be easier rather

 4    than do the designations just, just run the entire

 5    cross-examination.

 6              MS. BROWN:  I believe it starts at 184, line 18.

 7              MR. WILKINSON:  My first highlight is on 187 so --

 8    but I skipped some stuff so --I don't want to try if it's

 9    more than an hour but --

10              THE COURT:  Do you have two or three substantial

11    breaks?

12              MR. WILKINSON:  Yes, Your Honor.  The problem is

13    that there's, there's some very short snippets where I'm

14    just hitting on her familiarity with certain things that

15    were already discussed.  And then I wasn't really -- at the

16    time, I was highlighting because I wasn't really thinking of

17    it being transposed into the, into the video.  So I'd just

18    kind of like to know -- it might be easiest, if it's not too

19    terribly long, just to run the cross.

20              THE COURT:  Is any of that part that is excepted

21    testimony to which objections were posed?

22              MR. WILKINSON:  There were some objections as I

23    recall.  And I, I -- the one thing that is -- I guess now

24    that I think about it, we probably can't do the entire cross

25    because I was still -- at the time, our due process and
```

```
 1    other claims were still alive so there was, there was still

 2    certain lines of questioning that ran into that.  But what's

 3    highlighted is, is solely relevant to what our understanding

 4    was over the weekend of what --

 5              THE COURT:  Well, let me ask, is the simpler thing

 6    simply to hand up the redacted deposition?

 7              MR. WILKINSON:  I believe so, Your Honor.  And

 8    that's fine, that's fine with me if it's all right with you

 9    all.

10              MS. BROWN:  No objection.

11              THE COURT:  I'd like to have it, though, quickly

12    so we can continue with this witness and then go on to the

13    next one.

14              MR. WILKINSON:  It's right here, Your Honor, if

15    you want it.

16              THE COURT:  Well, once again, it looks to me like

17    you're handing me an awful lot of material for an hour.

18              MR. WILKINSON:  Right.  This is all three of her

19    depositions, but the last one is, the last one is the one we

20    were just watching.

21              THE COURT:  I just want the one that you're

22    interested in presenting.

23              MR. WILKINSON:  Okay.

24              THE COURT:  Is that the one in your hand?

25              MR. WILKINSON:  Yes, Your Honor.
```

```
 1              THE COURT:  And then is some of that marked out?
 2              MR. WILKINSON:  It's not marked out, but the
 3    only -- I only -- I'm pretty sure I only highlighted in this
 4    one things that, that were relevant to what our
 5    understanding of -- understanding was of what was left after
 6    the summary judgment order on Friday.  I can't swear I got
 7    it 100 percent right.
 8              THE COURT:  Well, if it's agreeable, let's put
 9    into evidence that which is left.  But if there are parts of
10    it that the Government's not agreeing to, then that needs to
11    be marked out.
12              MR. WILKINSON:  Yes, Your Honor.  I will -- and I
13    don't believe that there is but, but -- do you want to look
14    it over?  I know -- I meant to get her a copy of the e-mail
15    but I don't think that I did over the lunch break.
16              MS. BROWN:  I just haven't had the opportunity to
17    review the designations.  So if there is a possibility for
18    re-designation, I think that would be fine.
19              THE COURT:  Well, suppose you do this.  Let me
20    have the transcript that you're proposing to use.  And then
21    on the assumption that if there are deletions, they won't
22    amount to much, then after perhaps I've read through it you
23    can tell me what those are and we'll cross them out.
24              MS. BROWN:  I just don't have a copy of it yet.
25              MR. WILKINSON:  Right.  I will e-mail it to you as
```

```
1    soon as I get --

2              THE COURT:  Now, then, is there redirect?

3              MS. BROWN:  That's what I don't know yet.  I

4    haven't had a chance to review these yet.  So I don't know

5    if there's redirect.  I'm not sure what segments have been

6    selected.

7              THE COURT:  And you'll not know that until you

8    look at it this evening?

