```
              UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF WEST VIRGINIA
                       AT CHARLESTON
```

**RON FOSTER, individually, and**
**FOSTER FARMS, LLC and**
**MARKETING & PLANNING SPECIALISTS**
**LIMITED PARTNERSHIP,**

      Plaintiffs,

v.                                              Civil Action No. 2:14-16744

**UNITED STATES ENVIRONMENTAL**
**PROTECTION AGENCY and**
**GINA MCCARTHY, in her official capacity**
**as Administrator, UNITED STATES**
**ENVIRONMENTAL PROTECTION AGENCY,**

      Defendants.

### MEMORANDUM OPINION AND ORDER RESPECTING REMEDIES

In accordance with the court's Memorandum Opinion and Order and Findings of Fact and Conclusions of Law this day entered, the court considers the remedies that should be imposed. The issue has been briefed by both parties, each having recommended a remedy.

The EPA, the prevailing party, seeks both a civil penalty pursuant to 33 U.S.C. § 1319(d), and injunctive relief pursuant to 33 U.S.C. § 1319(b). Foster does not dispute that both a civil penalty and injunctive relief is an appropriate form

of remedy, but, in particular, disagrees with the EPA as to the amount of the civil penalty.

Turning first to the issue of injunctive relief, the EPA suggests that Foster perform remediation in the form of "compensatory mitigation at least at the rate they would have had to perform had they complied with the permit process." United States' Remedy Brief, "ECF # 251," at 1. Specifically, the EPA proposes:

> that the Court direct Plaintiffs to retain a qualified consultant to calculate and submit to the U.S. Environmental Protection Agency (EPA) the West Virginia Stream and Wetland Valuation Metric (SWVM) credit value of the filled portions of RR1, RR2, RR3, and RR4. Upon EPA's agreement that the SWVM credit value has been correctly calculated, the United States proposes that the Court direct Plaintiffs to provide off-site compensatory mitigation for that number of SWVM credits within the Little Kanawha watershed. The United States prefers that Plaintiffs purchase those credits from a mitigation bank, but Plaintiffs could purchase credits from West Virginia's in-lieu fee program, or perform permittee-responsible mitigation in the amount of the SWVM credits calculated.

Id. at 2.

The Clean Water Act, ("CWA"), authorizes the EPA to seek "appropriate relief" for any violations, "including a permanent or temporary injunction." 33 U.S.C. § 1319(b). The district court "ha[s] authority to issue such restorative orders so as to effectuate the stated goals of the Clean Water Act 'to maintain

the chemical, physical, and biological integrity of the Nation's waters,' 33 U.S.C. § 1251 (1983)." United States v. Cumberland Farms of Connecticut, Inc., 826 F.2d 1151, 1164 (1st Cir. 1987)

In evaluating remedial proposals for CWA violations, "courts have considered three factors: (1) whether the proposal 'would confer maximum environmental benefits,' (2) whether it is 'achievable as a practical matter,' and (3) whether it bears 'an equitable relationship to the degree and kind of wrong it is intended to remedy.'" United States v. Deaton, 332 F.3d 698, 714 (4th Cir. 2003) (quoting Cumberland Farms, 826 F.2d at 1164). Generally, "restoration of a violation site to its pre-violation condition is the preferred remedy." United States v. Bedford, No. 2:07-CV-491, 2009 WL 1491224, at *14 (E.D. Va. 2009) (citing Cumberland Farms, 826 F. 2d at 1161-65). But where, as here, restoration of the damaged site is not feasible, compensatory mitigation serves as another form of remediation. See id. ("Other forms of remediation are compensatory mitigation, such as purchasing credits at a mitigation bank to accomplish off-site creation of wetlands, or ensuring the preservation of existing wetlands." (internal citations omitted)). "Compensatory mitigation can be accomplished in one of three ways: 1) mitigation banks, 2) in-lieu fee programs, or 3) permittee-responsible mitigation, with the use of mitigation banks being the preferred

3

method." <u>Walther v. United States</u>, No. 3:15-CV-0021-HRH, 2015 WL 6872437, at *2 (D. Alaska 2015) (citing 33 C.F.R. § 332.3).

