IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

**RON FOSTER, et al.**

      Plaintiffs,

v.                                                                            Civil Action No. 2:14-cv-16744
                                                                                                                                                                                (Judge Copenhaver)

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,**

      Defendants.

### REPLY IN SUPPORT OF MOTION TO REVIEW AND RESPONSE IN OPPOSITION TO EPA'S CROSS-MOTION FOR INJUNCTIVE RELIEF

In this Clean Water Act[1] case, the parties' present dispute boils down to this: to mitigate mass balancing work affecting stream reaches RR1, RR2, RR3, and RR4 (the Reaches) at the Neal Run Crossing property, must the Developers[2] purchase 887.69 stream mitigation credits, as they contend, or must the Developers purchase 1,321 stream mitigation credits, as the Environmental Protection Agency (EPA) contends? The cost to the Developers is substantial in either case: about $710,000 under their proposal and about $1,056,800 under EPA's proposal.

Underlying this dispute are two bitter ironies for the Developers. The cruelest of these is that today marks the effective date of EPA's "Navigable Waters Protection Rule" (the WOTUS Rule)[3] under which at least two (and perhaps all four) of the Reaches would be non-jurisdictional and, thus, not subject to any mitigation requirement at all. Yet another is that EPA now urges this

---

[1] 33 U.S.C. § 1251 *et seq.*
[2] The "Developers" are Ron Foster, Foster Farms, LLC, and Marketing & Planning Specialists Limited Partnership.
[3] Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) (to be codified, in part, at 40 CFR Part 120).

Court to adopt a desk review using the *old* Randolph Engineering assessment[4] for *an entirely different set of stream reaches*—thus raising the question of why EPA even requested[5] that the Developers perform a *new* assessment for *these* Reaches.

Beyond the fact that these ironies suggest EPA's position is unjust, the Court should reject EPA's position on the merits. Unlike Terradon, which visited Neal Run Crossing to review *these specific* Reaches and then adjusted for pre-disturbance conditions, EPA performed no such visit and relied entirely on guesswork from historical reports and photographs of *an entirely different set of stream reaches*. And while demanding that the mitigation assessment account for 43 months between the Reaches' disturbance and the commencement of this case, EPA overlooks its own responsibility for this delay.

For these reasons, as discussed further below, the Court should deny EPA's cross-motion, approve Terradon' s mitigation assessment, and enter final judgment.

## ARGUMENT

A. **EPA's alternative mitigation assessment is unjust.**

    1. **The Developers have obtained no benefit from not seeking a permit.**

In its briefing, EPA argues that the mitigation requirement is intended "to ensure that illegal actors obtain no benefit from their decision to forego the permitting process."[6] The suggestion is that the Developers might benefit from purchasing only 887.69 stream mitigation credits (at a cost of about $710,000) rather than 1,321 stream mitigation credits (at a cost of about $1,056,800).

---

[4] Randolph Engineering, *Wetland and Stream Delineation Report: Neal Run Crossing – Pad #4 & Pad #5* (Mar. 10, 2011), ECF No. 270-82.
[5] *See* U.S.' Remedy Br. Regarding Mitigation and Penalty, ECF No. 251.
[6] *See* EPA's Resp. to Countercl. Defs.' Mot. for Review and Cross Mot. for Injunctive Relief 4, ECF No. 289.

It is hard to see how EPA can justify that view. Under either mitigation assessment, the Developers will pay nearly as much or more to mitigate impacts to 2,000 feet of the Reaches than it paid for the entire 90-acre Neal Run Crossing property in 2009.[7] Moreover, the Neal Run Crossing property has been effectively sterilized since mass balancing work at issue here was performed in 2010. And though EPA issued an Administrative Consent Order (ACO) in 2012 that found this work to be a Clean Water Act violation, this Court held that finding was unreasonable as applied to three of the four Reaches.[8] EPA's saving grace was that the ACO cut off the Developers' right to appeal the U.S. Army Corps' of Engineers' original jurisdictional determination, thus forcing the Developers to file this lawsuit in which the EPA could assert the counterclaim on which it ultimately prevailed. By any measure, the cost to the Developers from these proceedings has been enormous: they have incurred significant litigation costs, they have carried the Neal Run Crossing property for nearly 10 years, and they will, by any measure, pay significant fines and mitigation costs without ever receiving a permit that would allow development to proceed.

No reasonable person could review the facts of this case and think that the Developers will receive a benefit from purchasing 887.69 stream mitigation credits rather than 1,321 stream mitigation credits.

