UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

RON FOSTER; MARKETING &
PLANNING SPECIALISTS LIMITED
PARTNERSHIP; and FOSTER
FARMS, LLC,

   Plaintiffs and
   Counterclaim Defendants,

v.         Civil Action No. 2:14-cv-16744

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and ANDREW
WHEELER, in his official
capacity as Administrator,

   Defendants and
   Counterclaim Plaintiffs.

<u>MEMORANDUM OPINION AND ORDER</u>

   Pending is plaintiffs' Motion to Review and the defendants' Proposal for Further Proceedings.  <u>See</u> Mot. to Review, ECF No. 286 (filed Apr. 15, 2020); Prop. for Further Proceedings, ECF No. 310 (filed Sept. 28, 2023).

## I.    Procedural History

### a.    Case Background

In 2014, plaintiffs Ron Foster; Foster Farms, LLC; and Marketing & Planning Specialists Limited Partnerships (collectively, "Foster," "plaintiffs," or "counterclaim-defendants") sued the Environmental Protection Agency and the Administrator of the Environmental Protection Agency (collectively, the "EPA," "defendants," or "counterclaim-plaintiffs"), seeking injunctive and declaratory relief precluding the EPA from pursuing enforcement action against them with respect to the property at issue.  After the court ruled on dispositive motions, only the EPA's counterclaim against Foster remained.

On August 14 through 18, 2017, the court conducted a bench trial on EPA's counterclaim, which was the only remaining claim.  EPA claimed that Foster "filled 'waters of the United States' without a Section 404 Clean Water Permit to do so when they filled four headwater streams in 2010 on [Pad 4, which lies on Parcel D-3 of] their real estate acquired by them in 2009," which is known as the "Neal Run Crossing property," near Parkersburg, West Virginia.  <u>Foster v. United States Env't Prot. Agency</u>, No. 2:14-CV-16744, 2019 WL 4145583, at 2 (S.D.W. Va.

Aug. 29, 2019) (Mem. Op. and Findings of Fact and Conclusions of Law) (ECF No. 263) (hereinafter "Liability Order").[1]

Thereafter, on August 29, 2019, the court issued its **Memorandum Opinion and Findings of Fact and Conclusions of Law** and a **Memorandum Opinion and Order Respecting Remedies**. See Liability Order; **Foster v. United States Env't Prot. Agency**, No. CV 2:14-16744, 2019 WL 4148067 (S.D.W. Va. Aug. 29, 2019) (ECF No. 264) (hereinafter "Remedy Order").[2]  The court found that EPA prevailed on its counterclaim by proving that Foster had violated the Clean Water Act in that Foster "filled 1,970 linear feet of waters of the United States without a Section 404 Clean Water Permit to do so when they filled four headwater streams in 2010 on the Neal Run Crossing Property." See Remedy Order, at 58.

As part of this conclusion, the court found that the four headwater streams at issue, labelled Relevant Reaches 1, 2, 3, and 4 ("RR1," "RR2," "RR3," and "RR4"),[3] were subject to the

---

[1] Citations to the Liability Order herein will use the page numbers of the document as it appears on the docket, ECF No. 263.

[2] Citations to the Remedy Order herein will similarly use the page numbers of the document as it appears on the docket, ECF No. 264.

[3] Relevant reaches are referred to by Foster and his consultants sometimes as "stream assessment reaches," or "SARs."  RR1 correlates to SAR3(c), RR2 correlates to SAR3(b), RR3 correlates

EPA's jurisdiction under the Clean Water Act ("CWA") as "waters of the United States."  Liability Order, at 57; see 13 U.S.C. § 1251, et seq.  The court based its findings on Justice Kennedy's precedential concurring opinion in Rapanos v. United States, 547 U.S. 715 (2006), which has now been overruled and limited by the United States Supreme Court in Sackett v. Environmental Protection Agency, 598 U.S. 651 (2023).  See infra, at 7-9.

In the Remedy Order, the court levied on plaintiffs a civil penalty of $100,000 and ordered certain injunctive relief. See Remedy Order.  The court, "adopt[ing] the remediation suggestion of the [EPA]," ordered that Foster "perform remediation in the form of 'compensatory mitigation at least at the rate they would have had to perform had they complied with the permit process.'"  Remedy Order, at 2, 5.  The court ordered Foster to conduct an environmental evaluation, in accordance with the West Virginia Stream and Wetland Valuation Metric (hereinafter "WV SWVM"), to determine the number of "credits necessary to compensate for impacts to waters of the United States" resulting from the violations of the CWA that the court found Foster committed.  Remedy Order, at 11.  The court further required Foster to submit their evaluation and findings to the

_____

to SAR3(a), and RR4 correlates to SAR3.  See Liability Order, at 12.

EPA, who could then agree or disagree that Foster's calculated number of metrics was sufficient.  Id.  If EPA disagreed, Foster could file a motion seeking review thereof.  Id.

### b.   Foster's Proposed Relief and EPA's Response

Pursuant to the court's Remedy Order, Foster "retained Terradon Corporation, a West Virginia environmental consulting firm, to calculate the number of stream mitigation credits required under the West Virginia Stream [and Wetlands] Valuation Metric." Mot. to Review, at 2, ECF No. 286.  Terradon Corporation (hereinafter "Terradon") "calculated the need for 887.69 [] mitigation credits, with a corresponding cost of $710,152"[4] (the "Terradon Assessment").  Id.; Terradon Assessment, ECF No. 286-1.  Specifically, the Terradon Assessment concludes that the following number of mitigation credits were required per relevant reach: 203.64 for RR1, 160.76 for RR2, 214.96 for RR), and 308.33 for RR4.  Id., Ex. A, at 3. EPA responded by filing its objections to the Terradon Assessment.  See United States' Notice of Disagreement with Counterclaim Defendants' Mitigation Credit Calculation, ECF No. 285.

---

[4] The court notes that this correlates to an exact value of $800.00 per mitigation credit.

The Terradon Assessment is 53-pages long, consisting of a cover letter, dated November 18, 2019, addressed to Foster, signed by Megan Sword, the Terradon employee who conducted a site visit and field assessment in September 2019 and produced the Terradon Assessment; WV SWVM field data sheets from Sword's site visit and the WV SWVM forms for each stream reach; a "current photo log of the site conditions from the September 11, 2019 site visit;" and résumés for the Terradon employees working on the project, namely, Sword, who compiled the assessment, and Jason Asbury, who "reviewed" Sword's work.  Id., Ex. A.

Foster, while urging briefing regarding EPA's objections, asked the court to place the burden of persuasion as to the Terradon Assessment's correctness on EPA or, alternatively, to adopt the Terradon Assessment.  Id.  In so arguing, Foster contends that EPA's objections are not particularized inasmuch as EPA had not offered alternative stream mitigation credit figures or a competing stream mitigation assessment, and Foster "requests that the EPA be required to submit particularized objections to Terradon's assessment."  Id. at 3.

In its response, the EPA argues that the Terradon Assessment should be rejected inasmuch as it under-calculates the number of compensatory mitigation credits Foster should

obtain because it suffers from two fundamental infirmities: (1) it underestimates the functions of the filled streams inasmuch as Terradon is said to have assessed the streams in their post-impact condition rather than their pre-impact condition ("baseline function"); and (2) it fails to account for temporal loss.  <u>See</u> EPA's Resp. to Counterclaim Defendants' Mot. for Review and [EPA's] Cross Mot. for Inj. Relief, ECF No. 289 (hereinafter "EPA Mot. for Review Resp.").  EPA additionally offered its own calculation of mitigation credits necessary to satisfy the court's Remedy Order, which it determined to be 230.8437 for RR1, 252.9759 for RR2, 307.1422 for RR3, and 530.1422 for RR4.  <u>Id.</u>  The parties have fully briefed their positions as to the appropriate injunctive remedy in this matter.

### c.    Jurisdictional Analysis

By clarifying the meaning of "waters of the United States," the Court in <u>Sackett v. Environmental Protection Agency</u> decreased the jurisdictional reach of the CWA.  The court addresses whether EPA still has jurisdiction to enforce the CWA as to RR1, RR2, RR3, and RR4.  <u>See</u> <u>Sackett</u>, 589 U.S. at 678-79 (requiring the party asserting jurisdiction under the CWA to establish first that a water is a "water of the United States").