9              MS. BROWN:  Correct, Your Honor.

10             THE COURT:  And then once we finish with this

11   witness, what is next?

12             MS. BROWN:  It depends if Your Honor wants to

13   continue today.  We have Jeffrey Lapp here who's prepared to

14   testify.  Otherwise, our next witness is arriving tomorrow

15   morning.  And that will probably be Dave Walters and Todd

16   Lutte.  But they have -- they're not quite here yet, so we'd

17   probably have Jeffrey Lapp testify now.

18             THE COURT:  Well, we'll have Mr. Lapp in the

19   morning as well.  And the Court will undertake to look at

20   this yet today.  And then in the morning you can tell us

21   first thing what you're objecting to.  And then we'll cross

22   that out of the transcript.  I'll have to go back and see

23   what you want excised if there is anything.

24             MS. BROWN:  Understood, Your Honor.  Thank you.

25             THE COURT:  I think that's going to be the
```

 1    quickest way to do it.

 2        Anything else this evening?

 3            MR. WILKINSON:  No, Your Honor, not from

 4    plaintiff.

 5            THE COURT:  Do you want to hand that up now?

 6            MR. WILKINSON:  Yes, Your Honor.

 7            THE COURT:  When I run through this, it looks to

 8    me like there's a good deal more than an hour.  There are

 9    four pages on each page.  Towards the end there is

10    highlighted material.  What's that represent?

11            MR. WILKINSON:  Right, Your Honor.  That's, that's

12    what I'm saying.  Only the highlighted material is what I

13    have designated for your review out of my cross.

14            THE COURT:  Well, then if that's the case, that's

15    not so much.

16            MR. WILKINSON:  Right.

17            THE COURT:  And so I was somewhat frightened when

18    I saw the size of it.  But now that you tell me that, the

19    first half of it is largely unused.

20            MR. WILKINSON:  Right.  That's everything that we

21    just watched or the portions of it.

22            THE COURT:  So I think that we have an

23    understanding about that.  And we'll finish up with the

24    direct in the morning.  And you can also tell me in the

25    morning, because you're going to have to read this tonight

```
1     too, and tell me what you object to, what should be

2     stricken.  Then if the plaintiff resists that, we'll decide

3     it on the spot tomorrow.

4          So I think that covers us for this evening.  And I

5     would simply ask whether or not you have anything further.

6               MR. WILKINSON:  Your clerk asked the next -- the

7     last exhibit that was on our list was 206, although we

8     struck -- we amended and struck things out.  Do you want it

9     labeled as an exhibit?  207 would be the next exhibit number

10    if you want to -- is that what you want to do is mark it as

11    Plaintiffs' 207.

12              THE COURT:  Are you talking about this transcript?

13              MR. WILKINSON:  Yes, Your Honor.

14              THE COURT:  I don't think it -- it doesn't need to

15    be marked as an exhibit at all.

16              MR. WILKINSON:  That's fine.

17              THE COURT:  It's part of the evidence, the

18    transcript.

19          Anything else?

20              MS. BROWN:  No, Your Honor, not from the United

21    States.

22              THE COURT:  Very good.  We'll see you back at 9:30

23    in the morning.

24          (Trial recessed at 5:14 p.m.)

25
```

1                           **REPORTERS' CERTIFICATE**

2

3                  **Catherine Schutte-Stant, RMR, CRR,** and **Lisa A.**

4     **Cook, RPR, RMR, CRR, FCRR,** Official Court Reporters of the

5     United States District Court for the Southern District of

6     West Virginia, do hereby certify that, pursuant to Section

7     753, Title 28, United States Code, the foregoing is a true

8     and correct transcript of the stenographically reported

9     proceedings held in the above-entitled matter and that the

10    transcript page format is in conformance with the

11    regulations of the Judicial Conference of the United States.

12

13

14          /s/ Catherine Schutte-Stant          August 14, 2017

15             Court Reporter                              Date

16

17

18          /s/ Lisa A. Cook                      August 14, 2017

19             Court Reporter                              Date

20

21

22

23

24

25