Here, the court finds that the off-site compensatory mitigation proposed by the EPA, to be completed by Foster through purchasing the credits owed -- as determined by a qualified consultant to be retained by Foster and verified by the EPA -- from a mitigation bank, would confer maximum environmental benefit, is achievable as a practical matter, and bears an equitable relationship to the environmental harm sought to be remedied. Indeed, the court notes that Foster does not oppose this form of remediation, but requests that the plaintiffs be given the choice of the following:

1. Preservation of existing Plaintiff owned [streams], and, if necessary, purchase of additional stream lengths of equal or greater WVSWVM score to be preserved from any future loss by recorded environmental covenant in perpetuity; or

2. In lieu fee; or

3. On site mitigation performed by the Plaintiffs or contracted at Plaintiffs' expense; or

4. Off site mitigation performed by the Plaintiffs or contracted at Plaintiffs' expense; or

5. Off site purchase of mitigation bank credits of at least equal WVSWVM score; or

6. Some combination of any or all of the preceding options.

4

Plaintiffs' Remedy Brief, "ECF # 253," at 3. However, inasmuch as off-site mitigation through purchasing credits from a mitigation bank is the preferred method of the EPA in this case as well as in general, see 33 C.F.R. § 332.3 ("For these reasons, the district engineer should give preference to the use of mitigation bank credits when these considerations are applicable."), the court finds it appropriate to direct Foster to perform the specific remediation as suggested by the EPA. Accordingly, the court adopts the remediation suggestion of the counterclaim plaintiffs.

As for civil penalties, the counterclaim defendants assert that only a nominal penalty of $1 is warranted, whereas the counterclaim plaintiffs assert that $840,000 is appropriate.

The Clean Water Act provides that violators "shall be subject to a civil penalty not to exceed $25,000 per day for each violation." 33 U.S.C. § 1319(d). The Fourth Circuit has interpreted this language to mandate a civil penalty: "This language leaves little doubt that, under the circumstances of this case, a penalty in some form is mandated." Stoddard v. W. Carolina Reg'l Sewer Auth., 784 F.2d 1200, 1208 (4th Cir. 1986); see also Atl. States Legal Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1142 (11th Cir. 1990) ("This language makes clear that once a violation has been established, some form of penalty is

required."). Courts are afforded broad discretion in setting the penalty amount. See United States v. Smithfield Foods, Inc., 191 F.3d 516, 526–27 (4th Cir. 1999) ("Because of the difficulty of determining an appropriate penalty in a complex case such as this one, we give deference to the 'highly discretionary calculations that take into account multiple factors [that] are necessary in order to set civil penalties under the Clean Water Act.'" (quoting Tull v. United States, 481 U.S. 412, 427 (1987)); and Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 451 F.3d 77, 87 (2d Cir. 2006) ("District courts have broad discretion in calculating civil penalties under the CWA.").

To determine the appropriate civil penalty, "the court may begin either with the violator's estimated economic benefit from noncompliance (known as the 'bottom-up' method) or with the statutory maximum allowable penalty (known as the 'top-down' method)." Catskill Mountains, 451 F.3d at 87; and see Smithfield Foods, Inc., 191 F.3d at 528, n.7 ("the CWA does not require the use of either [the bottom-up or the top-down] method, however, courts have applied both."). From there, courts adjust the value provided from either method by applying the six factors set forth in the CWA: "[(1)]the seriousness of the violation or violations, [(2)]the economic benefit (if any) resulting from the violation, [(3)]any history of such violations, [(4)] any good-faith efforts

to comply with the applicable requirements, [(5)] the economic impact of the penalty on the violator, and [(6)] such other matters as justice may require." 33 U.S.C. § 1319.

Here, the court employs the bottom-up approach, which is also used by the EPA in its remedy brief. ECF # 251 at 10 – 20. Specifically, the EPA proposes that the penalty must be at least $84,438, which it calculates as Foster's economic benefit reaped from the CWA violations. Id. at 14-15. The EPA reaches this number by taking the net increase in value on the entirety of Parcel D3 -- $337,751 -- as provided by records of the Wood County Tax Assessor, and attributing 25% (i.e., $84,438) of that net increase to Pad 4, which is the portion of parcel D3 where the violations took place. Id. Importantly, the market value in 2017 provided by the EPA is generally consistent with that found by the court at pages 39 - 40 of its Findings of Fact and Conclusions of Law. Finding the EPA's calculation to be a reasonable estimate for the increase in value to Parcel D3, the court uses $84,438 as a base.

Turning, then, to the six factors set forth in the Clean Water Act, the court first considers the seriousness of the violation. In determining the seriousness of defendants' violations, "the court will consider the frequency and severity of

the violations, and the effect of the violations on the environment and the public." United States v. Smithfield Foods, Inc., 972 F. Supp. 338, 343 (E.D. Va. 1997). Foster used 100,000 cubic yards of fill material to fill 1,970 linear feet of stream, consisting of four streams on his property, which work took two months or more and cost Foster $352,000. Findings of Fact & Conclusions of Law at 10-11. The filled streams each significantly affect the chemical, physical, and biological integrity of downstream waters, and cannot feasibly be restored to their previous states. This factor favors a substantial penalty.