> **2. The EPA would not consider at least two (and perhaps all four) of the Reaches to be jurisdictional under the Navigable Waters Protection Rule that took effect on June 22, 2020.**

In response to the preceding argument on the benefit to the Developers (or lack thereof), EPA likely will respond that mitigation credits are not intended to be punitive but rather to promote

---

[7] Mem. Op. & Order 3 & 39, ECF No. 263.
[8] Mem. Op. & Order 83, ECF No. 237.

the Clean Water Act's no-net-loss policy.[9] Yet that no-net-loss policy extends only so far as EPA's jurisdiction under the Clean Water Act, and as of today (June 22, 2020), EPA no longer considers several features to fall within its jurisdiction, including (1) "ephemeral features, including ephemeral streams…" and (2) "[d]iffuse stormwater run-off and directional sheet flow over upland."[10]

Under the new WOTUS Rule adopted by EPA, at least two (and perhaps all four) of the Reaches would not be jurisdictional. Between Randolph Engineering, which the Developers hired in 2011, and Stroud Water Research Center, which EPA hired in advance of trial, there was agreement (or at least no dispute) that RR1 and RR3 were ephemeral and RR4 was intermittent.[11] The only disagreement was over RR2, which Randolph Engineering classified as ephemeral and Stroud Water Research Center classified as intermittent.[12] Yet EPA's adoption of the Randolph Engineering report for purposes of calculating its own mitigation assessment indicates that the disagreement is minor and suggests that Randolph Engineering's characterization of RR2 should prevail.[13] In any case, at least RR1 and RR3 (and perhaps RR2) would not be jurisdictional under EPA's current regulations.

The jurisdictional status of RR4 is not subject to this same bright-line test, since both Randolph Engineering and Stroud Water Research Center classified it as an intermittent stream. Even so, under EPA's current regulations, "diffuse stormwater runoff and directional sheet flow by their very nature do not convey channelized surface flow and do not provide regular and predictable surface water connections between upstream relatively permanent bodies of water and downstream

---

[9] *See, e.g.* EPA's Resp. to Countercl. Defs.' Mot. for Review and Cross Mot. for Injunctive Relief 4, ECF No. 289.
[10] Navigable Waters Protection Rule, 85 Fed. Reg. at 22,340-41.
[11] *See* Stroud Water Research Center, *Expert Report: Physical, Chemical, and Biological Connections Between Headwater Aquatic Habitats Associated with the Neal Run Crossing Property and Downstream Navigable Waters in Wood County, WV* 35 (June 22, 2015), ECF No. 266-38 & Randolph Engineering, "Table 2," *Wetland and Stream Delineation Report* at 24, ECF No. 270-82.
[12] *See id.*; *see also* Mem. Op. & Order 12 & 37.
[13] *See* Declaration of Katelyn Almeter 8 ¶ 20, ECF No. 289-1.

jurisdictional waters."[14] And no one disputes that RR4 lost an ordinary high-water mark, bed, and bank for approximately 125 feet through a neighboring hayfield.[15] This Court thus could reasonably conclude that RR4 would not be jurisdictional under EPA's current regulations.

EPA likely will argue in response that this case was tried and decided before its new regulations took effect. But EPA is seeking *prospective relief* in the purchase of stream mitigation credits. And a response based on the timing of this case only begs the question: how is it just to require the Developers to purchase anywhere between $430,0000 in stream mitigation credits (representing RR1 and RR3) and $1,056,800 in stream mitigation credits (representing all four Reaches) for waters that likely are no longer jurisdictional? There is no satisfactory answer, particularly when EPA could avoid this injustice by confessing error. It is disappointing that EPA has not.

> 3. **EPA chose not to rely on the Randolph Engineering report but, instead, requested the calculation that Terradon performed here.**

A final injustice is EPA's reliance on the Randolph Engineering report[16] for its counter-assessment.[17] If EPA considers the Randolph Engineering report to be the benchmark (or at least the floor) for a mitigation assessment, then it should not have asked the Court to have the Developers retain a qualified West Virginia environmental consultant to perform a mitigation assessment.[18] Instead, it should have asked the Court to adopt the Randolph Engineering report as the foundation for stream mitigation credits and saved the Developers the time and expense of preparing a mitigation assessment that, by all appearances, it was already inclined to reject.

---

[14] Navigable Waters Protection Rule, 85 Fed. Reg. at 22,278.
[15] Mem. Op. & Order 20-21, ECF No. 263.
[16] Randolph Engineering, *Wetland and Stream Delineation Report*, ECF No. 270-82.
[17] *See* Almeter Decl. 7-9 ¶¶ 18, 20 & 21, ECF No. 289-1.
[18] U.S.' Remedy Br. Regarding Mitigation and Penalty 4, ECF No. 251.

**B.     Terradon has submitted a reliable and reasonable mitigation assessment, and EPA has not.**

      **1.     Terradon has reliably accounted for the Reaches' pre-disturbance conditions**.

EPA is incorrect when it asserts that Terradon did not account for the Reaches' pre-disturbance conditions when preparing its mitigation assessment.[19] Much like EPA's consultant, Katelyn Almeter, Terradon reviewed photos of the undisturbed areas around the Reaches to adjust its mitigation assessment for pre-disturbance conditions.[20] The dispute is simply over *how* to account for those pre-disturbance conditions.