In its jurisdictional analysis in the Liability Order, the court looked to Rapanos v. United States, 547 U.S. 715 (2006), the then-binding case law on the definition of "waters of the United States."  See Liability Order, at 53.  In Rapanos, the plurality defined "waters of the United States" as: (1) traditional navigable waters, (2) waters connected to traditional navigable water that have a "relatively permanent flow"; and (3) wetlands that have a "continuous surface connection" to relatively permanent waters.  Rapanos, 547 U.S. at 755 (plurality opinion).  Justice Kennedy, in the precedential concurring opinion, held that the definition included waters or wetlands that have a "significant nexus" to a traditional navigable water.  Id. at 759 (concurring opinion of Kennedy, J.).  In Sackett, the Court determined that the Rapanos plurality was correct, and adopted its definition of "waters of the United States," as set forth above.  Sackett, 598 U.S. at 678.

In the Liability Order, the court concluded that all four relevant reaches satisfy the "significant nexus" test.  Id. at 57.  However, the court only explicitly stated that RR4 was "relatively permanent," and thus "waters of the United States" under the Rapanos plurality's and Sackett's definition. Liability Order, at 57.  The court was silent as to whether RR1,

8

RR2, or RR3, all of which flowed into RR4, also satisfied the Rapanos plurality's definition. Id. The court finds that pursuant to its Liability Order and Sackett, RR4 is a water of the United States subject to the EPA's jurisdiction under the CWA and that RR1, RR2, and RR3 are not "waters of the United States" for CWA purposes.

The parties agree that RR4 is the only "water of the United States" now at issue in this matter. The court will proceed by determining the injunctive relief and civil penalty for Foster's illegal filling thereof.

d.    The Parties' Arguments Regarding Appropriate Injunctive Relief

The court turns to the question of injunctive relief, in the form of compensatory mitigation, as to RR4, which Foster limits to 308.33 and EPA rates at 530.1422 in WV SWVM mitigation credits.

1.    Baseline Function

First, EPA argues that Terradon's calculated number of mitigation credits reflects stream "conditions after the building pad on Pad 4 had been constructed on top of the streams, and thus does not accurately account for the total

functional loss of the stream segments as they existed prior to Foster's unauthorized discharges." Id. at 6. EPA points to examples where "Terradon's post-disturbance assessment erroneously underestimates the WV SWVM calculation." Id. EPA argues that, in order to properly calculate the amount of stream mitigation credits Foster must acquire, it is necessary to correctly determine the pre-impact baseline function of the stream.

EPA offers the declaration of Katelyn Almeter, a life scientist in the Water Branch of the Enforcement and Compliance Assurance of EPA, who reviewed Terradon's assessment. Resp. and Cross-motion, Decl. of Katelyn Almeter ("Almeter Decl.") ¶¶ 1, 4.

Foster having purchased the Neal Run Crossing property in 2009 and having filled the four headwater streams in 2010, Almeter concludes that Terradon assessed the streams in their post-impact state. Almeter based this conclusion on the WV SWVM scores and "on the photographs supplied by Terradon and the sampling date (Sept. 11, 2019) reported in the Stream Assessment." Id. ¶ 10. In particular, Almeter notes her disagreement with certain of the RBP ("Rapid Bioassessment Protocol") scores and the HGM ("hydrogeomorphic") scores in the Terradon Assessment, which she concludes are indicative of the

Terradon Assessment's use of post-impact conditions rather than baseline conditions at Pad 4.  Id. ¶¶ 13-15, 17; EPA Resp. at 5-8.

Beginning with the RBP scores, Almeter offers several instances of what she believes are erroneous scores.  First, Almeter disagrees with the score of "3" assigned to RR4 for the "sediment deposition" parameter of the RBP.  Almeter Decl. ¶ 13. Under the RBP, a score of "3" means RR4 was in "poor" condition due to "heavy deposits of fine material" and is indicative of "an unstable and continually changing environment."  Id. Almeter, who did not visit the site, reviewed aerial photographs and site visit photographs of RR4 taken by EPA in 2010, which Almeter implies were taken prior to Foster's filling of RR4. Id.  Based on these materials, Almeter avers that RR4 should have been scored higher inasmuch as woody vegetation and groundcover existed in the undisturbed areas of the site around RR4.  Id.  These features "mean[] that the ground would have been ... stable and one would expect far less sediment in RR4 than a score of '3' would indicate."  Id.  Almeter estimates that RR4 would have scored in the "11-15" range, indicating "sub-optimal conditions."  Id.

Next, Almeter disagrees with Terradon assigning a score of "3" to RR4 for the "channel alteration" parameter of

the RBP.  Almeter Decl. ¶ 14.  A "3" for this parameter is typical of "banks shored with gabion or cement" and "over 80% of the stream reach channelized and disrupted."  Id.  According to Almeter, there is "no indication that alteration of the channels ... occurred prior to the unauthorized discharges, let alone alteration of this scale."  Id.  Almeter estimates that a score in the "16-20" range, indicating "optimal" conditions would be more accurate and reflect "channelization or dredging absent" and "stream with normal pattern."  Id.

Further, Almeter disagrees with the "riparian vegetative zone width" parameter scores of the RBP assigned for RR4.  Almeter Decl. ¶ 14.  It was scored "marginal" in the 3-5 range by Terradon, which is typical of a "width of riparian zone 6-12 meters; human activities have impacted zone a great deal."  Id.  In Almeter's opinion, a score in the "6-8" range reflecting "suboptimal" conditions would have been more appropriate due to the existence of a "mature tree stratum ... seen surrounding the areas of disturbance."  Id.

Finally, concerning the HGM component of the WV SWVM, Almeter again concludes that Terradon assessed water conditions as they exist post-impact rather than pre-impact.  Almeter Decl. ¶ 17.  "By way of example," she highlights the score of 0.34 assigned by Terradon to RR4 for "watershed land use," meaning

Terradon characterized "catchment vegetation as consisting of 95% coverage of open space/grass cover (with a runoff score of 0.3) and only 5% forest cover."  Almeter would have characterized the catchment vegetation as "50-100% forest," resulting in a score of 0.7 to 1.0.

In sum, EPA's first contention with the Terradon Assessment is that it analyzed the credits needed based on RR4's current function, rather than its function when Foster began its illegal filling.

Foster, in reply, maintains that the Terradon Assessment is reliable, principally relying on the Declaration of Jason Asbury, the vice-president of Geotechnical, Environmental & Field Services for Terradon, who reviewed Sword's work on the Terradon Assessment.  Foster Reply and Opp. at 7; see Foster Reply and Opp., Ex. A ("Asbury Decl.") ¶ 1. Foster's argument, based on Asbury's declaration, is that Sword's analysis is sound because she conducted a site visit and field assessment, during which she reviewed and assessed "existing streams that were on [s]ite as well as the areas of impact," and thereafter "reviewed photos of the undisturbed areas of the streams and adjusted her scores to appropriately account for pre-disturbance conditions."  Asbury Decl. ¶ 8. Asbury represents that "it is necessary to go out and view the

site" rather than determine a WV SWVM score "solely based on existing reports and outdated site visits." Id. ¶ 9. Thus, the Terradon Assessment is said to have "utilized current stream conditions in conjunction with previously submitted reports to determine appropriate WV SWVM scores for the impacted streams." Id. ¶ 9.

Additionally, Asbury disputes the reliability of Almeter's methods and contends that RR4 should not be considered a pristine streams, and that it should instead be rated as "low quality" because of timbering which had previously occurred at the site and which Almeter had not taken into account. Id. ¶¶ 11-13. As for EPA's contention that a reference stream (RR10) on an adjoining pad should be used for comparison purposes in "post-disturbance cases," Asbury states, "there is no rule that an offsite/non-impacted stream is the best comparison for an onsite impacted stream." Id. ¶ 13; Foster Reply and Opp. at 6.

The EPA replies by arguing that Asbury's arguments are untimely and should be disregarded inasmuch as it was Sword who conducted the site assessment and not Asbury who thus lacked personal knowledge. See EPA Surreply to Mot. for Rev. and Reply in Supp. Of Cross-motion to for Inj. Relief at 2-5, ECF No. 293 ("EPA Surreply & Reply"). Substantively, EPA argues that the described "pre-disturbance adjustment is absent from Terradon's

14

assessment report" and that Asbury left unexplained exactly how
Sword "adjusted" the scores, making it impossible to confirm
"which elements [Sword] adjusted and by how much."  Id. at 2-3.
More broadly, EPA disputes the validity of this purported
photograph-adjustment approach as an "appropriate methodology"
for assessing impacted streams.  Id. at 3-4.

### 2.    Failure to Account for Temporal Loss

Second, EPA notes that Terradon's assessment "does not
account for the length of time between the illegal stream
impacts and any mitigation."  EPA Mot. to Review Resp., at 8.
Temporal loss is not considered by Terradon in assigning 308.33
credits for RR4, but constitute 50.3722 of EPA's total credits
of 530.1422 for RR4.