Second, as for the economic benefit to Foster from the violations, the court notes that although the property value may have increased in the amount calculated by the EPA, in sum Foster has sustained a substantial loss by virtue of this dispute. As noted in the Findings of Fact and Conclusions of Law at page 39, Foster has been precluded from developing the land from November 2010 to date, thereby suffering a substantial financial setback. Because Foster has already lost considerably more than any economic benefit he received from the violation, this factor weighs against imposing a substantial penalty.

Third, as for any history of violations, no such history by Foster has been presented to the court.  This appears to be a first time environmental offense by plaintiffs.

Fourth, as for any good faith efforts to comply with the CWA, the court notes that although Foster was alerted to the potential need to obtain a permit by comments to his contractor made by EPA inspectors who were inspecting a nearby property, he did not seek a permit or contact the EPA to determine whether a permit was required.  Foster did, however, promptly engage Fox Engineering Company and Dan Metheny, an engineer therewith, to inquire about the need for a permit; Mr. Metheny informed Foster that no permit was needed.  Findings of Fact and Conclusions of Law at 9.  There is no indication that Foster was aware that Mr. Metheny was not qualified to make that determination.  On balance, this factor does not significantly aid the court in determining an appropriate penalty.

Fifth, as for the economic impact of the penalty on the violator, Foster is of sufficient wealth that a penalty at the EPA starting point of $84,438 would not be unduly onerous.

Sixth, when considering such other matters as justice may require, the court notes that the compensatory mitigation required of Foster will likely have a severe economic impact on

him.  See Stoddard, 784 F.2d at 1209 ("The amount of the penalty to be levied is, of course, discretionary with the court. . . . [T]he trial court may consider the fact of the substantial award of damages in the pendent claim and the need to apply available resources toward correcting the plant's problems."), and see also United States v. Key W. Towers, Inc., 720 F. Supp. 963, 966 (S.D. Fla. 1989) ("the final consideration in determining the amount of the penalty, 'such other matters as justice may require,' leads the court to provide the defendants with an option. Specifically, because of the parties and the court's primary concern of protecting the pond and providing a pollution-free habitat for the migratory birds and wildlife, the court will allow the defendants the option of paying the $250,000 fine or deeding to a charitable group, such as the Florida Land Trust, the 1.9-acre pond and a 50-foot buffer zone around that pond.").

Taking all of these factors into account, the court finds that a civil penalty that is sufficient but not greater than necessary to effectuate the goals of the CWA and to adequately punish the counterclaim defendants for their violations and deter future violators is one that exceeds the economic benefit the counterclaim defendants are deemed to have received from the violation, and fixes the civil penalty at $100,000.

Accordingly, based on the foregoing discussion, it is ORDERED that, within 120 days of the date of this order, the counterclaim defendants submit to the EPA an evaluation, performed in conformity with the West Virginia Stream and Wetland Valuation Metric, of the number of credits necessary to compensate for impacts to waters of the United States resulting from the loss of the stream segments that this court in its Memorandum Opinion and Order and Findings of Fact and Conclusions of Law found that counterclaim defendants filled in violation of the Clean Water Act.  The EPA shall thereafter promptly notify the counterclaim defendants and the court whether it agrees that the West Virginia Stream Wetland and Valuation Metric has been correctly calculated.  Upon receiving such notification that the EPA agrees with the calculation, the counterclaim defendants shall, within 90 days therefrom, purchase those credits from a stream mitigation bank pursuant to the procedures set out in 40 C.F.R. § 230.90-98, unless within 30 days after receipt of the EPA's agreement with the calculation, the counterclaim defendants file a motion seeking review thereof.  Alternatively, if the EPA does not agree with the calculation and the parties are unable to resolve the issue by agreement within 60 days after the EPA's rejection, the counterclaim defendants shall within another 30 days file a motion seeking review thereof.

Once the court has been notified that the credits have been purchased or has ruled on a review thereof as the case may be, a final judgment order carrying into effect the foregoing will be entered.

If, within the initial 120-day period noted on page 11, the counterclaim defendants fail to submit to the EPA the evaluation described above, any party to this action may seek entry of a final judgment order herein.

The Clerk is directed to transmit copies of this order to counsel of record and any unrepresented parties.

ENTER: August 29, 2019

John T. Copenhaver, Jr.
Senior United States District Judge