**Reference streams**. EPA argues that the Reaches' pre-disturbance conditions should be estimated using reference streams on Neal Run Crossing's neighboring Pad 5.[21] But not even EPA suggests that the use of reference streams is mandatory. Its brief cites 40 C.F.R. § 230.95(b), which states that "performance standards *may* be based on … comparisons to reference aquatic resources of similar type and landscape position."[22] And the guidance documents cited by Almeter likewise say only that "a regulatory body *may* require data from an adjacent undisturbed area."[23]

There may be cases where reference streams provide the only option for an assessment. But no one can claim that a reference stream will be a perfect comparison. As Terradon notes, even streams in close proximity can vary widely in quality for reasons attributable to watershed drainage, stream velocity, or surrounding environmental conditions.[24] And so unlike Almeter—who

---

[19] EPA's Resp. to Countercl. Defs.' Mot. for Review and Cross Mot. for Injunctive Relief 5-8, ECF No. 289.
[20] *Compare* Decl. of Jason Asbury 2-3 ¶¶ 5 & 8, attached hereto as **Exhibit A**, *with* Almeter Decl. 4 ¶ 5, ECF No. 289-1.
[21] EPA's Resp. to Countercl. Defs.' Mot. for Review and Cross Mot. for Injunctive Relief 7, ECF No. 289.
[22] 40 C.F.R. § 230.95(b) (emphasis added).
[23] Almeter Decl. 7 ¶ 16, ECF No. 289-1 (citing *Operational Draft Regional Guidebook for the Functional Assessment of High-gradient Ephemeral and Intermittent Headwater Streams in Western West Virginia and Eastern Kentucky* (emphasis added)).
[24] *Id.* at 6 ¶ 14.

makes no claim to have visited Neal Run Crossing—Terradon actually visited the Reaches and found undisturbed portions upon which it could base its assessment.[25] Terradon's approach is the more reliable and reasonable of the two.

**Calculations**. In conjunction with its reference-stream argument, EPA also challenges the scores that Terradon gave the Reaches using the West Virginia Stream and Wetland Valuation Metric (WV SWVM).[26] For instance, Almeter relies on photos from a 2011 EPA site visit to opine that Terradon should have assigned RR2 and RR4 higher scores for certain parameters.[27] Yet it is difficult to see how Almeter could reach these specific conclusions about on-site conditions relying solely on low-resolution photocopies of photographs, each no more than about 3.5" x. 5" in size.[28] Moreover, Almeter appears unaware that the area around the Reaches had been timbered before the mass-balancing work at issue here, and that debris remained from where the timbering had occurred.[29] This fact, in particular, undermines her alternative calculations that are premised upon the Reaches being located amidst a mature forest.[30]

At bottom, Almeter's calculations are nothing more than guesswork—a desk review comparing two sites that she never claims to have visited and inspected in person. Terradon's calculations, by contrast, were derived from a field assessment that observed the on-the-ground conditions for each of the Reaches at issue here. Once again, Terradon's approach is the more reliable and reasonable of the two.

---

[25] Asbury Decl. 3 ¶ 7.
[26] EPA's Resp. to Countercl. Defs.' Mot. for Review and Cross Mot. for Injunctive Relief 6-7, ECF No. 289.
[27] *See, e.g.,* Almeter Decl. 5-6 ¶¶ 11-15.
[28] *Id.*
[29] Aug. 18, 2017, Trial Tr. 17:12-16, ECF No. 258.
[30] *See, e.g.,* Almeter Decl. 5-6 ¶¶ 11 & 16.

2.  **Temporal loss should not be included in either mitigation assessment**.

Temporal loss is "the time lag between the loss of aquatic resource functions caused by the permitted impacts and the replacement of aquatic resource functions at the compensatory mitigation site."[31] When stream mitigation credits are purchased, however, there is a presumption against temporal loss because the mitigation project will already have been completed.[32] Even so, EPA argues that the Developers should be responsible for a 43-month temporal loss from the time the Reaches were disturbed through the filing of the complaint. This is inequitable.

The mass balancing work at issue here was performed in Fall 2010.[33] By March 2011, Randolph Engineering had submitted, at the Developers' request, a wetland and stream delineation report to the Army Corps for a jurisdictional determination.[34] Yet despite concluding as early as May 2011 that the mass balancing work had violated the Clean Water Act,[35] EPA did not issue the ACO until January 2012.[36] In violation of *Sackett*,[37] EPA then refused to permit the Developers an appeal from the ACO and waited another two-and-one-half years, until about May 2014, to refer the ACO to the Department of Justice for enforcement.[38] It was this referral that forced the Developers to file suit.