EPA first noticed Foster's CWA violations on September
10, 2010, and limits its request for temporal loss to what it
calculates as being 43 months and treats as being 3.5 years,
elapsing from that date until Foster initiated this action on
May 21, 2014.  See EPA Mot. for Review Resp. at 8.  Terradon's
mitigation credit calculation does not account for any temporal
loss of aquatic activity.  See Liability Order, at 5; Terradon
Assessment, at 26, 38, 40, ECF No. 286-1.  EPA argues that
Terradon's failure to account for temporal loss of aquatic

function is a "fundamental[] failure" in its calculation.  EPA
Mot. to Review Resp., at 8.

        In response, Foster again relies primarily on Asbury,
who believes temporal loss should be zero years inasmuch as
"[w]hen credits are purchased from a mitigation bank, there is
no temporal loss; the mitigation bank has been established and
the watershed improvements are mature and providing benefits to
the undisturbed watershed."  Asbury Decl. ¶ 16; see Reply in
Support of Mot. to Review and Resp. in Opp. To EPA's Cross-
Motion for Inj. Relief at 8, ECF No. 290 (hereinafter, "Foster
Reply and Opp.").  Asbury further states that, in his
experience, the United States Army Corps of Engineers ("USACE")
"as well as the West Virginia Department of Environmental
Protection recognize temporal loss as zero when purchasing
mitigation bank credits."  Id.

        Foster additionally raises an equitable argument,
asserting that any delay in this matter is attributable to the
EPA.  Foster Reply and Opp. At 8-9.  Though USACE concluded that
Foster violated the CWA in May 2011, the EPA did not issue an
Administrative Consent Order ("ACO") until January 2012, which
in turn was not referred to the Department of Justice until May
of 2014.  See id.  Foster further argues that it would be
inequitable to assign any temporal loss because EPA failed to

16

support the jurisdictional determinations in the ACO for all but one stream, RR4.  See id.  Under these circumstances, to assign temporal loss "would be to relieve EPA of any responsibility for its own unlawful conduct and assign the blame (and cost) to [Foster] instead."  Id. at 9.

To counter Foster's argument regarding the equities of accounting for temporal loss, EPA asserts that temporal loss in the enforcement context differs from temporal loss in the permitting process.  See EPA Surreply & Reply at 5.  In the permitting context, "if, as a condition obtaining a CWA section 404 permit, the permittee agrees to purchase compensatory mitigation bank credits, the temporal loss factor is not applied, because those credits are available (i.e., the mitigation project is already in effect) and purchased in advance of the impacts," and thus "no time lag exists between the impact to the aquatic resource and the mitigation for that impact."  Id. (emphasis in original).  In Foster's case, mitigation bank credits will be purchased *after* the streams were filled, and that time lag must be accounted for.

EPA argues that 43 months is not inequitable inasmuch as it represents a conservative estimate of temporal loss, accounting only for the time between EPA's first discovery of Foster's illegal activities in September of 2010 and the start

17

of this litigation in May of 2014 because, regardless of when EPA filed the ACO or Foster filed this action, Foster bore the responsibility for compliance with the CWA.  See supra, at 14.


    3.    EPA Cross Motion for Injunctive Relief

       Finally, in the alternative to forcing Foster to revise its calculation, EPA asks the court to order Foster to purchase 530.1422 mitigation credits for RR4 (the "Almeter Assessment"), as "conservatively calculated" by the EPA.  EPR Mot. for Review Resp., at 9.  Almeter avers that she produced the Almeter Assessment as part of her review of the Terradon Assessment.  Almeter Decl. ¶¶ 18-21.  Almeter uses the Terradon Assessment and a report produced by Randolph Engineering, entitled Wetland and Stream Delineation Report (the "Randolph Report"), commissioned by Foster and dated March 2011, see Def. Ex. 20, as well as trial evidence primarily consisting of photographs of the site.  Id.

       Almeter's figure is the product of two changes. First, she utilizes HGM scores from a reference stream on Pad 5 rather than the HGM scores produced by Terradon for RR4 on Pad 4.  Almeter states that the use of a reference stream is

"standard and appropriate practice" for assessing streams which have already been altered.  Id. ¶ 18.

Relying upon the Randolph Report, Almeter proposes using RR10 located on Pad 5 to serve as a reference stream for RR4 on Pad 4.  Specifically, Almeter avers that RR10 can be a reference stream for RR4 because "[b]oth have similar flow regimes, are in close proximity and similar landscape position, which mean they both formed under similar ecological processes." Id. ¶ 18.a.  Using the reference stream, the Almeter Assessment produces a significantly higher HGM score for RR4.

The second change is that Almeter calculated temporal loss as 3.5 years rather than the Terradon Assessment's zero. Using HGM figures from the reference stream and adding 50.3722 credits for temporal loss of 3.5 years, Almeter concludes Foster should purchase a total of 530.1422 mitigation bank credits for RR4.

Notably, although Almeter disputes the validity of the three aforementioned RBP parameters in the Terradon Assessment, namely, sediment deposition, channel alteration, and riparian vegetative zone width, for which she would have assigned higher scores to each because the pre-disturbance photos indicate greater pre-disturbance functionality than the scores assigned by Terradon imply, she uses the scores assigned to each

parameter by Terradon in her own calculation.  Id. at ¶¶ 13-14.
Consequently, the RBP scores in the Almeter Assessment are the
same as in the Terradon Assessment.  Likewise, Almeter uses the
WVDEP Water Quality Indicators and WV Stream Condition Index
figures from the Terradon Assessment.  And Almeter only
specifically disputes one of the twelve variables comprising the
HGM calculation, but varies upward from the Terradon Assessment
by using HGM factors for RR4 that are based on the RR10 stream
on Pad 5 that is used as a reference stream for which some
findings are found in the Randolph Report.

        Foster raises three arguments in opposition to the
Almeter Assessment: (1) Foster would receive no benefit from the
lower compensatory mitigation credit figure in the Terradon
Assessment; (2) the four reaches in question would likely no
longer be jurisdictional under the Waters of the United States
Rule in place in 2020 (without expounding in depth on this point
which, in any event, seems overtaken by Sackett); and (3) the
EPA at least partially relied on the Randolph Engineering
report, indicating, in Foster's view, that the EPA believes it
to be sufficient.  See Foster Reply and Opp., at 2, 3, 5.
Foster additionally raises several equitable arguments in
opposition to EPA's cross-motion for injunctive relief: (1) EPA
has not addressed the elements for injunctive relief under

_Winter v. Natural Resources Defense Council, Inc._, 555 U.S. 7 (2008); (2) EPA is not entitled to "another injunction" – rather, if EPA believes Foster has not complied with the Remedy Order, EPA's remedy "lies in contempt––not another injunction" (3) EPA cannot assume the authority to review the mitigation assessment and the court, as factfinder, cannot delegate its authority to EPA; and (4) the court should "simply consider the Terradon [Assessment] against the Almeter [Assessment]" rather than the "most likely outcome from EPA's request," which is "more time and expense submitting and resubmitting mitigation assessments until one finally matches EPA's own subjective judgment."  _Id._ at 9-10.

In reply, the EPA maintains that Foster should purchase at least as many credits as he would have had to purchase had he done so prior to discharging fill into the stream.  _See_ EPA Surreply & Reply at 6.  The EPA also notes that it did not concede that the Randolph Report should serve as a "benchmark," but rather maintained its argument that Foster should be forced to revise his calculation or, "in an effort to resolve this matter," the court should impose the EPA's "compromise" suggestion of mitigation credits which, for RR4, is 530.1422.  _Id._ at 6-7.

The EPA also opposes Foster's attempt to invoke the 2020 WOTUS Rule in that the law of the case precludes the consideration of a subsequent definition of waters of the United States and Foster is judicially estopped from asserting an argument otherwise.  See id. at 7-8.  Additionally, the EPA argues Foster, in relying on Winter v. NRDC, has misstated the standard for obtaining injunctive relief.  Winter, EPA contends, supplies the standard for obtaining preliminary injunctive relief, and the EPA rests on its previous briefing regarding the propriety of injunctive relief.  See id.; see also United States' Remedy Brief Regarding Mitigation and Penalty, ECF No. 251.