It would thus be inequitable to hold the Developers responsible for EPA's own pre-suit delay. But it would be doubly inequitable because this Court held that EPA failed to support the jurisdictional determination for all but RR4 when it issued the ACO.[39] The effect would be to

---

[31] 40 C.F.R. § 230.92.
[32] Asbury Decl. ¶ 16.
[33] Mem. Op. & Order 10-11, ECF No. 263.
[34] *Id.* at 13.
[35] *Id.* at 14.
[36] *Id.* at 15.
[37] *Sackett v. EPA*, 566 U.S. 120 (2012).
[38] Mem. Op. & Order 10-11, ECF No. 237.
[39] *Id.* at 83.

relieve EPA of any responsibility for its own unlawful conduct and assign the blame (and cost) to the Developers instead. The Court should refuse the invitation and, instead, calculate temporal loss at *0* under any mitigation assessment it approves here.

C. **EPA is not entitled to an injunction vesting it with the sole authority to approve or reject Terradon's mitigation assessment**.

EPA's response to the Developers' motion to review includes a cross-motion for injunctive relief[40] in which it asks the Court to order the Developers to revise Terradon's mitigation assessment to correct all alleged deficiencies. This request should be denied for four reasons.

*First*, EPA has not addressed any of the elements for injunctive relief under *Winter*.[41] This is reason enough to deny its request.

*Second*, the Developers are already subject to an injunction in this case: namely, the Court's remedy order[42] that affirmatively enjoined the Developers to prepare the mitigation assessment that is at issue here. If EPA believes that the Developers have failed to comply with the injunction, its remedy lies in contempt—not another injunction.[43] But there are no grounds for contempt here because the Developers have fully complied. They retained Terradon to perform a mitigation assessment, submitted it to the EPA for review, engaged in a meet-and-confer process when EPA rejected it, and by then submitted it to the Court for review. EPA's request is premised on the belief that it alone should have final approval over Terradon's mitigation assessment, which leads to the third point.

---

[40] EPA's Resp. to Countercl. Defs.' Mot. for Review and Cross Mot. for Injunctive Relief, ECF No. 289.
[41] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).
[42] Mem. Op. & Order Respecting Remedies 11, ECF No. 264.
[43] *See Gunn v. Univ. Committee to End War in Viet Nam*, 399 U.S. 383, 389 (1970).

*Third*, the remedy order itself reserves review of the mitigation assessment to this Court—not EPA.[44] In any case, it is this Court—not EPA—that sits as a factfinder in this case, and the Court cannot delegate that responsibility to EPA.

And *fourth*, an after-the-fact determination of the Reaches' pre-disturbance condition inherently requires the application of an individual consultant's judgment. The most likely outcome from EPA's request is yet more time and expense submitting and resubmitting mitigation assessments until one finally matches EPA's own subjective judgment. And in that case, the Court should simply consider the Terradon mitigation assessment against the Almeter mitigation assessment that EPA has said it is willing to accept.

## CONCLUSION

There are two competing mitigation assessments before this Court. One, prepared by Terradon at the Developers' request, was based on a field assessment of the Reaches at issue here. Another, prepared by an EPA consultant, was not and, moreover, holds the Developers responsible for a 43-month period marked largely by EPA's indecision of whether to issue and then enforce a flawed ACO. And in a bitter irony, the same day that the Developers submit this brief, the new WOTUS Rule takes effect under which at least two (and perhaps all four) of the Reaches at issue here would be considered non-jurisdictional and, thus, not subject to any mitigation at all. For these reasons, the Court should approve the Terradon assessment and deny EPA's cross-motion for injunctive relief.

**WHEREFORE**, for the foregoing reasons and those apparent to the Court, the Developers request that the Court enter an Order:

1. Approving Terradon's assessment;

---

[44] Mem. Op. & Order Respecting Remedies 12, ECF No. 264.

2. Denying EPA's cross-motion for injunctive relief;
3. Entering final judgment; and
4. Granting such other relief as the Court deems just and proper.

**RON FOSTER; MARKETING & PLANNING SPECIALISTS LIMITED PARTNERSHIP; AND FOSTER FARMS, LLC**

/s/ Joseph V. Schaeffer
Joseph V. Schaeffer (WV Bar # 12088)
SPILMAN THOMAS & BATTLE, PLLC
301 Grant Street, Suite 3440
Pittsburgh, PA 15219
412-325-3303 (o)
412-325-3324 (f)
jschaeffer@spilmanlaw.com

John C. Wilkinson, Esq. (WV Bar # 8869)
1530 Quarrier Street
Charleston, WV 25321
304-539-8101
jcmaxwilkinson@gmail.com