## II.  Stay and Post-Sackett Procedural History

While Foster's Motion to Review and EPA's Cross-Motion for Injunctive Relief were pending, the United States Supreme Court issued its decision in Sackett v. Environmental Protection Agency, 598 U.S. 651 (2023).  Thereafter, EPA moved the court to stay ruling on the parties' respective Motion to Review and Cross-Motion for Injunctive Relief until the United States could evaluate whether and how the Sackett decision impacted the government's position with respect to the pending motions.  See ECF No. 305 (filed June 20, 2023).  In its briefing on that motion, EPA also requested a stay until a new, Sackett-

conforming "waters of the United States" rule could be finalized.  ECF No. 307 at 1-2.  In light of the publication in the federal register of a final updated "waters of the United States" rule, the court ordered EPA to submit a proposal for further proceedings and set a briefing schedule accordingly. See Order, ECF No. 308 (filed September 8, 2023).

EPA filed its Proposal for Further Proceedings on October 16, 2023.  See Prop. for Further Proceedings, ECF No. 309.  EPA informed the court that it had "completed [its] evaluation" of Sackett.  EPA concluded that, as a result of Sackett, "and given that the [Liability Order] did not determine whether RR1, RR2, and RR3 satisfy the relatively permanent standard, EPA is withdrawing its request for compensatory mitigation for RR1, RR2, and RR3, and continues to seek injunctive relief in the form of purchase of compensatory mitigation credits solely for the unlawful filling of RR4."  Id. Consistent with the Almeter Assessment, EPA continues to seek 530.1422 WV SWVM credits for RR4.  Id. at 3.[5]

_____

[5] EPA noted that it was "reserve[ing] the right to seek compensatory mitigation for RR1, RR2, and RR3 if the Court does not grant the relief EPA proposes herein." Id. at 3 n.1. Inasmuch as EPA does not expand on this point, and inasmuch further as the rest of its briefing acknowledges that it is only seeking relief as to RR4 and the court has found only RR4 remains within its jurisdiction under the Act, the court finds that EPA cannot seek compensatory mitigation for RR1, RR2, and

In response, Foster levies two arguments: first, he objects to EPA's calculated number of credits for RR4 and reiterates his position that the court should rely on the Terradon Assessment for RR4; and second, he argues that the court should, commensurate with EPA's withdrawal of injunctive relief for RR1, RR2, and RR3, recalculate the civil penalty levied in the Remedy Order. <u>See</u> Response to EPA's Proposal for Further Proceedings, ECF No. 310, at 3 (hereinafter "Resp. to PFR").[6]

As to the injunctive relief, Foster continues to argue that "Terradon accurately calculated 308.33 stream mitigation credits for RR4" and "that any compensatory mitigation awarded by the Court should be limited to 308.33 stream mitigation credits for the reasons set forth in their previous" briefing. <u>Id.</u>

As to the civil penalty, Foster argues that, because EPA now only seeks relief as to RR4, the court should "recalculate the $100,000 civil penalty set forth in" the Remedy

---

RR3.  <u>See</u> EPA Reply to PFR, at 2 ("EPA has withdrawn its injunctive relief request for RR1, RR2, [and] RR3 after considering the Supreme Court's recent decision in <u>Sackett</u>").

[6] Of note, Foster reiterates that he has "previously objected and continue to object to the Court's determination that RR4 is a jurisdictional water of the United States and the imposition of any relief whatsoever concerning RR4." <u>Id.</u> at 3.

Order while using the bottom-up method of calculation, "request[ing] a ratable reduction in the amount of the civil penalty to reflect that EPA has withdrawn its request for compensatory mitigation for RR1, RR2 and RR3." Id.

In reply, EPA briefly reiterates its position that the court should rely on the Almeter Assessment's conclusion that 530.1422 WV SWVM credits are necessary to mitigate Foster's impact on RR4 and opposes any reduction in the civil penalty. Reply in Support of Proposal to Govern Future Proceedings, ECF No. 313 (hereinafter "EPA Reply to PFR").

As to the civil penalty, EPA argues that a civil penalty is mandatory under the CWA, and its purpose is to "protect the integrity of the CWA permitting process, deter future violators, and prevent violators from gaining an advantage over those who comply with the law." Id. at 2-3 (citing Remedy Order, at 5; Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185 (2000)). EPA contends that the court based its initial civil penalty "on the economic benefit to Defendants resulting from the violation," which has remained unchanged, and "concluded that $100,000 was appropriate because it exceeded the economic benefit and would punish Defendants and deter others." Id. at 3. Thus, EPA argues, the penalty should not change simply

because the total length of streams unlawfully filled is now
less.  Id.  In closing, EPA proffers an equitable argument that,
because it has withdrawn its request for compensatory mitigation
as to RR1, RR2, and RR3, the court's "concern with the cost of
mitigation weighs against a further reduction in penalty."  Id.
at 4.

    a.   Background Regarding Mitigation Credits

      To fully understand the parties' dispute, the court
briefly overviews the compensatory mitigation under the CWA and
the West Virginia Stream and Wetland Valuation Metric.

      Under the CWA, dredged or fill material may be
discharged to jurisdictional waters of the United States
pursuant to a section 404 permit.  33 U.S.C. § 1344.  Certain
wetlands and streams are considered jurisdictional waters under
the CWA.  Sackett v. EPA, 598 U.S. 651, 678-79 (2023); 40 C.F.R.
§ 120.2(a).

      Since 1990, it has been the policy of the United
States that there should be "no overall loss of values and
functions" of wetlands.[7]  This is commonly referred to as the

---

[7] Memorandum of Agreement Between the Environmental
Protection Agency and the Department of the Army Concerning

26

"no-net loss" policy.  In order to achieve no-net loss of wetlands, compensatory mitigation is commonly required in order to obtain a section 404 permit.

In 2008, the United States Army Corps of Engineers ("USACE") adopted the "Compensatory Mitigation for Losses of Aquatic Resources" rule (the "Mitigation Rule").[8]  73 Fed. Reg. 19594 (Apr. 10, 2008).  The Mitigation Rule formalized federal policy respecting the use of compensatory mitigation.[9]  See 40 C.F.R. § 230.91(e).  The goal of compensatory mitigation is to offset unavoidable impacts to jurisdictional aquatic resources which may occur as a result of a permitted discharge of dredged or fill materials.  See 40 C.F.R. § 230.93(a).  Although wetlands were the initial focus of the no-net loss policy, USACE concluded that the Mitigation Rule "should apply to compensatory mitigation for all types of aquatic resources that can be impacted by activities authorized by Department of Army permits,

---

Mitigation Under the Clean Water Act Section 404(b)(1) Guidelines (Feb. 6, 1990).

[8] Section 314 of the National Defense Authorization Act for Fiscal Year 2004 (Pub. L. 108-136) ("NDAA") directed the Secretary of the Army to establish "performance standards and criteria for the use, consistent with section 404 of the [CWA], of on-site, off-site, and in-lieu fee mitigation and mitigation banking as compensation for lost wetland functions in permits issued" under section 404.  40 C.F.R. 230.91(a)(1).

[9] The Mitigation Rule is enacted at 33 C.F.R. §§ 332.1-.8 (USACE regulations) and 40 C.F.R. §§ 230.91-98 (EPA).

including streams and other open waters."  Proposed Rule,
Compensatory Mitigation for Losses of Aquatic Resources, 71 Fed.
Reg. 15520 (Mar. 28, 2006); see also 73 Fed. Reg. 19596-97.

Mitigation banking is one type of compensatory
mitigation covered by the compensatory mitigation regulations.
A mitigation bank restores, establishes, enhances, and/or
preserves aquatic resources at a compensatory mitigation site or
sites.  40 C.F.R. § 230.92 (defining "Mitigation bank").
Assuming the compensatory mitigation site is successful, credits
are released for sale or transfer.  Id. (defining "Release of
credits").  Credits, in this context, are a unit of measure
representing the aquatic functions attained at the compensatory
mitigation site.  Id. (defining "Credit").  Function means the
"physical, chemical, and biological processes that occur in
ecosystems."  Id. (defining "Function")

The market for mitigation bank credits is comprised of
persons who wish to discharge dredged or fill material into
streams or wetlands pursuant to a CWA section 404 permit.  See
id. (defining "Permittee-responsible mitigation").  In the
context of compensatory mitigation, discharging results in a
debit, which represents the loss of a stream's aquatic
functions.  See id. (defining "Debit").  When, as part of

28

compensatory mitigation, at least as many credits are obtained
as resulting debits, the no-net loss policy is fulfilled.

1.    West Virginia Stream and Wetland Mitigation Credits

The adoption of the Mitigation Rule spurred the
development and adoption of the WV SWVM in 2010.[10]  The Federal
Mitigation Rule encourages the use of an "appropriate assessment
method . . . or other suitable metric . . . to assess and
describe the aquatic resource types that will be restored,
established, enhanced, and/or preserved by the mitigation
bank . . . project."  The WV SWVM serves as a metric for
assessing and describing proposed impacts on streams and
compensatory mitigation projects and to comply with the no net
loss policy.

Practically speaking, the WV SWVM is a two-page form
spreadsheet.  Of particular note here are Part I (Physical,
Chemical, and Biological Indicators, including the HGM and RBP
scores discussed herein) and Part III (Impact Factors, which
incorporates temporal loss) that are primarily at issue.  EPA

_____

[10] See USACE, "The West Virginia Stream and Wetland
Valuation Metric," West Virginia Stream and Wetland Valuation
Metric (army.mil), (February 2010).

raises specific issue with the Terradon Assessment's scoring of the HGM and RBP scores.

The HGM Score is utilized for high-gradient ephemeral and intermittent headwater streams in western West Virginia. For each stream, twelve variables are assessed and scored. These variables generate three scores for hydrology, biochemical cycling, and habitat functional capacity index. The RPB is a survey technique intended to provide basic physical data on aquatic life in lotic ecosystems. For each stream, the RBP section of the WV SWVM consists of ten parameters, each of which is assigned a score.

One aspect of temporal loss in the WV SWVM is "Temporal Loss-Construction." Temporal loss-construction is measured in years and reflects "the duration of aquatic functional loss between the time of impact (debit) and completion of compensatory mitigation (credit)." Factoring in temporal loss, the WV SWVM yields a final debit figure for an impacted stream.

### III. Findings of Fact and Conclusions of Law

The court makes the following findings of fact by a preponderance of the evidence, adduced both from trial and admissions and declarations within the parties' filings related

to Foster's Motion to Review and EPA's Proposal for Further Proceedings and subsequent filings, and makes its conclusions of law.  In so doing, the court will determine the appropriate injunctive relief and civil penalty to be assessed against Foster for the illegal filling of RR4.

### a.    Injunctive Relief

Compensatory mitigation is intended to offset the "aquatic resource functions that will be lost as a result of" discharges of dredged or fill material to waters of the United States.  40 C.F.R. § 230.93(a)(1).  In this context, "function" means the "physical, chemical, and biological processes that occur in ecosystems."  40 C.F.R. § 239.92 (defining "function").  To offset lost functions, a compensatory mitigation project must be at least equal to the loss of function in an impacted stream.

Compensatory mitigation projects must comply with the standards set forth in USACE and EPA regulations.  See 33 C.F.R. § 332.3(a)(3); 40 C.F.R. 230.93(a)(3).  Although the applicable federal regulations primarily focus on compensatory mitigation projects undertaken in conjunction with permitted unavoidable impacts to waters of the United States, "[m]itigation banks . . . may also be used to satisfy requirements arising out of an enforcement action."  Id. § 230.93(g).  When mitigation banking is used, the amount of mitigation banking credits required "must

be, to the extent practicable, sufficient to replace aquatic
resource functions." See 40 C.F.R. § 230.93(f)(1).  In
determining how many mitigation banking credits must be
obtained, "appropriate functional or condition assessment
methods or other suitable metrics . . . should be used where
practicable to determine how much compensatory mitigation is
required." See id.  In West Virginia, the WV SWVM is a suitable
metric for determining how much compensatory mitigation is
required to offset impacts.

     As the court has found, Foster, by discharging fill
into RR4 has caused its loss of function.  See generally
Liability Order.  Compensatory mitigation in this case, then,
must offset RR4's loss of function.  The court has ordered
Foster to utilize the WV SWVM to determine the amount of
mitigation bank credits he must purchase as an offset to his
illegal filling of RR4.  Foster's motion to approve the purchase
of 308.33 mitigation bank credits is based upon the Terradon
Assessment.  EPA opposes this calculation, challenging the
appropriateness of Terradon's methods and asserting that
530.1422 mitigation bank credits should be required.

     There are two principal sources of disagreement as to
the appropriate amount of mitigation bank credits Foster must
purchase.  First is the issue of baseline functions of RR4.

Foster and EPA agree that determining the appropriate amount of mitigation bank credits Foster must purchase requires determining its baseline function.  Foster and EPA disagree on what constitutes an appropriate methodology for doing so.

Second, Foster and EPA disagree as to the applicability of temporal loss, that is, the amount of time between the loss of aquatic function and its restoration via compensatory mitigation.  Foster maintains that, as a general matter, where mitigation bank credits will be used as compensatory mitigation, there is no temporal loss inasmuch as the compensatory mitigation project which released the credits for purchase already exists at the time of the impact.  EPA, on the other hand, maintains there is no temporal loss only when credits are available and purchased prior to impact.  In the context of a post-impact, enforcement proceeding, EPA proposes 3.5 years of temporal loss based on the time between the impacts at Pad 4 and the initiation of this action.

### 1.    Baseline Conditions

Before considering the assessment of baseline conditions in Terradon Assessment and Almeter Assessment, it is beneficial to review the condition of the Neal Run Crossing leading up to and at the time Foster began illegally filling RR4

inasmuch as it is disputed by the parties and relevant to the issue of RR4's baseline functions.

Neal Run Crossing consists of approximately 90 acres, divided into five pads for development purposes.  U.S. Ex. 165 at 165.0005.  Of these five pads, Pad 4 and, to some extent, Pad 5 are relied upon.  Pad 4 is approximately 12.9 acres and Pad 5 is approximately 11.6 acres.  Id.  On Pad 4, there existed the four impacted streams: RR1, RR2, RR3, and RR4.  Liability Order at 4.  RR1, RR2, and RR3 each flowed into RR4, which flowed off the Neal Run Crossing property.  Id.  Pad 5 also contains a number of streams, including RR10, used by Almeter as a "reference stream" for RR4.

A principal point of dispute concerns when and to what extent timbering occurred at Neal Run Crossing.  Aerial photographs from 2003 show the site as being predominately forested.  See U.S. Exs. 206B and 318.  The March 2011 Randolph Report describes Neal Run Crossing as consisting of "90 acres of timbered land" while also as being "located in a wooded area."  U.S. Ex. 165 at 165.0005-0006.  Aerial photographs reviewed by Randolph showed the site "as partially forested and timbered."  Id. at 165.0006.  "Minimal to severe disturbance of the site" was noted, but so, too, was the fact that "the entire limits of

the study [area] has been timbered in recent history." Id. at

165.0010; see also id. at 165.0005.

At trial, Foster could not place an exact date on when

the timbering happened, estimating it to have been one to five

years before he purchased it in August 2009. According to

Foster, there remained "still a good bit of debris around from

where that timbering had been done." Foster Testimony, ECF No.

258, at 17:15-16. Similarly, David Walters, of Walters

Excavating, testified at trial that the site had already been

logged by the first day he arrived at the property in September

2010. Walters Testimony, ECF No. 255, at 94; see also Foster

Testimony, ECF No. 258, at 101, 116-17. It thus appears that

sometime between 2003 and 2009 a portion of Neal Run Crossing

was timbered, including on Pads 4 and 5.

At the time Foster purchased the property in 2009,

some trees and other vegetation remained on Pad 4. Foster hired

Walters Excavation to clear brush and remove tree stumps from

Pad 4. Photographs of Pad 4 taken in 2010 and 2011 show

remaining vegetation, including trees, in some areas while other

areas appear to have been completely cleared and leveled because

of Foster's operations. See U.S. Ex. 6 at AR0001076-77

(September 2010 photographs of Pad 4 showing areas of vegetation

and areas of grading); U.S. Ex. 7 at USEPA0001248 (depicting

stream channel and vegetation in foreground and cleared and
filled area in background), USEPA0001253 (depicting dense wooded
vegetation in area upstream of where clearing and grubbing had
taken place on Pad 4); U.S. Ex. 222 (December 2011 photograph
depicting graded and filled portions of Pad 4 and areas above
the fill with vegetation remaining).  RR4 was located in a
partially timbered area.  Liability Order at 18.

Pad 5 also appears to have been timbered, although it
was not clear-cut prior to 2009.  Aerial photographs from 2014
show significantly more forested land on Pad 5, which lies about
100 feet east of Pad 4, and other areas of Neal Run Crossing
than on the westernmost portion of Pad 4.  U.S. Ex. 284.  As of
the trial in this matter, unlike Pad 4, it was not cleared and
grubbed by Foster.

By the time of the Randolph Assessment in March 2011,
the condition of Pad 4 and the streams located there had
deteriorated as a result of Foster's operations.  RR4 was
completely filled.  U.S. Ex. 20 at AR0000483.

As part of the Randolph Report, HGM field data sheets
were not completed for RR4, which was not assessed inasmuch as
it had been completely filled.  See U.S. Ex. 165 at 165.0011-12.
Randolph assessed RR10 on Pad 5, the reference stream adopted by
EPA's Almeter for RR4, U.S. Ex. 20 at AR0000527-29, AR0000540-

43, with an HGM average score of 0.74.  See id.  The assessment

of RR10 was denoted as having occurred "Before Project."  See

id.  RBP and West Virginia Stream Conditions Index ("WVSCI")

scores were not determined as part of the Randolph Report.

Based on the foregoing, the court finds that Neal Run

Crossing, and specifically the area around RR4, had been

partially timbered prior to Foster's acquisition of it in August

2009.  Although the precise extent of timbering on Pads 4 and 5

cannot be stated in quantifiable terms based on the record, by

the time of Foster's acquisition the wooded areas on Pads 4 and

5 were not in pristine, untouched condition, but neither were

they entirely lacking for trees or other vegetation.  The

remaining trees and other vegetation had not been cleared and

grubbed from Pad 4 prior to Foster's acquisition.  After

acquiring the property, Foster cleared and grubbed much of Pad 4

in September 2010, including much of the area of RR4.  Clearing,

grubbing, and filling operations did not occur on Pad 5.

Nearly a decade after the Randolph Report, the court

is left with the task of determining what RR4's baseline

function was prior to Foster's activities.  The parties have

offered two competing assessments, differing in their methods

and ultimate conclusions.  Determining the amount of

compensatory mitigation required to offset RR4's loss of

function necessarily depends on determining the value, in terms of function, of the stream reach prior to Foster's impact.  The parties disagree as to (1) what is an appropriate and reliable methodology for determining baseline function and (2) whether the Terradon Assessment or Almeter Assessment applied an appropriate and reliable methodology.

To briefly recap each of the two competing assessments, Terradon's employee, Sword, on behalf of Foster, conducted a field inspection of RR4, as well as of RR1, RR2, and RR3.  Sword inspected both "existing streams" and "areas of impact" including "current disturbed streams."  As part of her assessment, Sword completed HGM field data sheets and RBP field data sheets for each stream.  Asbury, a vice president at Terradon, claims that Sword then "adjusted her scores to appropriately account for pre-disturbance conditions."  Asbury Decl. ¶ 8.  This adjustment was based on photos of undisturbed areas and "previously [] submitted reports."  Id. at ¶ 9.  Sword also reviewed the Randolph Report and the Liability Order.  Ultimately, Terradon calculated the total WV SWVM credits required for RR4 to be 308.33.

On behalf of the EPA, Almeter used the Randolph Report, Liability Order, Terradon Assessment, and U.S. Exhibits 173 (Materials from U.S. Army Corps of Engineers, Huntington

District), 284 (Expert Report, Stroud Water Research Center), 6
(EPA photographs from September 2010), 22 (EPA photographs from
May 2011), and 5A, 5B, 186 and 317 (aerials and maps).  Almeter
concluded that Terradon scored the streams based on their
current, post-impact condition, due to low HGM and RBP scores
and the photographs accompanying the Terradon Assessment.

       In reviewing Terradon's Assessment, Almeter produced
an assessment of her own, which EPA has moved in the alternative
for the court to adopt.  Rather than reject the RBP scores from
the Terradon Assessment, Almeter utilized the same scores.
Similarly, Almeter used the WVDEP Water Quality Indicators and
WVSCI figures from the Terradon Assessment.  Notably, Almeter
says she used Terradon's scoring not because she agreed with it,
but because Terradon and Foster failed to provide data, location
information, and location access to enable Almeter to
independently determine these scores.  See Almeter Decl. ¶ 7;
EPA Resp. at 6 n.2, 8-10.  Almeter adopted Terradon's scores "in
the spirit of compromise" and as a "conservative" input for the
WV SWMA credit calculation.  EPA Surreply & Reply, at 6.

The only difference, then, in Part I[11] of the Terradon Assessment and the Almeter Assessment is the HGM score. Almeter substituted and used the HGM scores from the Randolph Report for RR10 on Pad 5 for the HGM score for RR4 instead of the HGM score in the Terradon Assessment. Almeter calculated total required credits, prior to application of temporal loss, to be 479.77 for RR4. The court notes that, in the EPA's "conservative" calculation, the incorporation of 3.5 years of temporal loss would increase the mitigation credits necessary for RR4 to 530.1422, an increase of 50.3722 credits.

Neither baseline condition assessment is flawless. Beginning with the Terradon Assessment, Sword's methodology is sometimes obscure. Asbury refers to "photos" which Sword used to adjust her field scores, but he does not direct the court to any specific photos, which would permit greater scrutiny of the Terradon Assessment. Nor is the photo-adjustment method Sword is said to have relied on explained in any detail. This may be due to the fact that Asbury lacks personal knowledge of what exactly Sword did — nowhere in his declaration does Asbury attest to having personal knowledge of Sword's methodologies, analysis, or conclusions. Moreover, from the court's review of

---

[11] As discussed above, Part I includes inputs regarding physical indicators of a stream (RBP data), chemical indicators (WVDEP Water Quality data), and hydrology data (HGM data).

the RBP and HGM field data sheets, which presumably were completed in the field by Sword, and the final WV SWVM sheets, which were presumably completed after the site visit, there is no indication how -- or even whether -- any scores were adjusted inasmuch as the scores in the WV SWVM are exactly the same as those in the field data sheets.

The court also notes that the Terradon Assessment does not provide coordinates or other geographic information to identify the locations of sampling points or assessment areas. Such information should have been supplied initially rather than being offered belatedly by Asbury, who should have simply provided them along with his declaration rather than offering to do so if requested. In view of the other ambiguities, this makes it rather difficult to perform a thorough review of the assessment. For example, Asbury refers, without specificity, to Sword's assessment of existing "unimpacted" portions of the streams. Accordingly, it is not clear how "unimpacted portions" of RR4 could be assessed, and Asbury's declaration leaves the court without explanation.

Foster also appears to overstate the impact of prior timbering on the RBP scores, which, as the court has discussed, constituted only partial timbering of the site. Although Foster asserts that EPA proposes rating the streams as "pristine"

despite the site having been timbered, EPA has not made that assertion.  EPA identified three parameters of the RBP that appeared to be low.  Far from proposing scores representative of pristine conditions, Almeter proposed a score in the "suboptimal" range.  Almeter Decl. ¶¶ 13-15.  Admittedly, Almeter's declaration is sometimes vague on the issue of timbering.  She describes the site as having a "relatively unimpacted wooded area," with a "mature tree stratum," and "mature, relatively dense vegetation."  Id. at ¶ 11.  Given the timbering which had occurred prior to Foster's acquisition of the site, such statements understate the amount of disturbance at the site prior to Foster's acquisition of it.  Nevertheless, the photographs Almeter reviewed do show several large trees and significant vegetation on site.

With respect to RBP scores, the court finds Almeter's critique of the Terradon Assessment to be persuasive in certain respects, but limited in others.  Almeter noted her disagreement with three out of ten RBP scores of RR4 in the Terradon Assessment.  Although Almeter explained how she would have scored these three parameters differently, EPA used Terradon's RBP scores in the Almeter Assessment.  Foster urges the court to view EPA's decision to proffer the very same scores, albeit as a compromise position, as undermining EPA's objection to this

aspect of the Terradon Assessment.  Almeter's use of Terradon's RBP scores, rather than the higher numbers she would have assigned to some of RR4's RBP scores, serves to decrease EPA's alternative proposed relief.

Respecting the HGM scores in the Terradon Assessment, Almeter has identified, as an example, one variable, namely, the "watershed land use" score for RR4, which she believes is incorrectly scored.  Because of this, Almeter proposes to substitute all of the HGM scores for RR4 in the Terradon Assessment with HGM scores from the RR10 reference stream on Pad 5.  Relying on Operational Draft Regional Guidance from July 2010, Almeter avers that the use of reference streams is "the generally recognized method" in post-impact cases and, as earlier noted, "standard and appropriate practice."  Almeter Decl. ¶¶ 16, 18.  In doing so, Almeter relies on a 2010 USACE Guidebook, entitled Operational Draft Regional Guidebook for the Functional Assessment of High-gradient Ephemeral and Intermittent Headwater Streams in Western West Virginia and Eastern Kentucky, from July 2010, stating:

> [r]egulatory agencies are responsible for determining permit requirements. For example, in recently disturbed locations or atypical circumstances, a regulatory body may require data from an adjacent undisturbed area to be evaluated and applied to the assessment report. In other cases, regulatory agencies may consider that

recently or intentionally disturbed areas did not meet reference standard conditions prior to disturbance.

2010 Guidebook at 5. According to Almeter, it "provides the methodology for the HGM component of the [WV SWVM]." Almeter ¶ 16.

The quoted passage on which Almeter relies does not appear in the 2017 version of the USACE Guidebook which replaced the 2010 issue and was expanded to include nearly all of Appalachia,[12] entitled Operational Draft Regional Guidebook for the Functional Assessment of High-Gradient Headwater Streams and Low-Gradient Perennial Streams in Appalachia, ERDC/EL TR-17-1 (January 2017).[13] However, relevant regulations provide that the "approved mitigation plan must contain performance standards that . . . may be based on variables or measures of functional capacity . . ., measurements of . . . aquatic resource

---

[12] This 2017 version of the guidebook was explicitly "developed with the input of a multi-agency, interdisciplinary team. This guidebook provides updated information relating to the assessment of headwater streams and is intended to replace the 'Operational draft regional guidebook for the functional assessment of high-gradient ephemeral and intermittent headwater streams in western West Virginia and eastern Kentucky.'"

[13] The 2017 Guidebook defines "reference streams" as "[s]treams that encompass the variability of a regional subclass in a reference domain. Reference streams are used to establish the range of conditions for construction, calibration of functional indices, and reference standards." Id. at 119. The 2010 definition is virtually identical.

characteristics, and/or comparisons to reference aquatic resources of similar type and landscape position."  40 C.F.R. § 230.95.

EPA has not demonstrated that the particular reference stream RR10 on Pad 5 is appropriate to use in this case.  As earlier noted, aerial photographs show significantly more forested land on Pad 5, supporting Asbury's contention that the streams on Pad 5 "are not appropriate reference streams for the streams that were filled" at the time they were filled by Foster because the Pad 5 streams had greater vegetative cover and would thus receive higher WV SWVM scores.  Asbury Decl. ¶ 12.

As previously discussed, in scoring the HGM, twelve variable measures are scored for each stream.  Out of these twelve HGM variables scored, Almeter has specifically identified only one variable with which she takes issue.  See Almeter Decl. ¶ 17 (identifying the "Watershed Land Use" HGM variable as improperly scored by Terradon).  Without more than a singular exemplary point of disagreement, the court cannot guess as to which other HGM scores are inadequate and by how much.  Despite any shortcomings of the Terradon Assessment, the court finds that EPA has not established that the HGM scores in the Terradon Assessment are insufficient.

The streams on Pads 4 and 5 may have had some similarity, as Almeter asserts, but the court cannot meaningfully compare the streams without more detail than EPA has provided.  Unlike Sword who made a field assessment, Almeter neither visited the site nor indicated that she was informed respecting RR10 by any of the several EPA employees who did.  In her declaration, Almeter states that both streams RR4 and RR10 "displayed similar past land use" which she acknowledges is "based on limited historical aerial photo review."  See Almeter Decl. ¶ 18.a.  The foundation for treating RR10 as comparable is simply too limited as to allow for such an analysis.

The court concludes that EPA has not carried its burden of persuasion to demonstrate that the Terradon Assessment does not satisfy Foster's obligations under the Remedy Order with respect to RR4's baseline conditions, as to which the court finds by a preponderance of the evidence that the Terradon Assessment of 308.37 WV SWVM credits for RR4 complies with Clean Water Act restoration requirements, excepting temporal loss.

### 2.   Temporal Loss

The parties fundamentally disagree as to the issue of temporal loss, which Foster maintains should be zero, inasmuch as he is purchasing credits from a mitigation bank.  EPA maintains it should be 3.5 years, inasmuch as Foster did not

actually purchase mitigation bank credits prior to filling the RR4 stream.

The Mitigation Rule established a preference for mitigation banking credits as compensatory mitigation, in part, because mitigation banks can "help reduce . . . temporal loss of resource functions and services."  40 C.F.R. § 230.93(b)(2). Id.  Federal regulations define temporal loss as:

> the time lag between the loss of aquatic resource functions caused by the permitted impacts and the replacement of aquatic resource functions at the compensatory mitigation site. Higher compensation ratios may be required to compensate for temporal loss. When the compensatory mitigation project is initiated prior to, or concurrent with, the permitted impacts, the district engineer may determine that compensation for temporal loss is not necessary, unless the resource has a long development time.

40 C.F.R. 230.92.  As previously discussed, temporal loss-construction is one aspect of temporal loss and is defined in the instructions to the WV SWVM as "the duration of aquatic functional loss between the time of impact (debit) and completion of compensatory mitigation (credit)."  The instructions to the WV SWVM (Version 2.1) also state: "The default value for . . . Mitigation Banking (provided Mitigation Bank credits have been approved and are available) is 0 years."

As the federal regulations and the WV SWVM provide, where a mitigation bank will be used to offset a permitted loss of aquatic resource functions, temporal loss can be calculated as zero. See 40 C.F.R. § 230.92. In order for temporal loss to be zero, several other things must also occur. Credits must be available for purchase. See id. (defining "release of credits"); see also id. § 230.98(o)(8). Credits are released for purchase only after a mitigation project hits certain measurable milestones. Id. § 230.98(o)(8)(i), (9).

Next, credits must actually be purchased or reserved for a particular permitted impact. See id. § 230.98(r). As the federal regulations explain,

> all activities authorized by [USACE] are eligible, at the discretion of the district engineer, to use mitigation banks . . . to fulfill compensatory mitigation credits for [USACE] permits. The district engineer will determine the number and type(s) of credits required to compensate for the authorized impacts. Permit applicants may propose to use a particular mitigation bank . . . . In such cases, the [mitigation bank] sponsor must provide the permit applicant with a statement of credit availability. The district engineer must review the permit applicant's compensatory mitigation proposal, and notify the applicant of his determination regarding the acceptability of using that mitigation bank . . . .

Id. Consistent with the foregoing process, to benefit from a mitigation bank project, credits must be purchased for a

48

particular project in conjunction with the permitting process. Id.  At any given time, there is a limited supply of credits for purchase in a given area.  See id. 230.98(q)(1).  USACE maintains a database of all credits released, withdrawn, and purchased from each mitigation bank.  See id. 230.98(q).

Released credits do not accrue to all projects in an area for the purposes of calculating temporal loss but must instead be specifically purchased and applied.  A mitigation bank is established for the purpose of selling stream mitigation credits to offset adverse effects of permitted discharges.  The mitigation bank is the only mitigation bank in a given geographic area, although at times mitigation credits may not be available.

Here, Foster argues he should be entitled to zero temporal loss even where he has not purchased or applied any particular credits and has already adversely impacted RR4.  Had Foster applied for a permit in 2010, had credits been available and released for purchase at that time, had he purchased credits, and had he applied his credits to the Neal Run Crossing project, he would be entitled to zero temporal loss.  The problem, of course, is none of those things occurred.  Foster did not purchase any mitigation bank credits and does not assert

that they were not available at that time.  The resulting temporal loss of aquatic resources must be counted against him.

Foster's equitable argument is also without merit. Foster was warned he may need a section 404 permit.  See Liability Order, at 7-8 ("The EPA inspectors asked [Foster's excavator] if a section 404 permit had been obtained for the Pad 4 work and advised him that one was likely required.").  He did not heed that warning.  Foster unlawfully discharged fill into jurisdictional waters of the United States.  That it took time for this civil action to materialize does not change the ultimate fact of Foster's liability and the resulting loss of aquatic resources.  EPA's position represents a reasonable compromise for an environmental harm which remains ongoing.

Inasmuch as Foster has failed to properly account for temporal loss in accordance with the WV SWVM, he has not complied with the court's Remedy Order.  To so comply, the Terradon Assessment must account for 3.5 years of temporal loss of aquatic function.

The Terradon Assessment determined that, excluding temporal loss, Foster could satisfy the court's injunctive relief order as to RR4 by purchasing 308.33 stream mitigation credits.  See Resp. to PFR, at 3.  Inasmuch as the court notes that the EPA's calculation has attributed 50.3722 mitigation

credits to temporal loss, and inasmuch further as that calculation is limited to the 3.5 year period prior to the filing of this action, the court finds by a preponderance of the evidence that a 50.3722 increase to the Terradon Assessment's 308.33 figure is reasonable and appropriate, and as to which EOA has carried its burden of persuasion.[14]

The court concludes that such an increase of 50.3722 credits "would confer maximum environmental benefits," be "achievable as a practical matter," and would "bear an equitable relationship to the degree and kind of wrong it is intended to remedy."  Remedy Order, at 3 (citing United States v. Deaton, 332 F.3d 698, 714 (4th Cir. 2003) (quoting United States v. Cumberland Farms of Connecticut, Inc., 826 F.2d 1151, 1164 (1st Cir. 1987))).

### 3.    Conclusion as to Injunctive Relief

The court finds that the Terradon Assessment satisfies the court's Remedy Order as to baseline function of RR4, but it

---

[14] Even if such an increase should be proportional to the lower starting figure, in light of the fact that EPA's estimate is its "conservative," "compromise" position, EPA Surreply & Reply at 6, the court finds that the increase of 50.3722 credits is the appropriate adjustment to "effectuate the stated goals of the Clean Water Act to maintain the chemical, physical, and biological integrity of the Nation's waters."  United States v. Cumberland Farms of Connecticut, Inc., 826 F.2d 1151, 1164 (1st Cir. 1987) (internal quotations omitted).

fails to satisfy the Remedy Order to the extent that it fails to account for temporal loss of RR4's aquatic function. Accordingly, the court adjusts upward the Terradon Assessment's conclusion as to RR4 and finds that the appropriate injunctive relief in this matter is to direct Foster to purchase 358.4022 mitigation bank credits within the appropriate watershed.

### b.   Civil Penalty

Turning to the parties' arguments as to civil penalty, the court first reviews the parties' positions.

In light of EPA's withdrawal of its request for compensatory mitigation for RR1, RR2, and RR3, Foster moved the court to recalculate (and decrease) the $100,000 civil penalty issued in the court's Remedy Order.  <u>See</u> Resp. to PFR.  In support, Foster notes that the court's calculation of $100,000 was first based upon the economic benefit Foster received from its development of Pad 4, and then adjusted upwards based upon the six factors regarding civil penalty outlined in the CWA.  In the Liability Order, the court found Foster illegally filled 1,970 linear feet in total, but, of that, only 740 linear feet is attributable to RR4 (37.56% of the total).  Foster argues that, because EPA has withdrawn its request for injunctive relief as to RR1, RR2, and RR3, the economic benefit

attributable to the development of the portion of Pad 4 through which those streams run should be removed from the court's consideration for the purposes of calculating civil penalty in this matter.  Foster thus requests, without further detail regarding the economic benefit to Foster attributable to any individual stream, a "ratable reduction" in the $100,000 civil penalty issued in the Remedy Order.

In response, the EPA argues that the court should leave the civil penalty as is.  EPA notes the mandatory nature of civil penalty where there is a CWA violation and the purpose of such a penalty is to protect the integrity of the CWA permitting process, deter future violators, and prevent violators from obtaining an ill-gained advantage over those who comply with the law.  EPA argues that, even though it no longer seeks injunctive relief as to RR1, RR2, and RR3, the court's analysis at arriving at a $100,000 penalty remains unchanged: Foster still permitlessly filled RR4 on Pad 4, and it was a "reasonable estimate" to attribute an increase of $84,438 in property value to that illegal activity.  Reply to PFR at 3; see Remedy Order at 7.  EPA notes that, after consideration of the six CWA civil penalty factors, the court concluded $100,000 was an appropriate civil penalty.  In essence, EPA asserts that Foster still obtained the same economic benefit, which remains

attributable to his illegal filling of RR4 into which the other streams flowed, and thus the $100,000 penalty should remain.

The court first turns to its analysis in the Remedy Order, upon which it will base its analysis of the civil penalty question herein.  <u>See</u> Remedy Order at 5-10.

The court noted the mandatory nature of civil penalty and the broad discretion afforded to the court in setting the penalty.  <u>Id.</u> at 5-6 (citing <u>United States v. Smithfield Foods, Inc.</u>, 191 F.3d 516, 526-27 (4th Cir. 1999)).  The court applied a "bottom-up" approach to first determine the "violator's estimated economic benefit from noncompliance," and, from there, adjusted the value provided therefrom "by applying the six factors set forth in the CWA: '(1) the seriousness of the violation or violations, (2) the economic benefit (if any) resulting from the violation, (3) any history of such violations, (4) any good-faith efforts to comply with the applicable requirements, (5) the economic impact of the penalty on the violator, and (6) such other matters as justice may require.'"  Remedy Order 6-7 (quoting 33 U.S.C. § 1319) (internal brackets removed).

In the calculation of economic benefit, the court essentially adopted a measure of EPA's logic in its Remedy Order.  Remedy Order 7.  The court found reasonable EPA's

calculation of $84,438 as the "economic benefit Foster reaped from the CWA violations."  Id.  EPA reached that number "by taking the net increase in value on the entirety of Parcel D3 -- $337,751 -- as provided by records of the Wood County Tax Assessor, and attributing 25% (i.e., $84,438) of that net increase to Pad 4, which is the portion of parcel D3 where the violations took place. United States' Remedy Brief Regarding Mitigation and Penalty, ECF No. 251, at 14.

Here, the court notes that nothing about this approach changes even when the court no longer considers Foster's activities regarding RR1, RR2, and RR3.  Considering only Foster's actions toward RR4, which lies on Pad 4 and into which RR1, RR2, and RR3 flow, Foster still obtained the same economic benefit — namely, $84,438 — by permitlessly filling RR4 and developing Pad 4.  Though Foster requests a "ratable reduction," considering that RR4 comprises only approximately 37% of the 1,970 linear feet between all four streams, he has not provided any information upon which the court can calculate the actual economic benefit obtained only from Foster's filling of RR4, rather than the development of Pad 4, generally.  Accordingly, the court finds no reason to disturb its finding that the $84,438 economic benefit Foster obtained from developing Pad 4 should serve as the basis for the civil penalty.

As to the six CWA factors, the court revisits the seriousness of the violation.  In analyzing this factor, "the court will consider the frequency and severity of the violations, and the effect of the violations on the environment and the public."  Remedy Order 7-8 (quoting United States v. Smithfield Foods, Inc., 972 F. Supp. 338, 343 (E.D. Va. 1997)).  When only considering RR4, the frequency of the violation remains the same, and the severity and effect remains significant: as previously found, "[t]he filled streams each significantly affect the chemical, physical, and biological integrity of downstream waters, and cannot feasibly be restored to their previous states."  Id. at 8. Nonetheless, the severity of this violation is somewhat lessened when only considering Foster's activities as to RR4, rather then all four streams.  Accordingly, this factor weighs in favor of decreasing the civil penalty.

The remaining five factors remain essentially unchanged from the court's prior findings.  Considering the lessened severity of the violation when only viewed in the context of RR4, the court reduces the civil penalty and fixes it at $85,000.

### IV.    Conclusion

The court GRANTS Foster's Motion to Review insofar as it seeks to limit its mitigation to 308.33 credits except for temporal loss and DENIES the motion insofar as the Terradon Assessment fails to account for temporal loss.  The court GRANTS in part and DENIES in part EPA's cross-motion for injunctive relief, inasmuch as the court herein requires Foster to adjust the Terradon Assessment upward to account for temporal loss of 50.3722 credits but declines to order either a full reassessment or to impose the Almeter Assessment.  As to both motions, the court fixes the civil penalty at $85,000.

As to injunctive relief, for the foregoing reasons and in accordance with the court's Remedy Order, counterclaim-defendants Ron Foster; Foster Farms, LLC; and Marketing & Planning Specialists Limited Partnership are ORDERED to purchase 358.7022 "credits from a stream mitigation bank pursuant to the procedures set out in 40 C.F.R. § 230.90-98" within 50 days of this order.  Remedy Order, at 11.  The parties are ORDERED to jointly notify the court of such purchase within 14 days therefrom.

As to civil penalty, counterclaim-defendants Ron Foster; Foster Farms, LLC; and Marketing & Planning Specialists Limited Partnership are ORDERED to pay a civil penalty of

$85,000.00 pursuant to 33 U.S.C. § 1319(d) within 50 days of this order.  The parties are ORDERED to jointly notify the court of the payment of this penalty within 14 days therefrom.

In view of the foregoing injunctive relief and inasmuch as Foster has no other history of Clean Water Act violations and is not shown to be a threat to commit violation of the Clean Water Act in the future, the court concludes that EPA's request that Foster be permanently enjoined from discharging pollutants into any waters of the United States except in compliance with the Clean Water Act is DENIED.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: August 21, 2024

John T. Copenhaver, Jr.
Senior United States District Judge